UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SAIFULLAH KHAN, | : | |
| Plaintiff, | : | cv _19-1966_ |
| | : | |
| v. | : | |
| YALE UNIVERSITY, | : | |
| PETER SALOVEY, | : | |
| JONATHON HALLOWAY, | : | |
| MARVIN CHUN, JOE GORDON, | : | |
| DAVID POST, MARK SOLOMON, | : | |
| ANN KUHLMAN, LYNN COOLEY, | : | |
| PAUL GENECIN, | : | |
| STEPHANIE SPANGLER | : | |
| SARAH DEMERS, JANE DOE, | : | |
| CAROLE GOLDBERG, | : | |
| UNKNOWN PERSONS, | : | |
| Defendants. | : | DECEMBER 13, 2019 |

**COMPLAINT**

1.      This is an action for violation of the plaintiff's rights arising under Title IX of the Education Amendments of 1972 (20 United States Code Section 1681) and 42 United States Code Section 1981, and for breach of his right privacy, breach of contract, breach of the implied warranty of fair dealing, breach of his right to be free from negligent and intentional infliction of emotional distress and breach of his right to privacy arising under Connecticut law. The plaintiff, a native of Afghanistan, was recruited by Yale University, offered a full scholarship and promised the very best education the United States could offer. What he received was a lesson in deceit, betrayal and the exercise of double standards. As a result of the acts and omissions of the defendants, the plaintiff has lost not just educational opportunity but the opportunity to live at peace either in the United States or in Afghanistan. He seeks monetary

1

damages and injunctive relief. The plaintiff seeks punitive damages and compensatory damages in the amount of $110 million, a sum sufficient to compensate him for his lost opportunities, and necessary to deter the defendants from misconduct in the future.

## Jurisdiction

2.      Jurisdiction and venue are evoked pursuant to 28 U.S.C. Sections 1331 and 1332 and 28 U.S.C. Section 1391(b).

## Parties

3.      The plaintiff, Saifullah Khan, was at all times relevant to this action an adult resident of the State of New Haven, matriculating as an undergraduate student at defendant Yale University. He is a citizen of Afghanistan.

4.      Yale University, herein after "the university," is a private educational institution organized and operating in the State of Connecticut. The university offers undergraduate, graduate and professional courses of studies, serving approximately 13,000 students. The university employs thousands of persons. It receives federal funds within the meaning of 20 U.S.C. Section 1681 et seq. ("Title IX"). The defendant maintains a series of residential colleges for the education and housing of undergraduate students.

5.      Peter Salovey was at all times relevant to this Complaint, and he remains, president of the university. He is also the Chris Argyris Professor of Psychology at the university.

6.     Jonathan Halloway was at various times relevant to this action, the Dean of Yale College, an undergraduate college operating and organized within the overall administrative structure of Yale University.

7.     Marvin Chun was at various times relevant to this action, the Dean of Yale College, an undergraduate college operating and organized within the overall administrative structure of Yale University.

8.     Joe Gordon was at various times relevant to this action, the Deputy Dean of Yale College, an undergraduate college operating and organized within the overall administrative structure of Yale University.

9.     David Post was at various times relevant to this action, a Yale University faculty member and the chair of the University-Wide Committee on Sexual Misconduct, a Yale University committee charged with the investigation and disposition of claims of sexual misconduct arising under university policies and procedures.

10.     Mark Solomon was at various times relevant to this action, a Yale University faculty member and the chair of the University-Wide Committee on Sexual Misconduct, a Yale University committee charged with the investigation and disposition of claims of sexual misconduct arising under university policies and procedures.

10.     Ann Kuhlman was at all times relevant to this action, the Executive Director of Yale University's Office of International Students & Scholars.

11.     Lynn Cooley was at all times relevant to this action Dean of Graduate Students at Yale University and a member of the University-Wide Committee on Sexual Misconduct.

12.     Paul Genecin was at all times relevant to this action a physician associated with the Yale Health Center and was a member of the University-Wide Committee on Sexual Misconduct that evaluated claims against the plaintiff.

13.     Stephanie Spangler was at all times relevant to this action the Title IX Coordinator for Yale University.

14.     Sarah Demers was at all times relevant to this action a professor of physics and chairperson of the University-Wide Committee on Sexual Misconduct that evaluated claims against the plaintiff.

15.     Carole Goldberg was at all times relevant to this action a clinical psychologist and faculty member at the Yale School of Medicine and an advisor to the Yale Sexual Harassment and Assault Response & Education center. She holds herself out to the world to be an expert in "trauma" and "sexual assault."

16.     Jane Doe was at all times relevant to this action an undergraduate student enrolled in Trumbull College at Yale University. She was a classmate of the plaintiff's, and, in November 2015, made a complaint alleging sexual assault against the plaintiff to officials at Yale University. Her identity is known to the other defendants. Her identity is not disclosed herein to satisfy university requirements that the identity of students involved in claims of sexual misconduct have their identities kept confidential.

17.     Unknown Persons employed by the university are named herein as conduits of private information transmitted to news media, including The Yale Daily News, The New York Times and The Washington Post.

## Recruitment: Promises Made

18.    Mr. Khan was born on January 27, 1993, in a refugee camp in Peshawar, Pakistan.

19.    Although Mr. Khan's father and grandfather had, prior to Mr. Khan's birth, lived in Kabul, Afghanistan for many years, the family was given an ultimatum by the Taliban in late 1992, either leave Afghanistan or face potential death. Mr. Khan was born six months after his family fled Afghanistan.

20.    Mr. Khan and his family lived in a refugee camp and various places surrounding it in Pakistan for 16 years, until the family was again threatened, this time by a Pakistani terrorist group. The family fled to the United Arab Emirates.

21.    Mr. Khan developed an early love of learning and reading; he satisfied his love of learning by means of newspapers, old books and the Internet. He was widely recognized as a precocious student.

22.    To satisfy his educational goals, Mr. Khan studied colleges and universities worldwide, to determine which schools offered the best educational opportunities and the necessary financial support. He determined that his best opportunities appeared to be in the United States.

5

23.    Mr. Khan applied to Yale University, drawn both by the university's commitment to academic excellence, and its self-proclaimed commitment to the goal of fostering an international community of scholars. He also concluded that the university had the means to offer generous financial support.

24.    The university promised that it would provide Mr. Khan with tuition, room and board, and the financial support necessary to thrive in the United States.

25.    Yale offered Mr. Khan a place in the Class of 2016. The university suggested that before matriculating in New Haven, Mr. Khan complete a post-graduate year at the Hotchkiss School in Lakeville, CT, a preparatory school. Mr. Khan agreed to do so. The entire cost of his education was covered by Hotchkiss, the university, and by university alumni. In making this offer, the university promised Mr. Khan access to the best possible education and an environment free from hatred based on gender, national origin or other indicia of identity.

26.    Mr. Khan became a full-time student at Yale in the fall of 2012.

### Welcome to the Hothouse

27.    The university has in recent years been subjected to regulatory and public relations scrutiny over how it handles claims of sexual misconduct by male students and male employees against female students and female employees. The campus is also in the thrall of various claims of identity entitlement, rendering the campus less a place of unbridled intellectual stimulation and more a smug hothouse catering to social justice warriors intent on remaking the world in their own image.

28.     In April 2011, the university received a letter from the Office of Civil Rights of the federal Department of Education (DOE), the so-called "Dear Colleague" letter. This letter advised recipients that universities needed to "take immediate action to eliminate [sexual] harassment, prevent its recurrence, and address its effects, or face potential loss of federal funding under Title IX of the Education Amendments of 1972, 20 U.S.C. Section 1681, et seq. and its attendant regulations.

29.     In the wake of the 'Dear Colleague" letter, the DOE began a highly publicized series of investigations of colleges and universities to determine whether those institutions took a strong enough stand against claims of alleged sexual harassment.

30.     In late 2010 and early 2011, the Office of Civil Rights concluded, in response to a complaint from a Yale student, that the university was deficient in the manner in which it responded to allegations of sexual misconduct on campus. The federal agency concluded that these deficiencies tended to create and foster a sexually hostile environment toward women.

31.     As a result of this criticism, the university created a University-Wide Committee on Sexual Misconduct, "UWC," to provide formal and informal means of resolving claims of alleged sexual misconduct. The UWC is charged with enforcing Yale's Sexual Misconduct Policy. The plaintiff was subject to the policies and jurisdiction of the UWC as a student.

32.     The university adopted Procedures Governing the UWC. These procedures set out the rights and responsibilities of an accuser, the accused and the university in a complaint about sexual misconduct.

33.     In 2013, the university was subject to hostile criticism and complaints by activists that it tolerated sexual misconduct by student and alumni groups, including a group calling itself "Students Against Sexual Violence at Yale," and a group of alumni who wrote an open letter to Defendant Salovey urging a more forceful response to allegations of sexual misconduct. The activities of the student and alumni groups were widely reported upon in the press.

34.     The university has, in recent years, been overcome by a spirit of precious unctuousness, perhaps best exemplified by the uproar associated with comments raised by the master of a residential college regarding Halloween costumes, a controversy steeped in a culture pandering to any and all claims of identity, and fostering a valorization of all claims of victimhood, no matter how incredible or bizarre those claims may be.

## Matriculation

35.     Mr. Khan attended classes as an undergraduate commencing in 2012 until November of 2015. He concentrated in neurosciences, taking a wide variety of courses on the mind and brain, completing coursework at both the undergraduate and graduate level.

36.     Mr. Khan also was a founding member of a student-run consulting firm and think tank devoted to the study of international terrorism and international conflict, Prologue Strategies, LLC.

37.     Mr. Khan served a teaching assistant at the Yale School of Management.

38.     Mr. Khan was expected to graduate with the Class of 2016 with a Yale baccalaureate. He was on the cusp of a world filled with promise.

### Promises Broken – A False Claim Of Rape, A Jury Acquits, But The University Chants #MeToo

#### *The False Rape Claim*

39.     On the night of Halloween in 2015, Mr. Khan met with a female student, Jane Doe, whose name is kept confidential out of respect for the university's confidentiality requirement in Title IX proceedings, at a Halloween party sponsored by an off-campus secret society. Thereafter, they attended a symphonic performance of the Yale Student Orchestra at Woolsey Hall, a campus auditorium.

40.     Mr. Khan and Jane Doe were familiar with one another from several on campus encounters.

41.     The couple left the performance early as Jane Doe was not feeling well. They walked together on campus for a brief period before returning to their co-educational dormitory, Trumbull College.

42.     Mr. Khan escorted Jane Doe to her room and was en route to his own room when Jane Doe asked him to return. When he did so, Jane Doe asked Mr. Khan to check on the whereabouts of one her friends. Mr. Khan left Jane Doe alone in her room and went to check on her friend.

43.     When Mr. Khan returned to her room, the couple engaged in consensual sexual intercourse, and, thereafter, both fell asleep. Their encounter was the sort of casual encounter encouraged and fostered by the university, which distributes condoms at various locations in the dormitories located on campus.

44.     When the couple awoke, they each went their separate ways.

45.     In the course of the morning, Jane Doe, reported to friends that she had been raped, and sought contraceptive care at the university health center, telling a health care worked she had engaged in consensual unprotected sex.

46.     In the days following Halloween Jane Doe went public with her claim of rape, and was taken to the Yale Women's Center, where counselors advised her on how to make a formal complaint against Mr. Khan. Ms. Doe had the advice and counsel of David Post as she created her formal complaint against Mr. Khan.

47.     On the strength of her written complaint alone, Deputy Dean Joe Gordon suspended Mr. Khan immediately, and ordered that he vacate the campus, and his room in Trumbull College. David Post ratified these decisions. The plaintiff was left homeless as a result.

48.     Members of the Yale Police Department immediately opened an investigation of a potential rape. By mid-November, Mr. Khan was charged with sexual assault in the first degree by the State of Connecticut, and was arrested and presented in the Superior Court for the Judicial District of New Haven.

49.    Mr. Khan was informed by university officials that he would be immediately deported from the United States because his suspension from the university would result in revocation of his student visa.

50.    Fearing deportation, Mr. Khan posted bond and went to stay with family located out of state.

51.    Through the activity of his criminal defense counsel, Mr. Khan persuaded the university to stay any disciplinary proceedings by the UWC pending the results of his criminal trial.

### *A Jury Acquits*

52.    Mr. Khan was tried before a jury of six in the Judicial District of New Haven in early 2018 and charged with sexual assault in the first, second, third and fourth degrees. After almost two weeks of evidence, during which both Jane Doe and Mr. Khan testified, the jury returned a quick unanimous not-guilty verdict on all counts, deliberating for less than one day. It was a complete exoneration of Mr. Khan. The verdict was returned on or about March 7, 2018.

53.    At the criminal trial, the State of Connecticut introduced evidence that Jane Doe was intoxicated, it also introduced text messages that Jane Doe sent to Mr. Khan, including a Shakespearean sonnet, in the days before their Halloween date, and it introduced the cat-costume she wore to the party at the secret society and to the symphony performance.

11

54.     On cross-examination in the jury's presence Jane Doe was unable to explain why she recalled some events, but not others; she gave no convincing account of why she had sent flirtatious comments to Mr. Khan via text message; she acknowledged giving conflicting stories to authorities about the so-called rape in her dorm room; she attempted to characterize a video of the couple happily walking across campus on a surveillance video as evidence of her impairment; she gave a description of her Halloween costume that attempted to avoid that fact she was dressed in a provocative manner; and, she provided no convincing account of how the couple had ended up in her room in the first instance.

55.     The Yale Daily News and other news outlets covered the trial closely, portraying Mr. Khan in an extremely unfavorable light.

56.     Soon, more than 77,000 persons signed a petition protesting Mr. Khan's readmission to the university. Mr. Khan had become a potent symbol around which so-called #MeToo activists congregated. Despite Mr. Khan's having been found not guilty after a full trial in which a jury of his appears listened to both Mr. Khan's and Jane Doe's testimony and decisively rejected Jane Doe's credibility, activists decided they believed Jane Doe.

### The University Chants #MeToo

57.     After his exoneration in the criminal case, Mr. Khan sought readmission to Yale. The university generally ignored Mr. Khan, and, throughout the 2017/2018 academic year, took no steps to bring to a closure the stayed UWC disciplinary procedure.

58.     Mr. Khan was eventually readmitted to the university, but was denied on-campus housing and otherwise treated as though he was not welcome on campus. He resumed his status as a full-time student in the fall of 2018.

59.     Students, faculty, the Yale Daily News and other intermeddlers protested Mr. Khan's return to Yale.

60.     On or about October 5, 2018, the Yale Daily News published an article entitled "Khan and his consort." The piece recounted allegations made by a deeply troubled young man, who contended he had a romantic relationship with Mr. Khan that involved Mr. Khan's sexually assaulting him in a kinky bout of fetishistic role-playing with a pseudonymous woman in Washington, D.C., and that Mr. Khan committed an act of physical violence in the form of a slap to the face while Mr. Khan and he were together in Indianapolis, Indiana. The young man is portrayed as a sexually submissive homosexual in thrall to Mr. Khan. He contends that Mr. Khan and he would often engage in sexually provocative telephone conversations and text messaging.

61.     There is nothing in the article by the Yale Daily News to suggest that the young man ever set foot on the Yale campus or that he had any affiliation whatsoever with Yale.

62.     As a direct and proximate result of the aforesaid reporting in the Yale Daily News, members of the Yale Police Department visited Mr. Khan on October 5, 2018, to determine whether the reporting had so distressed Mr. Khan that he needed or required professional help of any kind.  Mr. Khan reported that he did not need help. Mr. Khan agreed to appear at the Yale infirmary for a mental health consultation.

13

63.     Later in the day on October 5, 2018, Mr. Khan was contacted by two Yale administrators. Mr. Khan informed them that he was fine, had visited Yale's mental health clinic, and that he at no point considered harming himself or others. The administrators responded late in the evening of October 5, 2018, thanking him for his response and urging him to "get adequate sleep, eat well, and get some exercise."

64.     On Sunday morning, October 7, 2018, at approximately 8 a.m., Mr. Khan was asked to come to campus to meet with members of the Yale administration. Mr. Khan informed the administrators he would not do so, and Dean Marvin Chun of Yale College caused a letter to be hand-delivered to Mr. Khan informing him that he was suspended effectively immediately from Yale College due to an "emergency." According to Dean Chun, the suspension "appears necessary for your physical and emotional safety and well-being and/or the safety and well-being of the university community." As a result of the suspension, Mr. Khan was barred from the campus and prohibited from attending any of the classes be had been attending for the previous month. He was once again made homeless without warning or excuse.

65.     The university then informed him that he would lose his coverage under the university's health plan effective November 1, 2018.

66.     There is no credible evidence that permitting Mr. Khan to attend classes poses a threat of harm to himself or to anyone affiliated with Yale. Indeed, there was no reason whatsoever to suspect that Mr. Khan was a danger to himself or others as a result of the allegations reported in the Yale Daily News in October 2018. In fact, the university promotes and expects broad tolerance of the full range of expressions of human sexuality and of respect for every conceivable permutation of gender identity.

14

67.     Mr. Khan's suspension was pre-textual, and arise from a combination of factors including his unique history at Yale, the bitter disappointment of many Yale students and faculty that Brett Kavanaugh was expected to be confirmed as a Justice on the United States Supreme Court at or about the time of Mr. Khan's suspension, and a prevailing culture of over-heated sensibilities regarding claims of sexual assault shared by many students at Yale and expressed under the then-common hashtag #MeToo.

68.     As of the time of his October 2018 suspension, the university had still not convened a hearing on the claims of Jane Doe, who had graduated and was no longer matriculating at Yale. Mr. Khan had placed the University on notice that Mr. Khan intended to seek both judicial relief and an investigation from the federal Department of Education for violations of the law arising under Title IX.

69.     After he was suspended in October 2018, Mr. Khan has requested permission to attend classes with an escort in order to address any concerns the university may have about his safety due to the hostility of his classmates, and to assure that he does not pose a risk of harm to others. The university denied this request, although it has permitted other young men accused of sexual misconduct the opportunity to complete their degrees off-site.

70.     The university's actions in regard to the October 2018 suspension were pre-textual and were designed to accommodate a climate of opinion in which allegations of sexual assault are to be believed upon being made, in which the accused has no meaningful right to defend and in which the voices of those raised in solidarity with the accused drown out any semblance of due process and orderly fact-finding.

71.     Mr. Khan agreed to complete a psychiatric examination during this suspension to determine whether he was a risk of harm to himself or to others. The evaluator concluded that he posed no such threat.

72.     As a direct and proximate result of the university's summary suspension of Mr. Khan, he was unable to finish the classes that he began in August, lost education opportunity the university was contractually obligated to provide, and suffered further stigmatization.

73.     The allegations against Mr. Khan arising from the claims reported by the Yale Daily New in October 2018 resulted in no arrests, even though law enforcement officers investigated the claims in both Washington, D.C., and Indianapolis, Indiana.

## A FLAWED DISCIPLINARY PROCEDURE RESULTS IN EXPULSION

74.     In November, 2018, after twice being banned from campus for claims that were never proven or substantiated, Mr. Khan was permitted to return to campus for a UWC hearing on Jane Doe's 2015 complaint of sexual assault, the very charges for which Mr. Khan had been acquitted in the New Haven Superior Court.

75.     A five-member panel consisting of Sarah Demers, Paul Genecin, Anjelica Gonzalez, Etienne Greenlee and Amy Justice convened a "hearing" at which the results of a university fact-finder's report were reviewed.

76.     The hearing failed to afford Mr. Khan the elementary due process required by Title IX, and was a mere sham.

77.     Mr. Khan's accuser, Jane Doe, was not present at the hearing, but was permitted to give a statement from a remote location via teleconference. Mr. Khan was

not even permitted to be in the hearing room when the UWC panel asked Jane Doe questions, but was required to sit in an anteroom where he could listen to an audio-feed of the proceedings. Ms. Doe offered a prepared statement from the professional school she was then attending. The result was that Mr. Khan was denied any reasonable opportunity to confront, question, or otherwise face his accuser. The right to cross-examine and confront his accuser was a critical factor in his successful defense of the criminal charges arising from his accuser's accusations.

78.     Mr. Khan was unable to have the assistance of counsel in his hearing before the UWC; although counsel was permitted to be present, counsel was not afforded a right to speak, and therefore could neither pose questions to witnesses, nor tender objections when panel members repeatedly asked compound questions, assumed facts not in evidence, or otherwise transformed the hearing process into little more than the stillborn delivery of a predetermined outcome. The right of counsel to present a defense, and to protect Mr. Khan from procedural and evidentiary unfairness, was a critical factor in his successful defense of the criminal charges arising from his accuser's accusations. Throughout the proceedings, the UWC panel had present a member of the Yale Corporation Counsel's office for purposes of providing advice and counsel.

79.     Mr. Khan requested that a transcript or other electronic recording of the hearing be made so that he would have an adequate record for purposes of further administrative or legal review. His request to make an adequate record was denied by the panel.

17

80.     The UWC panel's decision to expel Mr. Khan was against the weight of the evidence and was inspired in whole, or in part, by animus toward Mr. Khan and out of a desire to placate those who protested his return to the Yale campus.

81.     As a direct and proximate result of the acts and omissions herein complained of, Mr. Khan has lost his opportunity to complete his educations at Yale, has suffered a breach of the contract that Yale entered into with him, has suffered a breach of his right to privacy, which has resulted in enormous reputational harm, and has suffered severe emotional distress. He now also faces deportation to his native Afghanistan, where, given his family's decision to seek refuge in Pakistan due to the hostility of the Taliban, Mr. Khan faces grave physical danger. Although Mr. Khan remains a resident of the United States, he is subject to immediate deportation.

## CLAIMS FOR RELIEF

### *Title IX – Breach of Due Process By Means Of Denial Of Right To Confront His Accuser, By Denial of His Right To Meaningful Assistance Of Counsel, By Denial Of His Right To Have An Adequate Record Of The Proceedings Against Him Created, By Rendering Him Homeless As A Result Of Summary Process And By Denying Him A Timely Adjudication Of The Claims Raised Against Him*

82.     Paragraphs one through one through 81 are incorporated herein.

83.     Title IX requires universities to adopt and apply fair procedures to the adjudication of claims raised against students.

84.     The university breached Title IX in the following ways:

a. Depriving Mr. Khan of a safe and secure environment by barring him abruptly from campus without notice and a meaningful opportunity to be heard on two separate occasions.

b. Depriving Mr. Khan of a timely adjudication of the claims made against him;

c. Depriving Mr. Khan of a meaningful right to confront his accuser;

d. Depriving Mr. Khan of the meaningful assistance of counsel at the UWC hearing.

e. Depriving Mr. Khan of the right to make an adequate record of the UWC hearing.

f. Failing to consider exculpatory evidence.

### *Breach of Contract*

85.     Paragraphs one through 84 of the foregoing are incorporated herein.

86.     The university entered into a written contract with the plaintiff upon offering him admission to permit him to complete his education so long as he fulfilled the academic requirements of the plaintiff's chosen field of study and otherwise remained a student in good standing. The contract offered the plaintiff the opportunity to remain in good standing so long as he abided by published university rules and regulations. Those published rules and regulations offered the plaintiff the right to contest any allegations that he had violated them by means of a fair adjudicatory proceeding, in this case, by means of the Procedures Governing the UWC.

87.     The university also offered the plaintiff housing and financial support so long as he remained a student in good standing.

88.     The university breached that contract in the following ways:

a.      Depriving Mr. Khan of a safe and secure environment by barring him abruptly from campus without notice and a meaningful opportunity to be heard on two occasions;

b.      Depriving Mr. Khan of a timely adjudication of the claims made against him;

c.      Depriving Mr. Khan of a meaningful right to confront his accuser;

d.      Depriving Mr. Khan of the meaningful assistance of counsel at the UWC hearing;

e.      Depriving Mr. Khan of the right to make an adequate record of the UWC hearing.

f.      Failing to consider exculpatory evidence.

### Breach Of The Implied Warranty Of Fair Dealing

89.     Paragraphs one through 88 are incorporated herein.

90.     The university is one of the nation's oldest corporations, having existed since before the creation of the United States of America. It is the repository of centuries of institutional knowledge, history and experience, and enjoys the full-time support of a corporation counsel's office staffed by lawyers who are graduates of some of the nation's top law schools.

91.     The plaintiff was a brilliant, but impecunious resident of a refugee camp in a distressed region of the world hoping for educational opportunity. He relied to his detriment upon the expressions of goodwill by agents of the university and on the university's reputation for excellence.

92.    The unequal bargaining power between the university and plaintiff induced the plaintiff to trust that the university would treat him with fairness and respect throughout his undergraduate career.

93.    The university offered the plaintiff full financial support on the condition that he sign what amounted to an adhesion contract filled with promises of fair treatment.

94.    The university violated the implied warranty of fair dealing by taking advantage of the unequal bargaining power it enjoyed and the plaintiff's dependence on the university for financial support thus requiring him to sign a document promising him fair treatment.

95.    In fact, the university violated the implied warranty of fair dealing in the following ways:

        a.    Depriving Mr. Khan of a safe and secure environment by barring him abruptly from campus without notice and a meaningful opportunity to be heard on two separate occasions.

        b.    Depriving Mr. Khan of a timely adjudication of the claims made against him;

        c.    Depriving Mr. Khan of a meaningful right to confront his accuser;

        d.    Depriving Mr. Khan of the meaningful assistance of counsel at the UWC hearing.

        e.    Depriving Mr. Khan of the right to make an adequate record of the UWC hearing;

f.   Depriving him of a safe and secure environment when students, faculty and administrators signed a petition demanding his removal from campus after he had been acquitted of committing any crime whatsoever;

g.   Adopting the histrionic claims of a non-student who claimed to have a sexual misadventure with Mr. Khan and another woman in Washington, D.C., as a pre-text for suspending Mr. Khan;

h.   Ignoring the professional opinion of an evaluator who concluded that Mr. Khan posed no risk of harm to himself or others and persisting nonetheless in keeping him from attending classes;

i.   Denying the plaintiff the right to complete his coursework remotely or under guard from third parties, despite offering similar accommodations to other students;

j.   Circulating on campus The Yale Daily News, a publication dedicated to the removal of Mr. Khan from campus, thereby fanning hostility to Mr. Khan.

### *Negligent Infliction Of Emotional Distress*

96.   Paragraphs one through 95 are incorporated herein.

97.   The university had a duty to provide Mr. Khan with a safe and secure environment, free from the unreasonable risk of emotional distress.

98.   In the manner and means described above, the university breached that duty, thereby causing the plaintiff to suffer emotional distress.

## *Intentional Infliction Of Emotional Distress*

99.    Paragraphs one through 98 are incorporated herein.

100.   The university has in recent years abandoned its commitment to fostering the development of critical intelligence in favor of placating various claims of identity entitlement. In support of its new mission of making students feel "safe" and otherwise currying the support of those seeking espousing various claims of victimhood, the university has adopted a policy and procedure of making scapegoats of students accused of engaging in unpopular speech and/or activities.

101.   Th university fosters an environment of sexual permissiveness so long as all participants in libidinal activities give "consent" to the activity. It fosters this climate of permissiveness by broad and liberal distribution of condoms on campus.

102.   The university turns a blind eye to the consumption of alcohol by minors on campus, realizing full well that excessive drinking makes students more reckless in the consent they give to others to engage in sexual conduct.

103.   Once the plaintiff was accused of sexual misconduct, the university, without an inquiry of any sort, suspended the plaintiff from campus, rendering him homeless while thousands of miles from his family.

104.   The university's treatment of the plaintiff was willful, wanton and done with reckless disregard of the consequences of its actions.

105.   As a direct and proximate result of the acts and omissions of the university, its agents and servants as herein described, the plaintiff suffered, and continues to suffer from, extreme emotional distress.

23

### Breach of Privacy – Publication Of Private Facts

106.   Paragraphs one through 105 are incorporated herein.

107.   Although university procedures under the UWC are confidential as a matter of university policy, the university permitted to disseminated to the press worldwide confidential details about the plaintiff, including, but not limited to, the following:

   a.   Claims that Mr. Khan was removed from the university because of the alleged threat he posed to other students incident to the university's learning of an alleged threesome involving Mr. Khan and a non-student male in Washington, D.C.

   b.   The fact that Mr. Khan was expelled from the university for "raping" a fellow student.

108.   The university knew or should have known that publication of such information in Afghanistan, Pakistan and United Arab Emirates would expose Mr. Khan to the serious risk of death should he return to any of those locations.

109.   Mr. Khan's family has reported the receipt of death threats as a result of publicity incident to Yale's disclosure of this information.

110.   As a direct and proximate result of the university's acts and omissions, Mr. Khan suffers from extreme emotional distress.

### Defamation – Jane Doe

111.   Paragraphs one through 110 are incorporated herein.

112.    Jane Doe and the plaintiff were, in fact, involved in a consensual sexual relationship in Jane Doe's dormitory room in Trumbull College on the night of October 31, 2015.

113.    In an attempt to explain her failure to rendezvous with friends on the night of October 31, 2015, Ms, Doe fabricated a claim of "rape," a claim she was later encouraged to pursue and publicize to campus officials, police officers, and others by Carole Goldberg.

114.    Jane Doe's testimony was rejected by a jury of her peers.

115.    Inspired by shame and rage, Ms. Doe persisted in her false and defamatory claims in an effort to obtain the expulsion of Mr. Khan from Yale, a vendetta at which she succeeded.

116.    Jane Doe's claims of rape constitute defamation and defamation per se.

**Tortious Interference With Business Relationships – Jane Doe**

117. Paragraphs one through 116 are incorporated herein.

118. A business relationship existed between Mr. Khan and Yale University, namely the contracting for the education of Mr. Khan in exchange for good and valuable consideration.

119. Jane Doe engaged in an intentional and improper interference with Mr. Khan's relationship, namely, the promulgation and the publication of intentionally

25

fabricated accusations against Mr. Khan and the pursuit of a crusade to obtain Mr. Khan's expulsion from Yale University.

120. As a result of Jane Doe's conduct, Mr. Khan lost the benefits of his business relationship with Yale University. He was suspended from attending classes and completing his degree at Yale University. He was rendered homeless. He was then expelled from Yale University.

121. Mr. Khan has experienced significant delay in completing his education, permanent professional damage, and significant delay to living a normal life as a result of the benefits he would have obtained through his business relationship with Yale University.

### DAMAGES

The plaintiff claims damages in the amount of $110 million as follows:

A.   Loss of educational opportunities;

B.   Loss of reputation;

C.   Emotional distress and suffering; loss of professional opportunities;

D.   Injunctive relief in the form of an order permitting the plaintiff to complete his Yale undergraduate degree;

E.   Punitive damages;

F.   Attorney's fees and costs;

G.   Such other relief as this Court deems fair and equitable.

**THE PLAINTIFF CLAIMS A TRIAL BY JURY AS A MATTER OF RIGHT**

THE PLAINTIFF

By_____
NORMAN A. PATTIS
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT 06511
203.393.3017
203.393.9745
npattis@pattislaw.com
ct13120