## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAIFULLAH KHAN, | No. 3:19-cv-01966 (KAD) |
| *Plaintiff*, | |
| v. | |
| YALE UNIVERSITY, PETER SALOVEY, JONATHON HALLOWAY, MARVIN CHUN, JOE GORDON, DAVID POST, MARK SOLOMON, ANN KUHLMAN, LYNN COOLEY, PAUL GENECIN, STEPHANIE SPANGLER, SARAH DEMERS, JANE DOE, CAROLE GOLDBERG, UNKNOWN PERSONS, | January 7, 2021 |
| *Defendants*. | |

## MEMORANDUM OF DECISION
## RE: JANE DOE'S MOTION TO DISMISS (ECF NO. 26)

Kari A. Dooley, United States District Judge:

Plaintiff Saifullah Khan ("Mr. Khan" or the "Plaintiff") filed this action against Yale University ("Yale"), several of its administrators and faculty members (the "individual Yale Defendants"), and former Yale classmate Jane Doe ("Ms. Doe" or the "Defendant")[1] following Mr. Khan's alleged suspension and eventual expulsion from Yale. Underlying each of his claims is an allegation that Ms. Doe falsely accused him of sexually assaulting her on Halloween night 2015. Pending before the Court is Ms. Doe's motion to dismiss the claims brought against her, claims sounding in defamation and tortious interference with business relationships. For the reasons that follow, the motion to dismiss is GRANTED.

---

[1] Mr. Khan alleges that the identity of Ms. Doe is known to the other Defendants (Compl. ¶ 16, ECF No. 1) but has received the Court's permission to litigate his claims against Ms. Doe under a pseudonym in order to maintain Ms. Doe's confidentiality. (*See* ECF No. 12.)

**Allegations**

The following allegations are taken from the Plaintiff's complaint and are accepted as true for purposes of the instant motion. *See, e.g.*, *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013).

Mr. Khan is a citizen of Afghanistan who at all relevant times was enrolled as an undergraduate student at Yale. (Compl. ¶ 3.) He was born in a refugee camp in Pakistan six months after his family fled from the Taliban in Afghanistan and spent much of his upbringing in a refugee camp and surrounding environments before the family later fled from a Pakistani terrorist group to the United Arab Emirates. (*Id*. ¶¶ 18–20.) Mr. Khan cultivated an early love of learning and was ultimately drawn to the educational opportunities in the United States and to Yale's promise of academic excellence in particular. (*Id*. ¶¶ 21–23.) He was expected to graduate Yale with the Class of 2016. (*Id*. ¶ 38.)

Ms. Doe was a classmate of Mr. Khan's and was likewise enrolled at all relevant times as an undergraduate student at Yale. (*Id*. ¶ 16.) On Halloween night in 2015, Mr. Khan and Ms. Doe, who were familiar with one another from prior campus encounters, met at an off-campus Halloween party before attending a musical performance at Woolsey Hall. (*Id*. ¶¶ 39–40.) Ms. Doe was not feeling well and so the two left the performance early and walked on campus together before returning to Trumbull College, where they both resided. (*Id*. ¶ 41.) After Mr. Khan escorted Ms. Doe to her room, she asked him to return and the two ultimately engaged in consensual sexual intercourse. (*Id*. ¶¶ 42–43.) In the morning Ms. Doe reported to friends that she had been raped, though she informed a health care worker that she had engaged in unprotected consensual sex when seeking contraception at the Yale health center that same day. (*Id*. ¶ 45.)

In the days that followed Ms. Doe went public with her rape claim and issued a formal complaint against Mr. Khan on the advice of the Yale Women's Center. (*Id*. ¶ 46.) Mr. Khan was immediately suspended by Yale Deputy Dean Joe Gordon based on Ms. Doe's written complaint

2

alone and was ordered to vacate campus, which rendered him homeless.  (*Id.* ¶ 47.)  The Yale Police Department opened an investigation and by mid-November the State of Connecticut filed criminal charges against Mr. Khan for first-degree sexual assault.  (*Id.* ¶ 48.)  In the meantime Yale's University-Wide Committee on Sexual Misconduct ("UWC") agreed to stay any disciplinary proceedings pending the outcome of the prosecution.[2]  (*Id.* ¶ 51.)  Mr. Khan subsequently faced trial before a jury in early 2018 for first, second, third, and fourth-degree sexual assault during a nearly two-week trial and was acquitted on all counts after less than a day of deliberations.  (*Id.* ¶ 52.)

Following his acquittal Mr. Khan sought readmission Yale, to which #MeToo activists galvanized an opposition, generating more than 77,000 signatures on a petition protesting his reenrollment.  (*Id.* ¶¶ 56–57.)  Mr. Khan was eventually readmitted and resumed full-time student status in the fall of 2018, though he was denied on-campus housing and treated as unwelcome on campus.  (*Id.* ¶ 58.)  In early October 2018, the Yale Daily News published an article relaying the allegations of a troubled young man who claimed that he had a romantic relationship with Mr. Khan that included an episode in which Mr. Khan sexually assaulted him during an act of role-playing with a woman in Washington, D.C., and an instance in which Mr. Khan slapped him in the face while the two were together in Indianapolis.  (*Id.* ¶ 60.)  The article did not provide any indication that this young man had any affiliation with Yale or had ever been to the Yale campus. (*Id.* ¶ 61.)

---

[2] Mr. Khan alleges that Yale created the UWC after the U.S. Department of Education's Office of Civil Rights ("OCR") found that the university had failed to address adequately sexual misconduct allegations and concluded that such shortcomings contributed to a sexually hostile environment on campus. (Compl. ¶¶ 29–31.)  In her memorandum and supporting exhibits Ms. Doe takes issue with Mr. Khan's characterization of the OCR investigation and represents that OCR deemed Yale's UWC procedures consistent with Title IX's strictures. (*See* Def.'s Mem. at 2–3 & n. 4–5, ECF No. 27.)  Because the Court need not resolve issues related to Yale's alleged non-compliance with Title IX in connection with the instant motion, the Court at this stage accepts Mr. Khan's allegations as true and does not consider the Defendant's Exhibits D through F.

Following publication of the article Mr. Khan was contacted by members of the Yale Police Department and by two Yale administrators to inquire as to his well-being and to determine whether he needed professional help. (*Id.* ¶¶ 62–63.) Mr. Khan agreed to undergo a mental health consultation but reported that he was fine and had not considered harming himself or others. (*Id.*) Mr. Khan was then asked to meet with Yale administrators and after indicating that he would not do so, Mr. Khan received a letter "informing him that he was suspended effectively[sic] immediately from Yale College due to an 'emergency,'" which Dean Marvin Chun described as "necessary for your physical and emotional safety and well-being and/or the safety and well-being of the university community." (*Id.* ¶ 64.) Mr. Khan was thus barred from campus and prohibited from attending his classes; he was again rendered homeless without warning and informed that he would lose his health care coverage effective November 1, 2018. (*Id.* ¶¶ 64–65.)

Mr. Khan alleges that Yale's professed concern with his safety and with the safety of the Yale community is not credible, as there is no evidence that Mr. Khan posed a danger to himself or to anyone else as a result of the article that appeared in the Yale Daily News, and because a psychiatric examiner concluded that Mr. Khan posed no such threat. (*Id.* ¶¶ 66, 71.) Instead, Mr. Khan asserts that his suspension was pretextual and arose from a confluence of factors that included his unique history at Yale and the heightened sensibilities surrounding sexual assault claims, which were often credited without investigation or due process at Yale as a function of the university's pervasive #MeToo culture. (*Id.* ¶¶ 67, 70.) Following his suspension Mr. Khan placed Yale on notice that he intended to seek judicial relief and open an investigation into Yale's alleged Title IX[3] violations in connection with his suspension and with the university's failure to convene a hearing on the claims of Ms. Doe, who had since graduated. (*Id.* ¶ 68.) Mr. Khan also requested

---

[3] Title IX refers to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*

and was denied permission to attend his classes with an escort to address Yale's safety concerns, though Yale had afforded other male students accused of sexual misconduct the ability to complete their degrees off-site.  (*Id.* ¶ 69.)

In November 2018 Mr. Khan was permitted to return to campus for a hearing convened by the UWC on Ms. Doe's 2015 sexual assault complaint.  (*Id.* ¶ 74.)  Ms. Doe, who had since graduated from Yale, was not present and provided a statement via teleconference.  (*Id.* ¶ 77.)  Mr. Khan was not permitted to be in the room when the UWC panel questioned Ms. Doe and was instead required to sit in an anteroom where he listened to an audio-feed of the hearing; as a result, Mr. Khan was denied an opportunity to confront his accuser.  (*Id.*)  And although Mr. Khan had counsel present, his attorney was not permitted to speak, question witnesses, or launch objections when panel members assumed facts not in evidence and asked compound questions.  (*Id.* ¶ 78.)  A member of the Yale Corporation Counsel's office was present throughout the proceedings to provide counsel to the UWC panel.  (*Id.*)  Mr. Khan also requested a transcript or recording of the hearing, which the panel denied.  (*Id.* ¶ 79.)  The UWC panel decided to expel Mr. Khan as a result of the hearing, which he contends failed to afford him the basic due process that Title IX demands. (*Id.* ¶¶ 76, 80.)  As a result of losing his opportunity to complete his Yale education, Mr. Khan is subject to immediate deportation to Afghanistan, where he faces serious physical danger due to his family's decision to seek refuge in Pakistan.  (*Id.* ¶ 81.)

In light of the foregoing, Mr. Khan brings claims against Yale and the individual Yale Defendants for a violation of Title IX, breach of contract, breach of the implied warranty of fair dealing, negligent infliction of emotional distress, intentional infliction of emotional distress, and breach of privacy.  As indicated above, Mr. Khan also brings claims against Jane Doe for defamation and tortious interference with business relationships, which Ms. Doe has moved to dismiss.

**Legal Standard**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept the complaint's factual allegations as true and must draw inferences in the plaintiff's favor. *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015). A motion filed pursuant to "Rule 12(b)(6) must be decided on 'facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken.'" *Lunardini v. Mass. Mut. Life Ins. Co.*, 696 F. Supp. 2d 149, 155 (D. Conn. 2010) (quoting *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999)) (brackets omitted). The "complaint must 'state a claim to relief that is plausible on its face,'" setting forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Kolbasyuk v. Capital Mgmt. Servs., LP*, 918 F.3d 236, 239 (2d Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Accordingly, 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678) (brackets omitted).[4]

**Discussion**

### Whether Jane Doe is Entitled to Absolute Immunity for Statements Offered During the UWC Proceedings

As an initial matter, the parties agree that Mr. Khan may not plead a defamation claim in connection with Ms. Doe's alleged accusations of rape in 2015 as any such claim would be time-barred.[5] It is instead apparent from Mr. Khan's opposition that his defamation claim is premised

---

[4] Ms. Doe also moves for dismissal pursuant to Connecticut's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute, Conn. Gen. Stat. § 52-196a. Because the Court agrees with Ms. Doe that Mr. Khan's claims are subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(6), the Court does not consider dismissal on this alternate basis.

[5] Mr. Khan does not agree, as discussed *infra*, that the same holds true for his tortious interference claims.

on Ms. Doe's testimony in the UWC proceedings.  Ms. Doe argues that because the UWC proceedings constitute quasi-judicial proceedings, she is entitled to absolute immunity from any liability for allegedly defamatory statements provided in the course of those proceedings.  She similarly asserts that absolute immunity also bars Mr. Khan's claim for tortious interference with business relationships to the extent it stems from those same statements.

The Connecticut Supreme Court has "consistently . . . held that absolute immunity bars defamation claims that arise from statements made in the course of judicial or quasi-judicial hearings." *Rioux v. Barry*, 283 Conn. 338, 344, 927 A.2d 304 (2007).  "The doctrine of absolute immunity as applied to statements made in the context of judicial and quasi-judicial proceedings is rooted in the public policy of encouraging witnesses, both complaining and testimonial, to come forward and testify in either criminal or civil actions." *Id.* at 343.  In other words "[p]articipants in a judicial process must be able to testify or otherwise take part without being hampered by fear of defamation suits." *Hopkins v. O'Connor*, 282 Conn. 821, 839, 925 A.2d 1030 (2007).  "The effect of an absolute privilege in a defamation action . . . is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously." *Chadha v. Charlotte Hungerford Hosp.*, 272 Conn. 776, 788, 865 A.2d 1163 (2005) (quotation marks omitted).  The Connecticut Supreme Court has likewise held that "the underlying purpose of absolute immunity applies just as equally to" the tort of intentional interference with contractual or beneficial relations "as it does to the tort of defamation." *Rioux*, 283 Conn. at 350.

The question to be decided here is whether the UWC proceedings were quasi-judicial proceedings so as to entitle Ms. Doe to the benefit of absolute immunity.  Ms. Doe argues that applicable Connecticut law brings the UWC proceedings squarely within the sphere of quasi-judicial proceedings.  Mr. Khan asserts that proceedings conducted by purely private institutions

and entities can never be quasi-judicial proceedings because they lack the necessary component of being conducted by a public actor.

"Judicial proceeding" in this context "has been defined liberally to encompass much more than civil litigation or criminal trials." *Hopkins*, 282 Conn. at 839.

> It includes any hearing before a tribunal which performs a judicial function, ex parte or otherwise, and whether the hearing is public or not. It includes for example, lunacy, bankruptcy, or naturalization proceedings, and an election contest. It extends also to the proceedings of many administrative officers, such as boards and commissions, so far as they have powers of discretion in applying the law to the facts which are regarded as judicial or quasijudicial, in character.

*Kelley v. Bonney*, 221 Conn. 549, 566, 606 A.2d 693 (1992) (quotation marks omitted).  The Connecticut courts have deemed a range of proceedings before governmental bodies "quasi-judicial."  *See, e.g.*, *Craig v. Stafford Const., Inc.*, 271 Conn. 78, 88–93, 856 A.2d 372 (2004) (investigation into alleged officer misconduct conducted by Hartford Police Department); *Kelley*, 221 Conn. at 571 (teacher decertification proceedings before State Board of Education); *Priore v. Haig*, 196 Conn. App. 675, 705, 230 A.3d 714 (App. Ct. 2020), *cert. granted*, 335 Conn. 955 (Oct. 13, 2020) (hearing conducted by Greenwich Planning and Zoning Commission); *Cohen v. King*, 189 Conn. App. 85, 90, 206 A.3d 188 (App. Ct. 2019) (attorney grievance proceeding); *Morgan v. Bubar*, 115 Conn. App. 603, 617, 975 A.2d 59 (App. Ct. 2009) (Department of Correction's affirmative action investigation process); *Carter v. St. Vincent's Med. Ctr.*, No. CV136039421S, 2014 WL 2257159, at *3 (Conn. Super. Ct. Apr. 22, 2014) (unemployment benefits hearing before Department of Labor); *Dlugokecki v. Vieira*, No. CV040184600S, 2005 WL 2077938, at *3 (Conn. Super. Ct. July 7, 2005), *aff'd*, 98 Conn. App. 252, 907 A.2d 1269 (App. Ct. 2006) (hearing before borough of Naugatuck inland wetlands commission).

Although the Connecticut Supreme Court has not had occasion to recognize (or not) a purely private proceeding as being quasi-judicial, nor has it expressly limited absolute immunity

to proceedings before state or municipal entities.  Instead it has identified six factors for courts to consider in deciding whether a proceeding is quasi-judicial, which include "whether the body has the power to: (1) exercise judgment and discretion; (2) hear and determine or to ascertain facts and decide; (3) make binding orders and judgments; (4) affect the personal or property rights of private persons; (5) examine witnesses and hear the litigation of the issues on a hearing; and (6) enforce decisions or impose penalties."  *Priore*, 196 Conn. App. at 696–97 (quoting *Kelley*, 221 Conn. at 567).  "These factors, however, are not exclusive nor must all factors militate in favor of a determination that a proceeding is quasi-judicial in nature for a court to conclude that the proceeding is, in fact, quasi-judicial."  *Id*. at 697.  "[I]n addition . . . 'it is important for a court to consider whether there is a sound public policy reason for permitting the complete freedom of expression that a grant of absolute immunity provides.'"  *Id*. (quoting *Kelley*, 221 Conn. at 567) (brackets omitted).

Ms. Doe has attached to her motion to dismiss the UWC procedures for addressing claims of sexual misconduct (the "UWC Procedures," Def.'s Ex. B, ECF No. 27-2), which are referenced in Mr. Khan's complaint (Compl. ¶ 32) and are publicly available on the Yale University website,[6] and which she submits the Court can consider in resolving the instant motion.  *See, e.g.*, *Lunardini*, 696 F. Supp. 2d at 155 (courts can look to documents incorporated in the complaint by reference as well as documents that are judicially noticeable on a motion to dismiss pursuant to Rule 12(b)(6).  According to the UWC Procedures, after the UWC determines that it will conduct a hearing on a formal complaint of sexual misconduct, the Chair of the UWC will appoint a hearing panel comprised of five UWC members.  (UWC Procedures ¶ 7.2.)  Within seven days of receipt

---

[6] *See UWC Procedures*, effective August 12, 2020, University-Wide Committee on Sexual Misconduct, https://uwc.yale.edu/policies-procedures/uwc-procedures (last accessed Jan. 6, 2021.)  The iteration of the UWC Procedures attached to Ms. Doe's motion to dismiss are those that went into effect on October 26, 2015.

of the complaint, the Chair must also appoint an impartial factfinder to investigate the complaint's allegations.  (*Id*. ¶ 7.3.)  The factfinder will conduct interviews and gather documents before presenting a written report that describes the relevant facts without reaching a conclusion as to whether a university policy has been violated.  (*Id*.)  The factfinder's report is provided to the hearing panel and to the parties, along with the complaint, the respondent's written response, and accompanying documents.  (*Id*.)

During the subsequent hearing, the complainant and respondent are each permitted to make a brief statement before submitting to interviews by the panel.  (*Id*. ¶ 7.4.)  These interviews are the primary purpose of the hearing, though "the panel may request the testimony of additional witnesses" in its sole discretion.  (*Id*.)  In addition, "[t]he panel may examine and take into account reports and evidence collected by law enforcement bodies or other investigators" as well as "a respondent's previous formal discipline for other acts of sexual misconduct" when determining culpability.  (*Id*.)  Following the hearing, the panel will decide by majority vote and via secret ballot whether a violation of university policy has been demonstrated by a preponderance of the evidence.  (*Id*. ¶ 7.5.)  If a violation is found, the panel will recommend a penalty via the same process.  (*Id*.)  "Within 10 days of the final hearing session, the panel will complete a report, setting out its findings of fact, its conclusion as to whether or not those facts constitute a violation of University policy, and its recommended penalty, if any," which is then forwarded to the relevant decision maker, *i.e.*, the dean of the respondent's school if the respondent is a student.  (*Id*.)  Copies are provided to the complainant and respondent, who may each submit a written response that the decision maker may consider in deciding whether to seek reexamination or clarification from the panel.  (*Id*.)  "The decision maker will then accept the panel's findings of fact, but may accept, reject, or modify the panel's conclusions or recommendations, in whole or in part," and "[t]he final

decision whether to impose a penalty, and what penalty or penalties to impose, belongs to the relevant decision maker." (*Id.*)

Relying on the caselaw which discusses and applies the relevant factors identified by the Connecticut Supreme Court in determining whether a proceeding is quasi-judicial, Ms. Doe argues, with respect to the UWC proceedings, that: (1) "[i]ndividuals associated with the UWC, including the hearing panel, exercise judgment and discretion in applying procedures, standards of proof, and definitions to the facts before them"; (2) "[t]he hearing panel (and the fact-finder) hears and determines facts and decides issues of credibility"; (3) "[t]he UWC process leads to binding orders and judgments"; (4) "the UWC process has the ability to affect the privilege private individuals have to continue as Yale students"; (5) "[t]he UWC panel (and the UWC fact-finder) hear from and examine witnesses during a hearing (and fact-finder interviews)"; and (6) "[t]he UWC Procedures empower the decision maker to make and enforce decisions and impose penalties." (Def.'s Mem. at 12–13.) Ms. Doe also cites the Court to *Rom v. Fairfield Univ.*, No. CV020391512S, 2006 WL 390448 (Conn. Super. Ct. Jan. 30, 2006), a case in which the Connecticut Superior Court held that proceedings held before the Judicial Board at Fairfield University which resulted in the plaintiff's suspension were quasi-judicial, although the court ultimately concluded that the defendants were entitled to qualified (as opposed to absolute) immunity.[7]

Mr. Khan does not take issue with Ms. Doe's description of the UWC Procedures. As indicated, he instead argues that the UWC proceedings are not quasi-judicial because Yale, as a private institution, is not a state actor. In his opposition he argues that Ms. Doe has identified no

---

[7] As the Superior Court there explained, "[w]hile a qualified privilege insulates many defamatory statements and shields many defendants from liability, the privilege does not protect a defendant who makes statements that are both defamatory and malicious." *Id.* at *7.

precedent in which the Connecticut Supreme or Appellate Court has extended absolute immunity to a private disciplinary proceeding.  "This Court is bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion."  *V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010). To be sure, neither the Appellate Court nor the Supreme Court for Connecticut has explicitly addressed the question of whether purely private proceedings might still be "quasi-judicial."  So it is not surprising that the parties each point the Court to cases from other jurisdictions.

Ms. Doe cites decisions in which courts have found statements provided in connection with hearings conducted by private educational institutions to be absolutely privileged.  *See Doe v. Univ. of Dayton*, 766 F. App'x 275, 290 (6th Cir. 2019) (noting however that plaintiff did not dispute that the defendant's "statements made in preparation for and during the disciplinary hearing are entitled to absolute immunity" under Ohio law in case alleging claims in connection with student's suspension from the University of Dayton following alleged violation of the university's sexual harassment policy); *Fogel v. Univ. of the Arts*, No. CV 18-5137, 2019 WL 1384577, at *9–10 (E.D. Pa. Mar. 27, 2019) (dismissing defamation claim based on alleged report of misconduct to University's Title IX coordinator on the grounds of absolute privilege).  Ms. Doe additionally cites *Razavi v. Sch. of the Art Inst. of Chicago*, 122 N.E.3d 361, 371, 2018 IL App (1st) 171409 (Ill. App. Ct. 2018), *case dismissed sub nom. Razavi v. Sch. of Art Inst. of Chicago*, 124 N.E.3d 475 (Ill. 2019), a case in which the Illinois Appellate Court held that allegedly defamatory statements made by two alleged sexual assault victims to campus authorities were absolutely privileged—including when those statements were repeated during an internal review process conducted by the institution—without deciding whether the related disciplinary hearing was quasi-judicial, *see id*. at 375.  In doing so the court cited, *inter alia*, the Restatement (Second)

of Torts, which affords an absolute privilege to "[o]ne who is required by law to publish defamatory matter." *Id* at 372 (quotation marks omitted).[8]

Mr. Khan, by contrast, cites cases in which courts have held that absolute immunity for defamatory statements made during quasi-judicial proceedings does not apply to hearings conducted by private institutions. *See Bose v. Bea*, 947 F.3d 983, 994 (6th Cir. 2020), *petition for cert. docketed* (U.S. Aug. 25, 2020) (reversing district court's holding that absolute privilege applied to quasi-judicial academic misconduct proceedings conducted by Rhodes College because "the Tennessee cases have applied this privilege only to statements made before public bodies" and have further "emphasized that a benefit to the public is what drives the privilege"); *Cuba v. Pylant*, 814 F.3d 701, 717 (5th Cir. 2016) (holding that disciplinary proceeding conducted by Southern Methodist University was not quasi-judicial under Texas law, as the cases that have applied the absolute privilege in this context "are limited to statements made in governmental administrative procedures that bear the trappings of adversarial litigation"); *Overall v. Univ. of Pa.*, 412 F.3d 492, 497–98 (3d Cir. 2005) (finding that district court erred in concluding that faculty grievance proceedings at the University of Pennsylvania were quasi-judicial proceedings, as the court's research failed to disclose "a single Pennsylvania case according quasi-judicial status to entirely private hearings" and further noting that "[s]ound reasons exist for this public-private distinction," as "[g]overnment hearings typically involve basic procedural safeguards that may be lacking in private proceedings.").[9]

---

[8] Ms. Doe notes that Connecticut also follows the Restatement in construing the tort of defamation. *See, e.g.*, *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004). Ms. Doe thus submits that even "[i]f the Court determines that the UWC proceedings are not quasi-judicial, it should nevertheless conclude that Jane is entitled to absolute immunity for her involvement with the proceedings under the rationale advanced in *Razavi* and the Restatement (Second) of Torts." (Def.'s Mem. at 12 n.7.)  The Court does not reach this issue in light of its conclusion that the UWC proceedings are quasi-judicial.

[9] Mr. Khan also cites *Doe v. Roe*, 295 F. Supp. 3d 664, 675 (E.D. Va. 2018), a case in which the United States District Court for the Eastern District of Virginia held that a Title IX investigation and proceedings conducted by Marymount University into sexual assault allegations "did not have the required guarantees of due process and fairness and

Each of the decisions cited by Mr. Khan reflects a reluctance by a federal Court of Appeals to extend absolute immunity to private institutional hearings absent any state court decisions that are in accord. And as described above, the circumstances in which Connecticut courts have recognized certain proceedings as "quasi-judicial" have generally involved governmental proceedings of some form. *See* slip. op. at 8, *supra*.[10] Absent some better indication as to how a Connecticut court might resolve this issue, this Court would also be reluctant to alter the landscape of Connecticut's immunity law.

The Court is not, however, without some guidance. As noted previously the Connecticut Superior Court has addressed the issue and has held that Fairfield University's Judicial Board procedures constituted quasi-judicial proceedings. *See Rom*, 2006 WL 390448, at *5.[11] Although

---

therefore were not quasi-judicial so as to entitle Roe to claim absolute immunity from Doe's defamation claim" without deciding whether absolute immunity could be invoked in a private institutional setting as a categorical matter. In doing so the district court relied upon Virginia law, which focuses on whether a proceeding conveys the safeguards of due process in determining whether such proceeding can be deemed quasi-judicial. *See id.* at 674–75. Mr. Khan asserts that he "did not receive due process because he was denied counsel's participation during the UWC hearings, the right to cross-examine Jane Doe, or a comprehensive adversarial hearing in person." (Pl.'s Mem. at 7 n.1 (citing Compl. ¶¶ 76–81).) However he does not cite any Connecticut case law in support of the proposition that this Court should determine Jane Doe's tort liability to Mr. Khan on the basis of the protections that Mr. Khan was allegedly denied by Yale and the Court thus declines to do so here. Nor, as discussed above, does Connecticut law determine the question of whether a proceeding is quasi-judicial by looking to the procedural protections afforded in such proceedings. *See e.g. Priore*, 196 Conn. App. at 696–97 (listing factors for consideration when determining whether a proceeding is quasi-judicial.)

[10] In this vein, in the context of defamation claims, the Connecticut Supreme Court has observed that "[a]bsolute immunity. . . presents a conflict or antinomy between two principles equally regarded by the law—the right of the individual, on one hand, to enjoy his reputation unimpaired by defamatory attacks, and, on the other hand, the necessity, in the public interest, of a free and full disclosure of facts in the conduct of the legislative, executive and judicial departments of government." *Gallo v. Barile*, 284 Conn. 459, 470, 935 A.2d 103 (2007) (quotation marks omitted). The Court further observed that "[w]ith respect to statements made in the course of a judicial proceeding, it is widely accepted that the public's interest in the unhampered operation of the government, when exercising its judicial functions, outweighs an individual's interest in the preservation of reputation." *Id.* (quotation marks omitted). These observations support the argument advanced herein by Mr. Khan but, as *dicta*, are not dispositive. And as discussed below, the parameters for determining whether a proceeding is quasi-judicial do not include a public/private litmus test.

[11] As noted previously, despite its conclusion the Superior Court in *Rom* determined that qualified as opposed to absolute immunity should apply to Fairfield University's disciplinary proceedings, relying in large part on *Cleavinger v. Saxner*, 474 U.S. 193 (1985), a case in which the United States Supreme Court held that the members of a federal prison's discipline committee were entitled to qualified immunity from legal actions brought by inmates for alleged constitutional violations. *Rom*, 2006 WL 390448, at *4. The Supreme Court in *Cleavinger* based its conclusion on the fact that the prison committee did not perform a "classic" adjudicatory function, as its members were "not professional hearing officers" and were instead Bureau of Prisons employees who were tasked with rendering

the *Rom* court did not analyze the distinction between government action versus private action, the issue was squarely raised and the argument advanced herein by Mr. Khan was rejected, albeit without explanation. *See id*. at \*3.

In addition, in *Preston v. O'Rourke*, 74 Conn. App. 301, 312, 811 A.2d 753 (App. Ct. 2002), the Connecticut Appellate Court held that an employment arbitration proceeding arising out of the termination of a state prosecutor was a quasi-judicial proceeding. In doing so the Appellate Court rejected the plaintiff's argument that the court should distinguish "between purely private labor arbitration and the actions of public administrative officers or bodies" for purposes of absolute immunity. *Id*. at 313–14. The Appellate Court's reasoning was based in part on the policy of preserving arbitration's function as an alternative method of dispute resolution—a policy reflected in a number of statutes that permit arbitration awards to be converted into court judgments, and also on the fact that the plaintiff was a state employee who had submitted to arbitration through his union pursuant to a collective bargaining agreement—a process also authorized by state statute. *See id*. at 314–15. In light of this latter consideration, the Appellate Court rejected the argument that the case involved a "purely private labor arbitration." *Id.* at 314. Instead, the Appellate Court characterized the arbitration proceeding as a "hybrid" between a private and public proceeding.[12] *Id*.; *see also Craig*, 271 Conn. at 86 (citing *Preston's* holding in providing examples of quasi-judicial proceedings). Although not dispositive of the issue, the case suggests that the public/private distinction may not be as significant as Mr. Khan suggests. And

credibility determinations as between their own co-workers and inmates; the Court therefore observed that they were "under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee." *Cleavinger*, 474 U.S. at 203–04. However *Cleavinger* did not address state tort claims, and this Court declines to follow the Superior Court's decision to apply only qualified immunity in the absence of a relevant precedent for doing so under Connecticut law. It is also worth noting that *Cleavinger* involved government actors so it is clear that the Superior Court did not rely on *Cleavinger* when deciding the issue raised and decided herein.

[12] Therefore, necessarily left unanswered is whether the argument would have succeeded, or at least garnered greater analysis, if the proceeding was between purely private parties.

the fact that the proceeding at issue here was one authorized by federal law, *i.e.*, Title IX and its regulations and interpretive guidance, supplies a further basis for extending immunity under the reasoning of *Preston*.  Further, as Ms. Doe notes, Connecticut law likewise imposes upon Yale the obligation to adopt and disclose policies for investigating and holding disciplinary procedures in response to allegations of sexual assault, stalking, or violence, which must be conducted by an official with appropriate training, apply a preponderance of the evidence standard, and permit the complainant and respondent to present evidence and witnesses during a disciplinary proceeding, among other requirements.  *See* Conn. Gen. Stat. § 10a-55m(b)(6).

Indeed, the Connecticut Supreme Court has emphasized that "it is important to consider whether there is a sound public policy reason for permitting the complete freedom of expression that a grant of absolute immunity provides." *Kelley*, 221 Conn. at 567.  The Court finds that the policy reflected in a grant of immunity of allowing "[p]articipants in a judicial process . . . to testify or otherwise take part without being hampered by fear of defamation suits," *Hopkins*, 282 Conn. at 839, applies equally in the circumstances presented here—an alleged sexual assault or sexual harassment victim testifying before a university fact-finding body at a proceeding convened pursuant to Title IX or comparable state statute.  *Cf. Razavi*, 122 N.E.3d at 373–74 ("If sexual assault victims are at risk of facing a civil lawsuit from their attacker throughout the reporting and disciplinary process, they will be less likely to come forward and report the crime. . . . This places the entire campus unnecessarily at a safety risk, thus dampening the intended purpose of higher education in a safe environment").  Finally, Mr. Khan identifies no substantive difference between a Title IX proceeding conducted by a public versus a private university that would warrant the application of absolute immunity in the former but not the latter.  And the fact that Title IX applies equally to private and public institutions would tend to undermine such a claim.  *See, e.g.*, Diane Heckman, *The Role of Title IX in Combatting Sexual Violence on College Campuses*, 325 ED. LAW

Rep. 1, 4 (2016) (explaining that "Title IX applies to sexual harassment activities by both public and private schools that receive federal funding"). The Court therefore holds that the UWC proceedings at issue here constitute a quasi-judicial proceeding entitling Ms. Doe to absolute immunity as to any allegedly defamatory statements made therein.[13] Ms. Doe is likewise immune from liability for any statements tendered during the UWC proceedings upon which Mr. Khan seeks to bring a claim for tortious interference with business relationships. *See Rioux*, 283 Conn. at 350–51.

### Whether Mr. Khan's Tortious Interference Claims Are Otherwise Time-Barred

Mr. Khan also asserts tortious interference claims against Ms. Doe arising out of her allegedly false rape accusation from November 2015, to include her statements to friends and to Yale in which she allegedly repeated the false accusation, all of which occurred during the same timeframe. (*See* Compl. ¶¶ 45–47.) Ms. Doe seeks dismissal of these claims on statute of limitations grounds. The applicable statute of limitations provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." *PMG Land Assocs., L.P. v. Harbour Landing Condo. Ass'n, Inc.*, 135 Conn. App. 710, 717, 42 A.3d 508 (App. Ct. 2012) (quoting Conn. Gen. Stat. § 52-577). Section "52-577 is an occurrence statute, meaning that the time period within which a plaintiff must commence an action begins to run at the moment the act or omission complained of occurs." *Id*. at 717–18 (quotation marks omitted).

---

[13] For this reason the Court does not address Ms. Doe's alternative argument that Mr. Khan's claims are barred by the educational malpractice doctrine articulated in *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 687 A.2d 111 (1996), and its progeny.

Because Ms. Doe's alleged accusations of rape in 2015 occurred more than three years before January 24, 2020—when Ms. Doe was deemed "served" in this action[14]—Ms. Doe asserts that any tortious interference claims stemming from these events are time-barred.  Mr. Khan asserts, without analysis, that the continuing course of conduct doctrine renders Ms. Doe's alleged rape accusations from 2015 actionable because they were part of a longer-term scheme to get Mr. Khan "expelled from Yale—an endeavor that took her almost four years to accomplish and which she eventually succeeded in doing."  (Pl.'s Mem. at 5.)  Ms. Doe responds that this doctrine is inapplicable.

"[W]hen the wrong sued upon consists of a continuing course of conduct," the continuing course of conduct doctrine provides that "the statute does not begin to run until that course of conduct is completed."  *Flannery v. Singer Asset Fin. Co., LLC*, 312 Conn. 286, 311, 94 A.3d 553 (2014) (quoting *Handler v. Remington Arms Co.*, 144 Conn. 316, 321, 130 A.2d 793 (1957)).  Connecticut courts recognize that in certain instances "it would be unreasonable to require or even permit [the plaintiff] to sue separately over every incident of the defendant's unlawful conduct"— specifically, where "[t]he injuries about which the plaintiff is complaining . . . are the consequence of a numerous and continuous series of events."  *Watts v. Chittenden*, 301 Conn. 575, 587–88, 22 A.3d 1214 (2011) (quoting *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)).

A plaintiff may properly invoke the doctrine upon a showing that "the defendant: (1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was

---

[14] In advancing this argument, Ms. Doe relies upon the date that she waived service of the complaint—January 9, 2020.  (*See* ECF No. 13). In fact, it is the date that Ms. Doe's waiver of service was filed with the Court—January 24, 2020—that appears to be the proper date for determining the limitations period.  *See Moss v. Wyeth, Inc.*, 872 F. Supp. 2d 154, 159 (D. Conn. 2012) (explaining that: (1) "when a federal court adjudicates state law claims, state statutes of limitations govern the timeliness of state law claims, and state law determines the related question of what events serve to commence an action and to toll the statute of limitations"; (2) "a case is considered 'brought' for purposes of a statute of limitations on the date of service of the complaint upon the defendant" under Connecticut law; and (3) when a plaintiff seeks a waiver of service under Fed. R. Civ. P. 4(d), "the complaint is served for statute of limitations purposes . . . when the executed waiver is filed with the court") (quotation marks and citations omitted).

related to the alleged original wrong; and (3) continually breached that duty." *Flannery*, 312 Conn. at 313 (quotation marks omitted).  At the second step, "a finding that a duty continued to exist after the cessation of the act or omission relied upon," must be established by "evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." *Id.* at 312 (quoting *Watts*, 301 Conn. at 584).   Mr. Khan does not allege a special relationship between the parties.  Instead he appears to rest his continuing course of conduct theory on Ms. Doe's alleged subsequent "wrongful conduct," which he would assert relates back to her original 2015 rape accusations and thus brings the initial rape accusations within the statute of limitations as contemplated under *Watts*.

The complaint includes only two sets of allegations concerning Ms. Doe subsequent to her 2015 sexual assault accusations.  First, Ms. Doe testified at Mr. Khan's criminal trial in early 2018. (Compl. ¶ 52.)  With respect to these allegations, Mr. Khan does "not state claims against Jane Doe for her statements to law enforcement or her testimony at his criminal trial." (Pl.'s Mem. at 10).  These actions cannot therefore be the basis for finding "later wrongful conduct" for purposes of the second showing requisite to invoking the continuing course of conduct doctrine.  Second, Ms. Doe provided testimony during the UWC proceeding in November 2018.  (Compl. ¶¶ 74, 77.) Although not specifically asserted by Mr. Khan, the Court construes his argument as being advanced under the *Watts* schema—that is, because the testimony at the UWC proceeding was rendered within three years of the accusations made in 2015, and because the 2018 testimony occurred within the statute of limitations set forth in Conn. Gen. Stat. § 52-577, for purposes of this case it can serve as "later wrongful conduct" which would then bring the 2015 conduct within the applicable statute of limitations under the continuing course of conduct doctrine.  *See Watts*, 301 Conn. at 596–98.  The Court need not decide whether *Watts*, which involved separate instances of intentional infliction of emotional distress over time, has equal application in circumstances

19

such as those presented here.  Insofar as the Court has determined that Ms. Doe is absolutely immune from liability for her testimony during the UWC proceeding, her testimony is not actionable and cannot therefore serve as subsequent "wrongful conduct" bringing the 2015 accusations within the applicable statute of limitations.

In the absence of any other allegations of wrongdoing that fall within the limitations period and relate back to Mr. Khan's otherwise untimely 2015 allegations, the continuing course of conduct doctrine has no application.[15]  The tortious interference claims based upon Ms. Doe's allegedly false rape accusations in 2015 are therefore dismissed as time-barred.

**Conclusion**

For the foregoing reasons, the Defendant's motion to dismiss is granted.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of January 2021.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

[15] Because the Court concludes that dismissal is warranted on this basis it does not address Ms. Doe's argument that the continuing course of conduct doctrine is inapplicable when the Plaintiff knew of the alleged harm.