21-95
*Khan v. Yale Univ.*

# In the

# United States Court of Appeals

# for the Second Circuit

————

AUGUST TERM 2021

No. 21-95-cv

SAIFULLAH KHAN,

*Plaintiff-Appellant*,

v.

YALE UNIVERSITY, PETER SALOVEY, JONATHON HALLOWAY, MARVIN CHUN, JOE GORDON, DAVID POST, MARK SOLOMON, ANN KUHLMAN, LYNN COOLEY, PAUL GENECIN, STEPHANIE SPANGLER, SARAH DEMERS, CAROLE GOLDBERG, UNKNOWN PERSONS,

*Defendants*,

&

JANE DOE,

*Defendant-Appellee*.

————

On Appeal from the United States District Court
for the District of Connecticut

————

ARGUED: OCTOBER 29, 2021

DECIDED: MARCH 4, 2022

————

Before: LIVINGSTON, *Chief Judge*, KEARSE, and RAGGI, *Circuit Judges*.

CERTIFIED COPY ISSUED ON 03/04/2022

_____

Plaintiff Saifullah Khan appeals from a February 9, 2021 partial final judgment of the United States District Court for the District of Connecticut (Dooley, *J.*), dismissing his claims for defamation and tortious interference with contract against defendant "Jane Doe" insofar as Doe's assertions that Khan sexually assaulted her in 2015 while the two were students at Yale University resulted in Khan's expulsion from the school. The district court concluded that Khan failed to state claims for which relief could be granted because Doe's initial 2015 assertions of sexual assault fell outside the applicable statute of limitations and her 2018 reassertions of the sexual assault at a Yale disciplinary hearing were shielded by quasi-judicial immunity, precluding both defamation and tortious interference claims. *See* Fed. R. Civ. P. 12(b)(6). Khan argues error in the application of quasi-judicial immunity to a private university's disciplinary proceedings and, thus, maintains that he states a plausible claim for defamation and for tortious interference. Because existing Connecticut law does not permit us to predict whether the Supreme Court of that state would extend quasi-judicial immunity to statements made at non-government proceedings generally, or at Yale's sexual misconduct disciplinary hearings specifically, we certify those questions to the Connecticut Supreme Court, deferring our resolution of this appeal in the interim.

QUESTIONS CERTIFIED AND DECISION RESERVED.

_____

CAMERON LEE ATKINSON (Norman A. Pattis, *on the brief*), The Pattis Law Firm, LLC, New Haven, CT, *for Plaintiff-Appellant*.

2

JAMES M. SCONZO (Brendan N. Gooley, *on the brief*), Carlton Fields, P.A., Hartford, CT, *for Defendant-Appellee*.

────────────

REENA RAGGI, *Circuit Judge*:

In 2015, while both were students at Yale University, defendant "Jane Doe" accused plaintiff Saifullah Khan of sexual assault.[1] As a consequence, Yale initiated university disciplinary proceedings against Khan, and the State of Connecticut criminally charged him with sexual assault. Khan and Doe each testified at both proceedings—in each other's presence, under oath, and subject to cross examination at trial, but with none of those procedures at the university hearing. Holding the prosecution to a proof-beyond-a-reasonable-doubt standard at trial, a jury acquitted Khan of all criminal charges. Applying a lesser, preponderance standard of proof

───────────

[1] While Doe's real name is known to the parties, Khan moved to pursue this civil action against her pseudonymously to avoid violating the privacy requirement of Yale's Sexual Misconduct Policy. That policy does not bind the federal courts, which generally require a complaint to "name all the parties." Fed. R. Civ. P. 10(a); *see Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 189 (2d Cir. 2008) (observing that public has "right to know who is using their courts" (internal quotation marks omitted)). This court has, however, recognized judicial discretion to depart from Rule 10(a) when a party's interest in anonymity outweighs "both the public interest in disclosure and any prejudice" to the adverse party. *Id.* at 189-90 (identifying factors properly considered in balancing interests). Because no party complains that the district court failed to balance these interests here or otherwise abused its discretion, we do not pursue the matter further and simply refer to defendant as "Jane Doe" in this opinion.

3

to its disciplinary proceeding, Yale found Khan to have violated its Sexual Misconduct Policy and expelled him.

Khan seeks to litigate Doe's sexual assault accusations for a third time, suing Doe in the United States District Court for the District of Connecticut (Kari A. Dooley, *Judge*) for defamation and tortious interference with contract, claims on which he would bear a preponderance burden at any trial.[2]  Khan now appeals from a February 9, 2021 partial final judgment of the district court dismissing his complaint against Doe in its entirety on absolute quasi-judicial immunity and statute of limitations grounds. *See Khan v. Yale Univ.*, 511 F. Supp. 3d 213 (D. Conn. 2021); Fed. R. Civ. P. 12(b)(6). Specifically, Khan argues that the proceedings of non-government entities cannot be quasi-judicial and, thus, Doe's accusations of sexual assault in a private university's disciplinary hearing are not shielded by absolute immunity.  Neither the Connecticut Supreme Court nor its intermediate Appellate Court has yet addressed whether quasi-judicial immunity can extend to non-government proceedings. Because we cannot predict whether Connecticut's Supreme Court would endorse such an extension, either generally or specifically as to Yale's disciplinary proceeding against Khan, we certify those and related questions to the Connecticut Supreme Court, deferring our resolution of this appeal in the interim.

---

[2]  In the same complaint, Khan also sued Yale and various of its employees for violating Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, as well as for state law breaches of privacy, contract, and the implied warranty of fair dealing, and for negligent and intentional infliction of emotional distress.

## BACKGROUND

The following facts are drawn from Khan's complaint, documents incorporated therein, and facts of which we may take judicial notice.  For present purposes, "we evince no views concerning whether the 'facts' we detail below are *actually* true.  Our task is limited to determining whether, *if* [Khan's] allegations were true, they would state a . . . claim."  *Menaker v. Hofstra Univ.*, 935 F.3d 20, 26 n.1 (2d Cir. 2019) (emphasis in original).  In applying this standard, we are obliged to view the facts in the light most favorable to Khan.  *See Littlejohn v. City of New York*, 795 F.3d 297, 306-07 (2d Cir. 2015).

## I. Doe's 2015 Claim of Sexual Assault

Saifullah Khan, a citizen of Afghanistan, was born in a refugee camp in Pakistan, to which country his family had fled after having their lives threatened by the Taliban.  When Khan was sixteen, his family settled in the United Arab Emirates, and it was from there that Khan applied for and received acceptance to Yale's undergraduate class of 2016.  In addition to providing Khan with the financial assistance necessary for him to attend Yale, the university helped Khan receive admission to (and financial support for attendance at) the Hotchkiss School, where he spent a preparatory year before entering Yale in the fall of 2012.

On Halloween night in 2015, Khan and fellow Yale student Jane Doe separately attended an off-campus party hosted by one of the university's "secret societies."  At some point, Khan and Doe left the party together to attend an on-campus event.  When Doe began to feel unwell, she and Khan left the event and returned to Trumbull College, the Yale dormitory where both resided.  Khan asserts that

5

after he dropped Doe off at her room and started to return to his own, Doe called him back and asked him to check on a friend. After Khan did so, he returned to Doe's room where the two had consensual sex before falling asleep.

The next morning, Doe told friends that Khan had raped her. That same day, however, when Doe sought contraceptive assistance at the university's health center, she reported having engaged in consensual, unprotected sex. A few days later, when Doe publicly repeated her rape claim, she was directed to the Yale Women's Center. There, a counselor (defendant David Post), assisted Doe in preparing a formal university complaint against Khan. Upon receipt of that complaint, a Yale deputy dean (defendant Joe Gordon) suspended Khan, ordering him to vacate his dormitory room and to leave campus. Soon thereafter, Yale began a disciplinary proceeding against Khan under the university's Sexual Misconduct Policy.

At and about the same time, the Yale Police Department opened an investigation into Doe's sexual assault claim. This ultimately resulted in the State of Connecticut criminally charging Khan with sexual assault in the first, second, third, and fourth degrees. *See* Conn. Gen. Stat. §§ 53a-70, -71, -72a, -73a. At Khan's request, Yale agreed to stay its disciplinary proceedings pending the conclusion of his criminal case.[3]

---

[3] As then in effect, Yale's Sexual Misconduct Policy, which we discuss *infra* at 13-16, stated that university disciplinary proceedings should *not* be deferred pending criminal proceedings. *See* App'x at 79. *But see Procedures of the University-Wide Committee on Sexual Misconduct*, Yale Univ. (eff. Sept. 10, 2021),

## II.     State Criminal Trial

The state's criminal case against Khan would not be resolved for approximately two and a half years.  On March 7, 2018, after a two-week trial, a Connecticut jury acquitted Khan of all charges after less than a full day's deliberations.  Khan attributes this outcome to his attorney's ability to cross-examine Doe, highlighting various memory lapses and inconsistences in her accounts of the alleged sexual assault, and eliciting flirtatious communications that she had sent Khan in the days before Halloween 2015.[4]

Khan's trial and its outcome were unfavorably reported on in the *Yale Daily News*.  Thereafter, over 77,000 persons signed a petition urging Yale not to readmit Khan, notwithstanding his acquittal.  Yale nevertheless permitted Khan to resume full-time student status at the start of the Fall 2018 term.

## III.    New Sexual Assault Allegations

On October 5, 2018, the *Yale Daily News* reported new sexual assault accusations against Khan by a man—not a Yale student—who

---

https://uwc.yale.edu/sites/default/files/files/UWC%20Procedures.pdf (now listing "concurrent criminal investigation" among "good causes" for extending disciplinary proceeding timelines).  Because no party to this appeal relies on this provision in their arguments to this court, we do not consider it further.

[4]  Khan does not sue Doe for statements made at trial, conceding that such testimony is shielded by absolute judicial immunity.  *See, e.g.*, *Bruno v. Travelers Cos.*, 172 Conn. App. 717, 727-29, 161 A.3d 630 (App. Ct. 2017) (affirming application of absolute immunity to testimony of witness in Superior Court hearing); *Doe v. Roe*, No. CV165037281, 2017 WL 3248167, at *1-2 (Conn. Super. Ct. July 3, 2017) (dismissing complaint for lack of subject matter jurisdiction, based on absolute immunity, where plaintiff claimed defamation in defendants' testimony in legal proceeding).

claimed Khan had assaulted him on a number of occasions at locations outside Connecticut.[5]  The day the article was published, Yale police and administrators contacted Khan to see if he was unduly distressed so as to require professional help.  Khan assured them that he was not distressed but agreed to a mental health consultation at the Yale infirmary.  Khan asserts that the consultation indicated no cause for concern.  Two days later, however, on Sunday morning, October 7, 2018, Yale administrators requested a meeting with Khan. When Khan refused, a letter from a Yale dean (defendant Marvin Chun) was hand-delivered to Khan advising him that his immediate suspension from the university and exclusion from campus were "necessary for your physical and emotional safety and well-being and/or the safety and well-being of the university community." Compl. ¶ 64.

Thereafter, Khan was not permitted to return to Yale's campus until November 2018, when Yale resumed its sexual misconduct disciplinary proceeding against Khan based on Doe's 2015 complaint.

## IV.    Yale Disciplinary Proceeding on Doe's Sexual Assault Claim

### A. Yale's Sexual Misconduct Policy

Yale's disciplinary proceeding against Khan was conducted pursuant to the university's formal Sexual Misconduct Policy, adopted in or about 2011.  Because Khan asserts that this policy was prompted by communications that Yale received from the United

---

[5]  Khan asserts that these accusations did not prompt any criminal charges or university disciplinary proceedings against him.

States Department of Education Office for Civil Rights ("DOE"), we briefly summarize those communications at the outset.

### 1. DOE Communications

In a communication dated April 4, 2011, DOE advised colleges and universities generally that their continued receipt of federal funding under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1861 *et seq.*, required them to take more rigorous action against sexual misconduct on their campuses. This communication, which came widely to be known as the "Dear Colleague Letter," told schools that to avoid themselves being charged with sexual harassment in violation of Title IX, they were obliged "to take immediate action" to address, prevent, and eliminate peer sexual misconduct about which they "know[] or reasonably should know." App'x at 90.[6] Toward that end, the letter instructed schools, *inter alia*, "to adopt and publish grievance procedures," and to provide employee training with respect to "report[ing]" and "respond[ing] properly" to sexual misconduct. *Id.* In so instructing, the letter emphasized that a school's investigation of sexual misconduct "is different from any law enforcement investigation." *Id.* Thus, while stating that parties should be afforded "the opportunity . . . to present witnesses and other evidence," *id.* at 95, the letter made

---

[6] The "Dear Colleague Letter" was not promulgated through the formal rulemaking process. *See* 5 U.S.C. § 553; *see also* Olatunde C.A. Johnson, *Overreach and Innovation in Equality Regulation*, 66 DUKE L.J. 1771, 1779-81 (2017) (noting criticism of DOE's avoidance of formal rulemaking in issuing "Dear Colleague Letter"). Thus, the letter is properly understood simply to provide "guidance." *See* App'x at 87 ("This letter does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations.").

no mention of such presentation needing to be under oath, subject to confrontation, or consistent with any particular evidentiary standards of reliability.  Indeed, the letter "strongly discourage[d] schools from allowing the parties personally to question or cross-examine each other during the hearing" and advised schools that they did not have to permit parties to be represented by attorneys.  *Id.* at 98.  The letter also instructed schools to use "a preponderance of the evidence standard to evaluate [sexual misconduct] complaints," rejecting the higher "'clear and convincing' standard" then being "used by some schools."  *Id.* at 96-97.[7]

---

[7] Several provisions in the "Dear Colleague Letter" prompted controversy, such that the letter, issued during the Obama administration, was rescinded by the Trump administration in 2017 (*i.e.*, before Khan's 2018 disciplinary hearing).  *See* Letter from Candice Jackson, Acting Assistant Sec'y for Civil Rights, Office for Civil Rights, U.S. Dep't of Educ., to Colleagues (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.
In 2020 (*i.e.*, after Khan's disciplinary hearing and expulsion), DOE issued final Title IX regulations for how public and private educational institutions receiving federal funds should respond to sexual harassment.  *See* 34 C.F.R. § 106.45(b) (stating that "recipient's grievance process must comply with the requirements of this section").  Among other things, these regulations require colleges and universities (1) to provide for a live hearing to resolve sexual misconduct complaints, though parties may appear either in person or, at the institution's discretion, "virtually, with technology enabling participants simultaneously to see and hear each other," *id.* § 106.45(b)(6)(i); (2) at the request of either party, to locate the parties "in separate rooms" during a hearing so long as technology permits them "simultaneously [to] see and hear the party or witness answering questions," *id.*; (3) to afford respondents a presumption of innocence, *see id.* § 106.45(b)(1)(iv); (4) to afford complainants and respondents the opportunity for direct cross-examination of witnesses by party advisors (who can be attorneys), *see id.* § 106.45(b)(6)(i); (5) to provide advisors for parties who do not have one, *id.*; and (6) to state in writing "[c]onclusions regarding the application of the [school's] code of conduct to the facts," *id.* § 106.45(b)(7)(ii)(D).  The Biden administration is

In another 2011 communication, this one prompted by a student complaint, DOE advised Yale that it had been deficient in responding to student reports of sexual misconduct. The Complaint does not indicate whether DOE pursued the matter further after Yale adopted its Sexual Misconduct Policy.

## 2. Connecticut Law

Although Khan does not plead Connecticut law's effect on Yale's Sexual Misconduct Policy, we take judicial notice that in 2012—*i.e.*, within months of Yale adopting its policy, and almost six years before the university's 2018 hearing on Doe's claims against Khan—Connecticut enacted General Statute § 10a-55m. *See Oneida Indian Nation of N.Y. v. New York*, 691 F.2d 1070, 1086 (2d Cir. 1982) (stating that court may take judicial notice of law). That law requires all institutions of higher education within the state—private as well as public—to adopt programs for the awareness, prevention, and investigation of sexual assaults.[8] Each covered institution must file with a committee of the Connecticut General Assembly copies of its policies regarding campus sexual misconduct and the materials used

---

presently reconsidering these rules. *See* Exec. Order No. 14021, 86 Fed. Reg. 13803 (Mar. 8, 2021); Letter from Suzanne B. Goldberg, Acting Assistant Sec'y for Civil Rights, Office for Civil Rights, Dep't of Educ., to Students, Educators, and other Stakeholders (Apr. 6, 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/20210406-titleix-eo-14021.pdf.

We need not discuss these policy changes further. For our purposes, it is sufficient to note this history and to credit Khan's allegation that the "Dear Colleague Letter" informed the formulation of Yale's Sexual Misconduct Policy.

[8] Connecticut's definition of an "institution of higher education" encompasses both public and private universities. *See* Conn. Gen. Stat. §§ 10a-55, 10a-173(3).

11

to implement them, and advise as to the number and outcome of any sexual assault, stalking, or intimate partner violence reports made to the institution. *See* Conn. Gen. Stat. § 10a-55m(f).[9]

In addition to reporting requirements, Connecticut law mandates, among other things, that covered institutions employ an "affirmative consent" standard in reviewing sexual assault claims. *Id.* § 10a-55m(b)(1)(A). The law defines "affirmative consent" as "an active, clear and voluntary agreement by a person to engage in sexual activity with another," *id.* § 10a-55m(a)(1);[10] and precludes finding affirmative consent by a person who was intoxicated or otherwise incapacitated at the time of a sexual encounter, *see id.* § 10a-55m(b)(1)(D).[11] While the law affords parties the right to present

---

[9] Some twenty years earlier, in 1990, Congress had enacted the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092, which requires federally funded colleges and universities publicly to report campus crime and the policies promulgated to ensure safety. That law was amended in 2013 by the Campus Sexual Violence Elimination Act, or Campus SaVE Act (part of the Violence Against Women Reauthorization Act of 2013). *See* Pub. L. 113-4 § 304, 127 Stat. 54, 89-92 (Mar. 7, 2013). As neither party cites this legislation to this court, we do not here consider how, if at all, it may have informed Yale's 2011 promulgation of its Sexual Misconduct Policy or the 2018 disciplinary proceeding pursuant to that policy conducted against Khan. Instead, we focus on Connecticut law because of further requirements that we now discuss in text.

[10] Connecticut does not require a covered institution to adopt this statutory definition *in haec verba* as long as it uses a definition with a "substantially similar" meaning. *Id.* § 10a-55m(h).

[11] The provisions regarding affirmative consent were added to the law in 2016, *see An Act Concerning Affirmative Consent*, 2016 Conn. Legis. Serv. 16-106 (West), *i.e.*, after Doe's 2015 sexual assault complaint but before Khan's 2018 disciplinary hearing. Because we have no record of the hearing before us, *see infra* n. 13, we do

witnesses and evidence at any disciplinary hearing and to be accompanied by an advisor, *see id.* § 10a-55m(b)(6)(C)(i)-(ii), it says nothing about whether the advisor may question witnesses or otherwise speak at the proceedings. Nor does the law impose any oath, confrontation, cross-examination, or other evidentiary-reliability requirements for such hearings. Also, it does not prescribe particular punishments for sexual misconduct established at disciplinary hearings.

### 3. Yale's Sexual Misconduct Policy

Yale's Sexual Misconduct Policy proscribes its faculty, employees, and students from engaging in sexual misconduct. The policy defines sexual misconduct

> [to] incorporate[] a range of behaviors including sexual assault (which includes rape, groping and any other non-consensual sexual contact), sexual harassment, intimate partner violence, stalking, and any other conduct of a sexual nature that is non-consensual, or has the purpose or effect of threatening or intimidating a person or persons.

App'x at 75. Otherwise, the policy focuses mainly on procedures for reporting and investigating such misconduct.

The policy provides, among other things, for a University-Wide Committee on Sexual Misconduct ("UWC"), consisting of approximately thirty members appointed by Yale's provost from across the university's faculty, student body, and managerial or

---

not know what role, if any, the affirmative consent standard (or, indeed, any portion of Connecticut law) played in the hearing.

13

professional employees.[12]    Upon the filing of a formal sexual misconduct complaint, the policy calls for the tenured faculty member chairing the UWC to appoint "an impartial fact-finder" to investigate the allegations, as well as five UWC members to constitute a hearing panel (the "UWC hearing panel") to determine if university policy was violated, and if so, to recommend appropriate discipline. *Id.* at 79-80.

Yale's policy empowers the appointed fact-finder to "gather documents and conduct interviews as necessary to reach a thorough understanding of the facts and circumstances surrounding the allegations of the complaint," which are then described in a "report" that may also address the credibility of witnesses, but not reach conclusions as to any violation of University policy.  *Id.* at 80.  While there is no requirement that statements made or evidence submitted to the fact-finder (or, later, to the UWC hearing panel) be sworn or otherwise satisfy any rules of reliability, Yale policy does state that a "[f]ailure to provide truthful information or any attempt to impede the UWC process may result in a recommendation for a more severe penalty or a referral for discipline."  *Id.* at 77.

---

[12]  All UWC members must participate in training pertaining to

> University resources for redress of sexual misconduct; sexual misconduct and equal employment, educational, and professional opportunity; methods of informal resolution; the interaction between University disciplinary processes and criminal processes; responding to retaliation; and other topics suggested by experts from within and outside the University.

App'x at 77.

14

The fact-finder's report is transmitted to the UWC hearing panel and to the complainant and respondent ("the parties"), whereupon the panel conducts a hearing "intended primarily" to allow its members "to interview the complainant and the respondent with respect to the fact-finder's report." *Id.* at 80. The parties do "not appear jointly before the panel" unless they expressly agree to do so. *Id.* Rather, when one is being interviewed by the panel, the other must remain in a separate room with only "audio access to the proceedings." *Id.* Preliminary to any panel interview, each party may make a 10-minute preliminary statement, a written copy of which is provided to the other party. The panel alone then poses questions to the party. And while parties may propose questions to the panel, the panel, "at its sole discretion," decides what questions to ask. *Id.* The policy appears to afford no opportunity for parties to offer closing statements. Further, while the policy permits parties to be accompanied by an advisor (who may be an attorney) at any step in the disciplinary process, it specifically prohibits an advisor from speaking for a party or offering evidence on his or her behalf.

Within 10 days of the final hearing session, the UWC hearing panel must set out its findings of fact and its violation conclusion in a written report to the relevant final Yale decisionmaker who, in the case of an accused student, is "the dean of the respondent's school." *Id.* at 81. Copies of this report are furnished to the parties, who have three days to submit a written response. The decisionmaker then determines whether any further hearings are necessary and, if not, renders a written decision setting forth the decisionmaker's conclusions as to any violation of Yale's Sexual Misconduct Policy and any penalties to be imposed. Student parties can appeal a

decisionmaker's determination to Yale's provost, but only on two grounds: (1) procedural error preventing a fair adjudication, and (2) new evidence not reasonably available at the time of the hearing.

### B. Yale's UWC Proceeding Against Khan

In November 2018, a UWC hearing panel convened to consider Doe's complaint that Khan had sexually assaulted her on campus three years earlier.[13]  Both Doe and Khan appeared at the hearing: Khan in person; Doe (who had by this time graduated from Yale) by teleconference from a remote location.  Despite the fact that Doe was not physically present, neither Khan nor his attorney-advisor was permitted to be in the hearing room when Doe made her preliminary statement and answered panel questions.  Rather, Khan and his attorney were required to remain in another room, provided with only an audio feed of Doe's appearance.[14]  Nor was Khan's attorney permitted to speak on his client's behalf or to voice objections to panel questions that Khan now asserts were compound or assumed facts not in evidence.

The final UWC hearing panel report is not before this court. Khan, however, asserts that the panel found him to have violated

---

[13]  We rely on Khan's complaint in describing the UWC hearing as no transcript of that proceeding is before the court.  While Yale policy calls for retention of the "minutes from each UWC hearing session," App'x at 83, Khan asserts that his request for a transcript or recording at the conclusion of his hearing was denied.

[14]  Excluding Khan and his attorney from the hearing room during Doe's appearance is perplexing not only because Doe was not physically present but also because the parties had already testified in each other's presence at Khan's criminal trial.

16

Yale's Sexual Misconduct Policy in his 2015 encounter with Jane Doe, as a result of which Yale expelled him.

## V.    The Instant Action

On December 13, 2019, Khan brought this federal action against Yale, various of its employees, and Doe.  On January 7, 2021, the district court granted Doe's motion to dismiss all claims against her. Insofar as Khan sued Doe for defamation based on her assertions of sexual assault before the UWC panel, the district court concluded that Doe enjoyed absolute immunity for her statements in this quasi-judicial proceeding.  *See Khan v. Yale Univ.*, 511 F. Supp. 3d at 226. While acknowledging that no binding Connecticut authority had extended absolute immunity to statements made during the proceedings of a non-government entity, the district court concluded that extending such immunity to a complaining party in a Yale UWC proceeding was warranted by the functional six-factor test employed by Connecticut to identify quasi-judicial proceedings, *see id.* at 220-21, and by public policy, *see id.* at 225-26.  Insofar as Khan sued Doe for tortious interference with contract based on her initial rape accusations in 2015, the district court concluded that his claim was barred by Connecticut's three-year statute of limitations for tort actions.  *See id.* at 226-27.  Moreover, because absolute immunity shielded Doe's 2018 statements to the UWC panel, the district court ruled that Khan could not rely on these later statements to demonstrate a continuing course of tortious interference falling within the limitations period.  *See id.* at 227-28.

The district court subsequently granted Khan's motion to reduce the ruling in favor of Doe to a partial final judgment, *see* Fed.

R. Civ. P. 54(b), from which judgment, entered on February 9, 2021, Khan timely filed this appeal.[15]

## DISCUSSION

## I.    Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6).  Where a party invokes diversity or supplemental jurisdiction to pursue state claims in federal court, a district court properly looks to the law of the forum state to assess the plausibility of the claims.  *See Bank of N.Y. v. Amoco Oil Co.*, 35 F.3d 643, 650 (2d Cir. 1994); *Rogers v. Grimaldi*, 875 F.2d 994, 1002 n.10 (2d Cir. 1989).  This court does the same in reviewing *de novo* the dismissal of those claims under Rule 12(b)(6).  *See Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 467 (2d Cir. 2019).

To state a claim for defamation under Connecticut law, a party must plead facts plausibly demonstrating that,

> (1) the defendant published a defamatory statement;
> (2) the defamatory statement identified the plaintiff to
> a third person; (3) the defamatory statement was
> published to a third person; and (4) the plaintiff's
> reputation suffered injury as a result of the statement.

*Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004).

---

[15]  The district court appears to have held Khan's remaining claims against Yale and its employees in abeyance pending resolution of this appeal.

18

To state a claim for tortious interference with contract under Connecticut law, a party must plead facts plausibly demonstrating,

> (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct.

*Rioux v. Barry*, 283 Conn. 338, 351, 927 A.2d 304 (2007).

Essential to both Khan's defamation and tortious interference claims is his allegation that Doe falsely accused him of sexual assault at the 2018 UWC hearing. While Khan also pleads that Doe falsely accused him of the same sexual assault in 2015, her 2018 repetition of the accusation is necessary for Khan's claim of a continuous, timely tortious interference with his contract with Yale. Thus, on this appeal, we need only consider whether the district court correctly dismissed all of Khan's claims against Doe because her 2018 statements were shielded by the absolute immunity that Connecticut extends to statements made by witnesses or complainants during the course of quasi-judicial proceedings.

In urging error, Khan does not dispute that Connecticut affords absolute quasi-judicial immunity from damages actions sounding both in defamation and tortious interference. *See Rioux v. Barry*, 283 Conn. at 311, 927 A.2d 304 (distinguishing such torts from action for vexatious litigation for purposes of quasi-judicial immunity). Instead, he argues that quasi-judicial immunity does not apply to proceedings by non-government entities such as Yale.

19

In deciding *de novo* whether Connecticut extends quasi-judicial immunity to Yale's UWC proceeding, we give the "fullest weight to pronouncements of the state's highest court." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 120 (2d Cir. 2021) (internal quotation marks omitted). Because the Connecticut Supreme Court has not addressed the application of quasi-judicial immunity to participants in non-government proceedings, we must endeavor, in the first instance, to "predict" how that court would resolve these questions. *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005). Toward that end, we consider the highest court's decisions in related cases, as well as relevant decisions of the state's lower courts and of other jurisdictions. *See Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th at 120; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 449 (2d Cir. 2013). Only if, after doing so, we conclude that Connecticut law "is so uncertain that we can make no reasonable prediction" as to how it would apply in this case will we consider certifying determinative questions to the state Supreme Court "for a definitive resolution." *DiBella v. Hopkins*, 403 F.3d at 111; *see* Conn. Gen. Stat. § 51-199b; 2d Cir. R. 27.2. This is such a case.

## II.    Quasi-Judicial Immunity

### A. Common Law Origin

The doctrine of absolute judicial immunity is not unique to Connecticut. Rather, this immunity, which shields judges, parties, and witnesses from damages actions for statements made by them in judicial and quasi-judicial proceedings, has its origins in English common law. *See Briscoe v. LaHue*, 460 U.S. 325, 330-31 (1983) (tracing judicial immunity to sixteenth century). With respect to witnesses,

20

the immunity is grounded in a public policy concern that the risk of damages actions could discourage persons from providing evidence or cause them to shade their testimony, thereby impeding the judicial search for truth. *Id.* at 333. Absolute immunity removes this risk, with the law relying instead on the adversarial process to identify truth and expose falsehood. *Id.* at 333-34 (observing that, underlying absolute immunity afforded witnesses is view that "truth-finding process is better served if the witness's testimony is submitted to 'the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies'").[16]

## B. Connecticut Supreme Court Precedents

Consistent with common law, "Connecticut courts have long held that '[p]articipants in a judicial process must be able to testify . . . without being hampered by fear of actions seeking damages for statements made . . . in the course of the judicial proceeding.'" *Vidro v. United States*, 720 F.3d 148, 151 (2d Cir. 2013) (quoting *Gallo v. Barile*, 284 Conn. 459, 466, 935 A.2d 103 (2007)); *see Blakeslee & Sons v. Carroll*, 64 Conn. 223, 232, 29 A. 473 (1894) (recognizing privilege). But, as Connecticut courts themselves acknowledge, they have not always been clear as to "the extent of the

---

[16] The absolute immunity from damages afforded complainants or witnesses in judicial or quasi-judicial proceedings is sometimes also referred to as a "litigation privilege" or "testimonial privilege." *See, e.g., Cohen v. King*, 189 Conn. App. 85, 206 A.3d 188 (App. Ct. 2019) ("litigation privilege"); *Preston v. O'Rourke*, No. CV 990071011S, 2000 WL 1281825 (Conn. Super. Ct. Aug. 28, 2000) ("testimonial privilege"). We use the phrase "quasi-judicial immunity" because the matter here at issue is whether a Yale UWC proceeding is "quasi-judicial."

privilege, or . . . the occasions" to which it applies, particularly with respect to quasi-judicial proceedings. *Blakeslee & Sons v. Carroll*, 64 Conn. at 233, 29 A. 473. The ambiguity persists to this day. *See, e.g.*, *Kenneson v. Eggert*, 196 Conn. App. 773, 782, 230 A.3d 795 (App. Ct. 2020) ("The judicial proceeding to which absolute immunity attaches has not been defined very exactly." (internal alteration and quotation marks omitted)).

At the end of the nineteenth century, the Connecticut Supreme Court was cautious in recognizing quasi-judicial immunity, explaining that because "[t]he doctrine of absolute privilege is so inconsistent with the rule that a remedy should exist for every wrong," the class of proceedings to which it applied "is comparatively a narrow one, . . . generally strictly confined to legislative proceedings, judicial proceedings in the established courts of justice, acts of State, and acts done in the exercise of military and naval authority." *Blakeslee & Sons v. Carroll*, 64 Conn. at 232, 235, 29 A. 473. Thus, in *Blakeslee & Sons*, the Connecticut Supreme Court declined to recognize an investigative hearing by a committee of the New Haven board of aldermen as a "judicial or *quasi* judicial" proceeding, even though the committee had the power to issue subpoenas and administer oaths according to the same rules as Connecticut's judicial courts. *Id.* at 234-35, 29 A. 473 (emphasis in original). The court reasoned that the committee could in "no proper sense . . . be called a judicial body or its proceedings judicial" because its singular purpose and duty was to "investigate the truth of certain statements made to the board of aldermen" in order to "report to the board . . . which might altogether disregard what the committee had done." *Id.* at 234, 29 A. 473. It ruled that "[a] judicial proceeding

22

within the meaning of the rule as to absolute privilege must . . . be one carried on in a court of justice established or recognized by law, wherein the rights of the parties which are recognized and protected by law are involved and may be determined." *Id.*

For almost a century, the Connecticut Supreme Court cited *Blakeslee & Sons* as support for recognizing "an absolute privilege for statements made in judicial proceedings." *Petyan v. Ellis*, 200 Conn. 243, 245, 510 A.2d 1337 (1986). But in *Petyan*, a sharply divided Supreme Court was more receptive than it had been in *Blakeslee & Sons* to extending the privilege to quasi-judicial administrative proceedings. The proceeding at issue in *Petyan* was a State Labor Department unemployment eligibility hearing. In affording absolute immunity to an employer who did not testify at the hearing but whose statements on a department form were considered by the hearing panel, the Connecticut Supreme Court observed that "the proceedings of many administrative . . . boards and commissions" are properly recognized as quasi-judicial and, thus, warrant absolute immunity "so far as they have powers of discretion in applying the law to the facts which are regarded as judicial or quasi-judicial, in character." *Id.* at 246, 510 A.2d 1337 (internal quotation marks omitted).[17] The Court concluded that this power was evident in the Labor Department proceeding because, "[i]n the processing of unemployment compensation claims, the administrator, the referee and the employment security board of review decide the facts and

---

[17] *See Chadha v. Charlotte Hungerford Hosp.*, 272 Conn. 776, 793 n.21, 865 A.2d 1163 (2005) (identifying *Petyan v. Ellis* as "first case in which [the Connecticut Supreme Court] expressly recognized that, at common law, persons who make statements in connection with quasi-judicial proceedings are afforded absolute immunity").

then apply the appropriate law." *Id.* at 248, 510 A.2d 1337 (citing applicable statutes). In short, unlike the committee in *Blakeslee & Sons*, whose power was only investigative, the hearing panel in *Petyan* had adjudicative power in the application of particular laws to facts.

At the same time that the Connecticut Supreme Court's decision in *Petyan* appears liberally to apply quasi-judicial immunity to adjudicating administrative agencies, its focus on the *application of law to facts* might be understood to state a limiting principle, one that cabins absolute quasi-judicial immunity to proceedings before government entities charged with applying particular *laws*. In short, a host of private entities—employers, social organizations (even some criminal enterprises)—may conduct factfinding proceedings to adjudicate disputes, but insofar as they apply their *own rules*, rather than the *law*, to disputed facts, their proceedings would arguably not qualify as quasi-judicial under *Petyan*.[18]

This, however, does not permit us to predict that the Connecticut Supreme Court would *never* recognize a non-government proceeding as quasi-judicial. What about circumstances where a non-government entity conducts a hearing mandated by certain laws? Or a hearing in conformity with certain laws? To date, the Connecticut Supreme Court has not considered, much less answered, any of these questions.

---

[18] *Petyan* drew its language on this point from the leading torts treatise. *See id.* at 246, 510 A.2d 1337 (quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser & Keeton on Law of Torts § 114, at 818-19 (5th ed. 1984)). Nowhere does the treatise suggest that such immunity would apply to non-government proceedings.

To be sure, that court has stated that it defines "'judicial proceeding' . . . liberally to encompass much more than civil litigation or criminal trials." *Hopkins v. O'Connor*, 282 Conn. 821, 839, 925 A.2d 1030 (2007).[19]  But its extensions of quasi-judicial immunity after *Petyan* have all been in the context of administrative proceedings by *government* entities.  *See, e.g.*, *Kelley v. Bonney*, 221 Conn. 549, 606 A.2d 693 (1992) (extending quasi-judicial immunity to State Board of Education teaching certificate revocation proceeding); *Craig v. Stafford Const., Inc.*, 271 Conn. 78, 856 A.2d 372 (2004) (same re: Hartford Police Department internal affairs investigation).[20]  Indeed, in both *Kelley* and *Craig*, the court reiterated *Petyan*'s pronouncement that the proceedings of administrative entities can be quasi-judicial "so far as they have powers of discretion in applying the law to the facts."  *See*

---

[19] In *Hopkins*, the Connecticut Supreme Court ruled that an allegedly defamatory statement in a police report that was a required first step to a court commitment proceeding fell within the scope of a "judicial proceeding," but that a statute criminalizing *malicious* falsity in such reports signaled a legislative decision to afford only qualified immunity to such statements. 282 Conn. at 841-48, 925 A.2d 1030.

[20] The identified quasi-judicial proceeding in *Rioux v. Barry*, 283 Conn. 338, 927 A.2d 304, was also governmental: a police internal affairs investigation.  But at issue there was whether absolute immunity shielded against a vexatious litigation action.  The Connecticut Supreme Court ruled that only qualified immunity applied to such an action because the elements of a vexatious litigation tort provided a level of protection against chilling witness testimony lacking in the elements of defamation and intentional interference with contracts.  *See id.* at 347-51, 927 A.2d 304. Similarly, the proceeding at issue in *Chadha v. Charlotte Hungerford Hosp.*, 272 Conn. 776, 865 A.2d 1163, was governmental—a medical license suspension proceeding by the Connecticut Board of Health.  But there the Connecticut Supreme Court ruled that the state legislature had explicitly abrogated absolute quasi-judicial immunity in favor of qualified immunity for evidence given in such proceedings.  *Id.* at 789-90, 865 A.2d 1163 (citing Conn. Gen. Stat. §§ 19a-17b & 19a-20).

*Kelley v. Bonney*, 221 Conn. at 566, 606 A.2d 693; *accord Craig v. Stafford Const., Inc.*, 271 Conn. at 85, 856 A.2d 372.

In each case, the court then went on to identify factors that could "assist in determining whether a proceeding is quasi-judicial," specifically,

> whether the body has the power to: (1) exercise judgment and discretion; (2) hear and determine or . . . ascertain facts and decide; (3) make binding orders and judgments; (4) affect the personal property rights of private persons; (5) examine witnesses and hear the litigation of the issues on a hearing; and (6) enforce decisions or impose penalties.

*Craig v. Stafford Const., Inc.*, 271 Conn. at 85, 856 A.2d 372 (quoting *Kelley v. Bonney*, 221 Conn. at 567, 606 A.2d 693).[21] But these were "in addition" to, not in lieu of, the foundational law-to-fact requirement. *Id.* And, in each case, the court instructed "[f]urther" that it was "important to consider whether there is a sound public policy reason for permitting the complete freedom of expression that a grant of absolute immunity provides." *Id.* (quoting *Kelley v. Bonney*, 221 Conn. at 567, 606 A.2d 693).

We understand these three principles to instruct as follows: First, a quasi-judicial proceeding is one that applies law to facts. Second, even some proceedings applying law to facts might not be quasi-judicial where consideration of the additional six factors

---

[21] While an administrative body need not possess all six powers to be identified as quasi-judicial, "the more powers it possesses, the more likely the body is acting in a quasi-judicial manner." *Craig v. Stafford Const., Inc.*, 271 Conn. at 95, 856 A.2d 372 (internal quotation marks omitted).

indicates that the entity at issue does not exercise powers akin to a judicial entity. And third, a separate inquiry into public policy may show that, even where proceedings satisfy the initial law-to-fact and adjudicative powers requirements, the public interest sometimes may support absolute immunity, but sometimes may not. For example, in some circumstances, public policy may be adequately served by qualified immunity, which shields all but malicious or knowing falsehoods. *See infra* at 39-41 (discussing *Cleavinger v. Saxner*, 474 U.S. 193, 204-206 (1985) (affording federal officials presiding at prison disciplinary proceeding only qualified immunity), and *Rom v. Fairfield Univ.*, No. CV020391512S, 2006 WL 390448 (Conn. Super. Ct. Jan. 30, 2006) (affording qualified rather than absolute immunity to witnesses in private university disciplinary proceeding)); *see also Doe v. Roe*, 295 F. Supp. 3d 664, 676-77 (E.D. Va. 2018) (holding, under Virginia law, that weak procedural safeguards and absence of government involvement in private university misconduct hearing made qualified rather than absolute immunity "appropriate privilege to apply").

## III. Inability to Predict Connecticut's Application of Quasi-Judicial Immunity to this Case

### A. Connecticut Supreme Court Precedents Admit No Prediction

Applying these precedents to this case, we cannot predict whether Connecticut would recognize a Yale UWC hearing as quasi-judicial so as to afford Doe absolute immunity.

#### 1. The Law-to-Fact Requirement

In *Kelley*, the Connecticut Supreme Court found the initial law-to-fact requirement satisfied because the Board of Education there

27

was required to apply particular laws and regulations to its findings of fact in order to revoke a teaching certification. *See Kelley v. Bonney*, 221 Conn. at 567-68, 606 A.2d 693 (identifying relevant law and regulation). In *Craig*, the court found the requirement satisfied by the police department's obligation to apply its "official code of conduct" and "collective bargaining agreement" to facts found during an internal affairs investigation. *Craig v. Stafford Const., Inc.*, 271 Conn. at 86, 856 A.2d 372.[22] By contrast, a UWC hearing panel is charged with applying not a particular law but Yale's own Sexual Misconduct Policy in determining whether found facts demonstrate student sexual misconduct warranting discipline.[23]

But if this makes it difficult to predict that Connecticut would recognize a UWC hearing as quasi-judicial, it does not necessarily resolve the immunity question in Khan's favor. As Khan asserts, Yale's Sexual Misconduct Policy was formulated to conform to the requirements of Title IX—or, at least, DOE guidance as to the requirements of that law. And, as we have judicially noticed, by the time Khan's UWC hearing was held in 2018, Yale was also subject to Conn. Gen. Stat. § 10a-55m, which sets out certain requirements for campus sexual misconduct proceedings. Thus, assuming that the

---

[22] The collective bargaining agreement was statutorily governed by Connecticut's Municipal Employee Relations Act, Conn. Gen. Stat. §§ 7-467 *et seq.*

[23] This comports with subsequent 2020 regulations pertaining to Title IX, which required colleges and universities to issue written "[c]onclusions regarding the application of the *[school's] code of conduct* to the facts." 34 C.F.R. § 106.45(7)(ii)(D) (emphasis added). The parties point us to nothing in these regulations, or in laws or guidance in effect at the time of the 2018 UWC hearing, that required colleges and universities to apply *law* to facts in disciplining student sexual misconduct.

28

Connecticut Supreme Court does use a law-to-fact requirement at the first step in identifying quasi-judicial proceedings, a question arises as to how that court might view the mandates of these federal and state laws in deciding whether Yale's UWC proceedings satisfy that requirement. We cannot tell.

## 2. Judicial-Like Procedures

Indeed, our ability to predict an answer to that question is complicated by the fact that, in identifying certain government administrative proceedings as quasi-judicial in *Kelley* and *Craig*, the Connecticut Supreme Court not only reiterated *Petyan*'s law-to-fact requirement, but also highlighted the employment of certain procedures akin to those used in traditional judicial proceedings to "ensure . . . reliability." *Kelley v. Bonney*, 221 Conn. at 571, 606 A.2d 693. Specifically, in both the Board of Education and Police Department proceedings at issue in those cases, (1) either witnesses (in *Craig*) or the complainant (in *Kelley*) were required to be under oath; and (2) parties were permitted (a) to "be present throughout the hearing," (b) to "be represented by counsel," (c) "to call and cross-examine witnesses," and (d) "to present oral argument." *Id.* at 569-70, 606 A.2d 693; *see Craig v. Stafford Const., Inc.*, 271 Conn. at 87-88, 856 A.2d 372. To be sure, in *Petyan*, the Connecticut Supreme Court had held that the absence of an oath requirement was not fatal to identifying a proceeding as quasi-judicial. *See Petyan v. Ellis*, 200 Conn. at 251-52, 510 A.2d 1337.[24] And in *Kelley* and *Craig*, the court observed that non-public, even *ex parte*, proceedings can be "judicial."

---

[24] The employer in *Petyan* certified—but did not swear to—the truthfulness of his form responses. *See id.* at 250, 510 A.2d 1337.

29

*See Kelley v. Bonney*, 221 Conn. at 566, 606 A.2d 693; *accord Craig v. Stafford Const., Inc.*, 271 Conn. at 84-85, 856 A.2d 372.[25]  Nevertheless, the emphasis that *Kelley* and *Craig* place on traditional reliability-ensuring judicial procedures suggests that the more such procedures are employed in an administrative proceeding, the more likely it is to be identified as quasi-judicial.  *See also Hopkins v. O'Connor*, 282 Conn. at 831 & n.3, 925 A.2d 1030 (citing "significant procedural protections afforded in [court] commitment proceedings"—including rights to be present at hearing, to appointed counsel, and to cross-examination— in identifying such proceedings as "judicial" for purposes of immunity); *Vidro v. United States*, 720 F.3d at 152 (citing *Craig* in stating that whether statement is "taken under oath is . . . relevant to whether it deserves an absolute privilege").  Presumably, no lesser standard would apply to non-government proceedings.

By that standard, it is difficult to identify Khan's UWC hearing as quasi-judicial.  Nothing in the present record indicates that UWC hearing witnesses testify under oath—only that there can be adverse disciplinary consequences for failing to testify truthfully (though what those might be for persons such as Doe, who have graduated and left Yale, is not clear).  *See* App'x at 77.  What the record does show is that a person under investigation is specifically not permitted to be physically present throughout UWC hearings.  Rather, when a complainant is interviewed by the committee—even remotely by teleconference, as in Doe's case—the person under investigation is

---

[25]  The most obvious non-public, *ex parte* proceeding to which absolute judicial immunity applies is a grand jury proceeding.  *See Vidro v. United* States, 720 F.3d at 152.

excluded from the hearing room and provided with only an audio feed of the proceeding. *See id.* at 80. Moreover, cross-examination is expressly denied, and there appears to be no opportunity for closing argument. As for an attorney, a person may enlist counsel as his hearing advisor, but the attorney may not speak on the party's behalf, question witnesses, raise objections, or actively participate in ways generally associated with the idea of "representation" in judicial proceedings. *See id.* at 78. Moreover, to the extent these departures from traditional judicial proceedings were informed or sanctioned by DOE's 2011 "Dear Colleague Letter," the result appears to have been intentional. *See id.* at 90 (stating that "school's Title IX investigation" into sexual misconduct "is different from any law enforcement investigation").

Thus, even assuming the possibility of the Connecticut Supreme Court recognizing a non-government proceeding as quasi-judicial, at least when law is being applied to facts, it is difficult to predict whether that court would recognize Yale's UWC hearing as quasi-judicial in the absence of so many of the judicial reliability procedures emphasized in *Kelley* and *Craig*.

### 3. Additional Six Factors

The uncertainty identified at the law-to-fact step of analysis is not removed by the additional six factors that *Kelley* and *Craig* list as relevant to identifying quasi-judicial proceedings. The Connecticut Supreme Court has plainly stated that "a quasi-judicial body need not possess all six powers" referenced in these factors to be identified as quasi-judicial. *Craig v. Stafford Const., Inc.*, 271 Conn. at 94-95, 856 A.2d 372 (internal alteration and quotation marks omitted).

31

Nevertheless, because "the more [such] powers it possesses, the more likely the body is acting in a quasi-judicial manner," *id.* (internal quotation marks omitted), it is important for us to understand just how the Connecticut Supreme Court would apply those factors in the circumstances of this case.

As earlier noted, we understand the six factors enumerated in *Kelley* and *Craig* to apply *in addition* to an initial law-to-fact requirement. Thus, we assume the factors are properly considered in light of that requirement. In short, we understand the first two factors to ask whether a hearing entity has the power (1) to "exercise judgment and discretion" in applying *law to fact*, and (2) to "hear and determine or to ascertain facts and decide" how the *law* applies to those facts. *Kelley v. Bonney*, 221 Conn. at 567, 606 A.2d 693. If that understanding is, indeed, correct, we cannot weigh these two factors without first knowing whether the Connecticut Supreme Court would consider Yale to be applying law to facts in conducting a UWC hearing. If the court would so conclude, then these discretion and decision factors would weigh in favor of finding a UWC hearing a quasi-judicial proceeding. If the court would not so conclude, then these factors would weigh against such a finding. For reasons already stated, we cannot predict the Connecticut Supreme Court's conclusion on that preliminary question.

Similarly, as to the third, fourth, and sixth factors (whether the body has the power to "make binding orders and judgments," "affect the personal or property rights of private persons," and "enforce decisions or impose penalties"), it may be important to know how, if at all, the Connecticut Supreme Court understands Yale to be

applying law in a UWC proceeding.  *Compare Craig v. Stafford Const., Inc.*, 271 Conn. at 89, 856 A.2d 372 (identifying internal affairs inquiry as quasi-judicial proceeding because, *inter alia*, police chief could himself act on inquiry's recommendations), *with Preston v. O'Rourke*, 74 Conn. App. 301, 314, 811 A.2d 753 (App. Ct. 2002) (equating arbitration award to binding order and judgment because it could be converted to a *court* judgment).  Further, we cannot predict how the Connecticut Supreme Court would weigh the fifth factor (whether the body may "examine witnesses and hear the litigation of the issues on a hearing") without knowing whether, in light of *Kelley* and *Craig*, the court contemplates that "witnesses" in judicial and quasi-judicial proceedings will be under oath and/or subject to cross-examination, and that the "litigation of the issues on a hearing" will occur with persons under investigation being present throughout the hearing, represented by counsel who can speak on their behalf, and afforded some opportunity for a closing statement.  *See Kelley v. Bonney*, 221 Conn. at 567, 606 A.2d 693.

### 4.  Public Policy

Finally, as for public policy considerations, the Connecticut Supreme Court in *Kelley* appears to have assumed that—and, therefore, did not discuss why—the public interest in full and frank Board of Education inquiries into a teacher's misconduct toward students warranted absolute immunity.  *See id.* at 571, 606 A.2d 693.  In extending absolute immunity to police internal affairs investigations in *Craig*, however, the Connecticut Supreme Court offered a public policy rationale that seems to apply to both cases.  The court there first identified the public concern: because of "the costs and inconvenience associated with defending a defamation suit,"

33

without absolute immunity, "good faith criticism of governmental misconduct might be deterred by concerns about unwarranted litigation." *Craig v. Stafford Const., Inc.*, 271 Conn. at 95, 856 A.2d 372 (internal quotation marks omitted). It then reached its public policy conclusion: "the policy of encouraging citizen complaints against those people who wield extraordinary power within the community outweighs the need to protect the reputation of the [person] against whom the complaint is made." *Id.* at 96, 856 A.2d 372.

This reasoning is not clearly analogous to this case. *Craig*'s policy rationale for applying absolute quasi-judicial immunity focuses on the public interest in the reporting of "governmental misconduct" because of the "extraordinary power" government officials frequently wield within a community. *Id.* at 95-96, 856 A.2d 372. By contrast, Khan's alleged misconduct, as recounted by Doe at the UWC hearing, while undoubtedly serious, is not "governmental" misconduct. And, as an undergraduate, Khan hardly wielded "extraordinary power" within the Yale community akin to that of a government official. Thus, we cannot predict from the Connecticut Supreme Court's reasoning in *Craig* whether the court would think public policy warranted the extension of absolute quasi-judicial immunity to a non-government proceeding, such as Yale's UWC hearing.

At the same time, and for reasons already discussed, we recognize that Yale's UWC proceedings, at least in some respect, may be required by federal and state law. Just as this raises questions about whether the proceedings themselves might be deemed to apply law to fact, it also presents a possible distinct public policy rationale

34

for affording immunity to participants in such proceedings. But that hardly means the immunity would have to be absolute. Connecticut's public interest might be adequately served by affording qualified immunity. In short, these questions "require[ ] value judgments and important public policy choices" that the Connecticut Supreme Court is better situated to make than this court. *Penguin Grp. (USA) v. Am. Buddha*, 609 F.3d 30, 42 (2d Cir. 2010).

\*    \*    \*

For all these reasons, our review of the Connecticut Supreme Court's quasi-judicial immunity precedents does not permit us to predict whether that court would extend such absolute immunity to non-government proceedings generally or to Yale's UWC disciplinary proceeding specifically.

### B. Connecticut Lower Court Decisions Admit No Prediction

Just as we are not able to resolve that question by reference to Connecticut Supreme Court decisions, so also are we unable to do so by looking to decisions of Connecticut's lower courts. While the decisions of such courts are "not controlling," where, as here, "the highest court of the State has not spoken on the point," we may nevertheless give them "some weight" in identifying state law. *Commissioner v. Bosch's Est.*, 387 U.S. 456, 465 (1967).

### 1. Connecticut Appellate Court

Like the state Supreme Court, the Connecticut Appellate Court has extended quasi-judicial immunity to a variety of administrative proceedings. *See, e.g., Priore v. Haig*, 196 Conn. App. 675, 705, 230 A.3d

714 (App. Ct.) (identifying planning and zoning commission hearing as quasi-judicial), *cert. granted* 335 Conn. 955, 239 A.3d 317 (2020); *Cohen v. King*, 189 Conn. App. 85, 91, 206 A.3d 188 (App. Ct. 2019) (extending absolute quasi-judicial immunity to chief counsel in disciplinary proceeding conducted pursuant to Connecticut Judicial Branch Administrative Policy), *cert. denied* 336 Conn. 925, 246 A.3d 986 (2021); *Mercer v. Blanchette*, 133 Conn. App. 84, 93, 33 A.3d 889 (App. Ct. 2012) (extending absolute immunity to statements made by member of panel monitoring compliance with federal consent judgment); *Morgan v. Bubar*, 115 Conn. App. 603, 617-21, 975 A.2d 59 (App. Ct. 2009) (extending absolute immunity to witness in Department of Correction internal investigation); *Preston v. O'Rourke*, 74 Conn. App. at 312, 811 A.2d 753 (identifying as quasi-judicial arbitration proceeding conducted pursuant to state statute, which upheld dismissal of state prosecutor).  But the Appellate Court has never extended such immunity to a purely private proceeding.

In urging this court to do so here, Doe argues that *Preston* should be viewed as a run-of-the-mill employment arbitration, which the Appellate Court itself described as a "hybrid" public-private proceeding.  *Preston v. O'Rourke*, 74 Conn. App. at 314, 811 A.2d 753.  The reason this does not persuade is that the Appellate Court so described the case in *rejecting* a contention that the arbitration at issue was a purely private proceeding.  Indeed, the court emphasized both the public roles of the opposing parties as well as the specific state laws that governed their employment contract and that approved arbitration for disputes arising thereunder.  *Id.* at 313-15, 811 A.2d 753.

36

To be sure, in explaining its conclusion, the Connecticut Appellate Court made a general observation: "If witnesses in arbitration proceedings were not afforded the protection of absolute immunity, as in more formal judicial proceedings, arbitration no longer would be seen as a desirable alternative form of dispute resolution." *Id.* at 314, 811 A.2d 753. But even if this might lend some support to an argument that a private proceeding can be deemed "public" by virtue of playing a role in a larger statutory scheme, it is not enough to let us predict that the Connecticut Supreme Court would reach that conclusion with respect to a Yale UWC hearing insofar as that proceeding and the policy underlying it is informed by Title IX and Conn. Gen. Stat. § 10a-55m. Much less can we predict that the Connecticut Supreme Court would identify the Yale proceeding as quasi-judicial in the absence of many of the judicial-like procedures highlighted in *Kelley* and *Craig*.

Indeed, that hesitancy is reinforced by the Connecticut Appellate Court's repeated use of language in *Priore* implying a background assumption that quasi-judicial proceedings are conducted by *government* entities. *See Priore v. Haig*, 196 Conn. App. at 703, 230 A.3d 714 (identifying "public policy" as final consideration identified in *Kelley v. Bonney* for determining "whether a *government body*'s proceeding is quasi-judicial in nature" (emphasis added)); *id.* at n.12 (observing that quasi-judicial nature of proceeding determined "by assessing whether the *government body* conducting the proceeding has powers that are characteristic of a body acting in a quasi-judicial capacity" (emphasis added)); *id.* at 704, 230 A.3d 714 (stating that rationale for absolute quasi-judicial immunity "rests in the public policy that every citizen should have the unqualified right

37

to appeal to *governmental agencies* for redress without the fear of being called to answer in damages" (emphasis added) (quoting 50 Am. Jur. 2d, Libel and Slander § 283 (2017))).[26]

We recognize that such language is *dicta* in *Priore* and not found in other Connecticut court decisions. Thus, we cannot predict whether the Connecticut Supreme Court will adopt it, or assign it any weight, in its pending review of *Priore*. *See* 335 Conn. 955, 239 A.3d 317 (granting writ of *certiorari*). Nor can we predict whether, and how, the Connecticut Supreme Court might view *Priore*'s observation—this one seemingly favorable to Doe—that the absence of an oath requirement not only does not foreclose identifying a proceeding as quasi-judicial, *see supra* at 29-30 & n.24 (discussing *Petyan*), but also "does not weigh against" such a determination, *Priore v. Haig*, 196 Conn. App. at 702, 230 A.3d 714, a conclusion difficult to reconcile with *Kelley* and *Craig*.[27]

In sum, because the quasi-judicial immunity decisions of the Connecticut Appellate Court do not speak clearly and consistently on

---

[26] Other statements in this treatise also discuss quasi-judicial immunity in the context of government proceedings. *See* 50 Am. Jur. 2d, Libel and Slander § 283 (Jan. 2022 update) ("Moreover, a proceeding is quasi-judicial in nature . . . if it is conducted by a *governmental* executive officer, board, or commission that has the authority to hear and decide the matters coming before it or to redress the grievances of which it takes cognizance." (emphasis added)).

[27] We also cannot predict how the Connecticut Supreme Court will view *Priore*'s assertion that "statements . . . made during the proceeding [may] be entitled to absolute immunity as a matter of public policy," "regardless of whether [the] proceeding is quasi-judicial in nature." *Id.* at 703 n.12, 230 A.3d 714. The district court did not reach such a conclusion in identifying Yale's UWC proceeding as quasi-judicial, nor does Doe urge affirmance on that ground.

issues pertinent to the question of whether absolute immunity might extend to statements made at non-government proceedings generally or to Yale's UWC proceedings specifically, they do not allow us to predict how the Connecticut Supreme Court would rule on that matter.

### 2. Connecticut Superior Court

One Connecticut Superior Court decision bears mention, if only because of its factual similarity to this case. In *Rom v. Fairfield University*, 2006 WL 390448, a student suspended from the defendant private university after a disciplinary hearing sued two hearing witnesses for defamation. The Superior Court appears to have identified the disciplinary proceeding as quasi-judicial. *See id.* at *5. But there is reason to question whether that was, indeed, the court's ultimate conclusion because witnesses at a quasi-judicial proceeding are entitled to *absolute* immunity but, in *Rom*, the court afforded them only *qualified* immunity. *See id.* at *7.

The Superior Court quoted *Kelley* in observing that absolute quasi-judicial immunity could extend to administrative proceedings, "so far as [officers] have powers of discretion in applying the law to the facts." *Id.* at *2 (quoting *Kelley v. Bonney*, 221 Conn. at 566, 606 A.2d 693). But nowhere did the court in *Rom* identify what "law" defendant's disciplinary committee was applying in finding plaintiff impermissibly to have been in a women's restroom and to have torn down posters in a campus residence hall. Nor did the court anywhere discuss whether, and under what circumstances, a non-government proceeding could properly be identified as quasi-judicial. Instead, the Superior Court relied almost exclusively on *Cleavinger v. Saxner*, 474

U.S. 193, in extending only qualified immunity to the university disciplinary proceeding.

But that reliance itself raises doubt.  In *Cleavinger*, the United States Supreme Court ruled that members of a federal prison disciplinary committee were entitled only to qualified immunity, rather than to absolute immunity, because, although the committee performed "an adjudicatory function" of "some societal importance," its members and procedures "had no identification with the judicial process of the kind and depth that has occasioned absolute [judicial] immunity."  *Id.* at 203, 206.[28]  In short, *Cleavinger* specifically did not find the prison discipline proceeding there at issue to be quasi-judicial, much less did it rule that quasi-judicial proceedings sometimes warranted only qualified, rather than absolute, immunity to witnesses or judges.  Rather, *Cleavinger* signals that the absence of processes such as representation, confrontation, cross-examination, etc., cautions against recognizing even some adjudicatory functions as quasi-judicial.  *See id.* at 206.  While the Supreme Court was not applying Connecticut law in *Cleavinger*, its focus on process in

---

[28]   The Supreme Court observed that the prison committee heard testimony, received documentary evidence, evaluated credibility and weighed evidence, and rendered a decision on guilt or innocence.  *See id.* at 203.  But the committee's members were not independent or professional adjudicators; rather, they were employees of the same institution that had brought the charges at issue.  Meanwhile, charged prisoners were not afforded lawyers or independent non-staff representatives, had no right to compel or cross-examine witnesses, and no right to discovery.  The proceedings were conducted with no cognizable burden of proof and no verbatim transcript, and hearsay and self-serving information were received.  In such circumstances, the Supreme Court declined to identify a judicial or quasi-judicial proceeding warranting absolute immunity.  Instead, it ruled that the committee members were shielded by qualified immunity, a lesser protection, but one "not of small consequence."  *Id.* at 206.

identifying quasi-judicial proceedings is somewhat analogous to the concern with process expressed in the Connecticut Supreme Court's decisions in *Kelley* and *Craig*.

For all these reasons, we cannot predict from the single Superior Court decision in *Rom* that the Connecticut Supreme Court would extend absolute, or even qualified, immunity to non-government proceedings generally or to Yale's UWC disciplinary proceedings specifically.

### C. Precedent from Other Jurisdictions Admit No Prediction

Insofar as the parties point us to cases from other jurisdictions, these precedents are not binding. Nevertheless, we may consider them too in endeavoring to predict how the Connecticut Supreme Court would decide the immunity question presented by this appeal. *See Caronia v. Philip Morris USA, Inc.*, 715 F.3d at 449 (acknowledging this court's ability "to consider all of the resources to which the highest court of the state could look, including decisions in other jurisdictions on the same or analogous issues" (internal quotation marks omitted)); *see also Kelley v. Bonney*, 221 Conn. at 567, 606 A.2d 693 (drawing six-factor test from Illinois law). In fact, precedents from out of Connecticut do not speak with sufficient clarity or consistency to permit us to make such a prediction.

### 1. Federal Cases

Beginning with our sister circuits, we note that more than a half-century ago, the Fourth Circuit adopted a district court opinion ruling that, under South Carolina law, a private arbitration qualified as a quasi-judicial proceeding. *Corbin v. Wash. Fire & Marine Ins. Co.*,

41

398 F.2d 543, 544 (4th Cir. 1968).[29] The district court there reasoned that "unqualified privilege does not depend on the rigid requirement of a strictly legislative or judicial proceeding; its limits are fixed rather by considerations of public policy," which, in South Carolina, accorded arbitration proceedings a "favored" status. *Corbin v. Wash. Fire & Marine Ins. Co.*, 278 F. Supp. 393, 396 (D.S.C. 1968).

We cannot predict whether Connecticut would adopt this reasoning. As already discussed *supra* at 36-37, the Connecticut Appellate Court has recognized an arbitration proceeding involving a state prosecutor and his government employer as a quasi-judicial proceeding but, in doing so, has emphasized the disputing parties' government roles and the state laws that both informed their contractual relationship and authorized arbitration of their dispute. *See Preston v. O'Rourke*, 74 Conn. App. at 313-15, 811 A.2d 753. Further, while the Connecticut Supreme Court has identified public policy as an important factor in identifying a quasi-judicial proceeding, we cannot predict that it would rely on that ground alone, given its repeated reference to the application of *law* to facts and the emphasis it has placed on procedural safeguards akin to those afforded in traditional judicial proceedings. *See supra* at 28-31.

Certainly, these last two factors have informed other, more recent decisions by Courts of Appeals declining to identify non-government proceedings as quasi-judicial. In *Overall v. University of Pennsylvania*, 412 F.3d 492 (3d Cir. 2005), the Third Circuit—in an

---

[29]  We necessarily proceed cautiously in reviewing federal court decisions discussing quasi-judicial immunity, mindful that they apply state laws that may not take identical views of the privilege.

opinion authored by then-Judge Alito—ruled that a private university's faculty grievance proceeding was not quasi-judicial. The court observed that those grievance proceedings that Pennsylvania had identified as quasi-judicial had all involved either "a government entity or an ostensibly private entity operating pursuant to a state or federal statute." *Id.* at 497. Further, the court noted that "sound reasons" supported a "public-private distinction," in that public proceedings "typically involve basic procedural safeguards that may be lacking in private proceedings." *Id.* at 498 (noting that University of Pennsylvania grievance procedure at issue "did not require sworn testimony").

The Sixth Circuit recently echoed the first point in *Bose v. Bea*, 947 F.3d 983 (6th Cir. 2020). In declining to accord absolute immunity to allegedly defamatory statements made during a private college disciplinary proceeding, the court observed that, under Tennessee law, the rationale for absolute quasi-judicial immunity was "a strong benefit to the public, often tied to a statute or to powers which the Tennessee legislature had specifically granted to the tribunal at issue." *Id.* at 995.[30]

In *Cuba v. Plyant*, the Fifth Circuit, applying Texas law, was still more emphatic in declining to extend absolute immunity to private university disciplinary proceedings, observing that the school did

---

[30] In an earlier, unpublished order, the Sixth Circuit observed that the plaintiff had not disputed that, under Ohio law, absolute immunity shielded his accuser's statements during a private university disciplinary proceeding. *See Doe v. Univ. of Dayton*, 766 F. App'x 275, 290 (6th Cir. 2019). For that proposition, the court cited *Savoy v. Univ. of Akron*, 2014-Ohio-3043, 15 N.E.3d 430, at ¶ 20 n.3 (Ohio Ct. App. 2014), which involved a *public* university proceeding.

"not have any law enforcement or law interpreting authority." 814 F.3d 701, 717 (5th Cir. 2016) (emphasis deleted).

Here, we do not know, and cannot predict, whether the Connecticut Supreme Court would view Yale to have been "operating pursuant to" Title IX or Conn. Gen. Stat. § 10a-55m in conducting the UWC proceedings that resulted in Khan's expulsion. *See Overall v. Univ. of Penn.*, 412 F.3d at 497. Nor do we know whether or to what degree the Connecticut Supreme Court would view Yale's UWC proceeding obligations under those federal and state laws to involve the enforcement, interpretation, or even application of those laws. Much depends on how strictly the Connecticut Supreme Court might require a non-government entity to be applying law to facts for its proceedings to be deemed quasi-judicial. Much also depends on how the Connecticut Supreme Court weighs the absence of judicial-like procedures highlighted in *Kelley* and *Craig* from Yale's UWC proceedings.[31]

## 2. State Cases

A few cases from other states have extended absolute immunity to witnesses in private college disciplinary proceedings. While the extension of immunity in such circumstances might well influence the

---

[31] District court decisions cited by the parties similarly lack the clarity and consistency necessary to permit us to predict how the Connecticut Supreme Court would answer these questions. *Compare, e.g., Fogel v. Univ. of the Arts*, No. 18-cv-5137, 2019 WL 1384577, at *10 (E.D. Pa. Mar. 27, 2019) (holding, with no mention of *Overall*, that absolute judicial immunity shielded author of letter to private university accusing professor of sexual harassment), *with Doe v. Roe*, 295 F. Supp. 3d at 676-77 (citing due process deficiencies in private university's disciplinary proceedings in denying accuser's statements absolute immunity).

Connecticut Supreme Court, because the underlying facts and reasons for decision do not yield easy analogies to this case, we cannot predict that the ultimate conclusion would be to afford absolute immunity here.

For example, in *Constantine v. Teachers College*, a New York trial court ruled that a private college's faculty advisory committee proceedings were shielded by absolute immunity from an action for defamation because, under New York law, that committee's disciplinary actions were ultimately judicially reviewable in an Article 78 proceeding. 29 Misc. 3d 1214(A), at *8-9, 918 N.Y.S.2d 397 (N.Y. Sup. Ct. 2010) *aff'd* 93 A.D.3d 493, 940 N.Y.S.2d 75 (1st Dep't 2012). Because it is not evident—and the parties do not urge—that Connecticut courts might play any similar review role with respect to action taken at a Yale UWC proceeding, this New York case does not permit us to predict that the Connecticut Supreme Court would identify a comparable hybrid private/public process here.

No more helpful is *Razavi v. School of the Art Institute of Chicago*, 122 N.E.3d 361, 2018 (1st) 171409 (Ill. App. Ct. 2018), *dismissed*, 124 N.E.3d 475 (Ill. 2019). While the Illinois Appellate Court there ruled that absolute immunity shielded student sexual assault complaints against a faculty member in the course of the defendant private school's investigatory proceeding, its rationale was not that the proceeding was quasi-judicial. Indeed, the court concluded that it was not. *See* 122 N.E.3d at 373.[32] Rather, the court reasoned that the

---

[32] The court found it "unnecessary to address" whether the subsequent disciplinary proceeding, which appeared to be governed, at least indirectly, by

investigation was part of a "continuum" that started with a report of alleged criminal conduct to campus security officers, and plaintiff conceded that absolute immunity shielded reports of crime. *See id.* By contrast, here, the only question before the court is whether the UWC disciplinary proceeding itself is quasi-judicial. Doe does not assert, and the district court did not find, that, even if that proceeding was not quasi-judicial, there was some other basis for extending absolute immunity to Doe's statements at the proceeding.

Finally, in *Hartman v. Keri*, 883 N.E.2d 774 (Ind. 2008), the Indiana Supreme Court extended absolute immunity to a *public* university's proceeding for investigating sexual harassment complaints. In reaching that conclusion, the court noted that three states—Maryland, California, and New York—had extended absolute quasi-judicial immunity to participants in school disciplinary proceedings. *See id.* at 777. But the cases cited all also involved public entities. *See id.* Thus, *Hartman* does not permit us to predict that the Connecticut Supreme Court would extend quasi-judicial immunity to a private school.

Making that task still more difficult is the *Hartman* majority's dismissal of the lack of judicial-like procedures in the university process—there, the absence not only of an oath requirement, confrontation, or cross-examination, but also of any hearing. The court concluded that these circumstances might support a respondent's complaint against the university, but not the denial of absolute immunity to persons who made statements to the

---

federal law, was quasi-judicial. *See id.* at 375; *see also id.* at 369-71 (discussing Campus SaVE Act).

investigating officer.  *See id.* at 777-78 (observing that "ultimate issue focuses less on the particular process and more on the recognition of the institution's interest in assuring a proper educational environment").[33]  We cannot predict that the Connecticut Supreme Court would adopt this reasoning given its own emphasis on—if not requirement of—*some* judicial-like processes in various cases identifying quasi-judicial proceedings.  We also note that to the extent the Indiana Supreme Court identified a particular need for protection from suit in the educational setting because "the subject of the complaint—the educator—is in a position of authority over the student," *id.* at 778, that reasoning does not translate to this case where the complainant and respondent were both students.

*     *     *

In sum, after reviewing relevant decisions of Connecticut's Supreme Court and its lower courts, as well as decisions from other jurisdictions, we cannot predict whether the Connecticut Supreme Court would extend absolute quasi-judicial immunity either to non-government proceedings generally or to Yale's UWC proceedings as applied specifically in this case.

---

[33] *But see id.* at 780 (Rucker, *J.*, concurring in result) (observing that proceeding itself must be quasi-judicial for participants in it to be afforded immunity).

## IV.    Certification

Connecticut law, as well as this court's local rules, permit us to certify questions of Connecticut law to the state's Supreme Court.  *See* Conn. Gen. Stat. § 51-199b(d);[34] 2d Cir. R. 27.2.[35]

As earlier noted, we do not certify questions lightly.  "Because it is our job to predict how the forum state's highest court would decide the issues before us, we will not certify questions of law where sufficient precedents exist for us to make this determination."  *DiBella v. Hopkins*, 403 F.3d at 111 (quoting *Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363, 370 (2d Cir. 1999)).  For the reasons detailed, we cannot make that determination in this case.  The Connecticut Supreme Court has "not squarely addressed" the questions of (1) whether a non-government proceeding can ever be quasi-judicial; and (2) if so, whether a Yale UWC proceeding is quasi-judicial.  Moreover, decisions by that state's lower courts, as well as decisions of courts of other jurisdictions, also do not permit us to predict how the Connecticut Supreme Court would answer them.  *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d at 42 (identifying factors relevant to decision to certify).  Insofar as answers to these questions "require[ ] value judgments and important public policy choices," the Connecticut Supreme Court "is better situated . . . to make" these than

---

[34] "The Supreme Court may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state."  *Id.*

[35] "If state law permits, the court may certify a question of state law to that state's highest court.  When the court certifies a question, the court retains jurisdiction pending the state court's response to the certified question."  *Id.*

this court. *Id.* Finally, the fact that answers to the identified questions "will control the outcome of this case" further supports certification. *Id.*

Doe's arguments to the contrary do not persuade. First, Doe argues that there is no need for certification because when this court certified a judicial immunity question to the Connecticut Supreme Court in *Gross v. Rell*, 585 F.3d 72 (2d Cir. 2009), *certified question answered*, 304 Conn. 234, 40 A.3d 240 (2012), the Connecticut Supreme Court "could have easily held that quasi-judicial immunity does not apply to private entities but it did not," instead, analyzing whether the private nursing home in that case "was performing a judicial function." Appellee Br. at 17. Doe urges us to infer from this action the Connecticut Supreme Court's implicit rejection of a public/private distinction in the application of absolute quasi-judicial immunity. We do not think such an inference is warranted. The question in *Gross* was not whether some proceeding conducted by the nursing home was properly recognized as quasi-judicial so as to afford witnesses at the proceeding absolute immunity. Rather, it was whether the absolute immunity of an undeniably judicial entity, the Probate Court, extended to the private nursing home's care of a resident subject to a court-ordered conservancy. In concluding that it did not, the Connecticut Supreme Court stated that the nursing home "was neither executing the orders of the Probate Court nor performing a function comparable to that of the Probate Court when it admitted and cared for [the resident], but was merely following the instructions of the conservator and performing its ordinary function as a nursing home." *Gross v. Rell*, 304 Conn. at 274, 40 A.3d 240. Nothing in this

response indicates the Connecticut Supreme Court's views about the questions raised on this appeal.

Second, Doe cites various cases emphasizing that "certification is an exceptional procedure." *Ruzhinskaya v. HealthPort Techs.*, 942 F.3d 69, 73 (2d Cir. 2019) (internal quotation marks omitted). We have explained at some length why this case is exceptional: "[In]sufficient precedents exist for us to make" a prediction as to whether Connecticut law would extend quasi-judicial immunity to non-government proceedings generally, or to the Yale's UWC proceedings specifically; and answers to those questions require value judgments and important public policy choices that the Connecticut Supreme Court is better situated to make than this court. *DiBella v. Hopkins*, 403 F.3d at 111 (internal quotation marks omitted); *see also Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d at 42. As Doe acknowledges, the decision to certify is "discretionary," *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 156 (2d Cir. 2016), and, in the circumstances of this case, we think it appropriate to exercise that discretion in favor of certification.

Third, Doe argues that she has "a constitutionally-recognized interest in not being put back in state court through the process of certification, an interest which is entitled to significant weight in a federal court's decision whether to certify." Appellee Br. at 29 (quoting *Valls v. Allstate Ins. Co.*, 919 F.3d 739, 743 (2d Cir. 2019)). We do accord proper weight to Doe's interest, but find it outweighed by another interest, also grounded in the constitutional principle of federalism: a state's interest in pronouncing its own law, particularly in matters requiring value judgments and important public policy choices.

Fourth, Doe argues that the added delay, cost, and stress of further litigation in the Connecticut Supreme Court counsels against certification.  We do not ignore these concerns, which are present, to some extent, in any certification.  *See Ferreira v. City of Binghamton*, 975 F.3d 255, 291 (2d Cir. 2020).  Nevertheless, we think those concerns are outweighed here by the benefit of obtaining determinative answers from Connecticut's highest court on questions of state law implicating serious policy concerns about how broadly the state wishes to afford absolute quasi-judicial immunity.

## CONCLUSION

A review of absolute quasi-judicial immunity cases from the Supreme Court of Connecticut, the lower courts of that state, and other jurisdictions does not permit this court to predict whether Connecticut's highest court would conclude, as the district court here did, that such immunity shields defendant Doe from plaintiff Khan's claims for defamation and tortious interference with contract. Accordingly, we CERTIFY the following questions to the Connecticut Supreme Court:

1. Under Connecticut law, can a proceeding before a non-government entity ever be deemed quasi-judicial for purposes of affording absolute immunity to proceeding participants?

2. If the answer to the first question is "yes," what requirements must be satisfied for a non-government proceeding to be recognized as quasi-judicial?  Specifically,

   a. Must an entity apply controlling law, and not simply its own rules, to facts at issue in the proceeding?  *See Petyan v. Ellis*,

51

200 Conn. at 246, 510 A.2d 1337; *see also* W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser & Keeton on Law of Torts § 114, at 818-19 (5th ed. 1984).

b. How, if at all, do the "power" factors enumerated in *Kelley v. Bonney*, 221 Conn. at 567, 606 A.2d 693, and *Craig v. Stafford Construction, Inc.*, 271 Conn. at 85, 856 A.2d 372, apply to the identification of a non-government entity as quasi-judicial; and, if they do apply, are these factors "in addition" to, *id.*, or independent of, a preliminary law-to-fact requirement?

c. How, if at all, does public policy inform the identification of a non-government entity as quasi-judicial and, if it does, is this consideration in addition to, or independent of, a law-to-fact requirement and the enumerated *Kelley/Craig* factors?

d. How, if at all, do procedures usually associated with traditional judicial proceedings—such as notice and the opportunity to be heard; the ability to be physically present throughout a proceeding; an oath requirement; the ability to call, examine, confront, and cross-examine witnesses; the ability to be represented by counsel—inform the identification of a proceeding as quasi-judicial? *See Craig v. Stafford Const., Inc.*, 271 Conn. at 87-88, 856 A.2d 372; *Kelley v. Bonney*, 221 Conn. at 568-70, 606 A.2d 693.

3. If it is possible under Connecticut law to identify a non-government proceeding as quasi-judicial, then, in light of responses to the above questions, was the 2018 Yale University

UWC proceeding at issue on this appeal properly recognized as quasi-judicial?

4. If the answer to Question 3 is "yes," would Connecticut extend absolute quasi-judicial immunity to defendant Jane Doe for her statements in that UWC proceeding?

5. If the answer to Question 3 is "no," would Connecticut afford defendant Jane Doe qualified immunity or no immunity at all?

The Connecticut Supreme Court may answer these questions in whatever order it deems best to assist this court in understanding how Connecticut law applies to this case. Similarly, and to the same purpose, the Connecticut Supreme Court may modify or expand these certified questions or address any other issues of Connecticut law pertinent to this appeal.

This panel retains jurisdiction for the purpose of resolving this appeal once the Connecticut Supreme Court has responded to our certification.

It is, therefore, ORDERED that the Clerk of this Court transmit to the Clerk of the Connecticut Supreme Court a certificate, as set forth below, together with this opinion and a complete set of briefs, appendices, and the record filed in this case by the parties.

## CERTIFICATE

The foregoing is hereby certified to the Supreme Court of the State of Connecticut pursuant to Second Circuit Rule 27 and Conn. Gen. Stat. § 51-199b.

A True Copy
Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

53