## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SAIFULLAH KHAN | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:19-cv-01966-KAD |
| | : | |
| V. | : | |
| | : | |
| YALE UNIVERSITY, ET AL., | : | |
| Defendants. | : | MARCH 19, 2025 |

## <u>MOTION TO COMPEL</u>

Plaintiff Saifullah Khan moves to compel Yale University to produce critical discovery that directly impacts his claims of gender bias and procedural unfairness in Yale's sexual misconduct proceedings. Despite four years of litigation, Yale has failed to produce essential investigative and adjudicative materials related to the allegations against him, comparative disciplinary records, and communications among key decision-makers. Yale's search methodology is fundamentally deficient—using inadequate custodians, restrictive search terms, and artificial date limitations—resulting in productions consisting mainly of documents already possessed. This stands in stark contrast to Khan's production of over 50,000 pages of documents to Defendants. We request an order compelling Yale's full compliance with proper search parameters and attorney's fees incurred in bringing this motion after extensive good-faith efforts to resolve these issues.

## I.    <u>CONCISE STATEMENT OF THE NATURE OF THE CASE</u>

Seven years ago, March 7, 2018, Plaintiff was found Not Guilty by a jury of his peers after he and fellow Yale student Jane Doe testified regarding her false allegation that he raped her. But after the jury returned its verdict in a court of law, Yale University returned its own verdict in a proceeding that lacked fundamental fairness, finding him guilty without due process. The gravamen of Plaintiff's complaint is that Yale's failure to provide him with a fair

disciplinary process in investigating and adjudicating Jane Doe's false allegation resulted in his improper suspension and ultimate expulsion from the University. Plaintiff therefore brings this action against Defendant Yale University alleging violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., as well as various state law claims including breach of contract, breach of the implied warranty of fair dealing, negligent and intentional infliction of emotional distress, and invasion of privacy.

Plaintiff's Title IX claim asserts that amid criticism of Yale's handling of sexual misconduct complaints, and pressure for the University to react more forcefully to allegations against male students, Yale took adverse action against Plaintiff, a male student, in response to Doe, a female student's sexual misconduct allegations by subjecting him to a clearly irregular investigative and adjudicative process. The alleged procedural deficiencies include Yale's failure to provide Plaintiff with adequate notice and opportunity to be heard prior to imposing interim suspensions, denial of Plaintiff's right to confront his accuser and to have effective assistance of counsel during the disciplinary proceedings, and Yale's failure to create an adequate record for appeal. Plaintiff maintains that these procedural irregularities, coupled with the pressure on Yale to aggressively pursue male students accused of sexual misconduct, give rise to the reasonable inference that Yale's actions were motivated by Plaintiff's gender and demonstrate sex discrimination in violation of Title IX.

Plaintiff's common law claims arise out of defects in Yale's disciplinary processes. Specifically, Plaintiff alleges that Yale's failure to adhere to its own policies and procedures governing sexual misconduct proceedings constitutes a breach of its contractual obligations to Plaintiff. Plaintiff further alleges that Yale's publication of confidential information regarding the allegations and proceedings to student newspapers and other media outlets constitutes invasion

of privacy. Finally, Plaintiff asserts that Yale's arbitrary imposition of interim suspensions and ultimate expulsion of Plaintiff constitutes negligent or intentional infliction of emotional distress.

Defendant Yale denies any wrongdoing and maintains that Plaintiff was afforded a disciplinary process that fully complied with Title IX and Yale's own procedures. Yale asserts Plaintiff's state law claims are preempted by Title IX. Yale further contends that Plaintiff's own disclosure of confidential information in violation of Yale policies precludes him from seeking equitable relief under the doctrine of unclean hands.

This case has an extensive procedural history before this Court. The Court has entered a Protective Order governing Plaintiff's access to certain sensitive discovery materials (ECF No. 198) and has ruled on several discovery motions, setting forth deadlines and protocols for the parties' document productions, privilege logs, interrogatory responses and expert disclosures (see e.g. ECF Nos. 225, 242, 253, 262, 267, 275). Recently, on January 29, 2025, the Court denied Defendants' motions seeking dismissal of Plaintiff's complaint (ECF No. 265).

## II.    SPECIFIC VERBATIM LISTING OF THE ITEMS OF DISCOVERY SOUGHT AND THE REASONS WHY EACH ITEM SHOULD BE ALLOWED

Pursuant to Local Rule 37(b)(1), Plaintiff provides the following specific verbatim listing of the items of discovery sought, along with the reasons why each such request should be allowed:

*Category 1:    Documents Related to the UWC Proceedings Against the Plaintiff*

**Request No. 1 (2020 Request):**

**Request:** "Provide copies of all documents (paper or electronic) created by and/or memorializing the proceedings of the University-Wide Council (UWC) or any other activities of the University

which caused the plaintiff to be removed from Yale and to have his student status revoked."

**Reason to Allow:** These documents are directly relevant to Plaintiff's Title IX due process and breach of contract claims, as they contain evidence of Yale's disciplinary process and whether it complied with its own policies. Plaintiff alleges that Yale's process was biased and procedurally flawed, and these materials will provide direct evidence.

**Request No. 2 (2020 Request):**

**Request:** "Provide copies of all documents (paper or electronic) created by and/or stored by any employees of Yale University when they met personally in groups of two or more to address, discuss, or otherwise deliberate about or take action regarding the claims made by 'Jane Doe' against Saifullah Khan (as referenced in Interrogatory #3, above)."

**Reason to Allow:** Yale's handling of Jane Doe's complaint is central to Plaintiff's claims that the process was unfairly biased and pre-determined. Internal discussions and decision-making documents are necessary to establish whether Yale employees improperly influenced the proceedings.

**Request No. 3 (2020 Request):**

**Request:** "Provide copies of any and all documents (paper or electronic) created by and/or in the possession of any of the defendants relating to or mentioning the claims of 'Jane Doe' against the plaintiff and/or any actions taken or contemplated by the UWC resulting from those claims."

**Reason to Allow:** These documents are highly relevant to Yale's Title IX and breach of contract liability, as they contain internal records that could establish bias, procedural defects, and failure to follow policies.

**Request No. 4 (2020 Request):**

**Request:** "Provide copies of all records (paper or electronic) of any proceedings of the

University-Wide Council (UWC), or any meetings or e-mail exchanges between or among the UWC members and/or any other defendant regarding the claims of 'Jane Doe' and/or any activities of the University which caused the plaintiff to be removed from Yale and to have his student status revoked."

**Reason to Allow:** Communications among UWC members and other Yale officials regarding Jane Doe's allegations are central to Plaintiff's claims of bias and improper influence in the UWC proceedings.

**Request No. 5 (2020 Request):**

**Request:** "Provide copies of all files in the University's possession regarding Saifullah Khan, including but not limited to documents, correspondence, meeting minutes, e-mail exchanges, notes of interviews, financial aid records, letters and/or any written materials obtained by you or your attorneys from any person in which plaintiff is discussed or mentioned."

**Reason to Allow:** Plaintiff's student records are central to his breach of contract and damages claims, including documentation of Yale's contractual obligations, academic status, and financial aid records.

**Request No. 6 (2020 Request):**

**Request:** "Provide copies of all recordings, minutes, notes or other documents generated by or memorializing any UWC proceedings as referenced in Interrogatory #7, above."

**Reason to Allow:** Interrogatory #7 requested information regarding the hiring and training standards for Title IX Coordinators. Documents related to these standards are essential to determine whether those responsible for handling Plaintiff's case were properly trained and whether procedural safeguards were followed.

**Request No. 55 (2024 Request):**

**Request:** "A copy of Jane Doe's UWC complaint that was heard in November 2018."

**Reason to Allow:** Plaintiff must have access to the exact allegations made against him to evaluate Yale's response and procedural fairness.

**Request No. 56 (2024 Request):**

**Request:** "A copy of all documents provided to members of the UWC panel that heard Jane Doe's complaint in November 2018 in preparation for the hearing in November 2018."

**Reason to Allow:** Yale claims it provided a fair hearing, but the materials available to the UWC panel are critical in assessing whether it was biased or procedurally improper.

**Request No. 57 (2024 Request):**

**Request:** "All documents that you contend demonstrate or otherwise show that the Plaintiff was afforded due process at the November 2018 UWC hearing."

**Reason to Allow:** Yale asserts it followed proper procedures—this request demands documentary proof of that claim.

**Request No. 58 (2024 Request):**

**Request:** "Any notes taken by any member of the UWC during the November 2018 hearing."

**Reason to Allow:** These notes are highly relevant to evaluating whether the panel engaged in bias, prejudged the case, or had improper influences during deliberations.

**Request No. 59 (2024 Request):**

**Request:** "Any minutes or other documents that portray or otherwise memorialize the conduct of the UWC hearing in November 2018."

**Reason to Allow:** There is no official transcript or recording of the hearing, so this is the only way to assess whether Plaintiff was afforded a fair process.

*Category 2:    Comparators - Yale's Handling of Other Sexual Misconduct Cases*

**Request No. 7 (2024 Request):**

**Request:** "For each complaint of sexual misconduct at Yale University from January 1, 2015 to the present that did not result in a student's emergency suspension or that did not result in a student's expulsion, please state:

a. The date(s) of the reported sexual misconduct;

b. The gender of the complainant and the respondent;

c. The disposition of the complaint, including any sanctions levied against the respondent (i.e., suspension, expulsion, dismissal, etc.), and the date of the disposition;

d. The date(s) of any emergency suspension(s) issued against the respondent; and

e. All facts that you contend justify why, if the disposition was less than expulsion or involved no emergency suspension, the respondent was treated more favorably than the Plaintiff in this matter."

**Reason to Allow:** Plaintiff alleges selective enforcement under Title IX and must show Yale treated similarly situated students differently. Yale has put its disciplinary decisions at issue and must produce comparator evidence.

**Request No. 8 (2024 Request):**

**Request:** "For each complaint of sexual misconduct at Yale University from January 1, 2015 to the present that did result in a student's emergency suspension or that did result in a student's expulsion, please state:

a. The date(s) of the reported sexual misconduct;

b. The gender of the complainant and the respondent;

c. The disposition of the complaint, including any sanctions levied against the respondent (i.e., suspension, expulsion, dismissal, etc.), and the date of the disposition;

d. The date(s) of any emergency suspension(s) issued against the respondent; and

e. All facts that you contend justified the emergency suspension(s) or expulsion."

**Reason to Allow**: These records will demonstrate any disparate treatment between Plaintiff and similarly accused students, which is central to Plaintiff's Title IX claims.

**Request No. 67 (2024 Request):**

**Request:** "All documents and communications referring to the number and nature of all sexual misconduct allegations reported to Yale University from January 1, 2015 to the present."

**Reason to Allow:** Plaintiff's selective enforcement and gender bias claims require statistical data showing Yale's patterns in handling sexual misconduct complaints.

**Request No. 68 (2024 Request):**

**Request: "**For the reports identified in response to request #67, all documents and communications referring to the number of cases adjudicated by the UWC and the date(s) of all such adjudications."

**Reason to Allow:** This data is needed to compare how long other cases took to be adjudicated versus how long Yale delayed Plaintiff's hearing.

**Request No. 69 (2024 Request):**

**Request:** "For the reports identified in response to request #67, all documents and communications referring to the number of students found responsible and the types of sanctions levied in each year from January 1, 2015 to the present."

**Reason to Allow:** Plaintiff must show Yale treated him more harshly than other accused students to establish disparate treatment under Title IX.

**Request No. 70 (2024 Request):**

**Request:** "For the reports identified in response to request #67, all documents and communications referring to the gender of the complainant and respondent in each year from January 1, 2015 to the present."

**Reason to Allow:** Establishing whether Yale treated male respondents differently than female respondents is key to proving Title IX gender bias.

*Category 3:    Communications Between Yale and External Entities*

**Request No. 12 (2024 Request):**

**Request:** "All communications between Yale University Police Department, Yale University employees, the New Haven Police Department, and the State's Attorney's Office, from November 1, 2015 to November 9, 2015, concerning Saifullah Khan or any allegation related to Saifullah Khan."

**Reason to Allow:** Yale's collaboration with law enforcement in Plaintiff's case is relevant to whether it improperly influenced his criminal prosecution or disciplinary process.

**Request No. 16 (2024 Request):**

**Request:** "All communications with the United States Center for Immigration Services regarding Saifullah Khan from 2012 to the present."

**Reason to Allow:** Plaintiff's immigration status was directly impacted by Yale's actions, particularly his suspension and expulsion.

**Request No. 17 (2024 Request):**

**Request:** "All communications with the SEVIS - Student and Exchange Visitor Program - regarding Saifullah Khan from 2012 to the present."

**Reason to Allow:** These records will show whether Yale took actions that jeopardized Plaintiff's student visa status, which is relevant to damages and potential retaliation claims.

**Request No. 20 (2024 Request):**

**Request:** "All correspondence between members of the Yale Daily News and employees of Yale University during 2015 through the present."

**Reason to Allow:** Plaintiff alleges improper leaks of confidential disciplinary information to the press, which supports his privacy, Title IX, and defamation claims.

**Request No. 19 (2024 Request):**

**Request:** "All petitions, letters, or other written communications, correspondence, or documents protesting Saifullah Khan's readmission to Yale University during 2018."

**Reason to Allow:** Plaintiff alleges external pressure from students and faculty led to Yale's refusal to reinstate him fairly. These materials will show whether Yale was improperly influenced by outside voices rather than following due process.

**Request No. 21 (2024 Request):**

**Request:** "All written communications from Saifullah Khan to any of your agents or employees during 2017, 2018, and 2019."

**Reason to Allow:** Plaintiff's communications with Yale document his efforts to be reinstated and Yale's responses (or lack thereof).

**Request No. 22 (2024 Request):**

**Request:** "All written communications from any of your agents or employees to Saifullah Khan in 2017 and 2018."

**Reason to Allow:** Plaintiff must have access to communications that discuss his academic standing, housing, readmission, and disciplinary status.

**Request No. 24 (2024 Request):**

**Request:** "All records of Jane Doe's counseling at The Yale Women's Center."

**Reason to Allow:** Plaintiff asserts Jane Doe's complaint was influenced by counseling staff who encouraged her to pursue the allegations. These records will shed light on the credibility and motivation behind Jane Doe's claims.

**Request No. 25 (2024 Request):**

**Request:** "All records of any kind relating to the meeting between Jane Doe and David Post referred to in your response to Paragraph 46 of the complaint."

**Reason to Allow:** Plaintiff alleges David Post played a role in Jane Doe's formal complaint against him. These records are necessary to evaluate whether Jane Doe was encouraged to make allegations for improper reasons.

**Request No. 63 (2024 Request):**

**Request**: "Any joint defense agreement between Yale University, or any of its agents or employees, and the Jane Doe defendant in this matter."

**Reason to Allow:** A joint defense agreement (sometimes called a "common interest agreement") would show whether Yale and Jane Doe are coordinating their litigation strategies and sharing

privileged materials in a manner that could bear on Plaintiff's Title IX and due process claims. The existence and scope of any such agreement is relevant to whether these Defendants' interests and defenses are truly independent or whether they are acting in concert. The fact of a joint defense agreement is not itself privileged, even if communications exchanged under that agreement may be. Therefore, Plaintiff is entitled to discover whether such an agreement exists, and if so, the terms that define the nature and extent of Defendants' common defense.

**Request No. 81 (2024 Request):**

**Request:** "All documents transmitted by any agent or employee of Yale University, including counsel, to the Connecticut Superior Court, Judicial District of New Haven, Honorable Judge Jon C. Blue, during 2015-2018."

**Reason to Allow:** Plaintiff's disciplinary and criminal cases overlapped, and Yale's communications with the court may reveal improper influence on the criminal proceedings.

**Request No. 82 (2024 Request):**

**Request:** "All documents transmitted by any agent or employee of Yale University, including counsel, to the New Haven State's Attorney's Office, during 2015-2018."

**Reason to Allow:** Yale's cooperation with prosecutors could show coordination in Plaintiff's criminal prosecution, which is relevant to Plaintiff's claims of unfair treatment and retaliatory discipline.

*Category 4:    Procedural Deficiencies in UWC Process*

**Request No. 31 (2024 Request):**

**Request:** "All documents of any kind concerning the October 5, 2018 visit by Yale University Police to Saifullah Khan."

**Reason to Allow:** Yale claimed Plaintiff posed a risk, leading to his October 7, 2018 emergency suspension—this request seeks documents to determine whether that claim was pretextual.

**Request No. 36 (2024 Request):**

**Request:** "All documents that relate to your determination on October 7, 2018, that emergency suspension was necessary for Saifullah Khan on that date."

**Reason to Allow:** Yale's stated justification for suspending Plaintiff must be scrutinized, particularly given the timing and lack of due process. Plaintiff was suspended without due process, and these documents are necessary to assess whether Yale followed its own emergency suspension procedures.

**Request No. 38 (2024 Request):**

**Request:** "All documents that you contend contain credible evidence that permitting Saifullah Khan to attend classes as of October 7, 2018, posed a threat of harm to Mr. Khan or to anyone affiliated with Yale University."

**Reason to Allow:** Yale's stated justification for removing Plaintiff from campus must be examined, particularly given the lack of evidence supporting such a decision.

**Request No. 39 (2024 Request):**

**Request:** "All documents that you contend contain reasons to suspect that Saifullah Khan was a danger to himself or others as of October 7, 2018."

**Reason to Allow:** Yale's safety justification for Plaintiff's removal is a key part of their defense. If they lack evidence, their actions may be deemed arbitrary and retaliatory.

*Category 5:    Plaintiff's Academic and Financial Records*

**Request No. 13 (2020 Request):**

**Request:** "Provide copies of all records documenting each and every financial transaction between the University and Saifullah Khan, including but not limited to: invoices, account statements, correspondence regarding financial transactions between the University and Mr. Khan, all bills, any statements of amounts due, any notices, announcements of residential assignments, any records of discussions as to Mr. Khan's financial obligations to the University and as to financial aid to Mr. Khan from any source."

**Reason to Allow:** Plaintiff's financial aid, tuition payments, and housing records are relevant to his breach of contract and damages claims. These documents also show Yale's handling of his student status before and after his suspension and expulsion.

**Request No. 78 (2024 Request):**

**Request:** "Plaintiff's academic transcript."

**Reason to Allow:** Plaintiff's academic status and credits are directly relevant to determining lost educational opportunities and damages due to his wrongful expulsion.

**Request No. 79 (2024 Request):**

**Request:** "All documents that refer to any tuition or other fees paid by the Plaintiff to Yale University."

**Reason to Allow:** Tuition and fee records are directly relevant to Plaintiff's damages claims and Yale's contractual obligations.

**Request No. 80 (2024 Request):**

**Request:** "All documents concerning the financial aid provided to the Plaintiff by Yale

14

University."

**Reason to Allow:** Yale's financial aid obligations form part of the contract between the University and Plaintiff, and this request seeks evidence regarding financial harm caused by his removal.

*Category 6: Yale's Sexual Misconduct Policies & Training*

**Request No. 64 (2024 Request):**

**Request:** "Documents evidencing the training of the following individuals regarding the handling of complaints of sexual misconduct and compliance with Title IX, from 2015 to the present:

- Peter Salovey
- Jonathan Halloway
- Marvin Chun
- Joe Gordon
- David Post
- Mark Solomon
- Ann Kuhlman
- Lynn Cooley
- Paul Genecin
- Stephanie Spangler
- Sarah Demers
- Anjelica Perez
- Etienne Greenlee
- Amy Justice
- Carole Goldberg
- Jasmina Beserivic
- Margaret Clark
- Detective Paul Sires
- Sgt. Marnie Robbins-Hoffman
- Detective Lori Feola
- Detective Jennifer Herten
- Detective Christopher Cofrancesco
- Brian Donnelly (retired)"

**Reason to Allow:** Plaintiff has alleged deficiencies in Yale's handling of Title IX complaints, including improper training and bias by decision-makers. This request seeks evidence of whether those responsible for Plaintiff's case were properly trained.

**Request No. 65 (2024 Request):**

**Request:** "Your current training materials regarding the handling of complaints of sexual misconduct and compliance with Title IX."

**Reason to Allow:** Yale's policies and training materials are necessary to determine whether officials followed proper Title IX procedures and whether the University enforces policies fairly.

**Request No. 75 (2024 Request):**

**Request:** "All documents and communications that were relied upon by Yale University in drafting its sexual misconduct policies from January 1, 2015 to the present."

**Reason to Allow:** Plaintiff's Title IX claims challenge the fairness of Yale's policies. This request seeks the underlying justifications Yale used in crafting its policies, which may reveal bias or improper enforcement practices.

**Request No. 76 (2024 Request):**

**Request:** "All Title IX training materials used to instruct Yale University faculty members, staff, and other employees from January 1, 2015 to the present."

**Reason to Allow:** These materials show Yale's official policies and expectations regarding handling sexual misconduct cases and will help determine whether Yale followed its own standards in Plaintiff's case.

*Category 7: Yale's Security & Crime Reporting Practices*

**Request No. 66 (2024 Request):**

**Request:** "Yale University's Daily Crime Logs, if any, for October 31, November 1, and November 2, 2015."

**Reason to Allow:** These records are important for verifying reports of Plaintiff's alleged misconduct and Yale's handling of related complaints.

**Request No. 74 (2024 Request):**

**Request:** "All annual security reports containing campus crime statistics for Yale University pursuant to the Jeanne Clery Act, from January 1, 2012 to the present."

**Reason to Allow:** Clery Act reports contain valuable data on how Yale records and responds to sexual misconduct allegations, which is relevant to Plaintiff's claims that Yale handled his case differently than other misconduct cases.

### III.    <u>HISTORY OF DISCOVERY DISPUTE</u>

The discovery history in this case demonstrates a consistent pattern of delay and minimal compliance by Yale University spanning more than four years. Plaintiff has diligently pursued discovery while Yale has repeatedly resisted producing core documents central to Plaintiff's claims. On June 15, 2020, Plaintiff served his initial discovery requests. Yale's response on October 22, 2020, consisted of approximately 400 pages of documents—virtually all of which were publicly available materials or non-substantive records. Critically absent were:

- Internal communications regarding Jane Doe's complaint

- UWC investigative materials

- Documentation of deliberations by decision-makers

- Records of comparator cases

For the next four years, Yale produced no additional internal documents responsive to Plaintiff's core requests despite repeated follow-up inquiries.

In stark contrast to Yale's resistance, Plaintiff has demonstrated exceptional transparency and cooperation. Since February 2024, Plaintiff has produced over 50,000 pages of documents, responded to supplemental requests, and provided authorizations for Yale to independently obtain additional records.

From June to September 2024, Plaintiff engaged in extensive meet-and-confer efforts regarding ESI production. On September 25, 2024, Plaintiff's counsel believed an agreement had been reached whereby Yale would undertake a reasonable ESI search with an extended discovery timeline to accommodate follow-up requests. However, Yale subsequently reneged on this understanding, as evidenced by Attorney Weller's October 21, 2024 communication refusing to modify the scheduling order and unilaterally deciding upon certain terms for an ESI search. Yale unilaterally agreed to search records from 16 custodians, imposing severe limitations on the ESI search that undermined its effectiveness, such as using only "Khan" and limited variations as search terms, applying artificially restricted date ranges, and excluding key decision-makers and participants.

On November 26, 2024—more than four years after Plaintiff's initial requests—Yale made a limited production of 3,445 pages, approximately 80% of which (2,756 pages) consisted of trial transcripts that Plaintiff already possessed. On December 12, 2024, Yale produced approximately 200 pages of notes from UWC proceedings without explanation for the lengthy delay in producing these clearly responsive documents. Yale's subsequent productions on January 6, 2025 (200 pages) and January 10, 2025 (4,079 pages, of which 2,331 were duplicative

documents already produced by Plaintiff) continued this pattern of minimal compliance. Ten percent of the January 10 production was marked "not for plaintiff's eyes" despite the existence of a protective order. Final productions on January 21 (266 pages) and January 23 (1,327 pages) completed Yale's production, which remains minimal at less than 10,000 pages, and less than 20% of the amount of pages of materials produced by the Plaintiff alone.

Throughout this process, Plaintiff has repeatedly attempted to resolve these disputes through good-faith negotiations, including:

1. Multiple meet-and-confer sessions to narrow disputed issues

2. Proposed compromises on search terms and custodians

3. Reasonable accommodation of Yale's scheduling concerns

4. Consent to protective measures for sensitive information

These efforts have been met with resistance, artificial limitations, and production of largely irrelevant or duplicative materials while core responsive documents remain withheld. Typically, each meet and confer really requires two meet and confers, as Yale has not been able to bind its client at any meet and confer on any issue, always requiring a follow up with the client after each meet and confer with the Plaintiff, essentially doubling the cost of discovery compliance in hours and effort. Despite the necessity of a client representative at a meet and confer to agree to anything, no client representative is ever brought to a meet and confer. The Court has provided clear directives regarding discovery, including orders dated December 18, 2024 (ECF No. 253) and January 23, 2025 (ECF No. 262). Yale's limited compliance with these orders further demonstrates the necessity for Court intervention to ensure Plaintiff receives the discovery to which he is entitled.

### III.    <u>LEGAL STANDARD</u>

"Where a party 'fails to produce documents . . . as requested,' Federal Rule of Civil Procedure 37 permits '[the] party seeking discovery . . . [to] move for an order compelling an answer, designation, production or inspection.'" *In re Aggrenox Antitrust Litig.*, 2017 U.S. Dist. LEXIS 196151, 2017 WL 5885664, at *1 (D. Conn. Nov. 29, 2017) (quoting Fed. R. Civ. P. 37(a)(3)(B)); *see also Scott v. Arex, Inc.*, 124 F.R.D. 39, 40 (D. Conn. 1989). *Baltas v. Hardy*, No. 3:23-CV-930 (VAB), 2024 U.S. Dist. LEXIS 194830, at *3 (D. Conn. Oct. 25, 2024).

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides for a broad scope of discovery in federal litigation. "Discovery under the Federal Rules of Civil Procedure is a conditional and carefully circumscribed process." *Bagley v. Yale Univ.*, 315 F.R.D. 131, 144 (D. Conn. 2016), as amended (June 15, 2016). The party seeking the discovery has the burden of demonstrating relevance. *Id*. This analysis "requires one to ask: Is the discovery relevant to a party's claim or defense? Which claim? Which defense? At this stage of the litigation, one looks to the parties' pleadings for their claims or defenses." *Id*. Once the requesting party has demonstrated relevance, "[t]he party resisting discovery bears the burden of showing why discovery should be denied." *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009). *McCulloch v. Hartford Life & Accident Ins. Co.*, 223 F.R.D. 26, 30 (D. Conn. 2004). ("Because the Federal Rules are to be construed liberally in favor of discovery, the burden falls on the party resisting discovery to show why discovery should be denied.").

Rule 26(b)(2)(C) requires the court to consider whether "(1) the discovery sought is unreasonably cumulative or duplicative, or obtainable from a cheaper and more convenient source; (2) the party seeking the discovery has had ample opportunity to obtain the sought information by earlier discovery; or (3) the burden of the discovery outweighs its utility." *U.S. ex*

*rel. McBride v. Halliburton Co*., 272 F.R.D. 235, 240-41 (D.D.C. 2011) (Facciola, M.J.);

*Willnerd v. Sybase, Inc.*, No. 09 C 500, 2010 WL 4736295, at *3 (D. Idaho Nov. 16, 2010) ("In

employing the proportionality standard of Rule 26(b)(2)(C) . . . , the Court balances [the

requesting party's] interest in the documents requested, against the not-inconsequential burden of

searching for and producing documents."). The third factor requires the court to consider (a) the

needs of the case; (b) the amount in controversy; (c) the parties' resources; (d) the importance of

the issues at stake in the action; and (e) the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C)(iii). Nevertheless, "[t]he party opposing a motion to compel carries a

'heavy' burden of persuasion." *U.S. v. AT&T Inc.*, No. 11-1560, 2011 WL 534178, at *5 (D.D.C.

Nov. 6, 2011). *See also Kleen Prods. LLC v. Packaging Corp. of Am*., No. 10 C 5711, 28 (N.D.

Ill. Sep. 28, 2012).

      "[T]he selection of custodians is more than a mathematical count. The selection of

custodians must be designed to respond fully to document requests and to produce responsive,

nonduplicative documents during the relevant period." *Kleen Prods*., *id.* The unilateral selection

of custodians undercuts the discovery process required by the Rules. *See Charvat v. Valente*, 82

F. Supp. 3d 713, 723 (N.D. Ill. 2015) ("[T]he Court is troubled by the unilateral selection of

custodians . . . without Plaintiff's input."). In contrast, an iterative, evidence-based transparent

process ensures a fair and efficient result. *See Otto v. Abbott Lab's, Inc*., 2014 WL 12612682, at

*4 (C.D. Cal. Mar. 10, 2014) (ordering additional custodians where "plaintiff's counsel has not

been sufficiently involved in the selection process to ensure a fulsome production of responsive

documents."); *Mann v. City of Chi.*, No. 15 CV 9197, 4 (N.D. Ill. Sep. 8, 2017) (ordering

additional custodians). When considering whether to order production from a custodian about

whom the parties have not agreed, courts generally consider (1) the likelihood of the custodian to

have information relevant to the claims and defenses in the litigation and (2) whether that relevant information is included within the electronically stored information maintained by the other designated custodians. *MariCal, Inc. v. Cooke Aquaculture, Inc*., No. 1:14-CV-00366-JDL, 2016 WL 9459260, at *2 (D. Me. Aug. 9, 2016) (ordering addition of company CEO to custodian list). But simply because a custodian may produce duplicative documents is no reason to exclude them from a list of custodians, where, for example, "it is reasonable to believe that they will have additional, highly relevant materials." *Mt. Hawley Insurance Company v. Felman Production*, 269 F.R.D. 609, 620 (S.D.W. Va. 2010).

All "[m]otions relative to discovery," including motions to compel, "are addressed to the discretion of the [district] court." *Soobzokov v. CBS*, 642 F.2d 28, 30 (2d Cir. 1981).

Under Rule 37, a court can impose sanctions where a party "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). The sanctions include "(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; (vi) rendering a default judgment against the disobedient party; or (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination." *Harvin v. Cheney*, No. 3:23cv328 (MPS), 2024 U.S. Dist. LEXIS 82837, at *7 n.3 (D. Conn. May 7, 2024). In addition to the sanctions above, the court must order the disobedient party to pay reasonable expenses, including attorney's fees, caused by the failure to comply with the discovery order. Rule 37(b)(2)(C).

When considering whether to impose sanctions under Rule 37, courts consider four factors: "'(1) the willfulness of the non-compliant party; (2) the efficacy of lesser sanctions; (3) the duration of the . . . noncompliance; and (4) whether the non-compliant party had been warned' that noncompliance would be sanctioned." *Guggenheim Capital, LLC v. Birnbaum*, 722 F. 3d 444, 451 (2d Cir. 2013) (quoting *Agiwal v. Mid Island Mortg. Corp.*, 555 F. 3d 298, 302 (2d Cir. 2009). *See Prudential Ins. Co. of Am. v. Kowalski*, No. 3:21-cv-00541 (VAB), 2024 U.S. Dist. LEXIS 198854, at *20 (D. Conn. Nov. 1, 2024). *See also Vasoli v. Yards Brewing Co.*, 2021 WL 5045920, at **1, 3 (E.D. Pa. Nov. 1, 2021) (imposing sanctions on defendants where it was "clear that there were shortcomings with how Defendants went about searching for documents responsive to Plaintiff's discovery responses.").

## IV.   ARGUMENT

### 1.    Yale Conducted an Inadequate ESI Search of its Own Choosing and Full Compliance Should be Ordered

Yale has failed to conduct a good-faith, comprehensive search of electronically stored information (ESI). After years of stonewalling discovery and promising to produce relevant records, Yale has unilaterally constrained the scope of its ESI searches—by limiting custodians, date ranges, and search terms—and has not provided any confirmation that relevant devices or social media accounts have been fully searched. The principles of discovery require that ESI searches be reasonable, iterative, and transparent, and that parties cooperate in good faith to ensure relevant materials are actually located and produced. Yale's approach falls far short of these standards.

### A.    Yale Refuses to Search Key Custodians

Yale's unilateral limitation to 16 custodians is arbitrary and inadequate. "The selection of custodians must be designed to respond fully to document requests and to produce responsive,

nonduplicative documents during the relevant period." *Kleen Prods.*, *supra*. Yale's selection process fails this standard because it omits numerous individuals with direct involvement in Plaintiff's case. By refusing to include officials like Peter Salovey, Jonathan Holloway, Margaret Clark, Stephanie Spangler, Ann Kuhlman, Imam Omer Bajwa, and others who had undisputed involvement or knowledge, Yale omits large swaths of potentially relevant ESI. Despite months of discussions between counsel and despite clear indications that other Yale administrators and officials possessed relevant emails, text messages, and files pertaining to Plaintiff's case, Yale has unilaterally restricted the list of custodians to 16 individuals of its own choosing from a much larger list of individuals provided by Plaintiff. Yale's list excludes multiple high-level administrators, board members, and faculty who were intimately involved in decision-making around Plaintiff's suspensions, expulsion, and readmission requests. Many of these excluded individuals are parties to the litigation.

The following custodians should be added to the 16 who Yale has agreed to search:

1.    **Peter Salovey**. As the ultimate authority at Yale, its president at the time of the case, and a named defendant, President Salovey had direct oversight of Title IX enforcement and received multiple communications about Plaintiff's case. Document YALE-000376 confirms his involvement in discussions about Plaintiff. Notably, Leighton Longhi communicated directly with President Salovey regarding Plaintiff's readmission, which resulted in special student status that allowed Plaintiff to return to Yale without going through normal readmission procedures. These communications remain undisclosed despite their centrality to Plaintiff's claims.

2.    **Jonathan Holloway**. Dean Holloway personally signed Plaintiff's 2015 suspension letter, which explicitly states he discussed the matter with Peter Salovey and and Joseph Gordon. As the official who implemented Plaintiff's initial removal from campus, his

communications are essential to understanding the decision-making process and potential gender bias in the application of Yale's policies.

3.    **Margaret Clark**. As Head of Plaintiff's residential college, Professor Clark participated in multiple meetings regarding both Plaintiff's initial suspension and his subsequent expulsion. She possesses unique knowledge about housing decisions, campus safety determinations, and internal discussions about Plaintiff that no other custodian would have. These communications directly relate to Plaintiff's claims that Yale fabricated safety concerns as pretext for gender-biased discipline.

4.    **Surjit Chandhoke**. Dean Chandhoke served during Plaintiff's second suspension and expulsion, making key determinations about his housing and student status. Her communications would reveal how Yale's residential college system handled Plaintiff's case differently from other disciplinary matters, particularly regarding gendered enforcement patterns.

5.    **Sarah Worley**. Ms. Worley conducted the actual investigation of Jane Doe's allegations against Plaintiff. As the fact-finder whose report formed the basis for all subsequent disciplinary decisions, her communications and notes are essential to evaluating procedural irregularities in Plaintiff's case. Yale has not demonstrated any efforts to obtain her investigation files.

6.    **Howard Zonana**. Dr. Zonana was specifically hired by Yale to assess Plaintiff over several months. Documents produced by Yale confirm his role. His communications with Yale officials would reveal how the University used psychiatric evaluations in its disciplinary process and whether such evaluations were influenced by gender.

7.    **Madelon Baranoski**. Hired by Yale to perform a psychiatric evaluation of the Plaintiff. Has unique discoverable relevant information that is responsive to the Plaintiff's requests.

8.    **Etienne Greenlee**. One of the 5 UWC panel members who adjudicated the Plaintiff's case at Yale. Mr. Greenlee's communications are directly relevant to understanding the deliberative process.

9.    **Stephanie Spangler**. The Yale University Title IX Coordinator during the relevant time period. Held many meetings with decisionmakers about Mr. Khan's case. Was involved in the investigation and adjudication. Was involved in the changing and setting of Title IX policies during relevant time periods. Her omission from the custodian list is particularly glaring given that Jason Killhefer, who had far less involvement, was included instead.

10.    **Leah Cohen**. Rabbi at Yale University, was an advocate for the UWC and was a supporter of Jane Doe. Her communications would reveal how Yale assigned and utilized advocates in the disciplinary process, which directly relates to claims of unequal treatment based on gender.

11.    **Omer Bajwa**. Plaintiff's Chaplain at Yale University, who refused to represent the Plaintiff in the UWC and cut ties with him when the accusation was made. His communications would demonstrate whether religious advisors were instructed to treat accused students differently based on gender, and how Yale's Muslim chaplain responded to Title IX allegations against a Muslim student.

12.    **Susan Sawyer, Alexander Dreier, and Harold Rose**. Members of the Yale University General Counsel's Office, they were heavily involved in the decisionmaking surrounding the Plaintiff. Although they are practicing lawyers, their business advice, advising of

the UWC, and nonlegal decisionmaking is not privileged and is unique and discoverable as related to the Plaintiff. This is shown by documents recently produced by Yale University describing or revealing their role as UWC advisers. The fact that they provided procedural guidance rather than legal representation means these communications are not privileged and contain essential information about Yale's enforcement decisions.

13.    **Lani Danilowitz**. A Secretary of the UWC, many communications that are unique, discoverable and responsive likely went through her and are only available by a search of her email. Her emails would contain unique scheduling information, procedural decisions, and communications that would not appear in other custodians' accounts.

14.    **Asha Rangappa**. A UWC member, who from the documents produced already appears to have been involved in meetings concerning the Plaintiff during the relevant time period, and thus likely has discoverable unique responsive relevant material. Documents produced by Yale confirm Ms. Rangappa's involvement in this case. As a former FBI official who later became a frequent media commentator, her role is particularly significant for understanding how security concerns were evaluated in Plaintiff's case.

15.    **Ben Della Rocca**. A UWC member student, was friends with Jane Doe, and the son of a former UWC chair. Has discoverable and responsive unique information related to the Plaintiff's case. His relationships raise significant concerns about conflicts of interest in the adjudication process and potential bias in decision-making.

16.    **Yale Daily News Reporters:** Britton O'Daly, Hailey Fuchs, Serena Cho, Alice Park, Ruiyan Wang, Jever Mariwala, Avigayil Halpern, Leland Strange, Alayna Lee, Jingyi Cui, Amelia Neirenberg, Khue Tran, Tristan Hernandez, Sonia Ruiz, Adam Walker, Finnegan Schick, Alex Bavalsky, Nikhe Braimah, Naina Agrawal-Hardin, Violet Barnett, Justin Crosby, Josephine

Cureton, Hannah Figueroa Velazquez, Michael Garman, Lauren Hartz, Jack Maketa, Adam Tufts, Edos Herwegh Vonk. Yale University has, for the first time in 2024, asserted an "unclean hands" defense based on alleged divulgence of confidential information. Yale-affiliated reporters obtained and published information about Plaintiff's case that was not publicly available. Their communications with Yale officials would reveal whether the University selectively disclosed confidential information while simultaneously accusing Plaintiff of doing so.

Yale Daily News reporters who wrote critical news articles about the Plaintiff; have Yale email accounts that Yale has access over. They obtained information during the criminal trial that no one else had and broke news to the public. Given that Yale University has now put forward a defense of unclean hands on a theory of divulging of confidential information, this information is particularly relevant and material to the Plaintiff's reply to the Defendant's defense.

17.    **Student Witnesses.** Aja Feranda, Tabitha Spencer-Salmon, Annemarie McDaniel, Keni Sabath, Reid Dibech, Richard Gayler, Dzelila Siljak, Julian Wise, Ahron Singer, Nicole Cai, Nicole Minkina. These Yale students were witnesses on the night in question of Ms. Doe's accusations. Their names are in the police report of the events in question. Yale requested that the Plaintiff search for several of these names in his own inbox and social media. These individuals have knowledge of the facts and circumstances regarding this case and their witnessing of events is unique, relevant, responsive, and discoverable. Their communications with Yale officials would reveal how witness statements were solicited, assessed, and potentially influenced during the investigation.

18.    **Michael Della Rocca**. A former UWC chair who was Chair during other investigations and adjudications of sexual misconduct at Yale University. Has discoverable and

28

unique relevant responsive information related to Mr. Khan's case. Professor Della Rocca possesses comparative information about how Yale handled similar cases. The father-son relationship between Michael and Ben Della Rocca also raises significant questions about potential conflicts in UWC appointments and deliberations.

19.    **Yale Police Department Officials**. Jennifer Herten, Cindy Shaw, Lori Feola, Deborah Mastroianni, Assistant Chief Woznyk, Assistant Chief Patten, Chief Higgins, Marnie Robbins-Hoffman, Paul Sires. These are members of the Yale University Police Department who either testified at trial (Herten, Feola, Robbins-Hoffman), participated in the investigation of the Plaintiff (Shaw, Mastroianni, Sires) or who were policymakers/decisionmakers at the department during the relevant events (Woznyk, Patten, Higgins). These individuals have relevant, discoverable, responsive, unique, nonprivileged information that should be collected searched gathered and produced. Their communications would reveal coordination between Yale's disciplinary process and law enforcement, which is central to Plaintiff's claims of unfair treatment.

20.    **Tom Conroy**. The Yale Spokesperson that interacted with the media and the public during the high profile saga of Mr. Khan's suspension and expulsion. Plaintiff had direct contact with the custodian. His communications would reveal Yale's public relations strategy regarding the case and any potential efforts to influence public perception of Plaintiff based on gender stereotypes.

## B.    Yale's Search of Existing Custodians is Inadequate

Even for those custodians Yale has agreed to search, the methodology employed is fundamentally flawed. Yale's production to date indicates numerous deficiencies in its ESI search and retrieval process.

*i. There Is No Confirmation That All Devices or Social Media Have Been Searched*

No individual defendant or custodian has ever confirmed whether it examined personal devices, personal email accounts, or social media platforms (such as Facebook Messenger, WhatsApp, or iMessage); nor has Yale ever confirmed whether it has examined personal devices, personal email accounts, or social media platforms used by employees or custodians to discuss Plaintiff's case. Given that Plaintiff's allegations revolve around administrators' communications inside and outside official channels, the failure to search personal devices raises serious concerns. A party cannot limit its search solely to official email accounts when relevant communications may exist on other platforms. Yale must verify and document that all relevant repositories have been thoroughly examined.

*ii. The Search Terms—Only Plaintiff's Name—Are Inadequate*

Yale has restricted its keyword searches to "Khan" or variations thereof, ignoring obvious terms like "Jane Doe," "Title IX," "UWC," "sexual misconduct complaint," "rapist," or references to suspensions and expulsions. Notably, Yale has insisted on those very same search terms when it comes to searching the Plaintiff's email inboxes and social media accounts. This narrow and one-sided approach imposed by Yale inevitably misses large volumes of responsive ESI. Searching only a single name is unreasonably narrow in complex disputes involving multiple overlapping issues. Yale's refusal to implement additional search terms—particularly when Plaintiff has identified them—reflects a lack of good faith and risks excluding the most

probative communications. We have set out a number of search terms necessary to be minimally adequate in the margin and in the conclusion of our memorandum.[1]

### iii. The Date Ranges Are Inadequate and Exclude Material Information

Yale also artificially limited the date ranges for its ESI searches, cutting off searches before and after key events. ESI relevant to pre-hearing coordination, post-hearing appeals, and subsequent policy discussions is left undiscovered. Date ranges for ESI must be broad enough to capture the entire timeline of relevant events. The Plaintiff has searched for discoverable information dating back to 2012, when he first came to Yale University; the Plaintiff's complaint alleges facts going back to 2011 and earlier relevant to the pressure maintained on Yale University to discriminate against men in Title IX disciplinary proceedings; the defendants have created a new focus in the case on fabricated allegations against the Plaintiff that were never raised during Plaintiff's UWC proceedings but which clearly may have had an influence on Yale's decisionmaking in 2015 and 2018. Accordingly, a time period range of 2012 to the present makes sense for the limited number of search terms and custodians that Plaintiff proposes to search. Any limitation on time artificially limits access to information necessary to prove the Plaintiff's case.

---

[1] "Jane Doe," [or the complainant's actual name], "Title IX," "UWC," "sexual misconduct complaint," "cat costume," "Yale Daily News, "Halloween AND (Party OR symphony OR concert OR YSO) AND (2015 OR "October 31")," "Rape OR 'sexual assault' OR 'non-consensual,'" "Expel OR Expulsion OR Suspend OR Suspension," "Complaint AND 'sexual misconduct,'" "'Jon Andrews' OR 'Jonathan Andrews' OR 'Jonathon Andrews,'" "Intoxicated OR vomit OR drunk OR drinking w/10 "sexual misconduct" OR "non-consensual" OR rape," "Police OR YPD OR 'Yale Police' w/10 "sexual misconduct" OR "non-consensual" OR rape," "Yale AND (Counsel* OR SHARE OR "Sexual Harassment and Assault Response & Education")," "FACE AND ((Title IX) OR (Families advocating FOR Campus Equality))" "BBC OR Documentary OR Louis Theroux", "Guilty OR Not Guilty", "Petition" "Elon OR Musk" "NYT OR New York Times"

### 2.    The Underlying Discovery Requests Are Relevant and Proportional

### A.    The Discovery is Relevant and Material

Rule 26(b)(1) permits discovery of any nonprivileged matter that is relevant to any

party's claim or defense and proportional to the needs of the case. Title IX discrimination claims,

breach of contract allegations, and related due process claims require comprehensive discovery

into the university's policies, decision-making processes, and comparator evidence to assess the

institution's consistency and bias in enforcement. *See Doe v. Columbia Univ.*, 831 F.3d 46, 57

(2d Cir. 2016) (procedural irregularities and external pressures on a university are relevant to a

Title IX discrimination claim); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (statistical

and comparative data on disciplinary outcomes are relevant in establishing gender bias in

university proceedings). The requested discovery is directly relevant to Plaintiff's claims that

Yale's disciplinary proceedings were infected by gender bias and procedural unfairness, as well

as to his state law claims regarding breach of contract, breach of fair dealing, and infliction of

emotional distress. Plaintiff has requested materials regarding:

- Yale's investigative and adjudicative materials in his disciplinary case (critical to assessing whether Yale followed its own rules and federal law) (E.g., Request No. 1, 2020; Request No. 55-58, 2024);
- Documents concerning Yale's disciplinary treatment of other students accused of sexual misconduct (necessary for Title IX selective enforcement claims) (E.g., Requests 7-8, 69-70, 2024);
- Communications between Yale administrators and external parties, including media outlets and law enforcement, regarding Plaintiff's case (relevant to Plaintiff's defamation and privacy claims) (E.g., Requests 12, 19-20, 82, 2024); and
- Electronically stored information (ESI) from key decision-makers, which Yale has refused to produce despite Plaintiff's good faith attempts to reach a compromise on search terms, custodians, and date ranges (E.g., Requests 2-4, 6, 2020; Requests 36, 64, 2024).

Despite the clear relevance of these materials, Yale has engaged in dilatory tactics,

unjustified objections, and an incomplete production of documents, producing primarily

irrelevant or redundant materials while failing to search for and produce the core evidence

Plaintiff has requested for years. Yale's failure to conduct a proper ESI search from key custodians, its unilateral limitation of search terms to only Plaintiff's name, and its refusal to produce materials from critical date ranges further demonstrate its bad faith resistance to discovery.

### B.      The Discovery is Proportional

Under Rule 26(b)(1), discovery must be proportional to the needs of the case, considering the needs of the case; the amount in controversy; the parties' resources; the importance of the issues at stake in the action; and the importance of the discovery in resolving the issues. Each of these factors weighs heavily in favor of allowing the discovery requests at issue here.

#### i. The Needs of the Case

This case presents serious claims involving fundamental due process violations, gender discrimination, and breach of contract in a university disciplinary proceeding, where the consequences for Plaintiff have been severe—a wrongful expulsion, irreparable reputational harm, and loss of future career opportunities. Moreover, "there is a large information disadvantage between" the Plaintiff and Defendants. *Garcia Ramirez v. U.S. Immigr. & Customs Enf't*, 331 F.R.D. 194, 199 (D.D.C. 2019). Information asymmetry arises when "one party has very little discoverable information while the other party has vast amounts of discoverable information." *Oxbow Carbon & Minerals LLC*, 322 F.R.D. 1, 8 (D.D.C. 2017) (compelling additional custodian). Yale has "vast amounts of discoverable information," *id*. Given that Yale's own policies and practices are at issue, the discovery sought is crucial to proving Plaintiff's claims. Evidence of whether Yale's disciplinary process was infected by gender bias, whether Yale treated Plaintiff differently than similarly situated female students, and whether Yale followed its own procedures goes to the heart of the Plaintiff's claims. Without robust discovery

into Yale's handling of sexual misconduct cases, its communications regarding Plaintiff, and its application of disciplinary procedures, Plaintiff cannot meaningfully pursue his claims.

### ii. The Amount in Controversy

Plaintiff seeks damages exceeding $110 million, reflecting the loss of educational opportunities, damage to reputation, and emotional distress caused by Yale's unlawful actions. This high amount in controversy justifies comprehensive discovery to determine the full extent of Yale's misconduct and its financial and professional impact on Plaintiff. By using this as a factor, courts recognize that the more significant the stakes, the broader the scope of discovery necessary to ensure fairness and accuracy. This is reflected in the vast amounts of discovery that the parties have demanded from the Plaintiff, including ESI searches that have been far more burdensome and required far more document review and research than the searches that Yale and Jane Doe have been willing to agree to themselves.

### iii. The Parties' Resources

Yale is one of the wealthiest and most prestigious universities in the world, with billions of dollars in endowment resources and access to sophisticated litigation tools. Plaintiff, by contrast, is an individual student who was wrongfully expelled and financially devastated by Yale's actions. The disparity in resources between the parties further weighs in favor of full discovery, as Plaintiff is entitled to access information in Yale's possession that is critical to proving his case. Yale is particularly well-equipped to provide comprehensive discovery.

### iv. The Importance of the Issues at Stake in the Action

This case involves fundamental rights under Title IX, due process protections in university disciplinary proceedings, and the enforceability of contractual obligations between students and institutions. The allegations that Yale's Title IX procedures systematically

disadvantage male students raise constitutional and statutory concerns of significant public importance. These are significant legal issues with implications beyond Plaintiff's individual claims, as the outcome of this case could impact how Yale and other universities conduct Title IX proceedings in the future. The broader implications of this case for university disciplinary processes across the country further support comprehensive discovery.

*v. The Importance of the Discovery in Resolving the Issues*

The discovery sought is the key evidence Plaintiff needs to establish Yale's liability. Without the withheld documents, Plaintiff is severely prejudiced in his ability to prove that Yale's process was tainted by gender bias and procedural unfairness. Discovery should not be limited where the information sought goes to the core of the plaintiff's claims. Information about how Yale has handled other sexual misconduct cases, communications among decision-makers about Plaintiff's case, and records of Yale's Title IX training and policies cannot be obtained from any other source.

**3.    The May 2024 Discovery Requests on Yale University Are Not Untimely**

Yale has objected to Plaintiff's May 2024 discovery requests on the baseless ground of untimeliness, despite the fact that:

1. Yale did not serve its own amended Answer, with new defenses, until April 2024;

2. Yale has continuously delayed discovery production since 2020 and failed to provide a meaningful production until late 2024.

A party cannot refuse to comply with discovery obligations and then claim the opposing party's follow-up discovery requests are untimely, particularly where the requested discovery is necessary to address issues created by Yale's own deficiencies in production. Attempts by

Case 3:19-cv-01966-KAD    Document 294    Filed 03/19/25    Page 36 of 40


defendants to evade discovery obligations by claiming requests are untimely when their own delays necessitated later requests should not be rewarded. Yale cannot stonewall discovery for four years and then claim requests for information are untimely.

### 4.    Yale's Other Objections to Plaintiff's Discovery Should be Overruled

Yale University has raised a broad array of objections to Plaintiff's discovery requests, including boilerplate and unsupported objections based on relevance, burden, duplication, confidentiality, privilege, and proportionality. Many of these objections are procedurally improper, as Yale has failed to meet its burden under Rule 26 and Rule 34 to demonstrate with specificity why discovery should be denied. Generalized and vague objections that do not include detailed explanations or evidence supporting their claims should be rejected. Plaintiff addresses and refutes Yale's primary objections below, demonstrating why they should be overruled in their entirety.

### A.    Yale's Objections Based on Overbreadth, Undue Burden, and Proportionality Should Be Rejected

Yale blanketly objects to dozens of discovery requests on the grounds that they are overbroad, unduly burdensome, and not proportional to the needs of the case, without providing any specific evidence of burden or cost.[2] In a telltale sign of boilerplate objection practice, Yale "incorporates" objections to other requests into its objections no fewer than 80 times responding to the Plaintiff's 2024 discovery requests. It is well-settled that generalized, boilerplate claims of "unduly burdensome and overly broad" are insufficient to justify withholding discovery—the responding party must provide detailed reasons or specific factual explanations as to why a request is unduly burdensome. Yale has failed to meet this burden.

---

[2] *See* Objection to RFP # 9, 10, 12, 13, 14, 16, 17, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 49, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 56, 57, 58, 59, 60, 61, 62, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 79, 80, 81, 82 (2024).

Additional examples of improper burden objections include: **Objection to Request for Production No. 6, 2020** (seeking all recordings, minutes, and notes from UWC proceedings) on the basis that compiling such records would be "extremely time-consuming and expensive". However, Yale maintains these records as part of its regular procedures, making it neither burdensome nor disproportionate to produce them. The information is directly relevant to whether Yale followed its own procedures in disciplining Plaintiff.

**Objections to Requests for Production Nos. 7, 9, and 10, 2020** (seeking comparator data on Yale's handling of sexual misconduct cases) based on "the volume of responsive documents" and the "difficulty of review". However, Plaintiff has limited his requests to specific categories of cases (sexual misconduct allegations between students) and specific timeframes (2015-present). All of Yale's boilerplate objections on burden and proportionality should be overruled. The requested discovery is highly relevant, and Yale has failed to substantiate its claims of burden with specific evidence.

## B.    Yale's Objections Based on Relevance are Misplaced

Yale frequently objects that discovery requests are not relevant to Plaintiff's claims or defenses. We previously have explained above how our discovery requests are relevant and material. Yale's specific relevance objections are meritless, including: **Objection to Request for Production No. 75, 2024** (seeking documents relied upon by Yale in drafting its sexual misconduct policies) as "not relevant because Plaintiff's case was decided under the UWC procedures in effect in 2018". This ignores that Plaintiff's Title IX selective enforcement claim may require a comparison of Yale's policies over time; **Objections to Requests for Production Nos. 67-72, 2024** (seeking statistical data on disciplinary outcomes by gender) on the grounds that these records do not involve Plaintiff's case. These objections reflect a fundamental misunderstanding of how selective enforcement and gender bias claims are litigated. Statistical

disparities in how universities discipline male vs. female students are probative of Title IX

discrimination. We outline why each of the requests we are seeking compliance with are relevant

and material in Section II *supra*. "Although not unlimited, relevance, for purposes of discovery,

is an extremely broad concept." *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004); *see also*

*Nunez v. City of New York*, No. 11-CV-5845, 2013 WL 2149869, at *2 (S.D.N.Y. May 17,

2013). *Edmondson v. RCI Hosp. Holdings, Inc*., 16-CV-2242 (VEC), 2 (S.D.N.Y. Jun. 8, 2018).

Because all these requests seek materials that are central to Plaintiff's Title IX and due process

claims, Yale's relevance objections must be overruled.

## C.    Yale's Objections Based on Confidentiality and Privacy Are Improper Given the Protective Order in Place

Yale repeatedly objects to producing discovery based on confidentiality, privacy

concerns, and alleged protections under FERPA, HIPAA, and other laws. However, these

objections lack merit because (1) the Protective Order in place already allows for confidential

designation and safeguards sensitive information, and (2) federal courts consistently hold that

privacy laws such as FERPA do not create an absolute privilege against discovery. Notably, Yale

has not updated its responses since the protective order has been put in place to remove any of

these objections, despite marking broad swaths of its production as "Not for Plaintiff's Eyes"

under that same order.

### i. The Protective Order Provides Ample Safeguards for Sensitive Information

The Court has already entered a Protective Order governing confidential discovery

materials (ECF No. 198), which allows Yale to designate documents as "Confidential" or "Not

for Plaintiff's Eyes" where Yale believes it is appropriate. Yale's reliance on privacy and

confidentiality objections is therefore entirely misplaced in its discovery responses, as the

Protective Order already provides a structured mechanism to protect sensitive records. Where a protective order is in place, confidentiality objections alone do not justify withholding relevant discovery. *See Edmondson v. RCI Hosp. Holdings, Inc.*, 16-CV-2242 (VEC), 4 (S.D.N.Y. Jun. 8, 2018); *ABC Rug Carpet Cleaning Serv. v. ABC Rug Cleaners*, 08 Civ. 5737 (RMB) (RLE), 5 (S.D.N.Y. Jan. 14, 2009). Because Yale can designate sensitive documents under the Protective Order rather than withholding them entirely, its blanket objections based on confidentiality must be overruled.

### ii. FERPA Does Not Create an Evidentiary Privilege

Yale objects to producing comparator and other evidence (Requests for Production Nos. 7, 67, 68, 69, 70, 71, 72) on the grounds that disclosure would violate the Family Educational Rights and Privacy Act (FERPA). However, FERPA does not create an evidentiary privilege. *See, e.g., Garza v. Scott & White Mem'l Hosp.*, 234 F.R.D. 617, 624 (W.D. Tex. Nov. 14, 2005); *Ellis v. Cleveland Mun. Sch. Dist.*, 309 F.Supp.2d 1019, 1023-24 (N.D.Ohio 2004). If there is any doubt, this court can order the production of student disciplinary records in Title IX litigation—FERPA permits disclosure of education records without student consent in compliance with a lawfully issued subpoena or judicial order. *See* 34 C.F.R. § 99.31(a)(9)(i)-(ii). Since the Protective Order already allows Yale to designate records confidential, FERPA is not a valid excuse to withhold data. Yale should be ordered to produce comparator records.

### iii. HIPAA Does Not Apply to University Disciplinary Records

Yale also objects to producing discovery related to Jane Doe's interactions with Yale's SHARE Center and other university officials (Requests for Production Nos. 24, 25) based on HIPAA privacy protections. However, HIPAA applies to medical providers and medical records—not university misconduct investigations or counseling services provided by non-

medical professionals. In fact, HIPAA does not shield records from discovery. *Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d 923 (7th Cir. 2004). This is especially so where a protective order is already in place and the Plaintiff has a demonstrable need for this information, which goes to the heart of his claims that the Defendants coordinated and conspired in making false allegations against him. *Hutton v. City of Martinez*, 219 F.R.D. 164, 167 (N.D. Cal. 2003) ("HIPAA does not preclude production of the medical records . . . in response to either a discovery request, subpoena, or this Court's order, under an adequate protective order.").

The privacy interest even in confidential medical records is conditional and a limited impairment of the right may be allowed if properly justified. *Soto v. City of Concord*, 162 F.R.D. 603, 618 (N.D. Cal. 1995). Moreover, Yale's own policies already reduce the expectation of privacy protections in disciplinary proceedings—students who file complaints know their claims will be investigated, shared with relevant university administrators, and potentially litigated. Given this, Yale cannot unilaterally withhold critical investigatory records on the basis of HIPAA when the information sought is not medical in nature and is directly relevant to Plaintiff's claims.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Plaintiff respectfully requests that the Court grant his motion to compel and enter an order in line with the proposed order attached to this memorandum as an exhibit.

Respectfully submitted,

/s/Alexander T. Taubes
470 James St., Ste 007, New Haven, CT 06513
alextt@gmail.com
(203) 909-0048
Ct30100