UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Saifullah Khan, | |
| Plaintiff, | Civ. No. 3:19-cv–01966-KAD |
| v. | |
| Yale University, et al., | |
| Defendants. | May 7, 2025 |

### YALE UNIVERSITY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

Yale University hereby submits its Memorandum of Law in Opposition to the Plaintiff's

Motion to Compel (ECF 294).

### I.  PRELIMINARY STATEMENT

The Court is aware of the history of discovery issues in this case. Plaintiff's actions in

filing this Motion continue his pattern of discovery and litigation abuses.

For Plaintiff to claim that Yale "unilaterally" decided upon the terms of its ESI search,

including hand-picking the custodians and only searching "Khan" and limited variations thereof,

is just false. Plaintiff grossly mischaracterizes the efforts and scope of Yale's document collection

and production to date and ignores the overbroad, unduly burdensome, and harassing nature of

the ESI search and additional production he now demands. Plaintiff fails entirely to explain *why*

the additional documents he seeks are relevant to this action, *how* they are proportionate to the

needs of this case, or *how* an expanded search of 67 additional custodians[1], in addition to the 16

---

[1] Although Plaintiff identifies 67 additional proposed custodians, Yale does not have custody or control over the records of Sarah Worley, a non-employee who Yale engaged as the fact-finder in Plaintiff's UWC proceeding. *See* Motion, at 25. Accordingly, this Opposition will refer to Plaintiff's request as a search for 66 additional custodians.

{N6065590;2}

of Plaintiff's requested custodians who have been searched, will return unique and relevant documents not duplicative of those already produced. The burden on Yale to undertake such an expansive and burdensome search—based on a Motion supported only by rampant speculation—would be immense and unjustified.

Although courts have held that the scope of discovery under Rule 26 is broad, "this does not mean that a party must automatically produce any document that catches its adversary's fancy." *Scricca v. Boppy Co., LLC*, No. 3:22-CV-01497 (RNC) (TOF), 2024 WL 1211061, at *3 (D. Conn. Mar. 21, 2024); *see also Williams v. City of Hartford*, No. 3:15-cv-933 (AWT) (SALM), 2016 WL 3102001, at *2 (D. Conn. June 2, 2016) ("Fed. R. Civ. P. 26(b)(1) does not allow a party to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so.").

Rather than seeking relevant and proportional information, Plaintiff's Motion appears intended to harass and burden Yale, seeking information that far exceeds the permissible bounds of discovery and revealing an obvious fishing expedition. Over and over again, Plaintiff has attempted to justify his unreasonable and unwieldly demands for unwarranted and irrelevant information by comparing the *quantity* of documents the parties have produced, while ignoring the *quality* of the documents he has received from Yale. Indeed, the only purported "evidence" Plaintiff attempts to point to in his Motion to support his unfounded claims that Yale's search is "inadequate" and "flawed" is the number of pages of documents that Yale has produced. He has consumed the resources of this Court and the parties with baseless demands. The Court should put an end to these tactics and deny the Plaintiff's Motion in its entirety.

## II.    RELEVANT BACKGROUND

Yale has appropriately and reasonably disclosed and produced discoverable information and documents and has engaged in extensive negotiations with Plaintiff over Yale's ESI search, including *applying the Plaintiff's requested search terms* on the inboxes of the 16 custodians *that Plaintiff requested.*

### How We Got Here

One thing on which the parties agree is that the Court "has provided clear directives regarding discovery . . ." Motion, at 19. The Court's directives, without doubt, included deadlines by which written discovery was to be propounded. Indeed, by December 4, 2023, this Court ordered that this stage of discovery be complete by January 31, 2024. *See* ECF 68 (approving and adopting January 31, 2024, deadline by which to propound discovery as proposed in the parties' joint 26(f) Report).[2] Plaintiff, however, served Yale with his second set of interrogatories and requests for production on May 9, 2024—more than three months after the Court ordered him to do so. Not only were Plaintiff's requests untimely, but they also included additional interrogatories, with discrete subparts, that took Plaintiff's total requests well over the 25-interrogatory limit, and included **eighty-two** additional requests for production, many of which were unreasonably duplicative and cumulative of the requests Plaintiff previously served on Yale, and to which Yale timely complied and objected, in 2020. *See* Yale's Responses and Objections to Plaintiff's 2020 and 2024 Written Discovery Requests, attached hereto as Exhibit B and Exhibit C, respectively. It should be noted that, prior to serving his untimely 2024

---

[2] Yale initially propounded its written discovery directed to Plaintiff on September 28, 2020, to which Plaintiff neither objected nor responded. Yale then re-sent the identical written discovery, with no revisions, on February 8, 2024. *See* Exhibit A (email from Attorney Weller dated February 8, 2024). Plaintiff thus had the opportunity to impose timely objections, which he failed to do. At no time did Yale serve Plaintiff with new or untimely written discovery.

requests, the Plaintiff never attempted to address any of Yale's objections to his 2020 discovery requests. In fact, the present Motion is Plaintiff's first attempt to challenge those objections, despite sitting on them for more than 4 years. Indeed, he filed this Motion *without* engaging in any good faith discussions on the objections and only engaged in a meet and confer on the objections after undersigned counsel brought the lack of any discussions to the Court's attention at the March 27, 2025, discovery status conference. *See* ECF 298.

## The Parties Negotiate an ESI Proposal

In an attempt to resolve Yale's objections to Plaintiff's untimely and otherwise objectionable discovery requests, in early July of 2024, the parties agreed to make a good faith effort to reach common ground on an ESI proposal. *See* Exhibit D, (email from Attorney Weller dated July 10, 2024). The parties agreed that Plaintiff would provide Yale with a reasonable list of his proposed custodians, date ranges, and search terms; Yale would review and respond with its counterproposal; and, the parties would discuss those proposals at a scheduled meet and confer. *Id.*

## Plaintiff Seeks Additional Time to "thoughtfully consider the relevant custodians, date ranges, and search terms."[3]

The ESI proposal Yale eventually received from Plaintiff was the antithesis of "thoughtful", "relevant" or "reasonable." What Plaintiff provided was, instead, an unworkable list of **over 380 custodians** (including members of Jane Doe's family, student journalists, members of the New Haven Police Department, and attorneys in Yale's Office of General Counsel)[4] and **more than 560 independent search terms** (including names of judges on the

---

[3] *See* Exhibit E (email from Attorney Taubes dated July 19, 2024).
[4] It should be noted that of the 67 additional proposed custodians identified in the present Motion, 66 were included on the Plaintiff's initial proposal. There can be no argument, therefore, that these individuals were not known to Plaintiff prior to filing this Motion. Thomas Conroy, identified on page 29 of Plaintiff's Motion, as the "Yale Spokesperson that interacted with the media and the public during" the Plaintiff's suspension and expulsion, was not

Second Circuit, the Honorable Judge Dooley, all seven Connecticut Supreme Court justices, Hollywood actors, and defendants in a separate lawsuit brought by Plaintiff) to be applied over a **thirteen-year period**. *See* Exhibit F, filed under seal (email from Attorney Taubes, dated July 22, 2024, attaching list of proposed custodians and search terms).

Instead of conceding that his proposal was far-fetched, Plaintiff doubled-down and took the position that each of the 560+ search terms—including terms like "Nazi" and "Rolling Stone" and "Johnny Depp"—"are directly relevant to Mr. Khan's case" and "can be justified individually and collectively." *See* Exhibit G, at 5 (email thread between Attorneys Weller and Taubes from July 10, 2024 through August 5, 2024). He also sought to justify the nearly 400 proposed custodians based on his skewed view of "the broad scope and complexity of this [single plaintiff, University disciplinary] case." *Id.*

For nearly two weeks, Plaintiff demanded that Yale respond to each of the 360+ proposed custodians and 560+ search terms and "provide specific complaints about what is unacceptable and what is not, and [that Plaintiff would then] provide a rationale or adjust accordingly." *Id.*, at 3. Such a burdensome request was neither reasonable, nor was it the process the parties agreed to when they decided to pursue an agreeable ESI search that would resolve Yale's objections. Accordingly, Yale requested that Plaintiff either provide a narrowly tailored and reasonable ESI proposal, or in lieu thereof, pursue the path of bringing Yale's objections before the Court. *Id.*, at 2.

---

previously identified as a proposed custodian. The Plaintiff, however, states that he had "direct contact" with Mr. Conroy, thereby suggesting that Mr. Conroy was previously known to the Plaintiff. What's more, Plaintiff's purported justification as to why Mr. Conroy is an appropriate custodian all but confirms that Plaintiff's request is nothing more than a fishing expedition.

<u>**Plaintiff Ostensibly Recognizes the Absurdity of His Demands**</u>

Choosing not to bring his untimely discovery requests before the Court, Plaintiff "revised" his initial ESI proposal. *See* <u>Exhibit H</u>, filed under seal (email from Attorney Taubes dated August 6, 2024). Plaintiff's second proposal remained untenable. This time around, Plaintiff proposed **forty-seven custodians** and unique combinations of **thirty-five search terms**. *Id.* Interestingly, while his initial proposal sought a search across the period from September 1, 2012 to the present (the same period he now demands Yale search (Motion, at 31)), Plaintiff clarified in his revised proposal that he was "particularly interested in the time periods of September 1, 2015 to September 1, 2016 and September 1, 2018 to September 1, 2019." *Id.* These time periods would make more sense, since they represent periods relevant to the events at issue in this case. Plaintiff in the present Motion has now taken steps backwards by seeking to expand the ESI search to 83 custodians (the 16 previously agreed-upon plus the additional 67 now sought), and to expand the time period from 2012 to present, or 13 years.

<u>**Yale Responds with its Counterproposal**</u>

From the forty-seven custodians on Plaintiff's revised proposal, Yale proposed searching the files of fifteen of those individuals on Plaintiff's list whom Yale identified as those likely to possess information responsive to the claims and defenses raised in this case, and further proposed applying specific and targeted date ranges for each custodian. *See* <u>Exhibit I</u>, filed under seal (email from Attorney Weller dated August 16, 2024). Given the significant number of custodians it agreed to search for this single plaintiff case, Yale proposed to apply variations of Plaintiff's name and known email addresses as search terms in an effort to capture only relevant documents and limit non-responsive hits. *Id.*

**Plaintiff Agrees that Yale's Proposed Custodians Should be Searched, but Demands More**

Continuing to delay resolution, Plaintiff did not respond to Yale's counterproposal for four weeks, when he claimed that Yale's proposal "remain[ed] too narrow" and again attempted to justify his position by pointing to "the significant disparity in document production." *See* Exhibit J, filed under seal (email from Attorney Taubes dated September 12, 2024). He proposed searching, in addition to Yale's 15 proposed custodians, **eleven** additional individuals, including multiple attorneys from Yale's Office of General Counsel.[5] *Id.* He also "insisted" that the periods from September 1, 2015, to September 1, 2016, and September 1, 2018, to September 1, 2019" be searched. Finally, he proposed eight additional strings of what he claimed were "carefully considered" search terms to be added to the terms Yale had proposed. *Id.*

Plaintiff never objected to Yale's proposed custodians (which were taken from Plaintiff's list), the time frames, or the search terms. Indeed, he agreed that Yale *should* apply the very search terms Plaintiff now contends are "inadequate."

**Plaintiff's Counsel Deems Yale's Agreement to Search Additional Custodians Identified by Plaintiff and All of Plaintiff's Proposed Terms Reasonable**

Nearing a workable framework for Yale's ESI search, the parties scheduled a meet and confer to discuss the parameters of that ESI search and other, unrelated outstanding discovery issues. At that meeting on September 25, 2024, Yale agreed to search an additional custodian from Plaintiff's latest proposal, for a total of **16 custodians**, as well as **all of the Plaintiff's**

---

[5] In his Motion, Plaintiff again seeks to have Yale search the inboxes of its in-house counsel. *See* Motion, at 26–27. Courts recognize that collecting and producing documents from attorneys necessarily increases the burden of review due to the increased time needed to cull and log privileged material, and it is these burdens that have generated a general presumption that attorney files should only be searched under rare circumstances, and only after all other avenues have been exhausted. *See, e.g., SS&C Tech. Holdings, Inc. v. AIG Specialty Ins. Co.*, 2019 WL 6701857, at *1 (S.D.N.Y. Dec. 9, 2019) (denying motion to compel inclusion of general counsel as custodian because the likelihood of privilege and the burden for complying "would be too high"); *Sprint Commc'ns Co. L.P. v. Charter Commc'ns, Inc.*, 2019 WL 3369659, at *1 (D. Del. July 15, 2019) (denying motion to compel designation of in-house counsel as an ESI custodian based on privilege and disproportionate burden).

**proposed search terms and date ranges**. *See* Exhibit K (email from Attorney Weller dated October 16, 2024, attaching notes from September 25, 2024 meet and confer). In addition to searching across the timeframes that Plaintiff "insisted" on, Yale indicated that it would also search across its initially proposed date ranges, to the extent they did not already overlap with what Plaintiff has requested. *Id.* **Plaintiff's counsel agreed that Yale's proposal was reasonable**, but that he would need to consult with the Plaintiff, and then advise on Plaintiff's final position. *Id.*

### Plaintiff Prematurely Proposes Extending the Scheduling Order

At the conclusion of this same meet and confer, Plaintiff's counsel also floated the idea of extending the then-operative scheduling order and suggested adopting an agreed-to post-production schedule by which the parties would complete their document production and schedule depositions. *Id.* At no point during the discussion of the ESI search did Plaintiff's counsel seek to tie his agreement to the ESI proposal to the acceptance of any such revised and extended scheduling order. Accordingly, at the conclusion of the September 25 meet and confer, Yale believed the Parties had reached an agreement in principle with Plaintiff on the parameters of its ESI search, subject to Plaintiff's counsel consulting with Plaintiff.

### Three Weeks Later, Plaintiff Reneges

On October 16, three weeks after the parties' September 25 meet and confer, Plaintiff, for the first time, sought to condition his acceptance of the previously agreed-to search process on Yale's assent to extend any deadlines under the scheduling order. *See* Exhibit L (email from Attorney Taubes dated October 16, 2024). Even then, Plaintiff did not assert that the agreed-upon custodians were "inadequate," that the search terms were "restrictive," or that the timeframes represented "artificial date limitations," as he now claims. *See* Motion, at 1. The Court (*Dooley,*

*J.*), moreover, had just recently informed the parties that it was "very unlikely to move this scheduling order . . ." *See* ECF 200, at 54:14–15. Given the Court's clear directive, and the fact that the close of discovery was not slated for six more months (*i.e.*, April 15, 2025), Yale could not agree to tie Plaintiff's acceptance of the ESI proposal to the condition that it also agree to request extensions of current discovery deadlines. *See* Exhibit M (email from Attorney Weller dated October 21, 2024).

Plaintiff threatened "court filings" and "court intervention" and demanded to know when Yale intended to produce ESI or whether it intended to stand on its objections to his untimely 2024 discovery requests. *See* Exhibit N (email from Attorney Taubes dated October 21, 2024).

### Yale Proposes an ESI Search with Anticipated Production Date in Mid-January

Cognizant of the then-existing discovery deadlines, Yale responded to Plaintiff's demands and informed him that it intended to collect and produce the ESI the parties discussed at the September 25th meet and confer by mid-January 2025. *See* Exhibit O (email from Attorney Weller dated October 23, 2024). Specifically, in light of the fact the Plaintiff rescinded his preliminary agreement to Yale's ESI counterproposal, Yale also informed the Plaintiff that, in order to meet its anticipated production date, it was moving forward with an ESI search as follows:

- Collection of data from the 16 agreed-to custodians;

- Use of the search term "Khan" and its variations as previously articulated by Yale, in order to capture any documents related to Plaintiff's case; and,

- Use of the expanded timeframes that Yale proposed at the meet and confer.

  *Id.*

**Plaintiff Unsuccessfully Attempts to Compel Production by a Date Certain**

Plaintiff followed through on his threats to "seek court intervention" on November 12, 2024 when he filed a procedurally deficient Motion to Compel seeking to force Yale to comply with his untimely discovery requests within 30 days and to extend the discovery deadlines the Court previously signaled it was not inclined to move. *See* ECF 224. The Court denied Plaintiff's motion the following day. *See* ECF 225.

Following the denial of Plaintiff's motion, the parties attended a meet and confer on November 19, 2024. At that meeting, Yale agreed to expand its ESI search to include the date ranges and an additional eight strings of search terms that Plaintiff proposed in response to Yale's counterproposal. *See* Exhibit P, filed under seal (list of agreed-to custodians, search terms, and date ranges).

**Yale Conducted the ESI Search that Plaintiff Agreed To**

Plaintiff's assertion that Yale "unilaterally constrained the scope of its ESI searches" (Motion, at 23) is simply false.  Yale engaged in extensive negotiations with Plaintiff regarding the parameters of Yale's ESI search and Plaintiff agreed that those terms were reasonable. *See* Ex. K. **Plaintiff even represented to this Court that the Parties had reached an agreement on custodians**. *See* ECF 233-1, Affidavit of Attorney Alex Taubes ("Attorney Weller represented that the Yale Defendants were in the process of collecting and reviewing ESI from *the agreed-upon* 16 custodians . . .") (emphasis added). In accordance with the parties' discussions at the November 19 meet and confer, Yale did exactly what the parties agreed to. It collected and searched the custodial files of the 16 custodians that Plaintiff identified as individuals having information relevant to this case for the specific date ranges Plaintiff requested (as well as Yale's expanded date ranges), and applied to those files *all* of the Plaintiff's search terms, which

without question, included more than just "Khan" or variations thereof, contrary to the Plaintiff's claims in the Motion.

In addition to its 2020 production and the collection, review, and production of the requested custodial files, Yale supplemented its ESI search with additional searches for various categories of responsive documents. For example, counsel for Yale visited the UWC office and made copies of and produced relevant and non-privileged files concerning Plaintiff, conducted a separate search of and produced relevant and non-privileged paper files, and produced additional relevant internal correspondence regarding the Plaintiff and the claims raised in this case, which correspondence covers communications among many of the additional individuals from whom Plaintiff now seeks to compel additional discovery.

Before its ESI production, and by November 25, 2024, Yale had produced to the Plaintiff more than 150 documents responsive to the Plaintiff's document requests, and made several additional productions comprising hundreds more relevant and responsive documents over the course of the next few months.[6] Consistent with the Court's Orders (*see* ECF Nos. 253, 257, 260, 262), and with Yale's initial offer to Plaintiff, Yale completed its ESI search and production on January 21, 2025, and to date has produced to the Plaintiff more than 1,600 responsive documents, totaling nearly 10,000 pages.

### The Present Discovery Dispute

As the foregoing demonstrates, Yale has been diligent and reasonable in providing discovery. In his Motion, the Plaintiff, however, challenges Yale's search methodology, baselessly claiming that its search was "fundamentally deficient." Motion, at 1. But it was the

---

[6] This was, of course, in addition to the documents Yale had produced to Plaintiff during the underlying UWC process (*e.g.*, copies of all relevant UWC documents, including Jane Doe's complaint, the Fact-Finder's Report, Panel Report, etc. It was also in addition to the documents Plaintiff obtained through discovery in his criminal case.

Plaintiff's own identification and selection of custodians, search terms, and timeframes that yielded the production results of which he now complains.[7]

While admitting that from June through September of 2024, the parties "engaged in extensive meet-and-confer efforts regarding ESI production," (Motion, at 18), Plaintiff now seeks to completely unwind the efforts of those meetings and the agreements reached concerning the custodians, terms and time frames to be searched.

Plaintiff has no basis to claim that "Yale has repeatedly resisted producing core documents" and he has failed to meet his burden by providing any non-conclusory explanation for: (1) why he needs Yale to search additional ESI; (2) how Yale's production is "incomplete" or "inadequate"; and (3) how and why he has been prejudiced in any way by Yale's production. *See* Motion, at 17, 23, 32. Plaintiff seeks an exorbitant amount of discovery at a time when the parties are preparing (for a second time) to schedule depositions and to prepare witnesses. If Plaintiff's motion is granted, it would require a significant enlargement of the discovery period and require that depositions proceed when written discovery is effectively starting anew. Yale's in-house and IT professional and TransPerfect personnel (Yale's ESI vendor) working on this project have estimated that it will take at least **6 months** to complete the collection and processing of the largely cumulative and duplicative, as well as the completely irrelevant, review Plaintiff now demands. At present the parties have agreed to deposition dates for seven (7) Yale employees between May 27 and July 25. If Plaintiff's Motion is granted this schedule will have

---

[7] It should also be noted that, as early as January 29, 2025, Plaintiff advised the Court of his purported issues with Yale's ESI search, stating that it was "apparent" that the search terms and custodians "failed to capture relevant and material information that was requested by the Plaintiff." *See* ECF 266, at 4. Plaintiff knew of these alleged "deficiencies" yet made no effort to meet and confer on the issue and waited nearly two months to file this Motion to Compel additional custodial searches. This is yet another example of Plaintiff's strategic delay tactics in this case. Equally troubling, Plaintiff did not carve out from the Court's original January 31, 2025 deadline for filing Motions to Compel, Yale's objections to his written discovery nor did he attempt to meet and confer on Yale's objections to his written discovery until **after** filing the instant Motion. The Court should deny his Motion for these reasons alone.

to be rewritten, and it will be difficult to arrange the depositions of these academics during the summer months. It will also be challenging to schedule depositions during the first several weeks of the fall semester.

The sheer number of additional custodians and search terms the Plaintiff has proposed searching across such a broad timeframe would require Yale to collect, process, and review literally *millions* of additional documents. The data collected for the 16 custodians Yale has already searched totaled an astounding 916GB and resulted in 3,073,035 records before search terms were applied. Conducting a new search of 66 additional custodians and applying Plaintiff's broad proposed terms across an approximate 13-year period would dramatically increase not only the data Yale would be required to collect, process, and review, but also the extraordinary costs Yale would be forced to incur. Plaintiff has provided no justification for foisting such an unreasonable burden on Yale. Plaintiff, without any rationale, simply insists that Yale should produce more documents, but that is not sufficient to justify an order that Yale be burdened with opening up discovery into 66 additional custodians and requiring it to review millions upon millions of additional documents.

Plaintiff seeks relief that will effectively start the discovery process over at a time when the Court has ordered that discovery should be winding down, all based on a Motion heavy on rhetoric and misstatements and designed to make it appear that Yale has flouted its obligations under the Rules and has failed to properly respond to discovery. Nothing could be further from the truth. Yale has worked diligently through a large-scale and complicated discovery process to meet repeatedly with Plaintiff, work within the ESI parameters he proposed to reach an agreement, and produce relevant and responsive documents. As detailed herein, each item that

the Plaintiff now seeks to compel has either been produced or is discovery that is not warranted. The Court should deny the Motion in its entirety.

### III.    NATURE OF THE CASE

The Plaintiff's core claims against Yale—all of which Yale denies—relate to allegations that Yale mishandled its investigation of Jane Doe's UWC complaint asserting that he had sexually assaulted her in violation of the University's Sexual Misconduct Policies and improperly expelled him from the University. Yale properly followed all of the University's procedures in addressing the complaints made against Plaintiff and in suspending and later expelling Plaintiff.

As Plaintiff acknowledges in his brief, the "gravamen of his complaint is that Yale's failure to provide him with a fair disciplinary process in investigating and adjudicating Jane Doe's false allegation resulted in his improper suspension and ultimate expulsion from the University." Motion, at 1-2. Despite acknowledging the narrow and specific issues in play in this case, the Plaintiff now seeks to impose unmanageable discovery obligations on Yale as he embarks on a fishing expedition into the records of 66 additional custodians whom the Plaintiff admits might possess "**potentially relevant** ESI" (Motion, at 24), and moves to compel responses to 43 requests for production to which Yale lodged timely, detailed, and specific objections, and for which Yale agreed to undertake a reasonable ESI search as a way of resolving the parties disputes thereto.

The Plaintiff's Motion appears to be nothing more than a misguided attempt to further delay this case, needlessly increase defense litigation costs, and obtain information that he fancies that has nothing to do with the claims raised in his Complaint. The Court has previously raised concerns about Plaintiff's ostensible intent to mobilize the internet to intimidate and harass

the defendants, and has cautioned Plaintiff about litigating this case on social media. *See* ECF 94, at 9:5–9, 14:12–19. It has also recently concluded that Plaintiff has engaged in "egregious" misconduct by violating this Court's Orders. *See* ECF 265, at 13. The Court must, therefore, balance Plaintiff's instant request against his plan to litigate this case outside of the Court, including with the documents he receives through discovery, and his willingness to violate Court Orders, including Orders restricting the use of items and information received in discovery.

Regardless, Yale has reasonably and appropriately complied with the Plaintiff's discovery requests and it conducted its ESI search using the custodians and search terms that Plaintiff proposed. There is no basis to support the relief sought in Plaintiff's Motion, which should be denied in its entirety.

## IV.    LEGAL FRAMEWORK FOR COURT'S REVIEW

### A. Discovery Standards

Federal Rule of Civil Procedure 26(b)(1) provides that discovery may be taken regarding "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," considering the importance of the issues at stake, the importance of the discovery in resolving those issues, the amount in controversy, and the weighing of burdens and benefits. *See* Rule 26(b)(1).

Courts are not required to permit a party to engage in a "fishing expedition" in the hope of supporting a claim. *See, e.g.*, *Tucker v. American Intern. Grp, Inc.*, 281 F.R.D. 85, 95 (D. Conn. 2012) (CSH) ("Plaintiff seeks . . . in effect, to dredge an ocean of [the defendant's] electronically stored information and records in an effort to capture a few elusive, perhaps non-existent, fish."); *Kaufman v. All Season Marine Works, Inc.*, No. 3:11cv1874 (VLB), 2012 WL 4928862, at *7 (D. Conn. Oct. 16, 2012) ("Discovery is not intended to be a fishing expedition,

but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support."); *Blinkoff v. Dorman*, No. 3:06cv607 (SRU) 2007 WL 9754530, at *2 (D. Conn. Sept. 11, 2007) ("To permit further discovery on the issue would be to authorize a fishing expedition at significant cost to Scottsdale, as well as to deflect attention from the issues and controversies that remain in this case.").

### B. Motions to Compel

"When a party files a motion to compel, it bears the initial burden to show the relevance of the information it seeks." *Huseby, LLC v. Bailey*, No. 3:20-cv-00167 (JBA), 2021 WL 3206776, at *6 (D. Conn. July 29, 2021). After this burden has been met, the "party resisting discovery [then] bears the burden of showing why discovery should be denied." *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009). "Put differently, the moving party must make 'a *prima facie* showing of relevance,' after which 'it is up to the responding party to justify curtailing discovery.'" *Huseby*, 2021 WL 3206776, at *6 (quoting *Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 48 (E.D.N.Y. 2018)).

All "[m]otions relative to discovery," including motions to compel, "are addressed to the discretion of the [district] court." *Soobzokov v. CBS, Inc.,* 642 F.2d 28, 30 (2d Cir. 1981). "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

### V. ARGUMENT

#### A. Plaintiff Fails to Carry His Burden in Demonstrating That he is Entitled to Additional ESI Discovery.

As the "party seeking to compel another party to search the files of additional custodians [Plaintiff] bears the burden of establishing the relevance of the documents it seeks from those

{N6065590;2}                                      16

custodians." *Mortg. Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.,* 2017 WL

2305398, at *3 (S.D.N.Y. May 18, 2017) (denying motion to compel discovery from additional

custodians in its entirety because "plaintiffs ha[d] not met the threshold for court intervention").

Plaintiff relies on Rule 26(b)(1)'s general, broad standard of relevance in an attempt to justify his

demand to seek discovery from 66 additional custodians. Motion, at 20. Plaintiff, however, must

meet a higher standard of relevance to justify his demands.

Specifically, Plaintiff "must demonstrate that the additional requested custodians would

provide unique relevant information by providing evidence that there are unique responsive

documents being missed in the current search scheme that would justify the inclusion of

additional custodians." *Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y.*

*Mellon*, No. 14 CIV. 9372 (GBD)(HBP), 2018 WL 2215510, at *9 (S.D.N.Y. May 15, 2018)

(internal quotations and citation omitted). He must also make a "particularized showing that

[each] specific . . . custodian[] will be the exclusive custodian of relevant information." *In re*

*Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2013 WL 4838796, at *2 (S.D.N.Y.

Sept. 11, 2013). Where, as here, the requesting party provides "no evidence that there are unique

responsive documents being missed in the current search scheme that would justify the inclusion

of additional custodians," its request for discovery from additional custodians must be denied.

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 107 (S.D.N.Y. 2013).

Here, Plaintiff admits that the 66 additional custodians that he seeks to compel may

possess only "***potentially relevant ESI***." Motion, at 24. He speculates "that other Yale

administrators and officials possessed relevant" information and that Yale's ESI search "excludes

multiple high-level administrators, board members, and faculty who were intimately involved in

decision making around Plaintiff's suspensions, expulsion, and readmission requests." *Id.* But

simply because "a person may have had some connection to the events in question does not automatically mean that such person must be included as an ESI custodian." *Enslin v. Coca-Cola Co.*, No. 2:14-cv-06476, 2016 WL 7042206, at *3 (E.D. Pa. June 2016) (denying motion to compel additional custodians because plaintiff provided no basis to "second-guess[] the responding party's representation that it conducted a reasonable inquiry for responsive information" and was not "able to articulate a basis for the court to find that ESI in the possession of the additional custodians would be different from, and not simply duplicative of, information that the responding party has already produced.").

Plaintiff provides no evidence that the files of any of the proposed custodians would contain unique responsive documents that are not duplicative of the records already produced from the 16 original custodians. In fact, his purported "justifications" for searching these additional custodians demonstrate that Plaintiff brought this Motion without a shred of evidence that any of the 66 proposed custodians possess additional non-cumulative relevant information. *See, e.g.,* Motion, at 27 ("many communications that are unique, discoverable and responsive *likely went through her.* . ." and another custodian "*appears* to have been involved in meetings concerning the Plaintiff during the relevant time period, and thus *likely* has discoverable unique responsive relevant material.")[8]. His speculation and curiosity cannot justify his unduly

---

[8] In addition to confirming that these proposed custodians do *not* have unique relevant information, Plaintiff's purported justifications confirm his Motion is nothing more than a fishing expedition. *See e.g.*, Motion, at 25, Request 6 urging a search into the records of Dr. Howard Zonana to "reveal how the University used psychiatric evaluations in its disciplinary process"; *id.* at 26, Request 7 claiming that Madelon Baranoski has unique relevant information "responsive to the Plaintiff's *requests*." (emphasis added). Asserting relevance to his own discovery requests, however, does not meet the standard of Rule 26: the discovery sought must be relevant to a claim or defense in the case. *See also id.*, at Request 11 claiming that a search of Omer Bajwa's records would "demonstrate how Yale's Muslim chaplain responded to Title IX allegations against a Muslim student." It is impossible to postulate that the Muslim chaplain's response to the Title IX allegations against Plaintiff have any relevance to the Plaintiff's claims in this case, especially when Plaintiff has raised no claim of religious discrimination.

burdensome demand for additional ESI collections and reviews when this search is not proportional to the needs of the case.

Plaintiff complains that Yale's search methodology is "fundamentally deficient" and that its production has been "inadequate," but fails to link any purported shortcomings with the failure to search the files of the additional 66 custodians. Plaintiff's mere speculation that other documents may exist (or his disappointment that the documents he does have do not support his theory of the case) does not provide a basis to order Yale to search additional custodians; the Federal Rules and well-established case law require far more. Plaintiff has not met the threshold for court intervention.

Plaintiff's inability to meet his burden with respect to the additional custodians is fatal to his Motion. The 16 custodians that Yale has already searched represent a reasonable search for responsive information; there has been no showing that Plaintiff's proposed additional custodians would provide any unique information. Thus, because the concept of proportionality instructs that Plaintiff is not entitled to "every single document, especially documents that have been or will be produced and which, therefore, have no marginal utility," the Court should deny the Plaintiff's Motion. *Blackrock*, 2018 WL 2215510, at *10.

### B. The Burden of Conducting Plaintiff's Proposed Search Far Outweighs the Benefits.

Even if Plaintiff met his burden of showing that each of the 66 additional custodians had some unique relevant information—which he categorically has not—discovery of their files would still not be warranted because the cost and burden on Yale to undertake such an expansive search (never mind the delay that such a search would have on this case) would be vastly out of proportion to what could be considered reasonable in this matter.

To date, Yale has already collected and processed for the 16 agreed-upon custodians, an enormous 916GB of data, equivalent to 3,073,035 records[9] and has incurred $ 65,957.98 in "electronic data-housing costs and related production and support costs" paid to its outside discovery vendor. *See* Exhibit Q, at ¶ 7, Declaration of Nina Cortiella, TransPerfect Legal. This, moreover, is on top of the equally significant expense associated with Yale's outside counsel's document review, privilege determinations and redactions, and production. Expanding the collection, review, and production in this case to include the files of 66 additional custodians searched over the span of 13 years, would likely return approximately **23 TB of data**[10], or approximately **149.5 million records**. *See* Exhibit R, at ¶¶ 15–16, Declaration of Thomas Castiello, Yale IT. Requiring Yale to collect and process documents from Plaintiff's full list of 66 additional custodians would thus likely result in **over $345,000 in additional costs** for Yale, before even factoring in the costs associated with Yale's outside counsel's review, privilege determinations and redactions, and production. *See* Ex. Q, at ¶ 10.

It is not just the monetary burden that is significant here. The sheer amount of time needed to collect, process, and review the exorbitant number of records will have a sweeping impact on the current case deadlines. Under the current scheduling order, *see* ECF 297, fact depositions are to conclude by August 15, 2025. The parties are currently in the process of scheduling depositions, having already agreed to dates for several of plaintiff's requested deponents, the earliest of which is currently scheduled for May 27, 2025, as well as the dates for the Plaintiff's deposition, slated for May 23, 2025.

---

[9] Many of these records comprise multiple pages, and in some instances, hundreds of pages.
[10] One terabyte (TB) is roughly equivalent to 6.5 million document pages. *See* Ex. R, at ¶ 14.

If Yale is forced to restart the discovery process, it will undoubtedly require a significant extension of the current, recently extended deadlines. The collection of thirteen years of data from the 66 custodians alone will take approximately 10 weeks. *See* Ex. R, at ¶ 17. That data will then need to be uploaded to Yale's ESI vendor's platform, a process that TransPerfect has estimated could take up to 153 days (or approximately five (5) months). *See* Ex. Q, at ¶ 9.

Once the documents are fully processed, and search terms are applied, Yale's lawyers would then need to review the documents to identify privileged materials. This review will undoubtedly take months. *See* Affidavit of Maria Laurato, at ¶¶ 22–23. Thus, granting the present Motion will require postponing the start of depositions until at least early to mid-2026, even under the most aggressive timeline.

Given the search Yale has already completed and the information it has already produced, the marginal utility of any information the additional custodians *might* possess is low. Yet the cost to Yale (and to the orderly and efficient administration of this case), on top of the costs it has already incurred in connection with its ESI search, would be substantial, unreasonable, and not proportionate to the needs of the case.

### C.   Yale's Search and Production of ESI is Reasonable and Appropriate in all Respects.

"Discovery disputes concerning the collection, review and production of ESI present special challenges that standard discovery disputes do not, including the substantial likelihood that the data possessed by the responding party is voluminous, stored in multiple formats and is duplicative across custodians." *Blackrock*, 2018 WL 2215510, at *7. Accordingly, courts in this Circuit have instructed that "the standard [in ESI discovery] is not perfection . . . but whether the search is reasonable and proportional." *Id.*; *see also Winfield v. City of New York*, 15 Civ. 5236 (LTS)(KHP), 2017 WL 5664852, at *11 ("In any ESI review, 'the Federal Rules of Civil

Procedure do not require perfection.'"); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sees., LLC*, 685 F. Supp. 2d 456, 461 (S.D.N.Y. 2010) ("Courts cannot and do not expect that any party can meet a standard of perfection [in ESI discovery].").

Consistent with these principles, when the adequacy of a party's ESI search terms or search methods are challenged, "the court applies a 'reasonableness test to determine the adequacy of the search methodology.' An adequate search is one that 'could . . . have been expected to produce the information requested.'" *Eurand Inc. v. Mylan Pharm., Inc.,* 266 F.R.D. 79, 85 (D. Del. 2010) (noting that "the reasonableness standard of FOIA is consistent with Fed. R. Civ. P. 26(1) and (2)(B) where reasonableness is the touchstone to determine the scope and appropriateness of the discovery requested and accessibility of electronically stored information."). If a party moves to compel additional ESI searching that is "unreasonably cumulative or duplicative or [where] the burden or expense of the proposed discovery outweighs its likely benefit" the motion should be denied. *See Helmert v. Butterball, LLC*, No. 4:08cv00342, 2010 WL 2179180, at *3 (E.D. Ark. May 27, 2010).

The "court should play no role in dictating" the responding party's "design of the search" unless the responding party's choices as to "search tools, selecting search terms, or . . . designating custodians," are "<u>manifestly unreasonable or the requesting party demonstrates that the resulting production is deficient</u>." (emphasis added) *Mortg. Resol. Servicing, LLC*, 2017 WL 2305398, at *2. Absent agreement among the parties, "the responding party is entitled to select the custodians most likely to possess responsive information and to search the files of those individuals." *Id.* A requesting party's mere "suspicion that all responsive documents have not been produced, without more," is not sufficient. *Swanson v. ALZA Corp.*, No. CV 12-04579-PJFH, 2013 WL 5538908, at *3 (N.D. Cal. Oct. 7, 2013).

In contrast to Yale's reasonable approach in collecting and producing ESI—which unquestionably included searching the very custodians, search terms, and timeframes Plaintiff proposed—the Plaintiff now urges, based solely on the number of documents Yale has produced thus far and Plaintiff's unsubstantiated speculation that more relevant documents exist, that Yale perform a search of nearly 50 additional keywords, including variations, applied over an arbitrary and excessive 13-year timeframe on the records of the 16 custodians Yale has already searched, as well as on 66 additional custodians, all of whom were known to Plaintiff at the time he brought suit.

Plaintiff cannot justify broadening Yale's ESI search on this basis, particularly where the agreed-upon custodian list already includes 16 members of the Yale community occupying a variety of positions, thereby ensuring a broad collection of relevant documents and information. Plaintiff must agree because they were on his list. Under these circumstances, Plaintiff cannot identify a concrete deficiency in the production, nor can he demonstrate that *any* of the additional proposed custodians will possess unique non-cumulative information. This is particularly true because "Plaintiffs do not need, and are not entitled under the rules of proportionality, to every single document related" to a discoverable issue. *In re Morgan Stanley Mortg.*, 2013 WL 4838796, at *2. Yale is not required to add ESI custodians that will be duplicative of information already produced, and the Federal Rules counsel against such discovery. *See* Fed. R. Civ. P. 26(b)(2) (instructing the court to limit the "extent of discovery" if it determines that the discovery sought is "unreasonably cumulative or duplicative.").

Yale Applied Plaintiff's Requested Time Frames and Search Terms Tied to Plaintiff's Name;
With His Broad Proposed Terms, He Now Seeks Unfettered Access into Effectively All
Custodial Files, Regardless of Relevancy

Contrary to Plaintiff's representation, Yale did not "restrict[] its keyword searches to

'Khan' or variations thereof." Motion, at 30. Yale's ESI search included the very search terms

that the Plaintiff proposed on September 12, 2024, which included many of the "obvious terms"

he complains Yale should now search, such as "Title IX", "UWC", "sexual misconduct",

"complaint", and "suspension", among others. *See* Ex. P. To be clear, Plaintiff is not seeking to

tie these broad search terms to his name. A search, therefore, of "suspension" across the inboxes

of 66 university custodians over a 13-year period would return tens, if not hundreds, of

thousands of documents about the irrelevant suspensions of other students for conduct unrelated

to the claims raised in this case, such as academic misconduct, and would add further risk of

sensitive information of non-parties being disseminated on social media.[11]

Plaintiff simply claims that Yale's search terms (*i.e.*, the Plaintiff's search terms) are

"inadequate" without any basis or example. That does not satisfy Plaintiff's burden on a motion

to compel. *See, e.g.,* 19 Sedona Conf. J. 1 (2018), Principle 7, p. 131 (the requesting party has the

burden on a motion to compel to show that the responding party's steps to produce relevant ESI

were inadequate).

What's worse, he now seeks to have Yale search approximately 50 additional terms that

either: (1) lack a logical link to *any* claim or defense in this matter (*e.g.*, "Elon OR Musk" and

"NYT OR New York Times"); or, (2) are untenably broad and refer vaguely to the subject matter

of this case without any connection to Plaintiff, making any request for them nothing more than a

---

[11] This is equally true where Plaintiff has requested all information for all unrelated UWC cases from January 1, 2015 through the present. *See* Section V.D., *infra.*

fishing expedition (*e.g.*, "Expel OR Expulsion OR suspend OR suspension" and "Complaint AND 'sexual misconduct'" and "Petition" and UWC"). Plaintiff makes no attempt to demonstrate how *any* of his additional proposed search terms would succeed in capturing relevant documents. Moreover, Plaintiff previously told Yale that he was "particularly interested in the time periods of September 1, 2015 to September 1, 2016 and September 1, 2018 to September 1, 2019" and later "insisted" that Yale search across those periods. Now he wants more: the files of **83 total custodians** to be searched from 2012 to the present, **a thirteen year time period**. He makes no attempt to justify this expanded time period.

Yale and the Plaintiff engaged in extensive negotiations regarding the terms of Yale's ESI search. The Plaintiff agreed to the search terms that Yale applied, but subsequently sought to condition his approval of those terms on the Defendants agreeing to extend case deadlines that the Court already signaled it was not inclined to revisit. Plaintiff's Motion should be denied based solely on his agreement to the search terms Yale previously ran. Indeed, Plaintiff knew about the additional custodians he now seeks to add to a new search and could have included those individuals and the additional search terms in the search he agreed to six months ago. If Plaintiff believed that these individuals actually had information relevant to this case, he would have, and should have, insisted on including them before the present time. The fact that Plaintiff did not do so establishes that the Plaintiff is simply seeking to harass Yale by making it run additional searches he previously acknowledged were unnecessary.

### D. Plaintiff has not met his burden to compel responses to requests for production that are untimely, irrelevant, facially overbroad, or not proportional to the needs of the case.

"Asking a court to compel a party to search the ESI of additional custodians is similar to asking a court to compel a party to undertake additional efforts to search for paper documents. In

either case, the requesting party is second-guessing the responding party's representation that it conducted a reasonable inquiry for responsive information, and in either case, the burden appropriately lies with the requesting party to show that the responding party's search was inadequate." *Enslin*, 2016 WL 7042206, at *3. "[I]nformation that is reasonably calculated to lead to the discovery of admissible evidence is considered relevant for the purposes of discovery." *In re PE Corp. Secs. Litig.*, 221 F.R.D. 20, 23 (D. Conn. 2003). "That said, discovery requests that are based on pure speculation and conjecture are not permissible. Moreover, discovery may not be used as a fishing expedition to discover additional instances of wrongdoing beyond those already alleged." *Id.* Here, Plaintiff seeks further responses to 43 individual discovery requests based on baseless accusations of "stonewalling", "delay", "minimal compliance", "dilatory tactics", "unjustified objections", and a "refusal" to produce documents in response to Plaintiff's purportedly unobjectionable discovery requests.

Yale has properly responded to Plaintiff's timely discovery requests seeking relevant information and documents—and, in fact, has already responded completely to much of the discovery sought in the Motion—but has lodged specific and detailed objections to those requests that: (1) were untimely served; (2) exceed the scope of relevant inquiry; (3) are facially overbroad; and, (4) are not proportional to the needs of the case. Despite its valid and, until now, unchallenged objections to Plaintiff's requests, Yale nevertheless undertook the extensive ESI search to address the parties' disputes as to Plaintiff's untimely 2024 written discovery, producing relevant and responsive documents to Plaintiff. Plaintiff is not entitled to both the ESI search it agreed to *and* 11th-hour discovery into his untimely requests for which all the negotiations and meetings that resulted in the ESI search was meant to resolve.

Nothing in the record justifies the sweeping discovery Plaintiff seeks into the seven broad categories of allegedly withheld information. He has made no showing that Yale is withholding any relevant and non-privileged documents. The notion that Yale's production is insufficient based on Plaintiff's ungrounded belief that more documents exist simply is not enough to grant a motion to compel that would effectively require Yale to go back to square one and begin its document collection efforts anew. *See, e.g., U.S. v. O'Keefe,* 537 F. Supp. 2d 14, 22 (D.D.C. 2008) (noting that in the face of a protest of "inexplicable deficiencies" in a party's production, vague and speculative notions that there, in essence, *should be more*, are insufficient to compel judicial action). Plaintiff has shown no indicia of bad faith on the part of Yale, as none exists, to warrant granting the sweeping relief he seeks in his Motion.

        i.    <u>Yale's Objections are Demonstrably Detailed</u>

Yale's objections to Plaintiff's requests for production are neither "boilerplate" nor "unsupported" as Plaintiff falsely claims. Rather, Yale's objections provide sufficient specificity to enable the Court to evaluate their merits. Yale has specifically detailed its objections to each discovery request the Plaintiff challenges in his Motion. Plaintiff's claim that Yale raised "boilerplate and unsupported objections" that are "procedurally improper" ignores the seven pages of specific "general objections" lodged in response to Plaintiff's untimely 2024 discovery requests, which objections are supported by specific citations to the record and uncontroverted authority, as well as the nearly 22 pages of specific and detailed objections to *each* of the 83 requests for production. Yale has thus met its burden under Rule 26(b)(1) by demonstrating specifically how, despite the broad and liberal construction afforded by the federal discovery rules, each of Plaintiff's untimely requests are not relevant, or how each question is overly broad, burdensome or oppressive. Accordingly, the Court should deny the Plaintiff's Motion to Compel

additional responses to his written discovery and sustain each of Yale's timely, appropriate, and detailed objections thereto.

      ii.    <u>Plaintiff has known of Yale's objections to his 2020 written discovery for four years; he's had Yale's objections to his 2024 written discovery for nearly one.</u>

In assessing the timeliness of a motion to compel, courts consider when the movant learned of the purported discovery deficiencies and the movant's diligence in bringing those deficiencies to the court's attention. In *Gucci Am., Inc. v. Guess?, Inc.*, 790 F. Supp. 2d 136, 140-41 (S.D.N.Y. 2011), for example, the court denied a motion to compel as untimely where it was brought approximately 18 months after the defendants served their discovery responses, noting that the "defendants' position . . . was made clear early and often," yet the plaintiff "never challenged those objections in an application to the Court." Similarly, in *Tyll v. Stanley Black & Decker Life Ins. Program*, No. 3:17-CV-1591 (VAB), 2018 WL 5847240, at *4 (D. Conn. Nov. 8, 2018), the court denied a motion to compel brought "on the eve of the [] discovery deadline," noting that the plaintiff "had plenty of opportunities to alert . . . the Court to the alleged [discovery] insufficiencies" earlier, "but did not do so." Numerous other courts have reached similar conclusions. *See, e.g.*, *Hyundai Merch. Marine v. U.S.*, No. 89 CIV. 2025 (PKL), 1992 WL 204360, at *1 (S.D.N.Y. Aug. 10, 1992) (denying motion to compel, "[n]otwithstanding the substantial amount in controversy in th[e] case," because the plaintiffs "suggest[ed] no good reason why they waited until the day before the discovery deadline to request information they had known about for at least a month"); *Gutman v. Klein*, No. 03 CV 1570 BMC RML, 2010 WL 4975554, at *2-3 (E.D.N.Y. Aug. 19, 2010) (denying motion to compel where, "[a]t numerous prior stages of this protracted litigation, defendants voiced their dissatisfaction with [plaintiff's]

production," including at a "lengthy conference" in which "the parties argued numerous discovery issues, but at which defense counsel did not raise the [alleged deficiency]").

Here, the Court should deny Plaintiff's Motion because: (1) it seeks the production of documents that are either not relevant to any of the claims or defenses in this action or disproportionate to the needs of this case; and (2) if the Court concludes that Plaintiff seeks some documents that would otherwise be discoverable, he has waived any right to those documents as a result of his undue delay in bringing the alleged discovery deficiencies to the Court's attention.

Even if it could somehow be concluded that Plaintiff had demonstrated any discovery deficiencies in this Motion, Plaintiff had knowledge of the alleged deficiencies he now complains of and has had multiple opportunities to raise such deficiencies months, indeed *years,* earlier. He instead waited until the eve of the close of document discovery to seek judicial relief. Accordingly, the Court should deny Plaintiff's Motion and sustain Yale's objections to RFPs 1-6 and 13 from Plaintiff's 2020 written discovery (*see* Ex. B), and RFPs 7, 8, 12, 16, 17, 19-22, 24, 25, 31, 36, 38, 39, 55-59, 63-70, 74-76, and 78-82 from Plaintiff's 2024 written discovery (*see* Ex. C), based on Plaintiff's failure to timely bring his complaints regarding Yale's production before the Court.

iii.   <u>Plaintiff already has many of the documents he seeks to compel.</u>

Plaintiff is requesting documents that he has had in his possession, for in some instances since as early as 2020. This demonstrates that Plaintiff has been less than diligent in reviewing the documents that Yale has produced. Among others, the Plaintiff seeks to compel production of the following categories of documents which are already in his possession:

1. *Plaintiff identifies 11 requests for documents related to the "UWC Proceedings Against the Plaintiff." (See Motion, at 3–7.[12])*

In addition to having received UWC-related documents during the pendency of his proceeding, by as early as 2020, Yale produced to Plaintiff additional relevant and responsive documents related to the UWC Proceeding, including internal correspondence regarding Jane Doe's complaint, Plaintiff's UWC hearing process, correspondence between Yale and Jane concerning her UWC complaint, correspondence between Yale and Plaintiff concerning the UWC process, and various other submissions to, from, and among the UWC concerning Jane's complaint against the Plaintiff. Yale then supplemented that production, as Plaintiff admits (*see* Motion, at 18–19), with *all* of the non-privileged paper files from the UWC office concerning Plaintiff, including, without limitation, the hand-written notes from all UWC panel members, the items provided the UWC members, and documents related to Plaintiff's appeal of the UWC report. Yale has produced all non-privileged documents responsive to this first category of requests, and has informed Plaintiff of this, most recently at the parties' April 22 meet and confer. Yet he persists in claiming there is more without a shred of evidence to support that claim.

2. *Plaintiff identifies 6 requests related to "Comparators." (See* Motion, at 7–9[13])

Plaintiff's request would require Yale to produce *all* information for *all* unrelated UWC cases from January 1, 2015 through the present. In response, Yale has produced all relevant and non-privileged documents in its possession responsive to these requests, including spreadsheets (with appropriate redactions) outlining the number and nature of other UWC complaints and outcomes. Yale further directed Plaintiff to Yale's publicly available annual reports on sexual

---

[12] *See* RFP Nos. 1–6 from Plaintiff's 2020 discovery requests (Ex. B), and RFP Nos. 55–59 from his 2024 discovery requests (Ex. C).
[13] *See* RFP Nos. 7, 8, 67–70 from Plaintiff's 2024 discovery requests (Ex. C).

misconduct. Plaintiff has all of the information he has requested. He is not entitled to every document related to the numerous UWC complaints that were filed over the last ten years.

> 3. *Plaintiff requests all communications between himself and Yale and its agents.* (*See* Motion, at 10–11)

In RFPs 21 and 22 (2024), Plaintiff seeks all written communications from Plaintiff to Yale and from Yale to Plaintiff from 2017, 2018, and 2019. These communications are as accessible to Plaintiff as they are to Yale. Moreover, Yale provided Plaintiff with access to his *entire* Yale inbox, and thus access to all correspondence he has requested.

> 4. *Yale produced Plaintiff's transcript two months before he moved to compel its production.* (*See* Motion, at 26)

In RFP 78 (2024), Plaintiff seeks to compel the production of his academic transcript. Yale produced this on January 21, 2025 (YALE-0008058). This is a blatant example of Plaintiff's wasting the Court's and defendants' time and resources on repetitive and baseless document requests.

> iv. <u>Yale has agreed to produce Plaintiff's financial records and to update its responses to several requests.</u>

During the April 22, 2025, meet and confer, Yale worked with Plaintiff to resolve the following challenged requests:

- **RFP 5 (2020)**: Yale has agreed to produce copies of Plaintiff's financial aid records (*see* Motion, at 5);

- **RFP 58 (2024)**: Yale agreed to produce, and has since produced, additional non-privileged pages of the UWC decision maker's hand-written notes (*see id.*, at 6); and,

- **RFP 68 (2024, requesting documents referring to the dates and number of cases adjudicated by the UWC)**: Plaintiff withdrew this request (*see id.*, at 8).

Moreover, Yale agreed to update its responses to the following challenged requests:

- **RFP 55 (2024)**: Without waiving its objection, Yale agreed to update its response to identify by bates-number, where in its 2020 production Jane's complaint was produced (notwithstanding that Yale had already identified the appropriate bates number in its objection) (*see* Motion, at 6);

- **RFP 17 (2024)**: Without waiving its objection, Yale agreed to update its response to identify by bates-number the relevant documents discussing Plaintiff's immigration status it has already produced (*see id.*, at 10);

- **RFP 25 (2024)**: Without waiving its objection, Yale agreed to update its response to reflect that it has searched for and has no records responsive to the request (*see id.*, at 11).

Yale's efforts at compromise *should* resolve the challenge to these requests such that the Court's intervention is unnecessary.

v.    <u>The parties' agreement that Yale supplement its interrogatory response should limit Plaintiff's requests for Title IX training materials to 2018.</u>

At a January 10, 2025 meet and confer, the parties agreed to narrow Plaintiff's 2020 interrogatory request for information on the training provided by the UWC from many years to the training provided in 2018. *See* <u>Ex. B</u>, Interrogatory 5(a). As part of their agreement, on February 12, 2025, Yale supplemented its response to Plaintiff's Interrogatory 5(a) with detailed information about the 2018 training. *See* <u>Exhibit S</u>, Supplemental Interrogatory Response. This should have also resolved the Plaintiff's RFPs 64, 65, and 76 (2024).

Moreover, at the parties' May 6, 2025, meet and confer, Yale offered to provide Plaintiff with Yale's 2018 Title IX training materials in an attempt to resolve fully the dispute as to

Plaintiff's RPF Nos. 64, 65, and 76. Plaintiff, however, indicated that he would need to see the

documents produced before agreeing to withdraw his challenge to those requests. As such, this

dispute remains unresolved, even though Yale offered a reasonable resolution.

vi.   <u>Yale adopts and incorporates the arguments raised by Jane Doe with
respect to RFP Nos. 24 and 63.</u>

In addition to the reasons set forth herein, the Court should also sustain Yale's objections

to Plaintiff's RFP Nos. 24 and 63 (*see* Motion, at 11) for the reasons set forth in Jane Doe's

Objection to Plaintiff's Motion to Compel, which Yale adopts and incorporates herein.

**E. Upon Denial of Plaintiff's Motion, Yale is Entitled to the Expenses
Incurred in Responding to the Motion, Including its Attorneys' Fees**

Pursuant to Fed. R. Civ. P. 37(a)(5)(B), if a motion to compel is denied, the court

> [m]ust, after giving an opportunity to be heard, require the movant,
> the attorney filing the motion, or both to pay the party . . . who
> opposed the motion its reasonable expenses incurred in opposing the
> motion, including attorney's fees. But the court must not order this
> payment if the motion was substantially justified or other
> circumstances make an award of expenses unjust.

"An award of expenses under Rule 37(a)(5)(B) is 'mandatory' unless an exception is

met." *Saliga v. Chemtura Corp.*, No. 3:12cv832 (VAB), 2016 WL 3093355, at *1 (D. Conn. June

1, 2016) (citing *Pegoraro v. Marrero*, No. 10 CIV. 00051 (AJN) (KN), 2012 WL 5964395, at *4

(S.D.N.Y. Nov. 28, 2012)). "The presumption in favor of imposing expense shifting sanctions

against a party who unsuccessfully litigates a motion to compel reflects the importance of using

monetary sanctions to deter abusive or otherwise unjustifiable resort to the judiciary in the

discovery process." *Saliga*, 2016 WL 3093355, at *1 (quoting James Wm. Moore et al., <u>Moore's</u>

<u>Federal</u> <u>Practice</u> ¶ 37.23[1] (3rd ed. 2015)). "The sanctions provision of Rule 37(a)(5)(B) was

intended 'to reduce the burden on the courts' by deterring the "making [of] unjustified motions

for discovery . . . ." *Id.* (quoting 8B Charles A. Wright et al., <u>Federal Practice and Procedure</u> §

2288 at 514 (3ʳᵈ ed. 2010). "The rule places directly on attorneys a somewhat unique sanction to refrain from the frivolous, to weigh carefully considerations of relevancy and privilege, and to advise in accordance with the best judgment." *Id.*

Yale has now expended needless resources defending yet another—the third—meritless motion to compel. As detailed herein, Yale is entitled to its expenses and fees incurred in the preparation of this opposition to Plaintiff's baseless Motion.

### F. An Award of Costs or Attorney's Fees to Plaintiff Would Be Unwarranted Even if the Court Grants Plaintiff's Motion.

The Plaintiff has not shown that any "offense" has occurred in Yale's execution of discovery searches, responses, or productions. Rule 37 allows a court to impose sanctions for a party's failure to cooperate during the course of discovery. *See* Fed. R. Civ. P. 37. Moreover, Rule 37(a)(5)(A) prohibits the Court from ordering the payment of attorneys' fees if "the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; [or] (ii) the opposing party's nondisclosure, response, or objection was substantially justified." A position is "substantially justified" if "reasonable people could genuinely differ on whether a party was bound to comply with a discovery rule." *Wenc v. New London Bd. of Educ.,* No. 3:14-cv-0840 (VAB), 2016 WL 4203371, at *1 (D. Conn. Aug 9, 2016) (internal citations and quotation marks omitted).

There is no basis for Plaintiff's request for sanctions. Yale has timely and appropriately complied with Plaintiff's discovery requests. Equally important, Yale is more than substantially justified in objecting to Plaintiff's untimely, duplicative, overly broad, irrelevant, disproportional, and otherwise improper discovery requests, served more than 3 months after the Court's deadline, and which also violate rule 33(a). Since Yale's initial compliance in September of 2020, the plaintiff has sat on these objections for more than 4 years; he has similarly failed to address

Yale's 2024 objections for nearly a year, despite multiple threats to do so.   His Motion, chock full of inaccuracies and omissions, provides no basis for the imposition of sanctions against Yale. Accordingly, his outrageous request should be denied.

### G.  Plaintiff Should Bear the Costs of Any Additional Discovery This Court May Order.

If the Court orders the search of additional custodians and/or orders Yale to run additional search terms over an approximate 13-year period, cost-shifting is appropriate. *See Barrera v. Boughton*, No. 3:07cv1436 (RNC) (DFM), 2010 WL 3926070, at *3 (D. Conn. Sept. 30, 2010) (Cost-shifting should be considered "when electronic discovery imposes an undue burden or expense on the responding party.") (quoting *Zubulake v. UBS Warburg, LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003).

Although the "presumption is that the responding party must bear the expense of complying with discovery requests," *Oppenheimer Find, Inc. v. Sanders*, 437 U.S. 340, 358 (1978), *Zubulake* sets forth a seven-factor test used to determine whether, despite this general presumption, the requesting party should bear the costs of producing electronic discovery:  (1) the extent to which the request is specifically tailored to discover relevant information; (2) the availability of such information from other sources; (3) the total cost of production, compared to the amount in controversy; (4) the total cost of production, compared to the resources available to each party; (5) the relative ability of each party to control costs and its incentive to do so; (6) the importance of the issues at stake in the litigation; and (7) the relative benefits to the parties of obtaining the information. *Zubulake*, 217 F.R.D. at 322. *Zubulake* instructs courts to "not just add up the factors"; instead, "the first two factors—comprising the marginal utility test—are the most important." *Id.*, at 322–23.

Here, Plaintiff's request to search an additional 66 custodians across a near 13-year period is not "specifically tailored to discover relevant information." As discussed, Plaintiff wholly failed to present *any* evidence that the proposed custodians have any unique, non-duplicative information not already captured by and produced from the 16 agreed-to custodians who served in key roles during the relevant time periods. Moreover, the relevant information Plaintiff seeks is "availabl[e] . . . from other sources", namely, the 16 custodians Yale has already searched, as well as from depositions. Further, the cost to collect, process, review, and ultimately produce documents from the additional 66 custodians after applying Plaintiff's broad search terms will, without question, be significant. *See* Exs. Q and R. In the end, an additional custodial production will cause Yale to incur additional and significantly burdensome costs for minimal, *if any*, benefit. Accordingly, should the Court order an additional custodial search and production, Yale requests that the Court order Plaintiff to bear those costs.

## VI.    CONCLUSION

Based on the foregoing, Yale respectfully requests that the Court deny Plaintiff's Motion in its entirety. The Motion represents nothing more than a fishing expedition that seeks the production of documents and information that is irrelevant and disproportionate to the issues in dispute and which would impose upon Yale the very type of discovery burden that our courts consistently disallow. This case has been pending since 2019. Extensive written discovery has been exchanged. Depositions are about to commence. It is time to get to the merits of this case and put an end to Plaintiff's delay tactics. This Motion should be denied.

THE DEFENDANT, Yale University,

By: _____
Giovanna Tiberii Weller (ct11187)
Patrick M. Noonan (ct00189)
Maria L. Laurato (ct 31443)
Carmody Torrance Sandak & Hennessy LLP
195 Church Street
P.O. Box 1950
New Haven, CT 06509
Phone: 203-777-5501
Fax: 203-784-3199
Email: gweller@carmodylaw.com
Email: pnoonan@carmodylaw.com
Email: mlaurato@carmodylaw.com

## CERTIFICATION OF SERVICE

This is to certify that on May 7, 2025, the foregoing was served by e-mail and/or regular mail, on all counsel of record, as follows:

Alexander T. Taubes
470 James Street, Suite 007
New Haven, CT 06513
alextt@gmail.com

Mario Cerame
Aeton Law Partners
311 Centerpoint Drive
Middletown, CT 06457
mariokcerame@gmail.com

James M. Sconzo, Esq.
Brendan N. Gooley, Esq.
Carlton Fields, P.A.
One State Street, Suite 1800
Hartford, CT 06103
jsconzo@carltonfields.com
bgooley@carltonfields.com

_____
Maria L. Laurato