UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SAIFULLAH KHAN | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:19-cv-01966-KAD |
| | : | |
| V. | : | |
| | : | |
| YALE UNIVERSITY, ET AL., | : | |
| Defendants. | : | MAY 14, 2025 |

### REPLY IN SUPPORT OF MOTION TO COMPEL

Yale's Opposition reveals the fundamental flaw in its discovery position: it seeks to hold Plaintiff to an alleged "agreement" that never existed. Yale's characterization of the parties' negotiations misrepresents the record. It also makes no sense. No reasonable litigant would permanently limit discovery to 16 custodians before reviewing a single document, yet Yale now claims Plaintiff is bound by discussions that explicitly contemplated further discovery based on initial productions. This disconnect between Yale's assertions and the factual record permeates its Opposition. Yale claims Plaintiff "agreed" to search parameters while omitting that such discussions were expressly conditioned on scheduling accommodations and rights to seek additional discovery—conditions Yale rejected. Yale invokes burden, but Yale cites inapposite commercial litigation precedents while ignoring directly applicable Title IX authority. Most troubling, Yale frames its minimal production as reasonable while failing to explain why core participants in Plaintiff's disciplinary proceedings remain unsearched.

The stark contrast between Title IX jurisprudence and Yale's cited authorities exposes the flaw in their position. While Yale relies on cases like *Blackrock*—massive financial litigations between sophisticated parties—courts handling Title IX cases recognize a different reality. As the court in *David Smith v. Brown University*, 1:22-cv-329-JJM-PAS (D.R.I. Sept. 28, 2023) explained, refusing to disclose internal records "precludes [plaintiff] from evaluating [the

1

university's] internal decision making, its rationale for findings of fact, its process for evaluating credibility contests, the procedural history of these claims, and its treatment of evidence generally—all areas of inquiry that go to the heart of his Title IX claim." This distinction matters because evidence of institutional bias rarely announces itself. Unlike commercial transactions that generate redundant documentation across deal teams, discriminatory intent often resides exclusively with senior decision-makers or emerges only through pattern analysis across multiple cases. Yale's attempt to apply RMBS litigation standards to a discrimination case would effectively immunize universities from Title IX liability by allowing them to control what evidence sees daylight.

## I. TITLE IX NEEDS DIFFERENT DISCOVERY THAN COMMERCIAL CASES

Yale's fundamental error lies in treating this Title IX case like a securities dispute. Every major case Yale cites—*Blackrock*, *Morgan Stanley*, *Fort Worth*—emerged from complex financial litigation, where plaintiffs already possessed substantial discovery, and sought cumulative documentation. Title IX cases operate under different principles for compelling reasons. Courts consistently recognize that discrimination plaintiffs face unique challenges that commercial litigants do not encounter.

The proper analytical framework appears in *Brown University*, *supra*, where the court granted a student's motion to compel over university objections. The court recognized the "substantial imbalance in access to information" inherent in Title IX cases, explaining that refusal to disclose internal records "precludes [plaintiff] from evaluating [the university's] internal decision making, its rationale for findings of fact, its process for evaluating credibility contests, the procedural history of these claims, and its treatment of evidence generally—all areas of inquiry that go to the heart of his Title IX claim."

2

This principle reflects a crucial distinction Yale ignores: commercial litigants can identify missing documents because they participated in the underlying transactions, while discrimination plaintiffs must uncover bias without knowing how it manifested behind closed doors. As *Brown* explained, requiring plaintiffs to "predict all the ways that bias might manifest itself in [the university's] conduct given the disparity of access to information between the parties" would create an impossible standard that effectively immunizes institutions from Title IX liability.

The practical implications of this distinction appear throughout the burgeoning Title IX jurisprudence nationwide. In *Doe v. Washington & Lee University*, 6:19-cv-23-NKM-RSB (W.D. Va. Mar. 25, 2020), the court granted a student's motion to compel similar administrative records, finding that "the content of investigative reports and hearing decision memos relating to allegations of similar sexual misconduct relates directly [to] his Title IX claims." The court rejected confidentiality objections—similar to those Yale raises here—noting these "concerns are properly addressed by...restricting access of these records to 'Attorneys Eyes Only.'"

Similarly, *Doe v. Ohio State University*, No. 2:15-cv-2830 (S.D. Ohio Oct. 16, 2015), recognized that determining whether a university "treats males unfairly in sexual misconduct investigations...necessitates looking at the data and the context surrounding that data." The court understood what Yale's Opposition refuses to acknowledge: evidence of institutional discrimination rarely concentrates in obvious places but rather emerges through comprehensive examination of decision-making patterns, comparative outcomes, and institutional communications that span multiple custodians.

Yale's attempt to invoke FERPA as a shield further demonstrates its misunderstanding of Title IX discovery. Courts have consistently rejected such objections as lacking legal basis. *Doe v. Northern Kentucky University*, 2:16-cv-28-WOB-JGW (E.D. Ky. Oct. 24, 2016), not only

3

compelled production over FERPA objections but sanctioned the university for raising them, while *Brown v. University of Kansas*, No. 10-2606-EFM-KGG (D. Kan. Feb. 27, 2012), held FERPA objections categorically improper in civil discovery. As *Doe v. Rollins College*, No. 6:18-cv-1069 (M.D. Fla. Apr. 10, 2019), explained, courts routinely order production of comparative disciplinary records subject to protective order and with names redacted—precisely the relief Plaintiff seeks here.

## II. THE SELECTION OF CUSTODIANS EXCLUDES KEY DECISION-MAKERS

Yale's Opposition inadvertently proves why additional custodians are necessary. While seemingly acknowledging that "high-level administrators, board members, and faculty...were intimately involved" in Plaintiff's case, Yale offers no explanation for excluding these admitted participants from its search. This disconnect between acknowledgment and action exposes the inadequacy of Yale's production. Consider one of the most glaring omissions: Stephanie Spangler, Yale's Title IX Coordinator throughout the relevant period. The person most responsible for Title IX compliance—who shaped procedures, attended key meetings, and coordinated Yale's institutional response—somehow fell outside Yale's definition of relevant custodians. No amount of commercial litigation precedent can justify excluding the Title IX Coordinator from a Title IX case.

Similarly inexplicable is the exclusion of Peter Salovey, Yale's President, who participated in discussions about Plaintiff's readmission. As chief executive overseeing Yale's Title IX compliance during a period of intense public scrutiny, Salovey's communications about institutional pressures and policy considerations exist nowhere else. Yet Yale deems his perspective irrelevant while claiming its production is comprehensive, without making any specific factual showing. These omissions form a pattern. Jonathan Holloway personally signed

Plaintiff's suspension letter after consulting with colleagues, but his deliberative communications remain unsearched. Sarah Worley conducted the investigation underlying all subsequent proceedings, but Yale claims her files lie beyond reach. Each exclusion individually might seem defensible; collectively, they reveal systematic avoidance of custodians most likely to possess evidence of discriminatory intent or procedural irregularities.

### III. YALE CANNOT CREDIBLY CLAIM AN "AGREEMENT"

Yale's centerpiece argument—that Plaintiff "agreed" to existing search parameters—collapses under scrutiny. The record demonstrates that Plaintiff's willingness to consider Yale's proposed custodians remained conditional on three factors: reviewing actual production to assess adequacy, retaining rights to seek additional discovery if gaps appeared, and receiving scheduling accommodations for proper discovery sequencing. Yale rejected these conditions while claiming the underlying discussions created binding obligations.

This selective enforcement of preliminary negotiations defies litigation reality. No competent counsel permanently restricts discovery before reviewing a single ESI document. When these discussions occurred, Yale had produced virtually nothing responsive to requests pending since 2020. Plaintiff faced an information vacuum—no internal emails, no deliberative documents, no evidence of decision-making processes. In this context, any "agreement" to limit discovery would be illusory, akin to waiving defenses before reading the complaint.

Yale's own Opposition acknowledges this timeline but draws the wrong conclusion. Rather than recognizing why conditional discussions could not create final agreements, Yale transforms Plaintiff's good-faith efforts to narrow disputes into permanent waivers of discovery rights. This heads-I-win-tails-you-lose approach—accepting aspects of negotiations Yale favors

5

while rejecting conditions that made those aspects palatable—cannot create enforceable agreements.

## IV. THE DISCOVERY SOUGHT IS NEITHER BURDENSOME NOR DISPROPORTIONATE

Yale's declarations do not prove that the discovery sought by Plaintiff would be unduly burdensome. Start with TransPerfect's numbers: 916GB from 16 custodians supposedly scales to 23TB for 66 additional custodians. This represents a perfect 25x increase in data for a 4x increase in custodians. This defies logic.

The processing time calculations are even more suspect. TransPerfect claims 6 days became 153 days—a 25.5x increase that perfectly mirrors the data increase. But this assumes processing time scales linearly with data volume, ignoring basic realities of modern e-discovery. Deduplication would eliminate thousands of redundant emails between custodians. Search terms would exclude vast swaths of irrelevant data before processing. Technology-assisted review creates efficiencies at scale. Yale's vendor either uses Stone Age technology or deliberately inflated these estimates.

Castiello's declaration reveals the game. He mechanically multiplies 4x custodians by 6x time period to reach 24x data volume. This kindergarten arithmetic is baseless. It assumes email volumes remain constant over thirteen years, ignoring document retention policies, role changes, and basic common sense.

Most revealing is what the declarations omit. Neither mentions deduplication, though emails between these custodians would be counted repeatedly in their calculations. Neither acknowledges that search terms would dramatically reduce data volume before processing. Neither explains the assumptions behind the numbers.

The technical excuses ring hollow. Castiello admits Yale's vendor "could not process data for multiple custodians included in a single file," requiring inefficient individual processing. This is simply a vendor limitation Yale chose to accept. Modern e-discovery platforms routinely batch-process dozens of custodians simultaneously. If TransPerfect cannot, Yale should find a competent vendor rather than weaponize their contractor's inadequacies against discovery.

Even accepting Yale's dubious calculations, proportionality analysis destroys their position. Consider what Yale asks this Court to accept: that $345,000 in discovery costs (0.3% of damages sought) justifies shielding evidence of potential gender discrimination at one of America's most powerful institutions. Yale's endowment exceeds $42 billion. They spent more on landscaping last year than this entire discovery request would cost. When institutions with effectively unlimited resources cry poverty to avoid producing discrimination evidence, proportionality analysis must account for this disparity.

The importance of discovery to resolving issues cannot be overstated. Without communications from President Salovey, Title IX Coordinator Spangler, and other senior officials, Plaintiff cannot prove whether gender bias infected his proceedings. These aren't peripheral witnesses who might provide cumulative testimony—they're the architects of Yale's institutional response whose unique communications exist nowhere else. Yale offers no explanation for excluding them beyond burden concerns.

The timing arguments Yale advances actually undermine their position. They claim production would extend into 2026, threatening case schedules. But this "threat" exists only because Yale stonewalled discovery for four years. Had they conducted proper searches in 2020 when first requested, processing time would be irrelevant now. More fundamentally, if these

custodians truly possessed no relevant information—as Yale must contend to justify exclusion—searching their files should yield minimal responsive documents requiring little review time.

Yale's real fear isn't burden but exposure. The declarations' focus on raw data volume while ignoring deduplication, search term filtering, and proportional review reveals the true concern: comprehensive discovery might uncover what selective production has concealed. No amount of vendor affidavits can justify hiding evidence of discrimination behind inflated cost projections and artificial technical limitations.

V. **CONCLUSION**

Plaintiff's case claims a lack of due process in Yale's disciplinary procedure. Courts follow due process. One reason is that Courts allow discovery. But Yale is denying the Plaintiff due process again, this time in Court, by stonewalling the appropriate exchange of relevant and responsive information contemplated by the Federal Rules. For the foregoing reasons, the Plaintiff respectfully requests that the Court grant his motion to compel and enter an order requiring Yale's compliance with discovery.

Respectfully submitted,

/s/Alexander T. Taubes
470 James St., Ste 007, New Haven, CT 06513
alextt@gmail.com
(203) 909-0048
Ct30100