UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SAIFULLAH KHAN | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:19-cv-01966-KAD |
| | : | |
| V. | : | |
| | : | |
| YALE UNIVERSITY, ET AL., | : | |
| Defendants. | : | MAY 14, 2025 |

## MOTION TO COMPEL

Plaintiff Saifullah Khan, through counsel, respectfully moves this Court for an order compelling Defendant Yale University to produce certain documents withheld on claims of privilege. Yale's April 28, 2025 Privilege Log identifies numerous emails and documents withheld under attorney-client privilege (A/C), work product (W/P), Family Educational Rights and Privacy Act (FERPA), and psychotherapist-patient privilege. Many entries appear to be improperly or over-broadly withheld. Many communications are administrative or procedural in nature (not legal advice), were shared with third parties (waiving any privilege), or are labeled with FERPA/psychotherapist privileges that do not appear to apply. Yale's blanket assertions of privilege lack the specific showing required to sustain withholding. For the reasons set forth below, Plaintiff asks the Court to compel production of the privilege log entries listed herein. In the alternative, Plaintiff requests *in camera* review of these documents. Plaintiff stands ready to accept appropriate protective-order safeguards (e.g. redaction of student identifiers) to address any genuine privacy concerns, consistent with FERPA's requirements.

    I.    **YALE'S PRIVILEGE LOG**

Yale's privilege log is attached as an exhibit to this motion. By this motion we seek to compel the following categories of entries:

1

**Administrative/Scheduling Emails (no apparent legal advice):** Entries 16, 52, 60 (A/C) : e-mails that simply arrange meetings or pass along routine policy questions—nothing more than logistical coordination, so no attorney-client privilege attaches.

**Public-relations/Media Strategy:** Entries 32, 36-40, 50-51, 55, 66-68, 92, 95, 109-125, 183 (A/C, W/P, FERPA) : threads crafting press statements and talking-points for the *Yale Daily News*, BBC, petitions, etc., handled by communications staff and widely circulated—PR work, not legal advice; copying counsel does not create privilege and broad distribution waives it.

**Ordinary UWC-discipline documents mis-tagged as work product**: Entries 4-5, 12-14, 31, 61, 69, 70-78 (A/C, W/P) : routine disciplinary e-mails, draft suspension letters and incident-report forms generated years before any lawsuit—prepared in the ordinary course, not "in anticipation of litigation," so the work-product doctrine does not apply.

**FERPA**: Entries 32, 40, 50-51, 68, 92, 97-101, 115 (FERPA, often with A/C / W/P) : Yale labels many internal e-mails "FERPA," but FERPA only requires privacy safeguards; it does not bar discovery. Redaction or a protective order is enough.

**Psychotherapist-patient privilege over-extended:** Entries 2, 96 (Psychotherapist, FERPA, A/C) : administrative e-mails that *summarize* or *forward* counseling information rather than record a confidential therapy session; once shared with multiple administrators, any psychotherapist privilege is lost.

**"Incident-report" broadcast lists (privilege waived):** Entries 97-101, 115 (A/C, FERPA) : campus-safety alerts about Plaintiff copied to senior administrators, police, and PR staff—so widely distributed that confidentiality (and any privilege) is waived; FERPA concerns can be met with redaction.

## II. LEGAL STANDARDS

"The party resisting discovery bears the burden of showing why discovery should be denied." *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009). Because privilege renders otherwise relevant information undiscoverable, courts "construe . . . privilege narrowly and apply it only where necessary to achieve its purpose." *In re County of Erie*, 473 F.3d 413 (2d Cir. 2007) at 418 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)). The party asserting the privilege bears the burden of establishing its elements. *Id*. "A document . . . is not privileged merely because it was sent to or received by an attorney and the client." *Vidal v. Metro-N. Commuter Ry. Co.*, No. 3:12-cv-248 (MPS)(WIG), 2014 WL 413952, at *5 (D. Conn. Feb. 4, 2014).

## III. ARGUMENT

### A. Attorney-Client Privilege—Communications Not Involving Legal Advice or Privilege Lost by Third-Party Involvement

To withhold a communication under attorney-client privilege, Yale must show it was a confidential communication between lawyer and client for the purpose of obtaining or providing legal advice. Communications that are purely administrative, informational, or business-related are not privileged, even if an attorney is copied, because no legal advice is sought or given. Likewise, including third parties outside the attorney-client relationship in a communication waives any privilege unless they are agents of the attorney or client necessary for the legal consultation. Yale's log includes entries where the primary purpose appears non-legal, or where third-party involvement has destroyed confidentiality.

Entry 16 is a prime example. This November 9, 2015 email from a Yale administrator (J. Besirevic-Regan) to another (S. Sawyer) is described as "seeking legal advice from OGC regarding scheduling a meeting with plaintiff." Merely arranging or scheduling a meeting, even

3

with counsel, does not entail legal advice and is not privileged. Courts routinely hold that "merely scheduling a meeting is not a privileged conversation." *See, e.g., Burgos-Stefanelli v. Napolitano*, No. 09-60118-CIV-Hurley/Hopkins, 2009 WL 10667764, at *3 (S.D. Fla. Dec. 17, 2009) ("Defendant must also disclose emails that simply involve scheduling matters or the transmission of attachments and facsimile cover sheets that do not contain privileged information."); *United States v. Freese*, No. 8:05CR131, 2006 WL 1041820, at *2 (D. Neb. Apr. 19, 2006) ("[M]erely scheduling a meeting is not privileged conversation[.]"); *In re: 3M Combat Arms Earplug Products Liability Litigation*, 3:19-md-2885 (N.D. Fla. March 20, 2020). The content of Entry 16 – an administrative coordination of a meeting – lacks substantive legal discussion and thus falls outside the privilege. Yale cannot shield basic procedural communications under the cloak of "legal advice."

Entries 50 and 51 present a similar issue. These emails involve Eileen O'Connor, Yale's communications official, and other non-lawyer administrators discussing a Yale Daily News inquiry and draft public response. While Yale included counsel (Alexander Dreier of OGC) on these emails, the focus is on media strategy and public communications, not legal advice per se. Inclusion of an attorney in a predominantly public-relations discussion does not magically render it privileged. Courts demand a clear showing that obtaining legal advice was the "primary purpose" of a communication; legal input must predominate, not be merely incidental to a business or PR discussion. Here, any legal perspective (e.g. ensuring the statement had no legal misstatements) appears secondary to reputational and operational concerns. Communications addressing how to handle press inquiries are often deemed business communications, not privileged legal consultations, especially when communications staff and other third parties are involved. *See, e.g.*, *EEOC v. BDO USA, L.L.P.*, 856 F.3d 356 (5th Cir. 2017), *opinion withdrawn*

4

*and superseded* 876 F.3d 690, 695-97 ("There is no presumption that a company's communications with counsel are privileged," and the proponent must demonstrate a clear connection to legal advice, not just business strategy). Yale's description of Entries 50–51 admits they concern a "response to inquiry from [a] news outlet" and a "draft response to same." These are public relations matters, and Yale cannot convert them into privileged attorney-client communications merely by copying in-house counsel. Simply labeling a communication "Confidential & Attorney-Client" or copying a lawyer does not suffice. The Court should therefore compel Entries 50 and 51; at minimum, any portions of those emails conveying factual information or PR input (as opposed to actual legal advice, if any) must be produced.

Additionally, any privilege was waived in these communications by the inclusion of third parties who are not necessary agents of the legal consultation. For instance, Entry 50 involves Yale's Vice President of Communications (O'Connor) and likely a Yale public affairs officer (Thomas Conroy). Such individuals, while Yale employees, fall outside the core attorney-client sphere unless their involvement was needed to assist counsel. Nothing indicates O'Connor or Conroy were acting as agents of counsel; rather, they were performing their regular roles in communications. If persons other than the client, its attorney, or agents are included, the communication is not confidential and the privilege does not attach. Yale cannot meet its burden to show these individuals were included for the purpose of obtaining legal advice rather than for routine business input. Accordingly, any attorney-client privilege that might have existed was waived by their participation.

### B.   Work Product – Documents *Not* Prepared "In Anticipation of Litigation"

Yale also asserts the work product doctrine (often alongside A/C privilege) for many withheld documents, including routine internal emails from 2015–2018. The work product

5

protection under Fed. R. Civ. P. 26(b)(3) applies only to documents prepared "in anticipation of litigation or for trial" by or for a party or its representative. It does not cover materials prepared in the ordinary course of business, or as part of routine investigations or proceedings, unless the primary motivating purpose was to aid in possible litigation. A "substantial and imminent threat" of litigation must have existed at the time of creation for work product to attach. Yale's blanket tagging of numerous Title IX investigative communications as "W/P" is not justified, as many were created as part of the normal UWC disciplinary process or administrative responses, not primarily to prepare for a lawsuit.

For example, Entries 50 and 51 (discussed above) are from March 2018, addressing media inquiries immediately after Plaintiff's criminal acquittal. At that time, Plaintiff's Title IX UWC hearing was ongoing (an internal disciplinary proceeding), but no lawsuit against Yale had yet been filed. Yale's log does not indicate that these communications were prepared at counsel's direction for use in prospective litigation; instead, they were reacting to press and student concerns. Preparing a public statement or handling a news inquiry is ordinary business activity for a university's communications department, not litigation preparation. Documents created for such non-litigation purposes do not become work product merely because the subject matter (sexual misconduct discipline) could later evolve into litigation. The primary motivating purpose of Entries 50–51 was to manage public relations, not to strategize over a lawsuit. Thus, Yale's work product claim over them is misplaced.

Looking further back, many log entries from 2015–2016 (when the initial Title IX complaint against Plaintiff was handled) are marked as W/P. However, at that time, Plaintiff had not filed any lawsuit; he was facing a campus hearing and a criminal case brought by the state (in which Yale was not a party). Documents like Entry 4 (Nov. 7, 2015 email with an attachment

drafted by OGC regarding Plaintiff's emergency suspension) and Entry 5 (Nov. 7, 2015 email providing an update on the suspension and counsel's draft correspondence) were part of Yale's ordinary disciplinary process following a student complaint. While Yale's Office of General Counsel (OGC) assisted in ensuring the suspension and related letters were legally compliant, those materials were prepared because Yale was conducting a disciplinary proceeding, not because Yale anticipated being sued by Mr. Khan at that time. Indeed, the "litigation" then in play was the criminal prosecution of Mr. Khan, not a civil action involving Yale. Internal communications dealing with a student's status, safety of the campus, or compliance with university procedures are quintessential ordinary-course documents. Unless Yale can show a specific, concrete threat of litigation by Mr. Khan as of 2015 – which it has not – it cannot legitimately claim those documents were work product.

Furthermore, even if some work product protection arguably attached to certain documents, Yale has not demonstrated why Plaintiff's substantial need for these materials outweighs that protection. Many withheld documents (like internal factual accounts, communications with third parties, or investigative files) likely contain facts essential to Plaintiff's claims of Title IX procedural irregularities and gender bias. For instance, Yale's handling of Jane Doe's complaint and the internal communications about it (e.g. Entries 2, 3, 5, etc.) are directly relevant to whether Yale followed its policies and treated Plaintiff fairly. Purely factual portions of documents do not become immune from discovery just by being routed through counsel. Plaintiff has no other means to obtain this contemporaneous evidence of Yale's decision-making. Thus, even if the Court found some work product qualified, Plaintiff respectfully submits that substantial need and undue hardship (inability to obtain equivalent

evidence) justify ordering disclosure of at least the factual content, if not the documents in full. *See* Fed. R. Civ. P. 26(b)(3)(A)(ii).

In summary, Yale's invocation of the work product doctrine is overbroad. The Court should find that the identified entries were not prepared "because of" litigation, but rather as part of Yale's normal Title IX process or public response, and therefore are not protected work product. Plaintiff requests an order compelling production of these documents. At minimum, the Court should require Yale to redact only any portions truly revealing attorney mental impressions and produce the rest (though no such redactions appear justified on the current record, since no active litigation strategy was in play for these early documents).

### C. FERPA "Privilege" is Baseless and Sanctionable

Yale's log frequently cites FERPA (the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g) as a basis to withhold documents (see Entries 2, 50, 51, 96, etc.). FERPA protects the privacy of student education records by prohibiting their disclosure without consent, but it is not a discovery privilege. *Rios v. Read*, 73 F.R.D. 589 (E.D.N.Y. 1977); *Ragusa v. Malverne Union Free School District*, 549 F. Supp. 2d 288, 291 (E.D.N.Y. 2008). FERPA does not transform educational records into privileged materials immune from discovery. Rather, FERPA permits disclosure of student records pursuant to a court order or subpoena, provided that reasonable notice is given to affected students. See 20 U.S.C. § 1232g(b)(2)(B). In other words, FERPA is a confidentiality statute; it does not create an absolute bar in litigation

FERPA does not grant Yale a license to unilaterally withhold relevant evidence. Here, the documents at issue are highly relevant to Plaintiff's Title IX claims and due process allegations. For example, Entry 2 contains information about an "unrelated UWC complaint" and a Jane Doe's communication with a counselor. If that Jane Doe is the accuser in Plaintiff's case, these

communications could shed light on her credibility or Yale's handling of her allegations. Even if it concerns another case, Plaintiff has pleaded a selective enforcement or pattern theory, seeking comparator information on how Yale treated other cases of sexual misconduct. Similarly, Entries 50 and 51 contain Yale's internal handling of the publicity around Plaintiff's case, which could reveal bias or motive. Entry 96 pertains to the SHARE Center administration – possibly reflecting how Yale provided (or failed to provide) support services in Plaintiff's matter or others. All of these are "education records" in Yale's possession directly tied to the issues in this lawsuit. Under FERPA, the proper course is not outright withholding, but rather balancing student privacy against the needs of the case. The information is crucial to Plaintiff's ability to prove his claims (e.g. disparate treatment, procedural unfairness, and the context of Yale's decision-making). Plaintiff's need outweighs any generalized privacy interest, especially given that a protective order is already in place (or can be put in place) to prevent public disclosure of any student-identifying details. Indeed, Plaintiff is amenable to Yale redacting names and personal identifiers of non-party students (such as Jane Doe or others) – a step which FERPA itself recognizes as sufficient to remove the record from FERPA's scope.

With such redactions, the privacy risk is minimal, and the records can be produced without running afoul of FERPA. Courts have consistently rejected objections like Yale's as lacking legal basis. *Doe v. Northern Kentucky University*, 2:16-cv-28-WOB-JGW (E.D. Ky. Oct. 24, 2016), not only compelled production over FERPA objections but sanctioned the university for raising them, while *Brown v. University of Kansas*, No. 10-2606-EFM-KGG (D. Kan. Feb. 27, 2012), held FERPA objections categorically improper in civil discovery. As *Doe v. Rollins College*, No. 6:18-cv-1069 (M.D. Fla. Apr. 10, 2019), explained, courts routinely order production of comparative disciplinary records subject to protective order and with names

redacted—precisely the relief Plaintiff seeks here. Indeed, Yale's FERPA objections are so baseless that they warrant the imposition of sanctions. *See Northern Kentucky Univ., supra*.

### D. Psychotherapist-Patient: Inapplicable to the Emails at Issue

Yale invokes the psychotherapist-patient privilege for a few log entries, most notably Entry 2 and Entry 96, which involve references to communications with counseling personnel. While the psychotherapist-patient privilege (recognized in *Jaffee v. Redmond*, 518 U.S. 1 (1996)) is a legitimate privilege protecting confidential communications between a patient and a licensed psychotherapist during therapy, it does not apply here. The key is that the communications must be made in confidence for purposes of diagnosis or treatment. Neither Entry 2 nor Entry 96 reflects a direct therapist-patient counseling session communication being sought from a therapy file. Rather, they are administrative emails circulating information that originated from a patient-counselor conversation or about counseling services. Once that information was pulled into broad administrative discourse, it lost any claim to the special protection of the psychotherapist privilege.

Entry 96 is an email between two Yale administrators (Dr. Lorraine Siggins and Carole Goldberg) about "the administration of the SHARE Center." This is clearly not a personal therapy communication at all – it is an operational discussion. Dr. Siggins, though a clinician, was writing in her administrative capacity, and Ms. Goldberg is an administrator. Communications between staff members about a patient, or about program administration, are not the same as communications between the patient and therapist in a counseling setting. The privilege protects the latter, not the former. *See Jaffee*, 518 U.S. at 15 (protecting confidential communications "made to licensed social workers in the course of psychotherapy"). Entry 96 does not record any confidential therapy session; it is one employee "checking in" with another.

Accordingly, psychotherapist-patient privilege does not attach. Yale's attempt to extend that privilege to an administrative context is unsupported by law. Entry 2 involves an email from a Yale official (David Post) to a group of other officials (Menon, Gleason, Killheffer, Spangler, Sawyer) summarizing or referencing "Jane Doe's communication with [a] SHARE counselor." Although content of what Jane told her counselor would ordinarily be privileged as a therapeutic communication, the moment the substance of that conversation was shared beyond the counselor-patient dyad – in this case, disseminated to Yale administrators and an attorney – the communication was no longer confidential in the therapeutic sense. The privilege belongs to the patient (Jane Doe), and only she can waive it or authorize disclosure. By all appearances, either Jane Doe herself (or the SHARE counselor with her consent) relayed some information to Yale's Title IX officials, or the officials otherwise became privy to it. Once that happened, the information was used within the university's disciplinary process. It is well established that disclosing a privileged therapy communication to third parties destroys the privilege. *See United States v. Bolander*, 722 F.3d 199, 223 (4th Cir. 2013) (psychotherapist-patient privilege waived if the patient shares the substance of the therapy conversation with others). Here, Jane Doe (implicitly or explicitly) allowed her statements to be conveyed to Yale's team handling the case. Those officials in turn emailed about it in Entry 2. Such an email cannot be withheld as a sacred therapy secret when it was circulated among five or more people outside the counseling room. It is no longer a "confidential communication between patient and therapist," and thus falls outside *Jaffee*'s scope.

      Moreover, even if Jane Doe never intended her counselor's words to go further, the fact is Yale has the information and is using it in its defense (by withholding it). Fairness dictates that Plaintiff should be able to discover what was said, especially if Yale's actions were influenced

11

by communications with the counselor. If Yale truly believed the information remained privileged to Jane Doe, it should have logged it as privileged and not even shared it internally. But Yale did share it internally (e.g. David Post's email). They cannot selectively use the privilege now as both sword and shield. Finally, any remaining privacy concerns regarding counseling information can be addressed without barring discovery. The Court could order that any highly sensitive mental-health detail be redacted or subject to attorneys' eyes only. But importantly, the basic fact that Jane Doe communicated with a SHARE counselor, and the general subject matter, are likely already known or documented in the case record. Plaintiff seeks this information to understand Yale's knowledge and actions. In this case, Entry 2 appears to contain factual information about a prior complaint or an accuser's statements that could be key to Plaintiff's defense (for example, if Jane Doe made inconsistent statements to her counselor versus Yale, or if Yale was on notice of exculpatory information). The Court should compel production of Entry 2 (and any similar documents), with any truly sensitive personal content restricted. As for Entry 96, as explained, it is not a patient communication at all – it should be produced in full.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court GRANT this Motion to Compel and order Yale to produce the documents corresponding to Privilege Log Entries 2, 4, 5, 12, 13, 14, 16, 31, 32, 36, 37, 38, 39, 40, 50, 51, 52, 55, 60, 61, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 92, 95, 96, 97, 98, 99, 100, 101, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, and 183, or to review them *in camera*.

Respectfully submitted,

/s/Alexander T. Taubes
470 James St., Ste 007, New Haven, CT 06513
alextt@gmail.com
(203) 909-0048
Ct30100