UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SAIFULLAH KHAN, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:19-cv-01966-KAD |
| | : | |
| V. | : | |
| | : | |
| YALE UNIVERSITY, ET AL., | : | |
| Defendants. | : | MAY 20, 2025 |

## MOTION FOR JUDGMENT OF DISMISSAL
## AND/OR OTHER SANCTIONS

Pursuant to Rule 41(b), Rule 37, and this Court's inherent authority, all Defendants respectfully move to dismiss this case due to Plaintiff's litigation misconduct. In addition, or in the alternative, Defendants seek other sanctions, detailed below.

## I.    PRELIMINARY STATEMENT

After this Court imposed sanctions on Plaintiff but declined to dismiss this case, Plaintiff engaged in further misconduct. He again indirectly disseminated Jane's name in violation of this Court's order. He did that just a few days after this Court's ruling denying Defendants' Second Motions to Dismiss based on Plaintiff's prior indirect dissemination of Jane's name. Plaintiff also delayed this case by producing over 70,000 pages of largely irrelevant documents, apparently without reviewing them for responsiveness. Additional misconduct by Plaintiff has also come to light since Defendants' most recent Motion to Dismiss. Dismissal is not only more than warranted, it is the only option left. The Court's attempts to stop Plaintiff's misconduct with lesser sanctions have failed. The Court should dismiss this case.

## II.    RELEVANT BACKGROUND

Before discussing the facts relevant to the instant Motion, which are detailed below, it is important to note that Defendants previously filed numerous Motions to Dismiss this case based

on misconduct by Plaintiff.  (*See, e.g.* ECF 75, ECF 123-1, ECF 130-1.)  Defendants incorporate here but will not repeat the misconduct raised in those Motions.  It is, however, important to emphasize that this litigation has previously been marred by "egregious" misconduct by Plaintiff and, as set forth below, the Court has repeatedly warned Plaintiff that his misconduct may result in dismissal. (*e.g.*, ECF 119 at 15 ("Plaintiff is advised that any release or deliberate disclosure of Jane Doe's identity in violation of this Court's order is sanctionable by the Court, including but not limited to dismissal.").)  Efforts to stop Plaintiff's misconduct have failed.  (*E.g.*, ECF 200 at 9:20 (The Court:  "I don't know what the right answer here is.  But I know it has to stop. . . .").)

## III.    RELEVANT LAW

This Court has inherent authority to dismiss a case for bad-faith conduct, including conduct that amounts to an abuse of the judicial process.[1]  (*See, e.g.*, ECF 265 at 2–3.)

> [S]anctionable bad-faith conduct includes "abuse of the judicial process[.]" *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020). . . .  [A] court may resort to dismissal "not merely to penalize," but "to deter those who might be tempted to such conduct in the absence of such a deterrent." [*Davis v. Saint Luke's-Roosevelt Hosp. Ctr.*, 771 F. App'x 116 (2d Cir. 2019)] (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976)). Dismissal is also appropriate where "'a party ... abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." *Davis v. Saint Luke's Roosevelt Hosp.*, No. 16-CV-6279 (JPO), 2018 WL 10384114, at *1 (S.D.N.Y. Apr. 16, 2018), *aff'd sub nom. Davis*, 771 F. App'x 116 (quoting *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)).

(ECF 265 at 3.)

Federal Rule of Civil Procedure 41(b) provides for dismissal "[i]f the plaintiff fails to . . . comply with [the Federal Rules] or a court order."  Fed. R. Civ. P. 41(b).[2]  As this Court has also

---

[1] *See* ECF 123-1 at 13–14 for a more detailed discussion of relevant law.  Plaintiff has conceded that Jane's recitation of the law at ECF 123-1 at 13–14 is accurate.  *See* ECF 157-1 at 9.

[2] Federal Rule of Civil Procedure 37 meanwhile authorizes sanctions in the discovery context.

recognized, "'[a]ll litigants . . . have an obligation to comply with court orders, and failure to comply may result in sanctions, including dismissal with prejudice.'"  *Conquistador v. Martin*, No. 3:19-CV-1965 (KAD), 2024 WL 2746893, at *1 (D. Conn. May 29, 2024) (quoting *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (*per curiam*)).  "The Second Circuit has identified five factors to guide the Court's . . . discretion under Rule 41(b), which ask whether

> (1) the plaintiff's failure to prosecute caused a delay of significant duration; (2) plaintiff was given notice that further delay would result in dismissal; (3) defendant was likely to be prejudiced by further delay; (4) the need to alleviate court calendar congestion was carefully balanced against plaintiff's right to an opportunity for a day in court; and (5) the trial court adequately assessed the efficacy of lesser sanctions.

*Id.*; *see also id.* (noting that same factors apply to "failure to comply with court orders").

"'[N]o one factor is dispositive' and the Court must instead 'review the dismissal in light of the record as a whole.'"  *Febres v. Yale New Haven Hosp.*, No. 3:19-CV-01195 (KAD), 2020 WL 2494724, *2 (D. Conn. May 13, 2020) (quoting *United States ex rel. Drake v. Norden Sys., Inc.*, 375 F.3d 248, 254 (2d Cir. 2004)).  "The selection of an appropriate sanction, including dismissal . . . , is a matter consigned to the discretion of the district court."  *Dodson v. Runyon*, 957 F. Supp. 465, 469 (S.D.N.Y. 1997), *aff'd*, 152 F.3d 917 (2d Cir. 1998).

The Second Circuit has noted that "flagrant disregard of court orders . . . justifie[s] the imposition of the sanction of dismissal."  *Blue v. O'Bright*, No. 3:21-CV-00762 (KAD), 2021 WL 5770017 (D. Conn. Dec. 6, 2021) (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176–77 (2d Cir. 1988)).

In *Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298, 303 (2d Cir. 2009), for example, the Second Circuit affirmed the dismissal of a case where the plaintiff "defied all of [the Court's discovery] orders, each of which warned of the possibility of sanctions, including dismissal" and the plaintiff "failed to comply with any of defendant's discovery requests" after the Court

"imposed a lesser sanction." The Second Circuit concluded that the plaintiff's failure to engage in discovery "amount[ed] to 'sustained and willful intransigence in the face of repeated and explicit warnings from the [C]ourt that the refusal to comply with [C]ourt orders would result in the dismissal of the action." *Id.* at 303 (alteration omitted) (quoting *Valentine v. Museum of Mod. Art*, 29 F.3d 47, 50 (2d Cir. 1994)); *see also Valentine*, 29 F.3d at 50 (affirmed sanction of dismissal). The Second Circuit observed that the district court "exceeded what was required in the circumstances." *Id.*

Similarly, in *Friends of Animals Inc. v. U.S. Surgical Corp.*, 131 F.3d 332, 333 (2d Cir. 1997), the Second Circuit affirmed a dismissal by Judge Eginton after Judge Eginton concluded that plaintiffs had engaged in "'a systematic pattern of discovery abuse.'" The Second Circuit emphasized plaintiffs' refusal to acknowledge their misconduct, noting that "plaintiffs' counsel[] maintains to this day that he and his colleagues bear no responsibility whatsoever for this predicament." *Id.* at 334. The Second Circuit also observed that it was "all too apparent . . . that lesser sanctions were ineffective in deterring discovery misconduct, that plaintiffs were warned that they risked incurring the sanction of dismissal, and that the abuse of the discovery process showed no signs of abasement." *Id.* The Second Court held that dismissal "was warranted." *Id.*

Dismissal is therefore appropriate where, for example, a litigant misleads the Court. *See, e.g.*, *Shepherd v. Annucci*, 921 F.3d 89 (2d Cir. 2019) (affirming dismissal where plaintiff omitted reference to certain prior lawsuits he had filed that disqualified him from *in forma pauperis* status).

It is also appropriate where a court has repeatedly warned the plaintiff of the prospect of dismissal but he has failed to change his behavior. "[T]he Second Circuit has repeatedly upheld dismissal as an appropriate sanction where the non-compliant parties were warned of the possibility." *Loc. Union No. 40 of the Int'l Ass'n of Bridge v. Car-Wi Const.*, 88 F. Supp. 3d 250,

4

266 (S.D.N.Y. 2015) (internal quotation marks omitted); *see also, e.g.*, *Obot v. Comm'r*, 254 F. App'x 57, 58 (2d Cir. 2007) (summary order) ("[I]t is difficult to imagine how a dismissal following an unheeded warning could be an abuse of discretion." (quotation marks omitted)).

This Court and others have dismissed cases for misconduct far less serious than the misconduct Plaintiff has engaged in in this action.[3]  Indeed, this Court most commonly dismisses cases when litigants do not do anything (*i.e.*, fail to prosecute their case) and violate this Court's orders by not complying with discovery, etc.  *See, e.g.*, *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172 (2d Cir. 1988) (affirming dismissal for "failure to obey repeated orders to provide discovery"); *Selletti v. Carey*, 17 F. App'x 18, 21 (2d Cir. 2001) (summary order) (affirming dismissal and holding that a "longstanding and egregious pattern of delay, obstruction, and simply inaction, which we found previously to weigh heavily in favor of dismissal, also put the district court well within the bounds of its discretion in dismissing the complaint" (citation and internal quotation marks omitted)); *Peters-Turnbull v. Bd. of Educ. of City of New York*, 7 F. App'x 107 (2d Cir. 2001) (summary order) (affirming dismissal for failure to comply with discovery); *see also, e.g.*, *Conquistador*, 2024 WL 2746893, at *3 (plaintiff "failed to comply with three recent Court orders and otherwise neglect[ed] to prosecute his case"); *Powell v. Ocwen Loan Servicing, LLC*, No. 3:21-CV-01605 (KAD), 2024 WL 5239340 (D. Conn. Dec. 27, 2024) (plaintiff "failed to comply with three court orders designed to address" a missing brief regarding subject matter jurisdiction); *Petty v. City of New Britain*, No. 3:17-CV-01798 (KAD), 2019 WL 121719 (D. Conn. Jan. 7, 2019) (plaintiff "largely uncooperative or unresponsive to" discovery efforts); *Davis v. Stop & Shop Supermarket*, No. 3:18-CV-01279 (KAD), 2019 WL 5696019 (D. Conn. Nov. 4, 2019) (plaintiff failed to engage with discovery); *Smith v. Sanchez*, No. 3:23-CV-00964 (KAD),

---

[3] Plaintiff has conceded as much. *See* ECF 157-1 at 10–11 (discussing cases involving lesser misconduct).

2025 WL 986122 (D. Conn. Apr. 2, 2025) (plaintiff failed "to follow court orders," including "to amend his complaint," failed "to conduct any discovery," failed to "update his address," etc.); *In re Bartley*, No. 3:19-CV-00400 (KAD), 2019 WL 6467353 (D. Conn. Dec. 2, 2019) (debtor made "bad faith" bankruptcy filings "to frustrate [a] foreclosure action" resulting in this Court affirming Bankruptcy Court's sanction of dismissal).[4]  In this case, Plaintiff has directly violated this Court's orders and otherwise engaged in "egregious" misconduct.  As detailed below, his conduct is far worse than a litigant failing to submit a brief, a consent form, or respond to discovery.

Notably, when Jane filed her First Motion to Dismiss (ECF 75) based on Plaintiff's initial disclosure of her name, Plaintiff responded by arguing that dismissal was not warranted because (1) dismissal is reserved for misconduct *like discovery violations that delay the case*, (2) Plaintiff had not been warned that his misconduct could result in dismissal, and (3) lesser sanctions were appropriate to address Plaintiff's misconduct.  (*See* ECF 77 at 4 ("The third and fourth *Brown* factors suggest a concern with discovery violations, and that is not the issue here.  The filing . . . account[s] for no meaningful delay. . . .  [T]here is no disruption of the Court's docket." (emphasis added)); at 3 ("[T]he [P]laintiff has not been placed on notice that his conduct 'would result in a dismissal,' the second *Brown* factor."); at 4 ("[T]here is nothing in the record that suggests the Court has considered a sanction less than dismissal."); *see also* ECF 157-1 at 9 (collecting cases addressing dismissal motions based on procedural violations).  As discussed in detail below, dismissal is now more than warranted under Plaintiff's own standard for dismissal.

---

[4] Many of the plaintiffs in these cases were, unlike Plaintiff, *pro se* and thus afforded extra latitude.  Several of these cases were also decided under Rule 37 instead of Rule 41(b) because the primary misconduct was discovery misconduct.  That is a distinction without a difference and it matters not which avenue the Court takes to consider dismissal in this case, however, because "there is little distinction whether the dismissal is technically made under Rule 41 or Rule 37" because the factors considered under Rule 41 and Rule 37 are analogous.  *E.g.*, *Peters-Turnbull*, 7 F. App'x at 110 (citing, among other cases, *Almonte v. Coca–Cola Bottling Co. of New York,* 169 F.R.D. 246, 249 n. 4 (D.Conn.1996), for the proposition that "[t]he factors for dismissal under Rule 41(b) are helpful in considering a dismissal under Rule 37.").  *See also* ECF 157-1 at 10.

## IV.    PLAINTIFF'S ADDITIONAL DISSEMINATION OF JANE'S NAME

Plaintiff has yet again indirectly disseminated Jane's name by encouraging others to publicize Jane's name in direct violation of this Court's orders.  (*See* ECF 91, ECF 119, ECF 265.) He has also apparently directly identified Jane in direct violation of this Court's orders.

### A.    Background Related To This Issue

On June 19, 2024, Judge Garcia prohibited Plaintiff from "directly or indirectly . . . disclosing or revealing Jane Doe's identity, including but not limited to on any social media platform."[5]  (ECF 119 at 15.)  As this Court recently explained:

> "Indirect," means *inter alia*, "deviating from a direct line or course: ROUNADABOUT" and "not straight forward and open:  DECEITFUL." Merriam-Webster's Collegiate Dictionary 634–35 (Frederick C. Mish et al. eds., 11th ed. 2009).  "Indirectly" is defined as "[i]n a way that is complicated or not obvious" or "without clearly mentioning or saying something."  *Indirectly*, Cambridge Dictionary,  https://dictionary.cambridge.org/us/dictionary/english/indirectly  (last visited January 24, 2025).  And it is axiomatic that one method of acting "indirectly" is through the conduct of others."

(ECF 265 at 14–15.)  The Court made those comments in explaining that "Plaintiff's [actions] [immediately after Judge Garcia's Order] were designed to and did in fact cause others to act in a fashion that violated the June 19 Order.  He was the impetus behind the disclosure, and through his words and deeds, manipulated his 'followers' to achieve his desired result."  (ECF 265 at 15.)

Plaintiff has again violated Judge Garcia's Order by disseminating Jane's name.  On July 17, 2024, after Judge Garcia entered her Order, Plaintiff emailed a blogger noting that his story had been "covered by" other bloggers, asking "to discuss [his] case a bit," and offering "to provide [the blogger] with appropriate documentations etc."  (**Exhibit A**.[6])  The blogger responded by

---

[5] This Court had previously prohibited Plaintiff from identifying "Jane Doe in any social media communication or elsewhere and" to "remove his posts that reference her identification."  (ECF 91.)

[6] The date of the email does not have a year on it.  There is no question that Plaintiff sent the email in July 2024 (after Judge Garcia's Order) because Plaintiff's email references having previously been "covered by" a different blogger. (Exhibit A.)  That coverage was posted in Fall 2023.  Hence, this email could not have been sent before July 2024.

████████████████████████████████████ includes evidence from this case,

███████████████████████. Given Plaintiff's offer to provide the blogger with "documentation[]," it appears that Plaintiff gave the blogger ███████████ in violation of Judge Garcia's and this Court's orders that Plaintiff may not "directly or indirectly . . . disclos[e] or reveal[e] Jane Doe's identity" and that "Plaintiff shall not identify Jane Doe." (ECF 119 & ECF 91.)

The blogger interviewed Plaintiff ███████.[7]  Plaintiff discussed, among other things, ███████████████, and a chapter ████████████ is devoted to that issue. (**Exhibit B**.)  During that discussion, Plaintiff made a number of comments encouraging others to publicize Jane's name.  (Exhibit B.)  He said:

- "My name is all over the media.  *Her name is not*."

- "[The fact that [m]y name is all over the media" and "[h]er name is not" "is *more problematic* from the perspective of I was found not guilty."

- "If you're going to accuse somebody and ruin their life, *your name should be attached* to your lies or your truth."

(Exhibit B (emphasis added).)

Plaintiff publicized ██████████████████████████ █████████████████████████████████. (**Exhibit C**.)  Plaintiff's caption for one of those publications said: ██████████████████[8]

████████████████████████████████████

████████████████████████████████████

---

[7] The Video includes the Second Circuit docket number for this case.  Plaintiff thus not only disclosed Jane's identity in violation of this Court's Orders, he also did it in a way that directly links her name to this case.

[8] Plaintiff has also made other publications intended to have his followers publicize Jane's name.  On October 17, 2024, for example, he stated: ████████████████████████ (**Exhibit D**.)

██████████████████████████████████████████

██████████████████████████████████████████

████████████████ (**Exhibit E**.)

### B.     Plaintiff's Dissemination Of Jane's Name Warrants Dismissal

Plaintiff apparently gave a blogger ███████████████ and other "documentation[]" after this Court and Judge Garcia prohibited Plaintiff from "directly or indirectly . . . disclosing or revealing Jane Doe's identity" and that "Plaintiff shall not identify Jane Doe." (ECF 119 & ECF 91.) That is a direct violation of this Court's and Judge Garcia's Orders.

Plaintiff then made public statements complaining about the fact that his name is all over the media but Jane's name is not, discussing his desire to name Jane, and then ███████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████.

Everything this Court noted about Plaintiff's prior actions that led to the dissemination of Jane's name at an earlier time is equally true with respect to Plaintiff's more recent actions. Plaintiff was the impetus behind the disclosure. (ECF 265 at 15.) He manipulated ███████████,

who he knew would be willing to publicize Jane's name, ████████████████████████████

██████████████████████████████████████████

████████. (ECF 265 at 15.) Plaintiff's actions "were designed to and did in fact cause others to act in a fashion that violated the June 19 Order" by doing exactly what the Court previously prohibited Plaintiff from doing. (ECF 265 at 15.)

Plaintiff's actions warrant dismissal. Plaintiff's obsession with disseminating Jane's name

despite the numerous Orders this Court and Judge Garcia have entered precluding him from doing so constitutes a "sustained and willful intransigence in the face of repeated and explicit warnings from the [C]ourt." *Agiwal*, 555 F.3d at 303.  It is also an "abuse[] [of] the process at a level that is utterly inconsistent with the orderly administration of justice" and "undermines the integrity of the process."  (ECF 265 at 3 (quotation marks omitted).)  This Court previously imposed a lesser sanction for this exact same type of misconduct.  (ECF 265.)  That lesser sanction not only failed to stop Plaintiff, it seems to have emboldened him; Plaintiff engaged in the exact same conduct which initially led the Court to sanction him ███████ after the Court entered the order.  (ECF 265; *see also, e.g.*, *Friends of Animals Inc.*, 131 F.3d at 334 (affirming dismissal where it was "all too apparent . . . that lesser sanctions were ineffective in deterring [] misconduct").)  When this Court denied the Second Motions to Dismiss, this Court held that Plaintiff's misconduct "[w]eigh[ed] in favor of dismissal" because "Plaintiff's conduct [came] on the heels of similar conduct for which Defendants sought dismissal."  (ECF 265 at 15.)  The same is true now.  Plaintiff publicized complaints about Jane's anonymity ████████████████████████ and solicited their help in outing Jane.  Plaintiff has no respect for this Court or its Orders.  He has had more than enough chances.  Indeed, when this Court denied the Motions to Dismiss, it did so in part because Plaintiff's misconduct "ha[d] not recurred over the ensuing seven plus months."  (ECF 265 at 16.)  Yet here we are again.

## V.    **Plaintiff's Decision** ████████████████████

Plaintiff has ████████████████████████ despite (1) the Court's orders that Plaintiff not "directly or indirectly . . . disclos[e] or reveal[e] Jane Doe's identity, including but not limited to on any social media platform" and not identify "Jane Doe in any social media communication or elsewhere and" to "remove his [prior] posts that reference her

identification," and (2) the Court's Decision that Plaintiff's actions in encouraging others to publish Jane's identity was an "egregious" violation of the Court's Orders.  (ECF 91, ECF 119, ECF 265.)

As this Court noted in its recent decision (ECF 265), Plaintiff made a series of publications that "were designed to and did in fact cause others to" publicize Jane's name on social media immediately after Judge Garcia's June 19, 2024 Order.  (ECF 265 at 15.) ███████████████ ███████████████████████████████████████████████████████████ ████

Plaintiff has thus been directly or indirectly identifying Jane ████████████████ in violation of this Court's Orders for the past ████████.  Plaintiff's willful decision not to █████████████ even after this Court held, more than three months ago (on January 29, 2025 (ECF 265)), that Plaintiff's actions were an "egregious" violation of this Court's Order is particularly stunning and demonstrates Plaintiff's contempt for this Court's Orders.

## VI. PLAINTIFF'S PRODUCTION OF OVER 70,000 PAGES OF DOCUMENTS

On February 27, 2025, as discovery was supposed to be winding down, Plaintiff produced approximately 70,305 pages of additional documents.  (**Exhibit G** ("Laurato Aff.") ¶ 4.) Defendants' review of that production has established that the vast majority of those documents are irrelevant to this case. (*E.g.*, Laurato Aff. ¶ 4.)  Given the sheer volume of irrelevant documents produced, it is impossible that Plaintiff conducted a good faith review of these documents before producing them.  The only reasonable inference is that Plaintiff dumped these irrelevant documents to delay this case and cause inconvenience and expense to Defendants.

### A. Background Relevant To This Issue

Plaintiff has sought to delay this case at every turn. In April 2024, for example, Plaintiff

filed Motions to extend discovery deadlines from April 2025 to October 2025.  (ECF 97; ECF 100; ECF 105.)  The Court advised the Parties that it was "very unlikely to move th[e] [S]cheduling [O]rder."  (ECF 200 at 54:14–15.)

The Defendants sought to comply with the Court's April 15, 2025 deadline for the close of discovery.  (*See* ECF 68.)  Judge Garcia ordered the Parties to obtain and then hold dates for depositions beginning March 13, 2025.  (*See* ECF 257; ECF 262.)  Defendants completed their document production (*see* ECF 262) and Plaintiff, who had by December 2024 produced over 14,000 pages of documents, was supposed to be producing what everyone understood would be a minor production of remaining documents.  (*See, e.g.*, ECF 274 (Joint Motion agreed to by all Parties reflecting understanding that Defendants would be able to review forthcoming production in a weekend and thus setting Defendants' expert disclosure deadline for the Monday after Plaintiff's Friday deadline for Plaintiff's supplemental production).)

On February 27, 2025, just weeks before most of the depositions in this case were supposed to take place and weeks before discovery was to close, Plaintiff produced over 70,000 pages of additional documents.

Plaintiff's production put Defendants in an impossible position.  They had to choose between moving forward—including allowing their witnesses to be deposed without knowing what was in Plaintiff's 70,305-page production—or agreeing to the extension of deadlines Plaintiff had long sought.  Defendants had no meaningful choice except to agree to Plaintiff's request for significant modifications of the Scheduling Order, despite the significant inconvenience to Defendants' witnesses.  (*See* ECF 295.)

Plaintiff's 70,000+ page production is so voluminous that Defendants have only recently finished reviewing it.  Putting aside that some of the documents are duplicative of what Plaintiff

had already produced, **the vast majority of the documents—approximately** *85%***—are** *not*
**relevant and non-responsive**.  (Laurato Aff. ¶ 4.)

When in doubt, Defendants construed documents as being responsive and relevant even
though they may not be.  (Laurato Aff. ¶ 5.)  Even with that overly generous approach,
approximately 85% of the documents are irrelevant and non-responsive.  A non-exhaustive list of
categories of documents that have no relevance to this case includes, but is not limited to:

- Hardcore pornography, including two videos and two photos;

- Spam emails, including emails from Amazon, Walmart, iTunes, etc. advertising products
  and/or services, such as the services of Walmart's photography center, advertisements for
  Bed Bath & Beyond, computer anti-virus software, and Words with Friends;

- Restaurant recommendations for restaurants in California;

- Uber receipts for Ubers Plaintiff took around New York;

- Credit card payment reminders;

- Newsletters, including newsletters from organizations like the American Society for the
  Prevention of Cruelty to Animals and alumni newsletters from The Hotchkiss School, as
  well as weekly newsletters from Yale's Office of International Students;

- Yale email announcements that have nothing to do with this case, such as announcements
  about campus events that occurred years before the events underlying this case;

- Other email announcements promoting events that have nothing to do with this case, such
  as an announcement for a conference at the University of Pennsylvania;

- At least 11,897 emails related to Families Advocating for Campus Equality ("FACE"), an
  organization that advocates for students accused of sexual misconduct, that almost
  exclusively have nothing to do with this case, such as an email sharing a poem someone's
  son wrote[9];

- A variety of other, miscellaneous, documents, such as a call for papers for a conference
  years before the underlying events of this case, an email about picking up t-shirts, etc.

---

[9] A small number of FACE emails relate to this case (largely the criminal trial), but most FACE emails are irrelevant.

(*See, e.g.*, Laurato Aff. ¶ 6.)[10]

Plaintiff's counsel has conceded during meet and confers that some of these documents (such as the pornographic materials) were mistakenly produced. But it cannot be the case that the other tens of thousands of additional unresponsive and entirely irrelevant documents were included due to an honest mistake.

Instead, the only reasonable inference is that Plaintiff intentionally loaded his production with thousands of irrelevant documents in order to prejudice Defendants on the eve of depositions in order to force a delay of this case. This was a classic "document dump" designed to distract the Defendants from the important work in this case and to cause the delay Plaintiff has long been seeking. Plaintiff had sought to delay this case since at least April 2024. (*E.g.*, ECF 105.) The Court did not grant Plaintiff's requested extension and indicated it would not materially change the Scheduling Order. (*E.g.*, ECF 200 at 54:14–15.) Plaintiff knew that the depositions of Yale witnesses were imminent. (*E.g.*, ECF 262.) Having failed to obtain his desired extension through proper means (a Motion), Plaintiff decided to obtain the extension by dropping tens of thousands of pages of irrelevant documents on Defendants. He knew Defendants could not possibly sort through them to determine what was relevant in time for the impending depositions. He also knew it would be impossible for Defendants to make an informed and timely evaluation of whether to file a motion to compel given the vast number of documents they would need to review. The goal was clear: He wanted to compel Defendants to agree to a significant extension to avoid being unfairly prejudiced.

---

[10] Ironically, it also appears that Plaintiff's production was underinclusive. Plaintiff gave Defendants electronic messages that contained the search terms Defendants asked for, but not other messages from those same conversations. For example, Plaintiff produced a single message that shows he was talking to someone about Jane, but not the other messages in that discussion, apparently because the other messages did not include the search terms Defendants asked for, even though those additional messages contained discoverable information.

Defendants do not lightly contend that this conduct was intentional. But the evidence is overwhelming. Indeed, Plaintiff's counsel represented to Judge Garcia that he "review[ed] everything" in the production before sending it. (ECF 293 at 6:25.[11]) This was not an accident.

## B. Dismissal Is More Than Warranted

As discussed in more detail below, the only meaningful sanction is dismissal of this case. Nothing else has deterred Plaintiff from engaging in misconduct.

It is a flagrant abuse of the judicial process and utterly inconsistent with the orderly administration of justice for a party to delay a case by deploying a dump of thousands of pages of irrelevant documents at the eleventh hour. (*See, e.g.*, ECF 265 at 3.) This tactic is especially egregious because the Court had denied Plaintiff's request for an extension and yet Plaintiff devised a scheme to frustrate the Court's order.

Moreover, not even one month elapsed between this Court sanctioning Plaintiff for "egregious" misconduct and Plaintiff engaging in additional egregious misconduct. (*See* ECF 265 at 15 (holding that Plaintiff's misconduct "[w]eigh[ed] in favor of dismissal" because "Plaintiff's conduct [came] on the heels of similar conduct for which Defendants sought dismissal.").) Plaintiff barely escaped dismissal, was warned and given a lesser sanction. *See, e.g.*, *Loc. Union No. 40*, 88 F. Supp. 3d at 266 ("[T]he Second Circuit has repeatedly upheld dismissal as an appropriate sanction where the non-compliant parties were warned of the possibility."). But it is clear that only dismissal will stop Plaintiff's misconduct. The lesser sanction has had no deterrent effect. *E.g.*, *Friends of Animals*, 131 F.3d at 334 (affirming dismissal where it was "apparent" "that lesser sanctions were ineffective"). To the contrary, it seems that Plaintiff was emboldened to engage in additional misconduct.

---

[11] "[S]o to answer your question, in terms of searching for their key words, they asked for a lot of key words. There were thousands and thousands of things that came up. We did go through all of those and we did review everything."

This Court denied the Second Motions to Dismiss in part because the "[P]arties ha[d] been working closely with Judge Garcia to complete discovery and the case [was] proceeding towards an adjudication on the merits." (ECF 265 at 16.)  The ink was barely dry on that statement when Plaintiff's further misconduct occurred.  Plaintiff intentionally destroyed Judge Garcia's carefully crafted plan for depositions, the close of discovery, and the advancement of this case.  A severe sanction is necessary not only because of Plaintiff's "egregious" misconduct, but also because there is a need "to deter those who might be tempted to such conduct [to delay other cases] in the absence of such a deterrent." (ECF 265 at 3.)  Many other litigants would surely like to delay a case by dumping irrelevant documents on their opponent.

Dismissal is now warranted under Plaintiff's own standard.  (*See* ECF 77 (Plaintiff arguing that dismissal is reserved for things like discovery violations that delay the case).)  Producing over 70,000 pages of largely irrelevant documents when discovery is about to close is an egregious discovery violation that plainly delayed this case.  Plaintiff had been warned over and over again about the prospect of dismissal.  (*E.g.*, ECF 119 at 15; *Obot*, 254 F. App'x at 58 ("[I]t is difficult to imagine how a dismissal following an unheeded warning could be an abuse of discretion.").)  Lesser sanctions have failed to stop Plaintiff's misconduct.  (ECF 265.)

## VII.    PLAINTIFF'S FALSE AND MISLEADING INTERROGATORY RESPONSES

Plaintiff also lied and misled Defendants in his interrogatory responses.  Jane asked him to disclose other sexual misconduct he had been accused of, and Plaintiff swore that he had only been accused of sexual misconduct by (1) Jane, and (2) Peter Roe.  We now know that Plaintiff lied in that response; discovery confirms Plaintiff was aware he had been accused of sexual misconduct by several other women.

### A.    Background Related To This Issue

#### 1.    Jane's Discovery Requests

In January 2024, Jane issued discovery requests to Plaintiff.    (**Exhibit H**.)    Jane's

interrogatories included the following interrogatory:

> Please identify all individuals that, to your knowledge, have alleged, stated, and/or
> otherwise asserted that you engaged in sexual misconduct with them and please
> identify all documents and communications, other than communications with your
> attorneys, regarding all such allegations, statements, and/or assertions of sexual
> misconduct against you.

(Exhibit H at 5.)

> Jane defined "sexual misconduct" broadly and in accordance with Yale's definition as:

> sexual assault (which includes rape, groping, and any other non-consensual sexual
> contact), sexual harassment, intimate partner violence, stalking, and any other
> conduct of a sexual nature that is non-consensual, or has the purpose or effect of
> threatening or intimidating a person or persons.

(Exhibit H at 2; *see also* **Exhibit I** (establishing that this is Yale's definition).)

> Jane also sought:

> All documents and communications, other than communications with your
> attorneys, concerning all allegations, statements, and assertions that you engaged
> in sexual misconduct, including but not limited to all allegations, statements, and
> assertions identified in response to Interrogatory 10 identified above.  This Request
> also includes authorizations sufficient to obtain all documents requested in this
> Request.

(Exhibit H at 9.)

Plaintiff waived any objections to Jane's discovery requests.  *See* Fed. R. Civ. P. 33(b)(4).

Plaintiff responded to Jane's interrogatory regarding sexual misconduct by identifying only

two individuals:  Jane and Peter Roe.  (**Exhibit J** at 21.)  Plaintiff did not identify any of the at

least seven other individuals who had made allegations against him.

In response to Jane's document request concerning other sexual misconduct, Plaintiff

directed Jane to what was at that time his entire production of 10,363 pages. (Exhibit J at 5.) With the exception of documents related to the alleged sexual assault in Washington D.C., and to the best of counsel's belief without again reviewing all of those documents, none of those documents appear to have anything to do with other misconduct allegations against Plaintiff, except one document which contains a link to the *Yale Daily News* article about the YCC allegations.

2.    *The Spring 2013 Complaint Against Plaintiff*

In Spring 2013, more than two years before the events giving rise to the present case, a woman ("Sally Roe 2"[12]) complained to Plaintiff's Residential College Dean and Academic Advisor that Plaintiff had grabbed her and forced himself on her. (**Exhibit K**.) Sally Roe 2 asked Plaintiff's Dean to talk to Plaintiff about her allegations and the Dean met with Plaintiff, discussed his behavior with him, and Plaintiff "realized that his behavior was not appropriate." (Exhibit K.) At the Dean's suggestion, Plaintiff wrote an apology email. (*E.g.*, Exhibit K.) In discovery, Plaintiff produced mental health counseling records that confirm Plaintiff was aware of this matter before he responded to Jane's interrogatory. This shows conclusively that Plaintiff knowingly submitted a false response to Jane's interrogatory by failing to disclose Sally Roe 2's complaint.

3.    *The Spring 2014 Complaint Against Plaintiff*

In Spring 2014, a woman ("Sally Roe 1"), complained about an incident involving Plaintiff that occurred "in March or April 2013." (**Exhibit L**.) Sally Roe 1 alleged that Plaintiff grabbed her, started making out with her in a forceful way, and tried to take her clothes off. (Exhibit L.) She also alleged that Plaintiff asked her numerous times for sex, oral sex, etc. and that she repeatedly said no. (Exhibit L.) Sally Roe 1 also reported that Plaintiff ███████████ ████████████████████████████████████████████ and that he "persistently

---

[12] The "Sally Roe" designations herein are the designations Defendants have given the "Sally Roes." (*See* ECF 197.)

texted" her after this incident  (Exhibit L.)

On April 27, 2014, a Yale faculty member, one of the individuals to whom Sally Roe 1 made her report, emailed Plaintiff asking him to meet to discuss an informal UWC complaint that had been made against Plaintiff.  (Exhibit L.)  Plaintiff met with the faculty member and others and recalled ███████████████████████████████████████████████ ███████ and otherwise denied the allegations.  (Exhibit L.)  Plaintiff agreed to receive training from Yale's Sexual Harassment and Assault Response & Education ("SHARE") Center.  (Exhibit L.)  Plaintiff then failed to properly complete that training and Plaintiff's Dean had to talk to Plaintiff about his failure to complete the training.  (Exhibit L.)  Given his repeated, documented conversations about this matter, Plaintiff was certainly aware of this alleged incident when he answered Jane's interrogatory, and his decision not to disclose it was intentional.

### 4.    The Yale College Council Meeting

In Spring 2014, Plaintiff stopped a meeting of Yale's College Council ("YCC") (Yale's student government) to address allegations that he had engaged in sexual misconduct.  (**Exhibit M.**)

As a subsequent *Yale Daily News* article reported, Plaintiff took the floor of the meeting to: "Excoriate a fellow YCC representative . . . [by] accusing her of leveling false accusations of sexual misconduct against him . . . ."  (Exhibit M.)  The *Yale Daily News* interviewed the representative who made the allegations against Plaintiff.  (Exhibit M at 4–5.)  She reported hearing "that multiple female students had considered reporting [Plaintiff] for sexual misconduct" and described her reaction to Plaintiff confronting her about the allegations against him during the YCC meeting.  (Exhibit M at 4–5.)

YCC's President in 2014 told the *Yale Daily News* that

> He and the other members of the YCC in the room did not expect that [Plaintiff] would begin forcefully accusing [another YCC representative] of bullying him . . . with accusations of sexual misconduct.

(Exhibit M.) YCC's President also told the *Yale Daily News* that he reported the allegations against Plaintiff to, *inter alia*, Yale's Title IX Coordinator. (Exhibit M at 3–4.)

Plaintiff was aware of the *Yale Daily News* article recounting these allegations before this case began. He had associates monitor media articles related to him and email him links to those articles. (**Exhibit N**.) The link to this article appears in one of those emails. (Exhibit N (1752).) This is more proof that Plaintiff lied when responding to Jane's interrogatory.

### 5. The November 2017 Allegations

The same *Yale Daily News* article also reported on "a separate Facebook post earlier [that] month [*i.e.*, in November 2017] [in which a] current Yale student wrote that [Plaintiff] made forceful advances on her and offered her drugs." (Exhibit M at 3.) The article went on to detail a student who was "a first year" "two years after the YCC" incident (*i.e.*, someone other than the individual(s) involved in the above allegations) who posted about Plaintiff allegedly "making advances on her" that included "offer[ing] her drugs." (Exhibit M at 6–7.) As previously noted, Plaintiff was aware of this *Yale Daily News* article before this case began, and therefore likely intentionally omitted this allegation from his interrogatory responses. (Exhibit M.)

### 6. The December 2017 Allegations

On December 1, 2017, another woman ("Sally Roe 4") made allegations against Plaintiff related to an incident that occurred in April 2015. Sally Roe 4 reported, among other things, that Plaintiff pushed her against a wall, tried to hold her hand, and asked her personal questions about her virginity and romantic life. (**Exhibit O**.) She also alleged that Plaintiff insisted on taking her to his room and offered her "pills" once they were there. (Exhibit O.) Plaintiff was aware of these

allegations before this case began because, as detailed below, he discussed them with a Yale mental health professional.

### 7.    The March 2018 Allegations

In March 2018, yet another woman ("Sally Roe 5") alleged that Plaintiff had attempted to grope her by putting his hand under her clothes and had ███████████████ (**Exhibit P**.) As discussed below, Plaintiff was aware of these allegations because he discussed it with a mental health professional.

### 8.    The April 2018 Allegations

In April 2018, a different woman ("Sally Roe 6"), alleged that Plaintiff sexually harassed her and other Yale students by making them feel uncomfortable and "creeped out" by looking through photos she had posted on Facebook and "liking" a photo of her in a bikini.[13]  (**Exhibit Q**.) Plaintiff was aware of this allegation because he discussed it with the mental health professional.

### 9.    The August 2018 Allegations

In August 2018, yet another woman ("Sally Roe 7") alleged that Plaintiff sexually harassed her by commenting "does she [*i.e.*, Sally Roe 7] want to be sexually assaulted?" while or after she was riding in an elevator with Plaintiff (the "Elevator Complaint")  (**Exhibit R**.)  Sally Roe 7 said she learned about Plaintiff's purported comment from one of Plaintiff's friends.  (Exhibit R.) Plaintiff was aware of this allegation before he responded to Jane's discovery requests because, as discussed in detail below, he referenced this "Elevator Complaint" in a media appearance.

### 10.    The Peter Roe/Sophie Allegations

In October 2018, the *Yale Daily News* published an article about allegations that Plaintiff sexually assaulted Peter Roe and a woman (whom the article referred to as "Sophie"). The article

---

[13] As discussed below, Jane's interrogatory required that Plaintiff disclose sexual harassment allegations.

described an alleged threesome involving Plaintiff, Peter Roe, and Sophie. (**Exhibit R**.) The article detailed Sophie's allegations, including describing that during the sexual encounter, Plaintiff "approached her from behind, restrained her and began forcing wine down her throat" and hit her "'really, really hard—like way too hard" in a way that "left some pretty unacceptable marks on" her face. (Exhibit R at 13.) Plaintiff is aware of this article and, thus, Sophie's allegations that he sexually assaulted her. (*E.g.*, Exhibit R.) While Plaintiff included Peter Roe in his interrogatory response, he falsely omitted Sophie's complaint about him when he verified his interrogatory responses under oath.

### 11. *Plaintiff Discusses Allegations With A Mental Health Professional*

In late 2018, Plaintiff discussed with a mental health professional the incidents with Sally Roe 1, Sally Roe 2, Sally Roe 4, Sally Roe 5, Sally Roe 6, and Sally Roe 7 (as well as allegations made by several other individuals). As that health professional's report explains, the substance of those allegations had been relayed to the health professional by Plaintiff's Dean and/or one of Yale's Title IX Coordinators. (Exhibit S at 17.) Plaintiff told the mental health professional the following:

> The first had occurred during his freshman year in which the Dean reported that a woman had not wanted to make a formal complaint but had felt pressured by [Plaintiff]. He said that he did not remember the exact details of the situation but did not disagree that he [] sent [an] email to her apologizing and did not make any attempts to see her. In terms of the program that he was referred to for sexual harassment training, he said he did not recall it as being a group but that he was referred to a person with whom he made an appointment and then made several other attempts to see him. When he did not appear, they exchanged emails and had a subsequent meeting. After that second meeting he said he was not given any other instructions for future meetings. He reported that he turned over the emails to investigators a number of months ago.

(Exhibit S at 17.)

Plaintiff was aware of these allegations because he discussed them with his provider, who

separately summarized them in a report. Plaintiff has had a copy of this report since 2018 and, even if he had somehow forgotten about these allegations, he surely would have been reminded about them when reviewing this important document in the context of this litigation. (*E.g.*, Exhibit S.) This is yet more proof that Plaintiff's omissions were intentional.

### 12.    *Plaintiff's Statements About Allegations Against Him*

In Fall 2023, before Plaintiff verified his responses to Jane's interrogatories, Plaintiff acknowledged that he was aware of a litany of complaints against him. In a video of Plaintiff after his return to Yale following his criminal trial, Plaintiff states that "there were about twenty different complaints against" him. The video can be accessed ████ Plaintiff even referenced the Elevator Complaint (where Plaintiff allegedly said or texted: "Does she want to be sexually assaulted?"), stating there was a complaint to the effect of: "He was in the elevator with me, I felt uncomfortable. Kick him out." (*See* ████

All of this is further proof Plaintiff lied in his response to Jane's interrogatory.

### 13.    *Jane Confronts Plaintiff About The Omissions, But Plaintiff Doubles Down*

In August 2024, Jane sent Plaintiff a discovery deficiency letter (**Exhibit T**) noting:

Interrogatory #10: We believe Plaintiff's response is deficient and request that he supplement it. For example, if you click here, you will see a video of Plaintiff saying that "there were about twenty different complaints against him" after his return to Yale. Please have Plaintiff identify the individuals who made complaints, allegations, etc. of sexual misconduct against him. Please have Plaintiff "identify all documents and communications, other than communications with [his] attorneys, regarding all such" complaints, allegations, statements, etc. to the extent that he cannot produce those documents and communications (see below and Jane's Request for Production #10 (requiring production of such documents and communications)). There is no need to identify or list documents and communications that Plaintiff produces.

. . . .

Request #10: We believe that Plaintiff's production of documents concerning other allegations of sexual misconduct against him is deficient. (See our discussion of

Interrogatory #10 above.) Please have Plaintiff produce all documents and communications (other than communications with his attorneys) concerning all allegations, statements, and assertions that he engaged in sexual misconduct with anyone other than Jane.

(Exhibit T.)

Counsel met and conferred on these and other issues. Counsel for Plaintiff represented that Plaintiff had conveyed to his counsel that Plaintiff was not aware of any sexual misconduct allegations other than Jane's and Peter Roe's allegations.

### B.    Plaintiff Lied In His Interrogatory Responses

The discussion above and corresponding exhibits establish that Plaintiff was aware of a litany of other sexual misconduct allegations against him but failed to disclose those allegations in response to Jane's discovery requests. Plaintiff has no excuse for not disclosing those allegations. Plaintiff waived all objection to Defendants' discovery requests. Fed. R. Civ. P. 33(b)(4); *see also* Fed. R. Civ. P. 41(b) (noting that dismissal may be based on violation of Rules as well as Orders); Fed. R. Civ. P. 37(d). Plaintiff's actions are outrageous, particularly in light of Plaintiff's other misconduct and his acknowledgment in response to Jane's first Motion to Dismiss that discovery misconduct can warrant dismissal. (ECF 77; *see also* cases cited *supra* (dismissing cases for discovery violations).) Plaintiff knew that these allegations are highly problematic for him and decided he would not only not tell Defendants about them, but that he would swear under oath that the only two allegations of sexual misconduct he was aware of were Jane's and Peter Roe's. Plaintiff tried to hide unfavorable evidence. Even more outrageously, when Jane called Plaintiff out for not fairly responding to her requests, Plaintiff doubled down, claiming he was unaware of any other allegations. *E.g.*, *Febres*, 2020 WL 2494724 at *2 (noting that actions by defendant such as filing motions can apprise plaintiff of risk of dismissal for misconduct). Defendants still do not know whether they are aware of all allegations against Plaintiff and have no way of knowing

24

whether Plaintiff may be aware of additional allegations of sexual misconduct.  And Defendants have no idea what else Plaintiff may have lied to them about.  Dismissal is warranted.

## VIII.   PLAINTIFF'S APPARENT MISREPRESENTATION TO JUDGE GARCIA

Plaintiff made a misrepresentation to his counsel and Judge Garcia regarding purported advice he received from his immigration attorney in an attempt to convince Judge Garcia to allow Plaintiff to release Jane's name to immigration officials.

### A.    Background Related To This Issue

It is important to note that Plaintiff previously made other misrepresentations directly to this Court.  As discussed in more detail in Jane's Second Motion to Dismiss, Plaintiff lied to this Court when he addressed the Court during the March 18, 2024 hearing and denied, among other things, harassing Jane.  (*See* Second Motion at 4–5; *compare* ECF 94 (Transcript Of March 18, 2024 Hearing) 21:4–6; 21:9–11; 21:19–20, *with* ECF 114).)  This Court subsequently recognized that Plaintiff was "dishonest" during that hearing.  (ECF 200 (Transcript Of July 25, 2024 Hearing) 46:11–13 ("[Y]our client sat in that chair three months ago and was dishonest with me.").)

This Court's admonishment had no effect on Plaintiff. He falsely represented that his immigration attorney advised him to respond to a request from immigration officials by producing documents containing Jane's name in an effort to disseminate Jane's name.

As the Court will recall, in 2024, Plaintiff received a request from the United States Citizenship and Immigration Services ("USCIS") for the "official transcript" from his criminal trial.  (*E.g.*, ECF 204.) ███████████████████████████████████████

████████████████████████████████████████████████████████

███████████    (*E.g.*, ECF 205.)  As part of that effort, Plaintiff made an "advice of counsel" argument:  "Plaintiff believes that his best course of legal action is to rely on advice of immigration

counsel and submit the requested documents as he submitted them in 2021. Not modified versions—the same documents." (*E.g.*, ECF 205 at 5; *see also* ECF 205 at 11 ("In this case, Plaintiff has been advised by his retained immigration counsel to submit the same documents he submitted in 2021. No one should interfere with that representation.").)

Judge Garcia scheduled a hearing and ordered Plaintiff's immigration attorney to attend. (ECF 209 ("Plaintiff[']s immigration counsel will attend the hearing.").) Plaintiff brought Attorney Glenn L. Formica to the hearing. (ECF 220 (Transcript Of October 21, 2024 Hearing) 4:20–22.) Rather than confirm Plaintiff's representation, Attorney Formica informed Judge Garcia that he had "effectively . . . not represented [Plaintiff] in years." (ECF 220 8:8; *see also* ECF 220 8:19–21 ("And then again last night by email [Plaintiff] confirmed that I was no longer his attorney because I think it was important since I was sort of in the middle."); 8:22–24 ("So that's a long explanation to say I'm no longer his attorney and haven't been his attorney for years.")

Jane's counsel then expressed grave concern about the inconsistency between what Plaintiff had told Judge Garcia and what Attorney Formica had told Judge Garcia. (ECF 220 19:23–20:12.) In response, Plaintiff's counsel suggested that Plaintiff received the purported advice to submit the prior documents from a different immigration attorney that Plaintiff chose not to bring to the hearing in response to Judge Garcia's Order requiring his immigration attorney to attend. (ECF 220 25:3–26:4.) After conferring with Plaintiff, Plaintiff's counsel then noted that Plaintiff had "noted that he is pro se" in his immigration case. (ECF 220 32:6–7; *see also* ECF 220 31:14–16 (The Court: "[H]e doesn't have another [i]mmigration lawyer who is going to be submitting these documents on his behalf?" Plaintiff's Counsel: "Not to my knowledge."). Plaintiff has since confirmed his *pro se* immigration status by filing a *pro se* mandamus action related to applications he has made to immigration officials. *See Khan v. Noem*, No. 3:25-cv-

00471-KAD (D. Conn.).  To sum it up, Plaintiff appears to have willfully lied to this Court about receiving advice from an immigration lawyer.

### B.    Plaintiff's Gamesmanship Regarding Immigration Advice – And His Other "Dishonesty" With The Court Warrants Dismissal

Plaintiff's apparent lies about the alleged advice from an immigration attorney warrant dismissal.  *See, e.g.*, *Shepherd*, 921 F.3d at 89 (affirming dismissal where plaintiff omitted reference to certain prior lawsuits he had filed to attempt to obtain *in forma pauperis* status he was barred from receiving).  That is particularly true because this is at least the second time that Plaintiff has been "dishonest" with the Court and the Court's prior admonishment of Plaintiff clearly had no effect in changing his willingness to lie.  (ECF 200 at 46:11–13.)  Indeed, this Court denied the Second Motions to Dismiss in significant part because it believed that Plaintiff had not engaged in any additional misconduct following his June 2024 violation of the Court's orders.  (*See* ECF 265.)  It appears that is not, in fact, the case.

## IX.    PLAINTIFF'S DECISION TO OTHERWISE MISLEAD OUR COURTS

Discovery has established that Plaintiff misled our Courts by asserting that he lacked an adequate record of the UWC Proceedings even though that is not the case.

Based on representations by Plaintiff, the Connecticut Supreme Court concluded that Plaintiff's "ability to appeal was severely constrained by the absence of any transcript or recording of statements, testimony, or questions raised during the UWC [H]earing."  *Khan v. Yale Univ.*, 347 Conn. 1, 46, 295 A.3d 855, 883 (2023); *see also, e.g.*, *Khan v. Yale Univ.*, 85 F.4th 86, 95 (2d Cir. 2023) (quoting the Connecticut Supreme Court's conclusion).

In actuality, Plaintiff has been sitting on a recording of the UWC Hearing (and his UWC Fact-Finder Interview) since before this case began.  Plaintiff only disclosed the existence of those recordings in documents he produced.

On September 28, 2020, Yale served discovery requests to Plaintiff. (**Exhibit U**) Yale's requests for production sought, among other things, the following:

> Please provide a copy of any memorandum, correspondence, transcript, audio or videotape recording or any other document or tangible item in plaintiff's custody or control which captures any conduct or conversation of any of the defendants or any agent, servant or employee of any of the defendants that is relevant or material to any of the allegations of plaintiff's complaint or to plaintiff's claim for damages.

(Exhibit U at RFP 22.)

On or about May 20, 2024, Plaintiff responded and did not object to this request. (**Exhibit V** at 6.**) While his response states, "see enclosed production," Plaintiff did **not** produce any transcript or related audio or video recordings until pressed by Defendants for a more complete response. On or about February 5, 2025, Plaintiff produced redacted transcripts of his recordings of the UWC proceeding.[14]

In October 2024, when Plaintiff had disclosed the existence of the recordings but had not yet produced them, Plaintiff relied on the Connecticut Supreme Court's and Second Circuit's conclusions regarding the alleged lack of "an adequate record for review." (ECF 218 at 4.)

Plaintiff's actions in leading numerous Courts to believe that he was "severely constrained by the [alleged] absence of any . . . recording" while he had recordings of the proceedings is another example of egregious misconduct and Plaintiff's disdain for our Courts. *Shepherd*, 921 F.3d at 89.

And Plaintiff's actions vis-à-vis this Court are in addition to the fact that Plaintiff improperly (in violation of Yale's rules, etc.) and secretly recorded UWC proceedings, and lied to the UWC panel about doing so. As Plaintiff's secret recording shows, the Chair of the UWC panel, Sarah Demers, informed all participants at the start of the proceedings that "no participants in a

---

[14] The redactions concern purported privileged conversations Plaintiff had with his counsel during the UWC Proceedings. The existence of these redactions raises questions about Plaintiff's representations regarding the ability of his attorney to assist him during the UWC Proceedings, which was another quasi-judicial immunity issue.

UWC hearing may record or transmit these proceedings." (**Exhibit W** at 12.)  In addition, before

Plaintiff provided his opening statement, Ms. Demers had the following colloquy with Plaintiff:

> MS. DEMERS: Alright. Thank you. Saif, would you and your advisor please confirm that you are not recording or transmitting this hearing?
>
> MR. KHAN: Yes, I confirmed with my advisor earlier. We're not recording this.
>
> MS. DEMERS: Okay.
>
> MR. KHAN: I – yes, he's not either.

(Ex. W at 19 and 20.)

A reminder to Plaintiff that he "must be honest with the committee" or face a more severe

penalty or additional charges apparently fell on deaf ears. (Ex. W at 20.)  Plaintiff does and says

what Plaintiff wants.

## X.    ADDITIONAL MISCONDUCT

Plaintiff has also engaged in other misconduct.  For example, and as set forth in more detail

in Defendants' Motions to Compel Plaintiff's privilege log entries relating to Mr. Roe (ECF 322

& ECF 325), Plaintiff has made a baseless claim that scores of communications with his friend,

who is not an attorney, are privileged.  Plaintiff claims, among other things, that Mr. Roe was part

of his criminal defense team, but Plaintiff's criminal defense attorney disavowed that claim and

did so in a document that Plaintiff reviewed before it was submitted.  The claim to privilege

regarding Mr. Roe being part of the criminal defense team is baseless.  This is further misconduct.

## XI.   DISMISSAL IS MORE THAN WARRANTED

The examples of misconduct described above individually warrant dismissal.[15]  That is

---

[15] The misconduct cited above is non-exhaustive.  As an additional example, Plaintiff provided authorizations for certain medical records, but then told one of his providers not to release records.  Defendants learned about this issue when the provider informed them that she could not release the records even with the authorization Defendants had provided because of instructions she had received from Plaintiff.  Defendants ultimately obtained the records after involving Plaintiff's counsel in this issue.

particularly true because of Plaintiff's extensive and egregious prior misconduct.  (*E.g.*, ECF 265.)  *See Selletti*, 17 F. App'x at 21 (affirming dismissal where "pattern" of misconduct persisted and justified dismissal "whether considered alone or in the aggregate with his previous conduct").  But the Court cannot consider the misconduct above in isolation.  It must instead evaluate "dismissal in light of the record as a whole."  *Febres*, 2020 WL 2494724, at *2; *see also, e.g.*, *Smith*, 2025 WL 986122, at *4 (dismissing case where plaintiff's "difficulties are not limited to any discrete issue or shortcoming that the Court could correct with incremental measures.").  When considered cumulatively, Plaintiff's actions constitute an "abuse[] [of] the [judicial] process at a level that is utterly inconsistent with the orderly administration of justice [and] undermines the integrity of the process," demonstrates "flagrant disregard of court orders," and "amount[s] to [a] sustained and willful intransigence in the face of repeated and explicit warnings."  (ECF 265 at 3; *Blue*, 2021 WL 5770017, at *1, *Aigwal*, 555 F.3d at 303.

The factors normally considered in conjunction with dismissal are of limited relevance to Plaintiff's unprecedented misconduct because those factors largely concern the less egregious misconduct of failing to engage in discovery, etc.  *See, e.g.*, *Conquistador v. Martin*, No. 3:19-CV-1965 (KAD), 2024 WL 2746893, at *1.  To the extent that the factors are relevant, however, they overwhelmingly support dismissal, as Plaintiff acknowledged in a prior filing.  (ECF 77.)

### A.    Plaintiff Has Caused Significant Delay

Plaintiff has caused significant delay to this case.  *See, e.g.*, *Davis*, 2019 WL 5696019, at *3 (dismissing case where plaintiff's "conduct [] caused a significant delay in the progress of the case").  In July 2024, this Court observed that "the amount of money and time and effort that has been spent in the last three or four months litigating [Plaintiff's] conduct outside the confines of this litigation is ridiculous.  It's ridiculous."  (ECF 200 at 9:7–10.)  The Court also noted that this

case would "be in a very different place than where [it was then]" "if everybody would just focus their attention on discovery, completing discovery, getting the case to trial," but that the Parties could not do that because, as the Court noted "that [was] not [Plaintiff's] agenda." (ECF 200 at 9:11–14.) Things have only gotten exponentially worse since the Court made those statements. The moment the Court declined to dismiss this case, Plaintiff disseminated Jane's name again, delayed this case for months by dropping 70,000+ pages of irrelevant documents on Defendants, and engaged in other misconduct that has once again required an enormous amount of time to be diverted away from discovery.

### B.    Plaintiff Has Been Warned Again And Again

Plaintiff has also persisted in misconduct despite a litany of warnings of dismissal in:

- Jane's First Motion To Dismiss (ECF 75)[16];

- Jane's Reply In Further Support Of Her Motion To Dismiss (ECF 79);

- The Court's Comments On March 18, 2024 (*E.g.*, ECF 94 at 8–9:9; 13:23–14:19[17]);

- Judge Garcia's June 19, 2024 Ruling And Order (ECF 119 at 15;[18] *see also* ECF 265 at 1);

- Judge Garcia's Comments On June 20, 2024 (*E.g.*, ECF 150 at 8:15–25[19]);

---

[16] It is well-established that warnings of prospective dismissals need not be from the Court and can instead be from a motion, etc. filed by an opposing party. *See, e.g.*, *Febres*, 2020 WL 2494724, at *2 ("[T]he instant motion to dismiss has itself apprised the Plaintiff that further delay will result in dismissal."); *Dodson*, 957 F. Supp. at 470 ("The second factor—whether plaintiff received sufficient notice that his case would be dismissed—[also supports dismissal]. Defendant's September 8, 1992, letter to plaintiff notice plaintiff of defendant's intent to move for a Rule 41(b) dismissal for failure to prosecute."). Regardless, both the Court and Defendants have provided ample warnings.

[17] The Court's comments admonishing Plaintiff and expressing its concerns put all who heard them, including Plaintiff, who was physically present, on notice that dismissal could result from misconduct.

[18] "Plaintiff is advised that any release or deliberate disclosure of Jane Doe's identity in violation of this Court's Order is sanctionable by the Court, *including but not limited to dismissal*." (emphasis added).

[19] "I would just caution you because I think Judge Dooley has been quite clear. And I think my order is quite clear that any violation of my order could lead to sanctions, *which could include dismissal of your claims* against Jane Doe and potentially Yale. . . . [T]he orders are orders of the Court. They're expected to be followed. And if they're not followed, there are significant potential repercussions." (emphasis added).

- Jane's Second Motion To Dismiss (ECF 123-1);

- The Yale Defendants' Motion To Dismiss (ECF 130-1);

- Jane's Reply In Further Support Of Her Second Motion To Dismiss (ECF 166);

- The Yale Defendants' Reply In Further Support Of Their Motion To Dismiss (ECF 171);

- The Court's Comments On July 25, 2024 (*E.g.*, ECF 200 at 7:4–10:16[20]);

- The Protective Order Plaintiff signed (ECF 197[21]); and

- The Court's January 29, 2025 Memorandum Of Decision.[22]

This Court and Judge Garcia have given Plaintiff far more opportunities to stop his misconduct and far more warnings than even unrepresented parties receive. *See, e.g.*, *Agiwal*, 555 F.3d at 303 (affirming dismissal and holding that Court "exceeded what was required" where Court gave far fewer warnings than this Court and Judge Garcia have given); *Conquistador*, 2024 WL 2746893, at *3 (dismissing case where plaintiff "was given notice on no less than there occasions that further failure to comply with the Court's orders could result in dismissal of th[e] action").

## C.    Defendants Have Been And Will Continue To Be Prejudiced

Defendants have been and will continue to be prejudiced.  Prejudice is presumed because of the delays Plaintiff has caused.  *E.g.*, *Peters-Turnbull*, 7 F. App'x at 110; *Dodson*, 957 F. Supp. at 470.  As the Court has noted, the Parties cannot focus on litigating this case because of Plaintiff's

---

[20] "*Dismissal of these claims as a sanction is the most severe sanction that I could mete out, and I haven't decided what to do about this situation.  I just know it has to end one way or another*—whether by court order; by the end of the litigation, which we know is what the Defendants are asking.  I don't know what the right answer here is.  But I know it has to stop. . . ." (emphasis added).

[21] "I understand that if I disseminate any documents or information designated "CONFIDENTIAL" or access or attempt to access any documents or information designated "CONFIDENTIAL – NOT FOR PLAINTIFF'S EYES," I will be subject to sanctions by the Court, *including but not limited to dismissal with prejudice* of all of my remaining claims, and other sanctions and penalties." (emphasis added).

[22] The Court's recitation of relevant law regarding bad faith conduct was alone sufficient to yet again warn Plaintiff that further misconduct might lead to dismissal.  The Court's conclusion that Plaintiff's known misconduct to date was "egregious" also alerted Plaintiff that any additional misconduct likely would result in dismissal.

misconduct.  (ECF 200 at 9:11–14; *see also Conquistador*, 2024 WL 2746893, at *3 (defendants prejudiced  because "they wasted time and resources appearing at three status conference at which Plaintiff did not appear").)  The Parties are currently in a critical stage of discovery, yet Defendants are once again addressing and attempting to prevent misconduct instead of devoting time to impending depositions.  Defendants are also prejudiced because Plaintiff's false and incomplete interrogatories leave them uncertain about whether Plaintiff has disclosed all of the sexual misconduct allegations against him or what else Plaintiff may have lied about in his interrogatories.  Given Plaintiff's past conduct, they are certainly not willing to accept Plaintiff at his word.  (*E.g.*, Exhibits Detailing Other Sexual Misconduct); ECF 200 at 46:11–13 ("The Court: . . .  You just said that I should take [Plaintiff] at his word.  Well, [Plaintiff] sat in that chair three months ago *and was dishonest with me*." (emphasis added)).  Plaintiff's misconduct will not stop absent dismissal.

### D.    Addressing Plaintiff's Actions Has Required Extensive Judicial Resources

The need to alleviate court congestion also supports dismissal.  This case has taken an inordinate share of this Court's limited judicial resources due to Plaintiff's misconduct.  (*See, e.g.*, ECF 200 at 9:7–10; ECF 200 at 9:11–14.)  The docket is filled with filings and entries related to Plaintiff's misconduct.[23]  More importantly, Plaintiff has disrespected this Court and its process at every turn.  He should not be allowed to continue to take enormous amounts of time away from the countless litigants who respect this Court and adhere to its rules.

### E.    Lesser Sanctions Only Emboldened Plaintiff

Lesser sanctions are inadequate.  The Court imposed lesser sanctions, including repeatedly

---

[23] *See, e.g.*, ECF 74, ECF 75, ECF 76, ECF 77, ECF 78, ECF 79, ECF 80, ECF 81, ECF 82, ECF 87, ECF 88, ECF 90, ECF 91, ECF 94, ECF 95, ECF 96, ECF 113, ECF 114, ECF 115, ECF 116, ECF 117, ECF 118, ECF 119, ECF 122, ECF 123, ECF 124, ECF 125, ECF 130, ECF 144, ECF 150, ECF 157, ECF 182, ECF 187, ECF 198, ECF199, ECF 200, ECF 265.

admonishing Plaintiff and then sanctioning him by allowing Defendants to present evidence of his misconduct at trial, only for those sanctions to lead to additional misconduct. *See, e.g.*, *Friends of Animals*, 131 F.3d at 334 (affirming dismissal where it was "all too apparent from the record . . . that lesser sanctions were ineffective in deterring . . . misconduct").

> **F.      The Court Should Dismiss The Case**

Enough is enough.  Dismissal is warranted for any one of the examples of misconduct detailed above.  Plaintiff's collective actions more than warrant dismissal.  That is particularly true in light of Plaintiff's extensive history of "egregious" misconduct in this case.

## XII.    THE COURT SHOULD ENTER ADDITIONAL AND/OR ALTERNATIVE SANCTIONS

In addition to dismissing this case, the Court should award Defendants the costs, including attorney's fees, associated with their review of Plaintiff's 70,305 page production.  Defendants should not have to bear the burden of Plaintiff's misconduct more than they already have.

Monetary sanctions alone are, however, insufficient and will likely only embolden Plaintiff.  "The *mildest sanction* [the Court can impose] is the reimbursement of expenses to the opposing party caused by the offending party's failure to cooperate." *Petty*, 2019 WL 121719, at *4 (emphasis added).  Moreover, Plaintiff is funding his litigation with other people's money, including donations.  He will not be deterred, and will instead be emboldened, by monetary sanctions because he does not have to pay any sanctions – other people will be paying.  As Defendants have previously noted, Plaintiff also uses this Court's Orders to try to drum up money for his lawsuit.  (*See* ECF 123-2.)  Plaintiff will no doubt crowdfund any monetary sanctions imposed and additional sums by once again misleading his followers about the Court's actions, thereby obtaining a net benefit and encouraging future misconduct.

As discussed above, nothing short of dismissal is warranted in this case.  If the Court

nevertheless disagrees, the Court should enter the following sanctions:

- That Defendants be given discovery to determine the full extent of Plaintiff's misconduct so that they can properly brief the issue of whether dismissal is warranted. This would include, but not be limited to, searches of Plaintiff's non-privileged communications since Fall 2023 given that Plaintiff's plan to harass Jane has existed since at least that time.

- That the Court preclude Plaintiff from obtaining further discovery. *See Harvin v. Cheney*, No. 3:23CV328 (MPS), 2024 WL 2044696 (D. Conn. May 7, 2024) (precluding the plaintiff from receiving "any further discovery" even though the plaintiff had not violated any court order because the plaintiff acted in bad faith by disseminating information). Plaintiff's desire to conduct a fishing expedition for additional information was presumably what led him to dump 70,305 documents on Defendants to delay this case.

- That the Court preclude Plaintiff from asserting claims for reputational damage and lost earning capacity. *Kalra v. Adler Pollock & Sheehan, P.C.*, No. 3:18-CV-00260 (KAD), 2021 WL 242052, at *9 (D. Conn. Jan. 25, 2021) (precluding plaintiffs from seeking damages in the following categories due to repeated discovery failures). Plaintiff's gamesmanship regarding other sexual misconduct means that Defendants cannot know whether they are aware of all other allegations against Plaintiff, which is a key issue relevant to, among other things, Plaintiff's reputational and lost earning capacity claims because other allegations of sexual misconduct undermine Plaintiff's claim that it was Jane's complaint against him that damaged his reputation and his claim that Jane's allegations and/or Yale's actions (as opposed to allegations of other victims) impacted his earning capacity.

- That the Court preclude Plaintiff from relying on information in Plaintiff's February 2025 production or the recordings that Plaintiff hid to prevent Plaintiff gaining any advantage from burying documents he may want to use in irrelevant documents and misleading our Courts about the availability of recordings of the UWC Proceedings.[24]

- That, if a trial is necessary, the Court instruct the jury that Plaintiff engaged in egregious misconduct in this case, including lying. *See, e.g.*, *Meyer Corp. v. Alfay Designs, Inc.*, No. 2010CV3647CBAMDG, 2016 WL 792398, at *7 (E.D.N.Y. Feb. 26, 2016) (noting situations where misconduct had led to an instruction that plaintiff had engaged in misconduct (not just the opportunity for cross-examination about that misconduct and/or an inference)); *see also, e.g.*, ECF 265 (concluding that Plaintiff engaged in "egregious" misconduct; ECF 200 at 46:12–13(concluding that Plaintiff "was dishonest with" the Court when he personally addressed the Court).) The Court's previous sanction allowing Defendants to cross-examine Plaintiff about his misconduct appears to have been insufficient to prevent additional misconduct. If this case is not dismissed, a further sanction is appropriate.

- That, if a trial is necessary, the Court allow the admission of all accusations of sexual

---

[24] Defendants should be allowed to use any documents or information they desire.

misconduct against Plaintiff without the need for any further foundation.  Plaintiff sought to conceal these accusations from Defendants and his actions caused, at minimum, a delay of approximately one year in identifying the information noted above.

Defendants reiterate that these sanctions will not be effective because nothing short of dismissal will stop Plaintiff's misconduct.

## XIII.  CONCLUSION

The Court should dismiss Plaintiff's claims with prejudice.  It should also award Defendants' monetary sanctions for their review of Plaintiff's 70,305 page production.  In the alternative, the Court should impose the other sanctions requested above.

DEFENDANT JANE DOE,

By: _/s/ Brendan N. Gooley_
James M. Sconzo (ct04571)
Brendan N. Gooley (ct30584)
CARLTON FIELDS, P.A.
One State Street, Suite 1800
Hartford, CT  06103
Tel.: 860-392-5000
Fax: 860-392-5058
Email: jsconzo@carltonfields.com
       bgooley@carltonfields.com

Her Attorneys

DEFENDANT YALE UNIVERSITY

By: _/s/ Giovanna Tiberii Weller_
Patrick M. Noonan (ct00189)
Giovanna Tiberii Weller (ct11187)
Maria L. Laurato (ct31443)
Carmody Torrance Sandak & Hennessy LLP
195 Church Street
P.O. Box 1950
New Haven, CT 06509
Phone: 203-777-5501
Fax: 203-784-3199
Email: pnoonan@carmodylaw.com
Email: gweller@carmodylaw.com
Email: mlaurato@carmodylaw.com

## <u>CERTIFICATION OF SERVICE</u>

This is to certify that on this 20th day of May 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system.


                    */s/Brendan N. Gooley*
                    Brendan N. Gooley