UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SAIFULLAH KHAN | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:19-cv-01966-KAD |
| | : | |
| V. | : | |
| | : | |
| YALE UNIVERSITY, ET AL., | : | |
| Defendants. | : | June 17, 2025 |

## MOTION TO COMPEL

Attorney Margaret Valois designated Mr. Roe as her "volunteer paralegal" in September 2018. The logged communications show why: he collected Yale disciplinary files, organized witness timelines, drafted strategy memos, and relayed attorney instructions during Plaintiff's criminal trial and Title IX proceedings—precisely the litigation support that Second Circuit law protects when performed by third parties necessary or highly useful to counsel. Yet Defendants falsely claim Plaintiff "refused" to produce documents he removed from the privilege log, when Plaintiff removed them at Defendants' request after conducting the review Defendants demanded, after expressly disclaiming interest in certain Roe communications during a meet and confer. They seek Rule 37 sanctions despite acknowledging Plaintiff already narrowed his log, citing cases that actually support privilege when—as here—the third party performed litigation tasks under counsel's supervision. Since undersigned counsel appeared, Plaintiff has produced over 45,000 pages, provided forensic phone and cloud imaging, signed every release requested, and met every deadline. When Defendants sought additional ESI, Plaintiff obtained vendor quotes. Nevertheless, to avoid further satellite litigation over these properly privileged communications, Plaintiff will produce all Roe documents simultaneously with this filing. This voluntary disclosure moots Defendants' motion while preserving Plaintiff's position that the documents were correctly withheld under established Second Circuit law.

1

## I.     LEGAL STANDARD

In *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961), the Second Circuit held that the attorney-client privilege attaches to communications with third-parties—in that case, an accountant employed by the client's attorney—where "the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer." 296 F.2d at 922. The Court recognized that the inclusion of a third party "in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client." *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999).

## II.     ATTORNEY-CLIENT PRIVILEGE PROTECTS COMMUNICATIONS WITH MR. ROE

The record shows that Plaintiff involved Mr. Roe in his communications with counsel for the purpose of aiding his attorneys in pending legal matters. In particular, in September 2018, attorney Margaret Valois, who represented Mr. Khan in post-trial and Yale-related proceedings, described Mr. Roe as her "volunteer paralegal," indicating that she enlisted Mr. Roe to assist in Plaintiff's representation. As a volunteer paralegal, Mr. Roe was part of the legal team. His role was to help gather information, develop legal strategy, and facilitate communications between Plaintiff's attorneys and Plaintiff during his criminal trial and university disciplinary proceedings. Communications involving Plaintiff, his attorneys, and Mr. Roe were made confidentially, for the express purpose of formulating legal advice, trial strategy, and litigation plans. Including Mr. Roe in these communications was necessary or at least highly useful for counsel's work – for example, Mr. Roe helped coordinate evidence collection and discussed trial logistics and theories that would inform counsel's advice. In substance, these were privileged communications between and among a client, an attorney, and an agent of the attorney.

Even communications solely between Plaintiff and Mr. Roe (without an attorney copied) remained within the sphere of privilege, because Mr. Roe was acting as an intermediary to assist Plaintiff's attorneys. When a client conveys information to an agent who is gathering facts for the attorney or relaying advice from the attorney, that communication is privileged under *Kovel*. Plaintiff reasonable expected that his communications with Mr. Roe regarding legal matters would be used to inform his attorneys' advice or strategy and would be kept confidential within the legal team. Many of the communications at issue were later shared with counsel or were undertaken at counsel's direction, confirming the legal purpose of the communications.

The Second Circuit in *Kovel* recognized that if a lawyer directs a client to first convey information to a non-lawyer agent (such as an accountant or, here, a legal assistant) so that the information can be organized or clarified for the lawyer's use, those communications are privileged just as if made directly to the lawyer. By the same token, Plaintiff's communications with Mr. Roe in anticipation of or following discussions with his attorneys are privileged. Mr. Roe was effectively a "necessary conduit" for certain communications between Plaintiff and counsel – for example, helping Plaintiff articulate complex technical or factual points for his attorneys, and helping counsel communicate requests and advice back to Plaintiff

### III.   THE WORK PRODUCT DOCTRINE INDEPENDENTLY PROTECTS THE ROE COMMUNICATIONS

Apart from the attorney-client privilege, many of the communications and documents involving Mr. Roe are also protected by the work product doctrine. The work product doctrine, codified in Fed. R. Civ. P. 26(b)(3), shields from disclosure materials prepared by a party or the party's representative in anticipation of litigation or for trial, unless the opposing party shows substantial need and an inability to obtain the equivalent without undue hardship. Work product

includes not only documents prepared by attorneys, but also those prepared by non-attorneys acting for the attorney or for the client in preparing for litigation, as defendants acknowledge. This encompasses communications with third parties who are assisting in trial preparation, since the rule expressly protects materials prepared "by or for a party's representative (including the party's attorney, consultant, surety, indemnitor, insurer, or agent)" (Fed. R. Civ. P. 26(b)(3)(A)).

Mr. Roe's assistance to Plaintiff and his lawyers was rendered during ongoing and anticipated legal proceedings – namely, Plaintiff's 2018 criminal trial, the subsequent Title IX disciplinary process at Yale, and the preparation for this civil lawsuit (filed in late 2019). During these critical periods, Mr. Roe worked closely with Plaintiff (and later with Attorney Valois) to help develop and execute legal strategy. By coordinating evidence gathering, identifying potential witnesses, and discussing how to counter the allegations against Mr. Khan, Mr. Roe was performing classic litigation support tasks under counsel's guidance. Because Mr. Roe "worked directly with and under the supervision of counsel and was responsible for such tasks as coordinating the gathering of evidence and identifying and contacting witnesses," the materials he created are protected work product, Montesa v. Schwartz, No. 12-cv-6057, 2016 WL 3476431, at *10 (S.D.N.Y. June 20, 2016).

Here, although Mr. Roe was an unpaid volunteer rather than a formally retained investigator, the nature of his involvement was the same as that of a paralegal or investigator on the legal team. He acted as Plaintiff's agent in conducting research and communicating about the case, specifically to further the litigation objectives of defeating the charges and claims against Mr. Khan. Documents and emails reflecting these activities (such as discussions of trial theories or legal logistics) were created because of the litigation and plainly would not exist but for the litigation. They therefore meet the "anticipation of litigation" test for work product protection.

Yale argues that some Roe communications predated Attorney Valois's formal engagement (which began around April 2018). But even communications from late 2017 and early 2018 were made when Plaintiff was actively involved in legal proceedings – specifically, the criminal prosecution that went to trial in February–March 2018, as well as potential university disciplinary action. Plaintiff and Mr. Roe certainly anticipated litigation and were preparing for it during that time frame. Indeed, Plaintiff was already a criminal defendant, facing trial, by December 2017, and was also facing a Title IX investigation by Yale. Thus, any documents or communications in which Plaintiff and Mr. Roe discussed "trial strategy" or compiled information related to the accusations were created with the unmistakable purpose of aiding in Mr. Khan's defense. Litigation was not a "remote possibility" – it was underway or imminent, satisfying even the strictest view that work product must be tied to concrete litigation prospects. Yale's own brief acknowledges that Mr. Roe's communications with Plaintiff concerned matters like undermining the accuser's credibility and post-trial issues, all of which are inherently litigation-related. Under these circumstances, the work product doctrine clearly applies. As the court observed in Montesa, work product protection requires a showing that materials were prepared "with an eye to some specific litigation" and not merely for general purposes. Here, the "specific litigation" (the criminal case and the disciplinary proceedings, followed by this lawsuit) was the driving force behind Mr. Roe's involvement.

Yale also makes much of its argument on a November 2, 2018 letter in which Norm Pattis, trial counsel for Mr. Khan's 2018 criminal case and prior counsel in this case, asserts that Mr. Roe "had no role in the defense" and was engaged in a "self-aggrandizing lie" for claiming otherwise. The letter fails to defeat privilege for several reasons. First, the privilege belongs to the client, not the attorney, and an attorney's out-of-court statement cannot waive it. Second,

5

privilege turns on the substance and the purpose of each communication, not on one attorney's later opinion. Communications remain privileged if, at the time they were made, the client reasonably believed that the third-party participant was helping counsel gives legal advice. *Kovel*, 296 F.2d at 921-22. Whether Mr. Pattis personally used Mr. Roe is irrelevant to the many logged emails showing Roe assisting counsel with Title IX strategy. Third, Pattis's letter came after Attorney Valois enlisted Mr. Roe as her "volunteer paralegal" and would not apply to any communications after that point. Fourth, at most Pattis's opinion disputes Mr. Roe's involvement in *his* team, not in Mr. Khan's legal team. The factual dispute between Attorneys Valois and Pattis would require an evidentiary hearing to resolve.

Even if Attorney Pattis did not personally approve of Mr. Roe's involvement, that does not defeat the privilege for communications that did occur. The scope of privilege is determined by the content and purpose of communications, not by one attorney's after-the-fact characterization. The fact remains that Plaintiff did communicate with Mr. Roe about trial strategy and that Mr. Roe was later formally brought onto the team by Attorney Valois. To the extent Mr. Roe was assisting behind the scenes during the criminal trial (even if Mr. Pattis was unaware or did not approve of this), those communications were undertaken in confidence to further Plaintiff's legal interests – which is sufficient for work product, if not privilege. And once Mr. Roe was enlisted by Attorney Valois, any communications involving him, Plaintiff, and Ms. Valois were classic privileged communications within a unified legal team.

Yale cannot show that Plaintiff waived work product protection by involving Mr. Roe. Unlike the attorney-client privilege – which can be waived by any voluntary disclosure to a third party – work product is only waived if the materials are disclosed in a manner that substantially increases the likelihood that an adversary will obtain them. Mr. Roe was aligned with Plaintiff,

not an adversary, and communications with him were intended to remain confidential within the litigation team. Sharing work product with a non-adversarial third party who is assisting in the litigation does not undermine the protection. Yale's theory of the privilege would endanger communications with investigators, experts, or other agents who further a client's case. Here there is no evidence that communications involving Mr. Roe were ever exposed beyond the confines of Plaintiff's trusted legal circle. To the contrary, they were treated as confidential case-related discussions.

In sum, even if the Court were to find that attorney-client privilege does not cover certain communications involving Mr. Roe (which Plaintiff maintains it does), those communications would still be shielded as work product. At minimum, they constitute "fact work product" reflecting the investigative and preparatory efforts of Plaintiff's team, and Yale has not demonstrated any substantial need that would overcome this qualified immunity (Fed. R. Civ. P. 26(b)(3)(A)(ii)). Moreover, some documents reveal mental impressions or legal theories of Plaintiff's counsel (for example, emails about "trial theories"), which would be "opinion work product" at the core of Rule 26(b)(3)'s protection, virtually never subject to disclosure.

None of Yale's cases are to the contrary. Yale cites *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F.Supp.2d 548, 563 (S.D.N.Y. 2008) for the general proposition regarding third-party waiver to a "stranger" to the attorney-client relationship, but that case found no waiver because the emails obtained by a third party were obtained by unauthorized access using stored passwords. *Pure Power* helps Plaintiff because the court reaffirmed that privilege is only waived when the client or lawyer voluntarily discloses a communication to a true outsider. There, the e-mail stayed privileged even after the opponent hacked and printed it, because it had never been shared beyond the legal team. The same logic applies here: Mr. Roe

7

was acting as our attorneys' lay assistant, so he is inside the privilege circle—not a "third-party stranger." Under *Pure Power*, any unauthorized acquisition by Yale can't create a waiver, and Plaintiff's communications with Roe remain protected.

*Riverkeeper, Inc. v. Coeymans Recycling Center, LLC*, No:1:20-cv-1025 (N.D.N.Y. Mar. 11, 2024) supports Plaintiff's position as well. The court refused privilege because the party seeking privilege "failed to show" that the outside activist was (i) formally engaged or supervised by counsel, (ii) performing tasks necessary to obtain or convey legal advice, or (iii) bound by any confidentiality commitment, so she looked "more like a concerned citizen than a litigation aide." Here we have the polar opposite: (1) Attorney Valois expressly designated Mr. Roe as her "volunteer paralegal," memorializing the relationship in writing; and (2) Roe's emails show he was collecting evidence, drafting strategy memos, and transmitting attorney instructions—the very litigation tasks *Riverkeeper* said would qualify. The deficiency that doomed privilege in *Riverkeeper* is not present in this case.

In *Montesa*, cited at ECF No. 322-1 at 11, 12, the court drew a bright line between grassroots activists who merely "provided information" without any supervision or confidentiality commitment and third-party helpers who were formally engaged and working under counsel's direction. Mr. Roe falls within the protected side of that line: counsel retained him as a "volunteer paralegal" to "protect his interests"—in other words, to help formulate a legal defense, gather facts, draft memos, and relay attorney instructions. Each communication was treated as confidential. The unprotected community members not engaged by counsel in *Montesa* were very different. Roe's communications remain privilege and work-product-protected.

The privilege cannot hinge on a written contract or a paralegal certificate. It should turn on the function and supervision of the third party. *Kovel* protects a non-lawyer who is "necessary **or** highly useful for the effective consultation" between client and counsel. The privileged entries show he was (1) collecting disciplinary-file documents from Yale, (2) organizing witnesses and timelines and legal theories, (3) relaying realtime campus procedure questions that only a fellow student could decipher for counsel. Those tasks made counsel's legal advice workable amid the highly stressful and difficult complex proceedings Plaintiff was thrust into by Defendants. Supervision is evident on the face of the log—most of the messages are multi-party chains with an attorney in one of the fields. Several entries are marked by counsel as privileged at the time. An attorney expressly called Mr. Roe her "volunteer paralegal" and kept him on strategy email traffic. The skill level is irrelevant. An interpreter with no legal training or a shipping clerk assisting in a fact-gathering investigation (as in *Hickman v. Taylor*, 329 U.S. 495 (1947)) can participate in litigation and have communications shielded by work product doctrine protection. Yale's suggestion that certain communications may have been personal rather than legal has some merit and was the focus of Plaintiff's attempt, at Yale's request, to narrow the privilege log. But Yale's suggestion that Mr. Roe's presence waives any legal protection to communications by and supervised by counsel is meritless under the law as Mr. Roe was working for the benefit of the legal defense.

Yale's reliance on *United States v. Mejia*, 655 F.3d 126 (2d Cir. 2011) is misplaced. *Mejia* involved a criminal defendant who asked his sister to relay a message to his attorney during a prison phone call that he knew was being recorded. The Second Circuit held that the call was not privileged because the presence of the prison monitoring (an "unsympathetic third party") meant that there was no reasonable expectation of confidentiality. 655 F.3d at 134. Far

9

from undermining Plaintiff's position, *Mejia* reaffirmed that communications remain privileged when the third party's involvement is for the purpose of assisting counsel and when the client takes care to keep the communications confidential. The defendant in *Mejia* lost privilege because he effectively broadcast his message in front of prison officials (a true third-party audience). Here, Mr. Khan's communications including Mr. Roe were kept strictly confidential and were intended to go only to Mr. Khan's attorneys (through Mr. Roe). Mr. Roe was not a passive messenger in a public setting; he was an active participant in strategy discussions with an expectation of secrecy. *Mejia* actually cites with approval the principle from *Kovel* that communications remain privileged if the third party's presence is to improve attorney-client communication. *Id.* at 132.

## IV. THE PRIVILEGE LOG IS ADEQUATE TO SUBSTANTIATE THE PRIVILEGE CLAIMS

Yale's motion also complains that Plaintiff's privilege log descriptions for the Roe communications are too vague. This argument is unfounded. Plaintiff's privilege logs comply with the requirements of Fed. R. Civ. P. 26(b)(5) and D. Conn. Local Rule 26(e). The logs identify, for each withheld document, the date, the participants (author and recipients, including Mr. Roe and any attorneys on the thread), the type of document (e.g. email), and a general subject matter description such as "criminal trial logistics," "trial theories," "post-trial logistics," or "Title IX strategy." This level of detail is sufficient to allow Defendants and the Court to assess the basis of the privilege, without divulging the actual substance of the communication (which would defeat the purpose of the log). The Local Rule expressly requires only a "general subject matter" description, and it cautions that if more detail would reveal privileged content, the log need not disclose it.

Defendants argue that terms like "logistics" or "theories" are too vague. But a description need not be a mini-brief; it must simply provide enough information to show why the document is privileged. Here, the presence of legal terms (trial, Title IX, strategy) and the inclusion of attorneys and Mr. Roe (not lay third parties) in the recipient list give a clear indication that these were communications in furtherance of legal counsel.

It is also worth noting that Plaintiff revised and narrowed his privilege logs in response to Yale's concerns. Yale's brief acknowledges that Plaintiff removed dozens of communications involving Mr. Roe from the log upon determining that they were non-responsive or not truly related to legal advice. This was at Yale's request—despite their unfounded accusation that we are somehow withholding these documents from them, we removed them from the privilege log at Yale's request. *See* Exhibit A, Affidavit of Attorney Alexander Taubes. This demonstrates Plaintiff's good-faith effort to limit his privilege claims to only those communications that squarely deserve protection (i.e., those tied to legal matters). The remaining logged communications involving Mr. Roe – approximately 210 entries on the updated log – all relate to time frames and topics where Plaintiff was seeking legal counsel or discussing litigation strategy

## V. NOTWITHSTANDING THE VALID PRIVILEGE CLAIMS, PLAINTIFF WILL DISCLOSE THE CHALLENGED DOCUMENTS

Notwithstanding that the Roe e-mails are protected under *Kovel* and Rule 26(b)(3), Plaintiff will voluntarily produce them now so that discovery can close without further satellite motion practice regarding Plaintiff's production. Plaintiff has literally produced everything asked of him since the undersigned counsel has appeared in this case.

This voluntary production does not concede that Yale's motion had merit. On the contrary, the documents were properly logged and withheld under a good-faith privilege position

11

grounded in Second-Circuit law; thus Yale's demand for fees under Rule 37 is baseless because (i) Plaintiff's stance was "substantially justified" and (ii) the prompt, unilateral disclosure moots any claim of prejudice. Given the vast disparity in discovery cooperation, it is Defendants' use of this, ECF No. 332 at 29, and essentially every dispute with the Plaintiff as a reason to seek sanctions or seek to dismiss the Plaintiff's case—not any actual misconduct of the Plaintiff—that warrants attention.

Indeed, Yale's own privilege log is at least as succinct as Plaintiff's—often limited to one-line descriptions. Since the undersigned has entered the case, Plaintiff has produced more than 45,000 pages of e-mail and chat data, opened his phone and cloud backups for forensic imaging, signed every FERPA, HIPAA, Tax, and Immigration release Defendants drafted, and, when Yale demanded additional ESI, even obtained vendor quotes so the searches could proceed without court involvement. Far from seeking delay, Plaintiff has met or beaten every production deadline and was the party who first proposed a joint discovery schedule. This elective disclosure of the Roe set should put to rest any suggestion that Plaintiff is hiding the ball—let alone that fee-shifting is warranted.

## VI.    CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that the Court deny Yale's motion to compel without merit or even moot.

Respectfully submitted,

/s/Alexander T. Taubes
470 James St., Ste 007, New Haven, CT 06513
alextt@gmail.com
(203) 909-0048
Ct30100

12