**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SAILFULLAH KHAN,<br>*Plaintiff,* | )<br>)<br>) | CASE NO. 3:19-cv-01966 (KAD) |
| v. | )<br>) | |
| YALE UNIVERSITY, *et al*,<br>*Defendants*. | )<br>)<br>) | March 27, 2026 |

**MEMORANDUM OF DECISION RE: MOTION TO DISMISS [ECF Nos. 332, 333]**

Civil litigation is not a game of blind man's bluff.  *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) ("Modern instruments of discovery serve a useful purpose," and "[t]hey together with pretrial procedures make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." (internal citations omitted)).  *See also Fulwiley v. United States*, No. 5:07-cv-1121 (NAM/GHL), 2009 WL 10722253, at *2 (N.D.N.Y. Feb. 10, 2009).  The parties are obligated to adhere to their disclosure obligations of both the helpful and unhelpful.  Fed. R. Civ. P. 26–37.  When all of the relevant information is properly gathered through discovery, sorted, and presented to the fact finder, the fair and just result will obtain.  *See Gordon v. Target Corp.*, 318 F.R.D. 242, 245 (E.D.N.Y. 2016) (collecting cases).  But where that process is so corrupted by one party's failure or refusal to play by the rules, the process breaks down and the search for justice, whatever form it might have taken, is lost.  Such is this case.  For the reasons that follow, the case is DISMISSED.

**Factual Allegations**

In October 2015, Plaintiff and Defendant Doe were undergraduate classmates at Yale University.  Compl., ECF No. 1 at ¶ 16.  On Halloween night, 2015, the two attended a Halloween party and student orchestra performance.  *Id*. at ¶ 39.  Following the concert, Plaintiff accompanied Doe to her room, where a sexual encounter ensued.  *Id*. at ¶¶ 39–43.  Thereafter, Doe filed a formal

complaint against Plaintiff, alleging that he raped her. *Id*. at ¶¶ 45–46. Plaintiff was suspended by Yale, and after an investigation by the Yale Police Department, criminally charged by the state of Connecticut with, *inter alia,* sexual assault. *Id*. at ¶¶ 47–48. He was subsequently acquitted on all counts after a jury trial and readmitted to Yale in 2018, before being suspended again for unrelated issues in October 2018.[1] *Id*. at ¶¶ 56–64. In November 2018, Yale's University-Wide Committee on Sexual Misconduct ("UWC") convened for a hearing regarding Doe's 2015 sexual assault allegations. *Id*. at ¶ 74. The UWC panel voted to expel Plaintiff. *Id*. at ¶ 80.

**Procedural History**

On December 13, 2019, Plaintiff Saifullah Khan ("Plaintiff" or "Khan") initiated this action against Yale University and several of its employees (the "Yale Defendants"), as well as former Yale student Jane Doe ("Doe," collectively, "Defendants"). Compl., ECF No. 1. His claims arise out of his expulsion from Yale following the Title IX UWC proceedings initiated by Doe's complaint that Khan had sexually assaulted her on October 31, 2015. *See id*. at ¶ 80. In 2019, Plaintiff brought claims against the Yale Defendants for due process violations under Title IX, breach of contract, breach of the implied warranty of fair dealing, negligent infliction of emotional distress, intentional infliction of emotional distress, and breach of privacy. *Id*. at ¶¶ 82–110. He also brought claims of defamation and tortious interference with business relationships against Doe. *Id*. at ¶¶ 111–21.

The parties' familiarity with the allegations and protracted procedural history of this case is presumed. The Court furthers the discussion of the procedural history of this case at the point of remand from the Second Circuit, following Plaintiff's successful appeal of this Court's order,

---

[1] Plaintiff alleges that this suspension was pretextual, related to his history at Yale, and Yale's "prevailing culture" regarding claims of sexual assault. Compl., ECF No. 1 at ¶¶ 67, 70.

dismissing the claims against Doe.[2]  The Mandate from the Circuit issued on November 15, 2023.

Mandate, ECF No. 65.  Less than six weeks later, Doe filed a motion for judgment of dismissal on

the ground that Plaintiff had violated this Court's pseudonymity order by publicly naming Doe to

his social media followers on Christmas morning, 2023, as the woman who, he asserted, had falsely

accused him of sexual assault.  Emergency Mot., ECF No. 74 (SEALED).  The Yale Defendants

thereafter amended their Answer to the Complaint by adding an affirmative defense of unclean

hands premised on, *inter alia*, the same conduct.  ECF No. 107.  Through a series of social media

posts, Mr. Khan presaged his intention to name his accuser with a "stay tuned" theme attendant to

each.  The post on Christmas morning was oddly styled as some sort of "big reveal."  It read:

> "most important thread of my life:
> [Jane Doe's Full Name (including Middle Initial) in Bold and Italics]
> in 2015 the military officer of russian origins falsely accused me of rape
> [Jane Doe's Full Name (including Full Middle Name) in Italics]'s 3 sentence email triggered @Yale's bureaucratic machinery that would make kafka proud and horrified"

> Ex. H, ECF No. 75-8 at 2.

Later the same day, Plaintiff also posted the following on the same thread:

> "Some people think this is the title of a court case.  [Jane Doe] is her name.  [Jane Doe] is the one who falsely accused me of rape."

> Ex. I, ECF No. 75-9 at 2.

The Court convened a hearing on the motion on March 18, 2024.  The Court initially shared

its concern that the pseudonymity order did not explicitly preclude Plaintiff from disclosing Doe's

identity outside the confines of the litigation and only required that she not be identified in any

---

[2] The Court dismissed the claims finding that quasi-judicial immunity protected Doe from claims arising out of statements she made at the UWC proceedings.  Mandate, ECF No. 65-1 at 2–3.  Upon appeal, the Circuit court certified the question of quasi-judicial immunity under Connecticut law and its availability under the circumstances alleged here.  *Id*. at 5–6 n.4.  While the Connecticut Supreme Court acknowledged that quasi-judicial immunity is recognized under Connecticut law, it further held that the procedures employed by Yale were so lacking, that quasi-judicial absolute immunity did not attach to Doe's statements at the UWC hearing.  *Id*. at 6.  The case was then remanded with direction to deny Doe's motion to dismiss.  *Id*. at 2–3.

3

submission docketed in this case.  Tr., ECF No. 94 at 3–6.  While Plaintiff's conduct certainly violated the spirit of the pseudonymity order, the Court could not conclude that it was expressly prohibited by the order.[3]  Accordingly, the Court determined that dismissal as a sanction for the disclosure was not warranted.  *Id*. at 24.

However, at the hearing, counsel for Plaintiff[4] expressed the view that the disclosure was inappropriate and perhaps contrary to the parties' mutual understanding that such a disclosure would run afoul of the pseudonymity order, whether it would or would not.  *See id*. at 7–8.

The Court thanked counsel for his candor and continued: "What I have seen does give me concern about what's going on here, and some of the things that Mr. Khan has done that give me pause.  Because some of the tenor and tone of the posts feel less like his plan is to have his rights vindicated as it is to exact retribution, and that is not the purpose of the use of our courts or litigation generally.  When he has posted about the litigation and talking about attending depositions,[5] there is a sense of an intent to intimidate.  There is a sense of an intent to harass.  The idea of sort of mobilizing the Internet — I mean, this is borderline doxing, and it's very concerning."  *Id*. at 8–9.  While Plaintiff disagreed with the Court's assessment, through counsel, he assured the Court that his intentions were "to fully and fairly litigate this case and bring it to a jury."  *Id*. at 12.  Counsel continued: "I've explained to him that any other questions about his compliance with court orders could cost him my representation of him. . . . So his intentions are to

---

[3] By the time of the hearing, Doe had filed a motion for a protective order, seeking to preclude Plaintiff's access to certain non-public discovery.  Mot. for Prot. Order, ECF Nos. 81, 82 (SEALED).  On March 15, Plaintiff had filed his objection to the motion for a protective order and filed a separate motion to vacate the Court's order treating Doe pseudonymously.  *See* ECF Nos. 90, 89.  Both motions had been referred to Magistrate Judge Garcia for adjudication and the Court did not take up the issues raised in the cross motions.  *See* Order, ECF No. 92.

[4] Attorney Norman A. Pattis represented Plaintiff.  He subsequently sought permission to withdraw, Mot. to Withdraw, ECF No. 176, which was granted, Order, ECF No. 178.

[5] Plaintiff posted: "Deposition will be even more exciting now[,]" Ex. G., ECF No. 75-7 at 22, and "I'm showing up to my false accuser's deposition.  And every other defendant's deposition[,]" *id*. at 12.

obey your orders, but to fight hard to vindicate his claims." *Id*. at 12–13.  The Court then expressed concern that Plaintiff may intend to litigate the case on social media out of concern that it could "infect the entire process."  *Id*. at 14.[6]  Although Plaintiff challenged the Court's authority to essentially issue a "gag order," precluding him from discussing the case more broadly on social medial, the issue was not further discussed and no specific order was issued save for an order that Plaintiff not disclose Doe's name on social media until such time as the then-pending motions addressing the pseudonymity order and Doe's requested protective order were fully adjudicated. *Id*. at 19–20.  The Court further ordered Plaintiff to remove any of his posts on social media that contained Doe's true name.  For his part, Plaintiff apologized; decried any intent to harass or intimidate and acknowledged that he "jumped the gun," because he "misunderstood."  *Id*. at 21.[7]

On June 19, 2024, following extensive briefing and oral argument, Magistrate Judge Garcia issued a ruling on the competing motions regarding Doe's anonymity.  *See* Ruling and Order, ECF No. 119.  Therein, she determined that Jane Doe's continued anonymity was warranted and issued an order (the "June 19 Order") prohibiting Plaintiff or his counsel from directly or indirectly "publicly disclosing or revealing Jane Doe's identity, including but not limited to on any social media platform," and informing Plaintiff that any "release or deliberate disclosure of Jane Doe's identity" in violation of the order could subject him to sanctions, "including but not limited to

---

[6] The Court's concerns proved prescient.  As brought to the Court's attention by the Yale Defendants, on June 16, 2025, Plaintiff, in response to an inquiry regarding the status of the case, posted to his X account: "We're deep in discovery.  Yale refuses to provide the very damning documents so we filed motions to compel them.  And the pseudonym is on the chopping block.  Once that happens, operation dragonfire will start.  Several chapters in the pipeline."  Yale Opp. to Mot. to Compel, ECF No 345 at 2.  The Court construed this posting to be a thinly veiled threat to publicly name Jane Doe and admonished Plaintiff that to do so would violate the June 19 Order.  Order, ECF No. 354.

[7] The Court, at the hearing on Defendants' second motion to dismiss found that Plaintiff's statements to the Court during the hearing on the first motion to dismiss were dishonest.  *See* Tr., ECF No. 200 at 46.  For example, as Defendant Doe demonstrated in her memorandum in support of the second motion to dismiss, discovery (certain recordings) revealed that Plaintiff, by his own admission, understood prior to Christmas 2023, that he could not reveal Jane Doe's name.  Defendant Doe also identified several other of Plaintiff's averments which were belied by the discovery in the case.  *See* Ex. D, ECF No. 279-4 at 5–6 (SEALED).

dismissal." *See id*. at 15.  Thereafter, by motions dated June 24, 2025 and June 28, 2025, Doe and the Yale Defendants again sought dismissal of this action as a sanction for Plaintiff's willful violation of the June 19 Order.  Doe Second Emerg. Mot. to Dismiss, ECF No. 123 (SEALED); Yale Emerg. Mot. to Dismiss, ECF No. 130.  After briefing and oral argument, the Court again denied the motions to dismiss.  Order, ECF No. 265.  Although the Court rejected Plaintiff's argument that he had not intentionally violated the June 19 Order, and indeed, found that he had willfully done so, the Court also concluded that the severe sanction of dismissal was not warranted, given the Court's strong preference for cases to be adjudicated on their merits.  *Id*. at 13, 15. Because the Plaintiff's conduct leading up to the second motions to dismiss, which the Court found to be "egregious" is part of an escalating pattern of Plaintiff thwarting his obligations in this litigation, the Court repeats the underlying factual basis for the motion and the Court's findings. *Id*. at 13.

Screenshots of Plaintiff's posts beginning within hours of the issuance of the June 19 Order reveal the following posts: "i [sic] have been officially gagged by the federal court system of the United States for my speech on this platform," and posted a picture of the June 19 Order with the relevant portion highlighted.  Doe Second Emerg. Mot., ECF No. 123-1 at 7, 9 (SEALED).  He then posted "my actions are limited.  I am going to 100% obey this ruling.  I can't directly or indirectly tell anyone what to do.  In no way shape or form should my [posts] here be interpreted in any way to construe anything beyond the limited scope of 'this ruling applies to me.'"  *Id*. at 8, 10 (SEALED).  Other individuals on the platform responded to Plaintiff's posts.  One wrote "Sorry to hear about this.  It's a damn shame someone can make false accusations and remain anonymous. A huge flaw in the system.  Hoping one day her name can be revealed so that her and others like her are shamed.  It's only right."  *Id*. at 10 (SEALED).  Plaintiff responded, "c'est la vie.  i'm [sic]

doing my part.  hopefully [sic] others contribute in their own way." *Id*. (SEALED).  To another user, who posted "others can still say her name tho [sic] Sir," Plaintiff wrote, "I can not [sic] instruct anyone on their personal actions.  I must fully adhere, abide, and be obedient to the courts and the rule of law."  *Id*. at 11 (SEALED).  Plaintiff went on to specifically "tag" another user, writing to this person "[other user] et al; this gag order only applies to me." *Id*. (SEALED).  That individual then posted a photo of Jane from when she was in high school and her real name, which the same user had also done following Plaintiff's disclosure of Doe's name on Christmas in 2023. *Id*. at 12 (SEALED).  Plaintiff did not deny that he made these posts.  Rather, he argued that his posts did not violate the June 19 Order.  Tr., ECF No. 150 at 23–24.

In its ruling denying the motion to dismiss, the Court first acknowledged Plaintiff's "troubling" conduct in connection with the "bizarre suspense building exercise" by which Plaintiff disclosed Doe's identity on Christmas morning 2023 and observed that Plaintiff was warned that his "conduct was not an appropriate adjunct to this litigation."  Order, ECF No. 265 at 13–14.  The Court found that after the issuance of the June 19 Order,

> "Almost immediately, Plaintiff took again to his social media account; posted the Court's order; declared himself 'gagged' by the federal courts; clarified that the order only applied to him, not to others; espoused that perhaps 'others would do their part;' and tagged a specific individual who, on cue, then revealed Doe's name and photograph.  Having already revealed Doe's identity via the same account seven months earlier, Plaintiff knew that his audience could (and likely would) easily share this information."

*Id*. at 14 (citations omitted).

The Court rejected Plaintiff's argument that his intent when posting was "irrelevant" and that his conduct did not actually violate the letter of the June 19 Order as utterly specious.  *Id*.  The Court concluded that Plaintiff's posts were designed to and did in fact cause others to act in a fashion that violated the June 19 Order.  He was the impetus behind the disclosure, and through

his words and deeds, manipulated his "followers" to achieve his desired result. His protestations to the contrary were "belied by the entirety of the record before the Court and [were deemed] otherwise not credible." *Id*. at 15.

Nonetheless, the Court did not dismiss the case observing that Defendants would be permitted to cross-examine the Plaintiff at trial regarding all of his litigation misconduct as probative of his motives, his bias, and ultimately his credibility. *Id*. at 16. Perhaps out of an ill-conceived well-spring of hope, the Court believed such a prospect would serve to deter Plaintiff from further misconduct.

The instant motion to dismiss was filed on May 20, 2025 by Doe and the Yale Defendants. ECF Nos. 332, 333 (SEALED). Defendants attach documents and evidence that they argue demonstrate sweeping and repeated instances of litigation misconduct. Plaintiff filed his response to the motion on June 27, 2025. Opp. to Mot. to Dismiss, ECF No. 364 (SEALED). On July 10, 2025, Defendants filed a supplemental memorandum in support of the motion to dismiss to which they attach additional documentary evidence of yet more misconduct by Plaintiff. Ex. 1, ECF 371-1. On July 11, 2025, the Defendants filed a Reply in further support of the motion. Def. Reply, ECF No. 373. Plaintiff filed a response to the supplemental memorandum on July 20, 2025. Pl. Resp., ECF No. 377. Given the serious and troubling nature of the allegations, the Court, *sua sponte*, stayed the case pending adjudication of the instant motion. Order, ECF No. 361.

**Standard of Review**

*Inherent Authority*

"It is well settled that 'courts traditionally have exercised considerable authority to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Hall v. Oriska Corp Gen. Contracting*, No. 21-1564, 2022 WL 17420307, at *2 (2d Cir. Dec. 6, 2022) (quoting

*Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 172–73 (1989)).  This inherent authority includes the power to sanction "bad-faith conduct."  *Davis v. Saint Luke's-Roosevelt Hosp. Ctr.*, 771 F. App'x 116, 116 (2d Cir. 2019) (summary order) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, (1991)).  Such sanctionable bad-faith conduct includes "abuse of the judicial process[.]" *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020).  A court's decision to impose sanctions under its inherent authority is "truly discretionary," *id*., but "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion."  *Chambers*, 501 U.S. at 44.  "Such sanctions are warranted only where there is clear and convincing evidence of bad faith." *Harvin v. Cheney*, No. 3:23-cv-328 (MPS), 2024 WL 2044696, at *4 (D. Conn. May 7, 2024) (citing *Yukos Cap. S.A.R.L.*, 977 F.3d at 235).

"The sanction of dismissal . . . is a drastic remedy that should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions."  *Davis*, 771 F. App'x at 116 (citing *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007)). If a party's conduct evinces "flagrant bad faith," a court may resort to dismissal "not merely to penalize," but "to deter those who might be tempted to such conduct in the absence of such a deterrent."  *Id*. (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)).  Dismissal is also appropriate where "'a party . . . abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process."  *Davis v. Saint Luke's Roosevelt Hosp.*, No. 16-cv-6279 (JPO), 2018 WL 10384114, at *1 (S.D.N.Y. Apr. 16, 2018), *aff'd sub nom. Davis*, 771 F. App'x 116 (quoting *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)).

**Rule 41(b)**

In addition to their inherent and traditional authority, federal courts are explicitly authorized to involuntarily dismiss cases under Fed. R. Civ. P. 41(b).  Rule 41(b) provides for dismissal "[i]f the plaintiff fails to prosecute or to comply with [the federal] rules or a court order." The decision to dismiss an action as a sanction lies within the discretion of the district court.  *Smalls v. Cnty. of Suffolk*, 718 F. App'x 16, 19 (2d Cir. 2017).  The Second Circuit has identified five factors to guide the Court's exercise of discretion under Rule 41(b).  District courts must consider:

> "(1) the duration of the plaintiff's failure to comply with the court order; (2) whether the plaintiff was on notice that failure to comply would result in dismissal; (3) whether the defendants are likely to be prejudiced by further delay in the proceedings; (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard; and (5) whether the judge has adequately considered a sanction less drastic than dismissal."
>
> *Spencer v. Doe*, 139 F.3d 107, 112–13 (2d Cir. 1998) (citation omitted); *see also Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d. Cir. 1995).

No one factor is dispositive.  *Spencer*, 139 F.3d at 113.  Because a Rule 41(b) dismissal "is one of the harshest sanctions," it must "'be proceeded by particular procedural prerequisites, including notice of the sanctionable conduct, the standard by which it will be assessed, and an opportunity to be heard.'"  *Smalls*, 718 F. App'x at 19 (quoting *Baptiste v. Sommers*, 768 F.3d 212, 217 (2d Cir. 2014)).  A "dismissal pursuant to Rule 41(b) operates as adjudication on the merits unless otherwise specified by the Court."  *Rzayeva v. United States*, 492 F. Supp. 2d 60, 89 (D. Conn. 2007).

**Rule 37**

Pursuant to Rule 37(b), if a party fails to obey a discovery order, the Court may issue an order, inter alia, "prohibiting the disobedient party from supporting . . . designated claims . . . or from introducing designated matters in evidence; . . . dismissing the action . . . in whole or in part;

10

[or] rendering a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A). "A district court has wide discretion to impose sanctions, including severe sanctions, under Federal Rule of Civil Procedure 37." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006). For example, in *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, the United States Court of Appeals for the Second Circuit upheld the dismissal of a party's complaint "for its failure to obey repeated orders to provide discovery" to an opposing party. 845 F.2d 1172, 1176 (2d Cir. 1988). There, the court found noteworthy that the non-compliant party "repeatedly refused to answer" the other party's interrogatories. *Id*. Although the Second Circuit acknowledged that dismissal was a "drastic remedy," it agreed with the district court that the non-compliant party's "flagrant disregard of court orders . . . justified the imposition of the sanction of dismissal: [the non-compliant party] failed to provide any meaningful discovery concerning a core trial issue despite three clear court orders, which included two warnings that dismissal would follow if [the non-compliant party] failed to provide adequate responses." *Id*. at 1176–77.

Under whatever authority the Court proceeds, it is well-established that there is a clear and significant preference for cases to be decided on their merits. *See Mandala v. NTT Data, Inc.*, 88 F. 4th 353, 362 (2d Cir. 2023). As such, dismissal is considered the least-favored sanction, and the sanction of last resort. *Harvin*, 2024 WL 2044696, at *4 (citing *Shcherbakovskiy*, 490 F.3d at 140). And if the Court can fashion lesser sanctions to address the party's misconduct, lesser sanctions should be chosen. *Id*.

**The allegations of misconduct**

The Defendants' allegations encompass multiple instances of misconduct which, generally fall into five buckets. First, Defendants assert that Plaintiff intentionally produced over 70,000 pages of documents in discovery — of which roughly 85% were deemed wholly irrelevant or

11

unresponsive — in bad faith and for the purpose of delaying impending depositions. Second, Defendants assert that the withholding of text messages between Plaintiff and Peter Roe on the basis of attorney-client or work product privilege was utterly specious. Third, Defendants assert that Plaintiff lied in his certified Interrogatory responses when he failed to disclose multiple accusations of sexual harassment or sexual misconduct levied against him by women other than Jane Doe when he was a student at Yale. Fourth, Defendants assert that, similar to his prior conduct, Plaintiff indirectly disclosed Doe's identity when he posted (and re-posted) a video wherein he complains about his inability to name Jane Doe, which, predictably, resulted in his followers doing just that. Fifth, Defendants identified multiple instances where Plaintiff has been dishonest with the Courts.[8] Ultimately, Defendants assert, enough is enough. Plaintiff cannot be trusted to proceed in good faith, and that given the current record before the Court, Defendants are left at an insurmountable disadvantage. As was argued, they do not know what they do not know and Plaintiff cannot be trusted to answer honestly the Defendants' inquiries in discovery. *See* Tr., ECF No. 397 at 87.

Plaintiff denies any bad faith litigation conduct either with respect to the document production; the assertion of attorney-client privilege or the interrogatory responses. He denies "indirectly" disclosing Jane Doe's identity for a second time and otherwise attempts to explain away the Defendants' accusations. Opp. to Mot. to Dismiss, ECF No. 364 at 3–4 (SEALED). Tellingly, Plaintiff's opposition to the motion to dismiss attaches no documentary or testimonial evidence. *See generally* Opp. to Mot. to Dismiss, ECF No. 364 (SEALED). In terms of Plaintiff's

---

[8] This list is not exhaustive. By way of further example only, Defendants accuse Plaintiff of additional unauthorized disclosure of protected material to a blogger and accuse Plaintiff of signing a release of information authorization but then taking steps to block any release of information. See Mot. to Dismiss, ECF No. 332 at 7–9. The Court need not, decide whether Defendants' additional accusations are proven, insofar as it has determined to dismiss this case for the reasons discussed above.

conduct, the opposition engages in a series of conjectural musings in an effort to suggest an alternative, innocent, explanation for Plaintiff's lapses. *See id*. (SEALED). What the opposition does not do is confront the growing mountain of evidence that Plaintiff simply cannot be trusted to act in good faith, to meet his discovery obligations honestly, and to abide by the Court's orders.

*The Document Production*

On May 13, 2024, the Court referred this matter to Judge Garcia to provide pretrial management, discovery oversight, and scheduling. Ref. Order, ECF No. 110. Judge Garcia met frequently with counsel to promptly address any concerns or disagreements that arose. *See* Minute Entries, ECF Nos. 120, 174, 192, 240, 256, 263, 272, 286, 296, 306, 330. Discovery was scheduled to be completed by April 15, 2025. Order, ECF No. 68. Multiple depositions were scheduled for or anticipated to be scheduled in March of 2025. Orders, ECF Nos. 257, 262. However, there remained outstanding issues regarding additional documents to be produced by Plaintiff. *See* Joint Status Report, ECF No. 261; Order, ECF No. 262. As of February 18, 2025, Plaintiff's deadline to produce responsive documents and a privilege log was February 21, 2025. Order, ECF No. 262. On February 18, 2025, the parties jointly requested a modest modification to the deadline and sought a one-week extension for Plaintiff to produce both additional documents and a privilege log. Joint Mot. for Ext. of Time, ECF No. 274 at 1. The joint motion further requested that Defendants be permitted to disclose experts *three (3) days* after the production, so as to allow a review of the production in advance of the expert disclosures. *Id*. at 2.[9]

On February 27, 2025, Plaintiff sent Defendants a link to the remaining document production. *See* Joint Status Report and Mot. for Ext. of Time, ECF No. 284 at 1. The production

---

[9] Defendants reasonably posit that in requesting only three days to review the anticipated production before disclosing experts, it is manifest that Defendants anticipated a much smaller final production of records from the Plaintiff. Notably, Plaintiff joined in the request, implicitly assuring the Defendants that the impending production could be meaningfully reviewed in three days. Joint Mot. for Ext. of Time, ECF No. 274 at 2.

numbered in excess of 70,000 pages of documents, requiring the postponement of then-scheduled depositions, further extensions of the scheduling order as well as an extensive and expensive document review. *Id*. Through the Affidavit of reviewing counsel, Defendants aver, and Plaintiff does not meaningfully disagree, that the documents were largely irrelevant. Ex. G, ECF No. 332-2 at ¶ 4. Counsel avers that approximately 85% of the documents are unresponsive to the requests, and even if arguably responsive, completely irrelevant. *Id*. at ¶¶ 4–5. The documents included many spam emails to Plaintiff; advertisements, communications with various persons which pre-date the events at issue, sometimes by years; pornography (admittedly by mistake); Uber receipts; restaurant recommendations; credit card payment reminders; blast email announcements on unrelated issues and the like. *Id*. at ¶¶ 6–7.

Defendants argue that this was a contrived dump of voluminous documents in order to extend, of necessity, the case management schedule set by the Court. Mot. to Dismiss, ECF No. 332 at 11. In response, Plaintiff decries any bad faith and argues simply that he erred on the side of disclosure to avoid any claim that he inappropriately withheld documents. Opp., ECF No. 364 at 6–9 (SEALED). It is difficult to discern any legitimate decision to err on the side of production for many of the records produced, i.e. random advertisements.

*Indirectly Identifying Jane Doe on Social Media*

After the Court's decision on Defendants' second motion to dismiss, in which the Court concluded that Plaintiff had willfully and egregiously instigated the disclosure of Jane's identity by his social media followers, *see* Order, ECF No. 265 at 13, Defendants aver he did it again, *see* Mot. to Dismiss, ECF No. 332 at 9–11.

Plaintiff gave a video interview with a blogger regarding this litigation. Ex. B, ECF No. 333-2 (SEALED). During the interview, Plaintiff lamented his inability to publicly disclose Doe's

name by virtue of the Court's order. *Id.* (SEALED). After the video interview was posted by the blogger, Plaintiff re-posted the video four times to his social media followers, to include those who had previously disclosed Jane's name at Plaintiff's instigation. Ex. C, ECF No. 333-3 (SEALED). One of the re-posts included the caption "Next, naming the infamous Jane Doe!". *Id.* at 3 (SEALED). Not surprisingly, in response, multiple of Plaintiff's followers again posted Doe's name. *See* Ex. E, ECF No. 333-5 (SEALED). As he did in response to the second motion to dismiss, Plaintiff decries any responsibility for the disclosure and asserts the same specious argument that the Court expressly rejected when ruling on the earlier motion. Opp. to Mot. to Dismiss, ECF No. 364 at 5–6 (SEALED).

*Interrogatory Responses*

Defendant Jane Doe served Interrogatories on Plaintiff. Ex. H, ECF No. 332-3. Interrogatory No. 10 asked: "Please identify all individuals that, to your knowledge, have alleged, stated, and/or otherwise asserted that you engaged in sexual misconduct with them and please identify all documents and communications, other than communications with your attorneys, regarding all such allegations, statements, and/or assertions of sexual misconduct against you." *Id.* at 4. In the instructions and definitions section, Jane Doe defined "sexual misconduct" in line with Yale's definition to mean "sexual assault (which includes rape, groping, and any other non-consensual sexual contact), sexual harassment, intimate partner violence, stalking, and any other conduct of a sexual nature that is non-consensual, or has the purpose or effect of threatening or intimidating a person or persons." *Id.* at 3. In response, Plaintiff answered: "Jane Doe[;] Peter Roe[.]" Ex. J, ECF No. 332-5 at 3. The Interrogatory responses were signed and sworn to by Plaintiff. *Id.* at 4.

Defendants challenged the completeness of this answer. Mot. to Dismiss, ECF No. 332 at 17–25; Ex. T, ECF No. 332-9. In response, Plaintiff's counsel confirmed that he had discussed the issue with his client and confirmed that the answer was accurate. Aff., ECF No. 332-1 at ¶ 4. Defendants have produced documentary evidence which reveal that Plaintiff was accused of sexual misconduct while a student at Yale by other young women. *See* Ex. K, ECF No. 333-8 (SEALED); Ex. L, ECF No. 333-9 (SEALED); Ex. M, ECF No. 332-6; Ex. N, ECF No. 332-7; Ex. O, ECF No. 333-10 (SEALED); Ex. P, ECF No. 333-11 (SEALED); Ex. Q, ECF No. 333-12 (SEALED); Ex. R, ECF No. 332-8; Ex. S, ECF No. 333-13 (SEALED).

In Spring 2013, a woman pseudonymously identified as "Sally Roe 2" reported to Plaintiff's Residential College Dean and Academic Advisor that Plaintiff had "grabb[ed] her and forc[ed] himself on her." Ex. K, ECF No. 333-8 at 2 (SEALED). The Title IX Coordinator met with both Sally Roe 2 and Plaintiff. *Id*. (SEALED). Plaintiff told his Dean that he realized his behavior was not appropriate and, at the suggestion of the Dean, wrote Sally Roe 2 an apology email. *Id*. at 3 (SEALED).

Approximately one year later in Spring 2014, another woman, referred to pseudonymously as "Sally Roe 1" reported an incident that occurred in March or April of 2013. Ex. L, ECF No. 333-9 at 2 (SEALED). She reported that after a party, Plaintiff grabbed her, made out with her in a forceful way, attempted to remove her clothes, and requested sex, oral sex, and other sexual acts multiple times, to each of which she said no. *Id*. (SEALED). She reported that he kissed her so forcefully that it caused her ear to bleed. She reported that Plaintiff "persistently" texted her for months following the incident. *Id*. (SEALED). At the time, Plaintiff denied the allegations. He did recall her ear was bleeding but thought it was from an earring, felt bad that he did not read her cues accurately, and agreed to attend training from Yale's Sexual Harassment and Assault Response

& Education ("SHARE") Center. *Id*. (SEALED).  Plaintiff communicated with staff members and his Dean several times regarding the informal UWC complaint that was filed by Sally Roe 1 and the SHARE training over email. *Id*. at 3–5 (SEALED).

In November 2017, the Yale Daily News reported on a Facebook post wherein a Yale student wrote that Plaintiff had "made forceful advances on her and offered her drugs."  Ex. M, ECF No. 332-6 at 4.  The article also detailed a second report from a first-year student to whom Plaintiff "forcefully . . . ma[d]e advances." *Id*. at 7.  She reported that he had also offered her drugs, which she declined. *Id*. at 8.

In 2014, Plaintiff, a member of the Yale College Council (YCC), became involved in a dispute with another YCC member.  He accused her of making false accusations against him of sexual misconduct involving other Yale students.  The dispute was the subject of an article in the Yale Daily News in which the YCC member confirmed that she had learned that multiple female students had considered reporting sexual misconduct by Plaintiff.  While it is unclear whether Plaintiff knew the identities of these other women, he was certainly aware of the article as it was sent to him by an acquaintance.  Ex. N, ECF No. 332-7.

As acknowledged and disclosed by Plaintiff, a (now former) friend of Plaintiff, Peter Roe, made a sexual assault complaint against Plaintiff.  Ex. J, ECF No. 332-5.  What Plaintiff did not disclose in his Interrogatory response was that the incident giving rise to Peter Roe's accusation, involved a third person, referred in the discovery as "Sophie." *Id*.  Sophie agreed to meet for a sexual encounter with Peter Roe and Plaintiff in June 2018.  Ex. R, ECF No. 332-8 at 8.  In October 2018, the Yale Daily News published an article regarding the sexual encounter, to include, Peter Roe and Sophie's allegations of what occurred. *Id*. at 8–10.  Sophie alleged that Plaintiff restrained her from behind; forced wine down her throat; hit her very hard, and "left some pretty unacceptable

17

marks" on her face. *Id*. at 9. It is beyond the pale to suggest for even a moment that Plaintiff was unaware of Sophie's accusations, especially, as discussed below, Plaintiff and Peter Roe planned the encounter and even anticipated the potential use of violence against Sophie.[10] *Id*.

In the face of this evidence, Plaintiff's opposition speculates that Plaintiff perhaps did not recall these events or perhaps Plaintiff did not consider these events responsive. See Opp. to Mot. to Dismiss, ECF No. 364 at 11–13 (SEALED); Tr. ECF No. 397 at 37–41. Plaintiff's counsel need not speculate as to why his client did or did not include these accusations in his Interrogatory response. He could have simply asked his client to explain himself. He chose not to do so.

At the hearing on the instant motion, Plaintiff testified, due in large measure to the Court's dissatisfaction with the opposition.[11] Tr., ECF No. 397 at 71–80. He testified that he interpreted the Interrogatory as only including circumstances where he had been charged criminally. *Id*. at 73–74. However, the Defendants specifically challenged the Interrogatory response. Mot. to Dismiss, ECF No. 332 at 18–25; Ex. T, ECF No. 332-9. In a deficiency letter attached as Exhibit T to Defendants' motion, Defendants told Plaintiff's counsel: "We believe Plaintiff's response is deficient and request that he supplement it. For example, if you click here, you will see a video of Plaintiff saying that 'there were about twenty different complaints against him' after his return to Yale. Please have Plaintiff identify the individuals who made complaints, allegations, etc. of sexual misconduct against him." Ex. T, ECF No. 332-9 at 3. Following a meet and confer, Plaintiff's counsel confirmed that he had discussed the issue with his client and confirmed the

---

[10] Defendants identify additional complaints against Plaintiff which surfaced in 2018 and which referenced conduct from prior years. *See, e.g.*, Ex. P, ECF No. 333-11 (SEALED); Ex. Q, ECF No. 333-12 (SEALED). It is unclear the extent to which Plaintiff knew the identities of these women or the specifics of their allegations. He has referenced them generically at times and so appears to have had some knowledge as to additional complaints against him. *See, e.g.*, Ex. S, ECF No. 333-13 at 4 (SEALED). It is not obvious however that such generic knowledge would have triggered his disclosure obligations as to Interrogatory 10.

[11] The Court recognized that Plaintiff could assert applicable privileges to the Court's inquiry. Tr., ECF No. 397 at 4. He did not assert any such privilege. *Id*. at 71–80.

accuracy of his sworn interrogatory answer.  Aff., ECF No. 332-1 at ¶ 4; ECF No. 333 at 24 (SEALED).  Against this backdrop, Plaintiff's testimony is simply not credible.

*The Assertion of Attorney Client Privilege – Peter Roe*

In response to Jane Doe's discovery requests, Plaintiff asserted that some of the requested documents were "protected by the attorney-client privilege and work product protection/privilege."  Ex. J, ECF No. 332-5 at 5.  He thus withheld communications between Plaintiff and Peter Roe, on the assertion that Peter Roe was part of Plaintiff's legal team.

Peter Row is a former friend of Plaintiff.  As discussed above, the relationship soured, and Peter Roe ultimately accused Plaintiff of sexual assault in connection with the encounter with Sophie.  Ex. R, ECF No. 332-8.  But prior to their falling out, they were in frequent communication, largely by text message.  It was these text messages that Plaintiff sought to protect from disclosure.  Although Plaintiff subsequently withdrew the privilege assertion on the eve of oral argument on Defendants' motion to compel the communications, the issue is not, as posited by Plaintiff, rendered moot or meaningless.

Before reviewing the communications themselves, a review of the basic parameters of the attorney client and work product privilege is appropriate.  "Federal Rule of Civil Procedure ('FRCP') 26 requires that the party asserting a privilege '(i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed — and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.'"  *Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*, 295 F.R.D. 28, 36 (E.D.N.Y. 2013), *aff'd*, 29 F. Supp. 3d 142 (E.D.N.Y. 2014) (quoting Fed. R. Civ. P. 26(b)(5)(A)).

19

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (citing *In re Cnty of Erie,* 473 F.3d 413, 419 (2d Cir. 2007)).  "The privilege's underlying purpose has long been 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" *Id*. (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  "[I]n order for the attorney-client privilege to apply, 'the *predominant purpose*' of the communication must be 'to render or solicit legal advice.'" *Favors v. Cuomo*, 285 F.R.D. 187, 198 (E.D.N.Y. 2012) (quoting *Erie*, 473 F.3d at 420) (emphasis added).

The party asserting the attorney-client privilege bears the burden of establishing that the communications to be protected are, indeed, communications between a client and their attorney, intended to be confidential, and were for the purpose of obtaining or providing legal advice.  *Id*.; *see also Harnage v. Kenny*, No. 3:19-cv-938 (SDV), 2022 WL 2046140, at *3 (D. Conn. June 7, 2022) ("The party asserting the privilege bears the burden of establishing its elements." (citation omitted)).

Attorney work-product privilege is distinct from attorney-client privilege.  "The work-product privilege protects documents created by counsel or per counsel's directive, in anticipation of litigation." *Koumoulis*, 295 F.R.D. at 39 (citing *In re Grand Jury Subpoenas Dated March 19, 2002 & August 2, 2002*, 318 F.3d 379, 383 (2d Cir.2003)).  The party asserting the privilege again bears the burden of demonstrating that they are entitled to such privilege.  "To be entitled to protection for opinion work product, the party asserting the privilege must show 'a real, rather than speculative, concern' that the work product will reveal counsel's thought processes 'in relation to

20

pending or anticipated litigation.'" *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183–84 (2d Cir. 2007) (quoting *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d at 386)).  Conclusory assertions of privilege are insufficient.  *Koumoulis*, 295 F.R.D. at 39.

Against this back drop, the Court turns to the withheld communications.  In 2018, Plaintiff and Mr. Roe were planning to meet together, with Sophie, for a sexual encounter.  In advance of this encounter, on May 23, 2018, Plaintiff and Mr. Roe texted.

> Mr. Roe: Just locked down someone for the 6th and 7th [by the way] . . . Who's your daddy . . .  I mean . . . khasegi
>
> . . .
>
> Plaintiff: Oh nice . . . That should be fun.
>
> Mr. Roe: Yeah, she seems great.  Into spanking, gagging, pain, nipple play, breath play, bondage, discipline and "spit for lube" . . . this will be the first time ive intentionally had a sexual experience with a woman.
>
> Plaintiff: ah okay
>
> Mr. Roe: You dont seem nearly as excited as i was hoping you would be lol
>
> Plaintiff: I am . . . just busy . . . didn't sleep well.

Ex. B, ECF No. 371-3 at 2–4.

Mr. Roe sends a photo of Sophie to Plaintiff and they discuss her personal appearance as well as her academic background.  *Id*. at 5–7.  The conversation continues:

> Mr. Roe: She has been looking for a male couple to cuckold. . . .She wants me to "eat her p[slang] while he f[expletive]s me."
>
> Plaintiff:  That is crazy hot.

*Id*. at 7.

21

The text messages continued on mundane matters.  Later the same day, the conversation returned to Sophie and a discussion of the sexual encounter with explicit detail as to what Plaintiff envisioned occurring.  Mr. Roe responded: "Haha.  Whatever you ask of me, ill make it happen." *Id*. at 15.  The conversation continues:

> Mr. Roe: . . . She and i talked about some things but i told her youd probably be fine just talking about it in person which is what she prefers.
>
> Plaintiff:  Okay good :) . . . Bitch is getting con non con
>
> Mr. Roe: Con non con?
>
> Plaintiff: Non consensual.
>
> . . .
>
> Mr. Roe: Her only concern was that you may be too dominant because she wanted to be serviced too.  Which . . . I can take care of that . . .
>
> Plaintiff: Well, I do abuse sluts and do a bit of after care.
>
> *Id*. at 19–21.

The text conversation continued on the subject of the planned sexual encounter with Sophie as well as Mr. Roe's sexual attraction to Plaintiff.

Plaintiff's privilege log described the May 23, 2018 text exchange as follows: "khan and legal team discuss post-trial logistics, FACE matters, media and related info — work product protection because this discussion was at the direction of attorneys and in preparation for litigation."  Ex. C, ECF No. 371-4 at 2.  This assertion is sanctionable on its face and given the damning nature of the communications in the context of this litigation — a claim that Jane Doe falsely accused Plaintiff of sexual assault — an intent to conceal from the fact finder, probative and relevant evidence, is not only a reasonable inference but perhaps a necessary one.  *See* Fed. R. Civ. P. 37.

Earlier text messages were also withheld.  On March 26, 2018, in response to a text from Mr. Roe which contained a photo of an unnamed blond woman, Plaintiff wrote: "F[expletive]. Blonde bimbos is my fetish. . . . I want to choke them."  Ex. D, ECF No. 371-5 at 2–3.  On April 13, 2018, Plaintiff texted Mr. Roe: "Like literally they should sell rape fantasy books" to which Mr. Roe responded: "I'm sure they do."  Plaintiff added, "With stories from reality . . . They do?"  Ex. E, ECF No. 371-6 at 2.  On April 5, 2018, in response to another photograph sent to Plaintiff from Mr. Roe, Plaintiff texted: "If a f[slur] girl like that looked at me with a lil weener between her legs . . . I'd pounce on her."  Ex. F, ECF No. 371-7 at 2.

During a separate text conversation on May 11, 2018, Plaintiff texted Mr. Roe: "If I had 5 dollars for every gender, I would have 5 dollars coz women are objects."  Ex. H, ECF No. 371-10 at 3.  Also on May 11, 2018, Mr. Roe texted about a different woman, [name omitted]: "I feel like she'd definitely be down to have a f[slur] eat her out after she's just had her brains f[expletive] out by an alpha rapist [smiling with tongue out emoji]," to which Plaintiff responded: "That's so hot."  Mr. Roe then texted: "I bet she'd let you do violent things to her too."  Ex. J, ECF No. 371-11 at 2.  The discussion then turns to an explicit discussion about Mr. Roe and Plaintiff participating in what can best be described as a rape fantasy.[12]  *Id*. at 3–4.  Mr. Roe and Plaintiff also discuss finances, taxes, the stock market, investing and other personal matters.[13]  Ex. K, ECF 371-12 at 3–18.  What they do not discuss is pending or anticipated litigation.

---

[12] Mr. Roe: "God.  I'd love to watch a girl lose control completely.  Lay helplessly while you plow her and all she can do is whimper. . . . She won't be able to say no.  I'll be holding her mouth for you."  To this, Plaintiff responded: "doesn't matter if she screams so let her mouth be open . . . I got my fingers to push into her throat."  To this, Mr. Roe responded: "So hot."  Ex. J, ECF No. 371-11 at 4.

[13] The Second Circuit has explicitly held that such communications are not protected by attorney-client privilege.  *See, e.g.*, *Colton v. United States*, 306 F.2d 633, 638 (2d Cir. 1962) ("Attorneys frequently give to their clients business or other advice which, at least insofar as it can be separated from their essentially professional legal services, gives rise to no privilege whatever.") (collecting cases).

All of these communications were withheld on the assertion of an attorney-client or work product privilege on the theory that Mr. Roe provided paralegal-like assistance to Plaintiff's legal team. Resp., ECF No. 377 at 1–2. In response to the motion to dismiss, Plaintiff blithely asserts that "Parties are entitled to test the boundaries of privilege so long as they log the documents and have a plausible basis, as Plaintiff did here." *Id*. at 2. Plaintiff is wrong. Although he asserts that Mr. Roe was a "volunteer paralegal" assisting with Plaintiff's post-trial matters, this is irrelevant. *Id*. Regardless of whatever label Plaintiff tried to put on Mr. Roe, there is simply no construction of the conversations that would bring them, even arguably, within the scope of any privilege — attorney-client or work product. The privileged communications must be for the purpose of obtaining legal advice. *See, e.g.*, *Favors*, 285 F.R.D. at 198. Rape fantasies and strategizing a three-way sexual encounter cannot, in good faith, be characterized as an attorney-client communication subject to the privilege. Nor frankly, can the mundane communications about finances, the stock market, taxes and the like be so labeled. *See Colton*, 306 F.2d at 638.

And it goes without saying, or least it should, that there are no non-frivolous claims to be made that these communications were "at the direction of" Plaintiff's lawyers "in anticipation of litigation." Ex. C, ECF No. 371-4 at 2; *see also Koumoulis*, 295 F.R.D. at 39. The inescapable conclusion is that Plaintiff did not want to disclose these communications and therefore attempted to shield them behind a specious assertion of the privilege and a misleading and false privilege log.

*Dishonesty with the Court*

Defendants also assert that Plaintiff has been dishonest in his dealings with the Court. Following the issuance of the June 19 Order, ECF No. 119, Plaintiff received a request from the Department of Homeland Security in connection with his asylum application. *See* ECF No. 207

24

(SEALED). The request sought transcripts from Plaintiff's criminal trial. Because he had previously submitted unredacted versions of those transcripts in 2021, he sought to do so again, but feared such action would run afoul of the June 19 Order. Emerg. Mot., ECF No. 206 at 1–2. Plaintiff therefore sought relief from the Order insofar as "Plaintiff believe[d] that his best course of legal action [was] to rely on the advice of immigration counsel and submit the requested documents as he submitted them in 2021." *Id*. at 5. He asserted that "*Plaintiff has been advised by his retained immigration counsel* to submit the same documents he submitted in 2021. **No one** should interfere with that representation." *Id*. at 22 (first emphasis added; second emphasis in original).

Accordingly, Judge Garcia convened a hearing on Plaintiff's request and also directed Plaintiff's immigration counsel to attend. Order, ECF No. 209. Attorney Glenn Formica attended "pursuant to the Court's order" as Plaintiff's immigration counsel. Tr., ECF No. 220 at 4. However, during the hearing, Plaintiff's counsel advised the Court that he was "recently informed" that Attorney Formica no longer represented Plaintiff in immigration proceedings. *Id*. at 7. And Attorney Formica confirmed that he had not represented Plaintiff "for years." *Id*. at 8. In fact, it was revealed that Plaintiff was appearing *pro se* in the immigration proceedings. *Id*. at 31–32. Plaintiff's claim that his retained immigration counsel advised him regarding which documents to submit to DHS was clearly false. To the extent he suggests that perhaps it was a different unnamed lawyer in attorney Formica's office, he offers only unsupported supposition. *Id*. at 25–26. It was Plaintiff who was directed to bring the immigration attorney on whose advice he was relying. Order, ECF No. 209. Plaintiff chose Attorney Formica. Attorney Formica had offered no such advice.

The Defendants also rely upon Plaintiff's withholding of a secretly made recording of the Yale UWC hearing in 2019.  Mot. to Dismiss, ECF No. 332 at 27–29.  Although Plaintiff was in possession of the UWC recording at all times, he did not disclose its existence until 2024,[14] *see* Ex. V, ECF No. 332-11 at 3, and he did not produce a transcript of the proceeding (redacted because he also recorded his conversations with Attorney Pattis) until February of 2025, *see* Mot. to Dismiss, ECF No. 332 at 28; Tr. ECF No. 397 at 86.  Concerning on this issue is the fact that Plaintiff made arguments to the Connecticut Supreme Court and the Second Circuit premised on the fact that there was no record of the UWC proceedings.  *See Khan v. Yale Univ.*, 347 Conn. 1, 46 (2023); *Khan v. Yale Univ.*, 85 F.4th 86, 89 (2d Cir. 2023).  For example, Plaintiff argued to the Supreme Court that it was "unclear" whether the witnesses were placed under oath.  Ex. J, ECF No. 373-10 at 3.

Of course, since Plaintiff had recorded the proceedings, he knew that the witnesses were not sworn.  Plaintiff also argued that he had requested a transcript or a recording of the hearing at the hearing but was denied.  The subsequently disclosed recording and transcript do not contain any such request or denial.  *See* Reply, ECF No. 375-1 at 9 (SEALED) (citing *Khan v. Yale Univ.*, 27 F.4th 805, 816 n.13 (2d Cir. 2022)).  And Plaintiff relied on this lack of record to lament his ability to meaningfully appeal the issues before the Court.  In its decision, the Connecticut Supreme Court agreed and stated that Plaintiff's "ability to appeal was severely constrained by the absence of *any* transcript or recording of statements, testimony, or questions raised during the UWC hearing."  *Khan*, 347 Conn. at 46.  In short, Plaintiff withheld the existence of this recording from the Defendants, the district court, the Second Circuit Court of Appeals, and the Connecticut

---

[14] In response to a request for production seeking any such recording, Ex. U, ECF No. 332-10 at 4–5, Plaintiff averred "see enclosed production[,]" Ex. V, ECF No. 332-11 at 3.  The recording was not, however, included and only surfaced later.

Supreme Court. And of course, this means that the Defendants litigated Jane Doe's motion to dismiss and subsequent appeal, completely unaware of its existence.

It is, of course, impossible to know whether, had the existence of the recording been disclosed, the issues on appeal would have been decided any differently. Certainly, there was no official recording of the proceeding or transcription of same per the UWC protocols, something the Supreme Court found troubling, to be sure. *Id*. at 39. And the lack of any record of the proceedings was but one of five deficiencies identified by the Supreme Court. *Id*. But the Plaintiff still permitted the courts to be under the false impression that there was no existing recording of the proceedings. And of course, Plaintiff was asked at the outset of the UWC proceedings whether he would confirm that he was, in fact, not recording the proceedings. Ex. W, ECF No. 333-14 at 6 (SEALED). He said he was not — another lie and one kept concealed from the Defendants until 2024.[15] *Id*. at 6–7 (SEALED).

**An Appropriate Sanction**

The Court does not detail each instance of misconduct relied upon by Defendants as such an exhaustive undertaking is unnecessary. And the Court relies to varying degrees on the misconduct detailed above.

As to the document production, while the Court agrees that the production of over 70,000 pages of largely irrelevant materials has all the hallmarks of a classic "document dump," the Court does not, on the present record, infer that it was Plaintiff's intent to forestall impending depositions

---

[15] At the hearing on the instant motion, Plaintiff testified that Attorney Pattis was aware of the recording at the time because "[h]e was there as I was recording. He witnessed the phone. At that point I had a Google Pixel phone that I used to record, it was sitting on the table." Tr., ECF No. 397 at 74–75. He was, at best, equivocal. When called out for the wishy-washy nature of his testimony, through counsel, he indicated that Mr. Pattis knew of the recording. *Id*. at 97–98. Aside from the fact that this seems exceedingly unlikely given Attorney Pattis' status as an officer of the court, the transcript further reveals that when asked to confirm that neither plaintiff *nor his advisor* were recording the hearing, Plaintiff responded: "Yes, I confirmed with my advisor earlier. We're not recording this. . . . yes, he's not either." Ex. W, ECF No. 333-14 at 6–7 (SEALED).

or the conclusion of discovery. It certainly had that effect, and such an effect was absolutely predictable, but the misconduct was in the *production itself* of largely unresponsive and irrelevant documents.

The indirect publication of Jane Doe's name through precisely the same method found by this Court to be egregious and intentional is shocking. *See* Order, ECF No. 265 at 13; Ex. C, ECF No. 333-3 (SEALED); Ex. E, ECF No. 333-5 (SEALED). It appears that Plaintiff will not be deterred. Notably, he did not seek reconsideration of this Court's decision or findings, he simply chose to ignore them. And with respect to the instant motion, he merely reiterates the arguments the Court has already rejected. *See* Opp. to Mot. to Dismiss, ECF No. 364 at 5–6 (SEALED).

The inaccurate and false sworn Interrogatory responses reveal that Plaintiff will withhold damaging information in discovery so as to increase the likelihood of his success on the merits. As discussed above, it is clear his lawyer knew nothing of the sexual misconduct claims made against Plaintiff by women other than Jane Doe and simply relied upon Plaintiff's self-report. *See* Aff., ECF No. 332-1; Tr., ECF No. 397 at 36. When questioned by the defense, Plaintiff's counsel confirmed that he had checked with Plaintiff about any other complaints. Mot. to Dismiss, ECF No. 332 at 24; Aff., ECF No. 332-1 at ¶ 4.[16] Nothing. And as discussed above, the Court finds his claim to have interpreted the Interrogatory as applying only to claims that resulted in criminal charges, see Tr., ECF No. 397 at 73, as straining credulity beyond its breaking point.

Consistent with Plaintiff's efforts to conceal these other complaints, are Plaintiff's efforts to conceal his communications with Peter Roe through a specious assertion of attorney-client or work product privilege and a false and misleading privilege log. And the significance of this

---

[16] As discussed above, Defendants' counsel sent a deficiency letter to Plaintiff's counsel, to include a challenge to Interrogatory 10. Ex. T, ECF No. 332-9. By Affidavit, ECF No. 332-1, Defendant Doe's counsel avers that counsel met and conferred and Plaintiff confirmed, through counsel, that he was not aware of any other allegations of misconduct other than those he disclosed. Plaintiff does not challenge this averment. Ex. T, ECF No. 332-9.

litigation misconduct is hard to overstate.  As Defendants rightly assert — they do not know what they do not know.  *Id*. at 87.  Defendants reasonably assert that the entirety of the privilege log is now subject to challenge — a costly, time-consuming and resource draining undertaking — all occasioned because Plaintiff has demonstrated that he cannot be relied upon to simply tell the truth. *Id*.

Plaintiff has been cautioned by the Court multiple times that his misconduct could have consequences, to include dismissal of his complaint.  *See* Order, ECF No. 119 at 15 ("Plaintiff is advised that any release or deliberate disclosure of Jane Doe's identity in violation of this Court's Order is sanctionable by the Court, including but not limited to dismissal."; Tr., ECF No. 150 at 8 ("[M]y order is quite clear that any violation of my order could lead to sanctions, which could include dismissal . . . the orders are orders of the Court.  They're expected to be followed.  And if they're not followed, there are significant potential repercussions."); *see also* Tr., ECF No. 94 at 8–9, 12–13; Order, ECF No. 265 at 2–4, 15–16; Executed Prot. Order, ECF No. 197 at 6; Tr., ECF No. 200 at 9.  The Court has previously denied two motions to dismiss based upon litigation misconduct.  Minute Entry, ECF No. 91; Order, ECF No. 265.  Simply put, there is no fair, just or reasonable path forward for the defendants.  The Court ends where it began.[17]

Civil litigation is rooted in "notions of fairness on which our legal system is founded."  *See Bridges v. Wixon*, 326 U.S. 135, 154 (1945).  When one party repeatedly commits egregious misconduct and, in turn, unfairly disadvantages the opposing parties, dismissal is an appropriate sanction.  It is well-settled that it is within the Court's discretion to issue sanctions, including dismissal.  *See Chambers*, 501 U.S. at 44–45.  "In considering the appropriateness of dismissal or

---

[17] It has been said, "Oh, what a tangled web we weave, when first we practice to deceive."  Sir Walter Scott, "Marmion."  This well-embedded idiom of modern culture, first published in 1808, captures the truism that when you lie or act dishonestly, you initiate a domino-like structure of complications and problems which will eventually spiral out of control.  Very unfortunately, this idiom also precisely describes this case.

29

other sanctions for discovery abuse, the Second Circuit has instructed district courts to consider four non-exclusive factors: '(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the noncompliant party had been warned of the consequences of noncompliance.'" *In re Bear Stearns Cos., Inc. Secs., Derivative, & ERISA Litig.*, 308 F.R.D. 113, 124 (S.D.N.Y. 2015) (quoting *S. New England Tel. Co. v. Global NAPs, Inc.*, 624 F.3d 123, 144 (2d Cir. 2010)).   There is no question that Plaintiff has willfully ignored the Court's orders — despite multiple warnings — and engaged in escalating misconduct for a prolonged period.

Indeed, Courts have repeatedly found dismissal to be an appropriate sanction where the plaintiff was warned of that possibility and continued to engage in misconduct. *See Koehl v. Bernstein*, 740 F.3d 860, 862–63 (2d Cir. 2014) (upholding the district court's dismissal where the petitioner continued to use obscene and abusive language toward the Magistrate Judge despite warning); *Manigaulte v. C.W. Post of Long Island Univ.*, 533 F. App'x 4, 6–7 (2d Cir. 2013) (summary order) (upholding the District Court's dismissal where the petitioner failed to appear for deposition after being warned that such failure would result in a recommendation of dismissal); *In re Bear Stearns Cos., Inc. Secs., Derivative, & ERISA Litig.*, 308 F.R.D. at 124–25 (dismissing as a sanction for repeated discovery non-compliance); *Shomo v. Eckert*, 345 F.R.D. 570, 580–81 (W.D.N.Y. 2024) (dismissing for discovery violations after repeated warnings to the *pro se* plaintiff).

The Court can discern no lesser sanction to address the repeated and escalating misconduct by Plaintiff in this case.  He has been fairly warned, warnings which he did not heed.  Seeing no

viable path forward for a fair and just adjudication of the claims and defenses in this case, the

Motion to Dismiss is GRANTED.

The Clerk of the Court is directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 27th day of March 2026.


 /s/ Kari A. Dooley
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE